## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DOCTORS FOR AMERICA, | |
| Plaintiff, | |
| v. | |
| OFFICE OF PERSONNEL MANAGEMENT, | |
| CENTERS FOR DISEASE CONTROL AND PREVENTION, | Civil Action No. 25-cv-322 |
| FOOD AND DRUG ADMINISTRATION, | |
| and | |
| DEPARTMENT OF HEALTH & HUMAN SERVICES, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Last Friday, the Centers for Disease Control and Prevention (CDC) and the Food and Drug Administration (FDA), agencies within the Department of Health and Human Services (HHS), abruptly removed public access to a host of webpages and datasets that serve as vital resources for health professionals. Much of the information has been hosted on the FDA and CDC websites for years, with some webpages extending back to the 1990s. Health professionals rely heavily on this information to diagnose and treat patients and to undertake research that advances public health, including through clinical trials meant to establish the safety and

efficacy of medical products. The agencies provided no warning that the resources would disappear, and they have provided no reasoned explanation for denying access to the information. The takedowns were a reaction to an unlawful memorandum issued by the Office of Personnel Management (OPM) just two days earlier, which instructed agencies that "[n]o later than 5:00 p.m. EST on Friday, January 31, 2025," they must "terminate any [agency programs] that promote or inculcate gender ideology" and "[t]ake down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology."[1]

Removal of the webpages by CDC and HHS was arbitrary, capricious, and not in accordance with law, and without observance of required procedures. *See* 5 U.S.C. §§ 706(2)(A), (D). Congress has enacted laws to ensure that agencies do not abruptly and arbitrarily revoke access to important resources. The Paperwork Reduction Act of 1995 (PRA) mandates that every agency must "ensure that the public has timely and equitable access to the agency's public information" and "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." 44 U.S.C. §§ 3506(d)(1), (3). To comply with the PRA and Administrative Procedure Act (APA), the CDC, FDA, and HHS should have maintained public access to webpages and datasets that provide important information to healthcare practitioners and researchers. Instead, they slashed information from their websites, in spite of the serious threat that doing so posed to

---

[1] https://www.opm.gov/media/yvlh1r3i/opm-memo-initial-guidance-regarding-trump-executive-order-defending-women-1-29-2025-final.pdf.

public health. And because OPM's instruction exceeded OPM's purported basis of authority, *see* 5 U.S.C. §§ 1103(a)(1), (5), the agencies' removal of vital health-related materials cannot be justified on that basis. The agencies' actions create a dangerous gap in the scientific data available to monitor and respond to disease outbreaks, halt or hamper key health research, and deprive physicians of resources that impact clinical practice.

Plaintiff Doctors for America (DFA) is a membership organization of doctors, other health professionals, and medical trainees, whose members had relied on the webpages and datasets that have been removed. For many DFA members, the removals have forced them to scramble in search of alternative resources to guide how they treat patients; slowed their clinical practices or reduced the amount of information they can convey to patients in time-limited visits; and paused or slowed their vital research. The lack of access harms DFA members' patients by delaying care, making it harder to detect disease outbreaks that place them at risk, and hindering communications between doctors and the patients. Given the ongoing harm that Defendants' actions have inflicted, a temporary restraining order is vital to restore the status quo ante and to protect public health and DFA members' practices until the Court has an opportunity to more address fully the illegality of Defendants' actions.

# BACKGROUND

**Statutory Framework**

Congress enacted the PRA to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and to "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology." 44 U.S.C. §§ 3501(2), (7).

To accomplish those goals, the PRA mandates that every agency must "ensure that the public has timely and equitable access to the agency's public information" and must "regularly solicit and consider public input on the agency's information dissemination activities." *Id.* §§ 3506(d)(1), (2). The PRA further mandates that agencies must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." *Id.* § 3506(d)(3).

Agencies, including HHS, have promulgated guidance making clear that the term "information dissemination product" includes "any electronic document … or web page" that an agency disseminates to the public.[2]

**Executive Order 14168 and OPM's memorandum**

On January 20, 2025, President Donald Trump issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological

---

[2]    https://aspe.hhs.gov/hhs-guidelines-ensuring-maximizing-disseminated-information.

Truth to the Federal Government."[3] The Order directed agencies to combat what the President described as "gender ideology," including by requiring agencies to "use the term 'sex' and not 'gender' in all applicable Federal policies and documents."

On January 29, 2025, Charles Ezell, the Acting Director of OPM, issued a memorandum titled "Initial Guidance Regarding President Trump's Executive Order *Defending Women*."[4] The memorandum required that "[n]o later than 5:00 p.m. EST on Friday, January 31, 2025," agency heads must, among other things, "terminate any [agency programs] that promote or inculcate gender ideology" and "[t]ake down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology."

When it issued its memorandum, OPM asserted that it possessed authority to require agencies to act based on 5 U.S.C. §§ 1103(a)(1), (5). Those provisions vest in the Director of OPM authority for "securing accuracy, uniformity, and justice in the functions of [OPM]," *id*. § 1103(a)(1), and "executing, administering, and enforcing— (A) the civil service rules and regulations of the President and the Office [of Personnel Management] and the laws governing the civil service; and (B) the other activities of the Office including retirement and classification activities; except with respect to functions for which the Merit Systems Protection Board or the Special Counsel is primarily responsible," *id*. § 1103(a)(5).

---

[3] https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/.

[4] https://www.opm.gov/media/yvlh1r3i/opm-memo-initial-guidance-regarding-trump-executive-order-defending-women-1-29-2025-final.pdf.

**Removal of data and webpages**

In response to OPM's memorandum, agencies have removed numerous webpages and databases related to medical treatment and public health.

CDC has removed numerous webpages and datasets that served as resources for clinicians, researchers, and the general public. Among those recently removed from CDC's website are:

- Webpages for "The Youth Risk Behavioral Surveillance System." CDC has explained that this resource "identifies emerging issues, and plans and evaluates programs to support youth health" and "gives the best picture of what is going on at national, state, and local levels." CDC has also stated that the information is "used by health departments, educators, lawmakers, doctors, and community organizations to inform school and community programs, communications campaigns, and other efforts." CDC has maintained the webpages since at least 1999. The front page as of January 23, 2025, is archived at https://web.archive.org/web/20250123183607/ https:/www.cdc.gov/yrbs/.[5] A webpage through which researchers could access

---

[5] The Court may take judicial notice of the historical status of websites as preserved on the Internet Archive Wayback Machine. "The Internet Archive Wayback Machine is a service that allows people to visit archived versions of Web sites. Visitors to the Wayback Machine can type in a URL, select a date range, and then begin surfing on an archived version of the Web." Wayback Machine General Information, Internet Archive, https://help.archive.org/help/wayback-machine-general-information. As the D.C. Circuit has recognized, "[t]he contents of webpages available through the Wayback Machine constitute facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 303 (D.C. Cir. 2023) (internal quotation marks omitted).

some Youth Risk Behavioral Surveillance Survey results as of December 28, 2024, is archived at https://web.archive.org/web/20241228010359/https://nccd.cdc.gov/Youthonline /App/Results.aspx?TT=A&OUT=0&SID=HS&QID=QQ&LID=XX&YID=2021 &LID2=&YID2=&COL=S&ROW1=N&ROW2=N&HT=QQ&LCT=LL&FS=S1 &FR=R1&FG=G1&FA=A1&FI=I1&FP=P1&FSL=S1&FRL=R1&FGL=G1&F AL=A1&FIL=I1&FPL=P1&PV=&TST=False&C1=&C2=&QP=G&DP=1&VA =CI&CS=Y&SYID=&EYID=&SC=DEFAULT&SO=ASC.          Webpages containing the datasets remain down. *See* Decl. of Reshma Ramachandran (Ramachandran Decl.) ¶ 5 (discussing removal).

- Webpages on "Data and Statistics" for "Adolescent and School Health." The webpages provided information and datasets collected by CDC's Division on Adolescent and School Health (DASH) on youth school health policies and practices. The front page as of December 20, 2024, which had listed multiple national datasets including the Youth Risk Behavior Surveillance System, School Health Profiles, and Adolescent Behaviors and Experiences Survey, is archived at https://web.archive.org/web/20241220225258/https://www.cdc.gov/ healthy-youth/data-statistics/index.html. The webpages remain down. *See* Ramachandran Decl. ¶ 5.

- Webpages for "The Social Vulnerability Index." The webpages provided information and datasets that "help public health officials and local planners better prepare for and respond to emergency events with the goal of decreasing

human suffering, economic loss, and health inequities." CDC has maintained the webpages since at least 2020. The front page as of January 21, 2025, is archived                    at                    https://web.archive.org/web/ 20250121005832/https:/atsdr.cdc.gov/place-health/php/svi/index.html.    The webpages remain down. *See* Ramachandran Decl. ¶ 5.

- Webpages for "The Environmental Justice Index." The webpages provided information that "delivers a single rank for each community to identify and map areas most at risk for the health impacts of environmental burden." The front    page    as    of    January    21,    2025,    is    archived    at https://web.archive.org/web/20250121013828/https:/www.atsdr.cdc.gov/place-health/php/eji/index.html. The webpages remain down. *See* Ramachandran Decl. ¶ 5.

- A report on "PrEP for the Prevention of HIV Infection in the U.S.: 2021 Guideline Summary." The webpage provided "health care providers the latest information on prescribing pre-exposure prophylaxis (PrEP) for HIV prevention to their patients and increasing PrEP use by people who could benefit from it." The webpage as of January 19, 2025, is archived at https://web.archive.org/web/20250119145832/https://www.cdc.gov/hivnexus/m edia/pdfs/2024/04/cdc-hiv-together-brochure-prepguidelineupdate2021-provider.pdf. The webpage remains down. Ramachandran Decl. ¶ 5.

- Webpages for "HIV Monitoring." The webpages provided information and datasets that CDC gathered from public health labs, healthcare systems, and

population surveys in order to better understand the distribution of HIV among different populations and communities. The front page as of January 23, 2025, is archived at https://web.archive.org/web/20250123181509/https://www.cdc.gov/hiv-data/. Among the HIV Monitoring pages that CDC removed are those about the National HIV Behavioral Surveillance program, which is a cross-sectional survey collecting data on risk behaviors, testing behaviors, and prevention to help guide research and local public health efforts to reduce HIV transmission. The front page for the National HIV Behavioral Surveillance program as of January 23, 2025, is archived at https://web.archive.org/web/20250123024336/https://www.cdc.gov/hiv-data/nhss/index.html. The webpages remain down. *See* Ramachandran Decl. ¶ 5.

- A webpage on "Getting Tested for HIV." The page explained why individuals should get tested for HIV, how they can get tested, and what test results mean. The webpage as of January 24, 2025, is archived at https://web.archive.org/web/20250124144310/https://www.cdc.gov/hiv/testing/index.html. The webpage remains down. *See* Ramachandran Decl. ¶ 5 (discussing removal).

- Webpages on "National ART Surveillance System (NASS)." The webpages provided information and datasets from CDC's National Assisted Reproductive Technologies (ART) Surveillance System, which since 1996 has collected data on ART procedures from fertility clinics across the country as mandated by the Fertility Clinic Success Rate and Certification Act of 1992. The front page as

of January 17, 2025, is archived at https://web.archive.org/web/20250117223212/https://artreporting.cdc.gov/Default.aspx. The webpages remain down. *See* Ramachandran Decl. ¶ 5.

- A webpage for "CDC Contraceptive Guidance for Health Care Providers," which provided a landing page for various clinical recommendations and tools for clinicians to provide high-quality reproductive health care, along with a page linked to on that page containing "U.S. MEC and SPR Provider Tools" and guides that were linked to on that page, including "When to Start Contraceptive Methods and Routine Follow-Up," "What to Do If Late, Missed, or Delayed Combined Hormonal Contraception," "What to Do If Late or Missed Progestin-Only Pills," and "Management of Bleeding Irregularities While Using Contraception and Management of IUDs When Pelvic Inflammatory Disease (PID) Is Found." The landing page webpage as of December 21, 2024, is archived at https://web.archive.org/web/20241221054405/https://www.cdc.gov/contraception/hcp/contraceptive-guidance/index.html. The "U.S. MEC and SPR Provider Tools" webpage as of December 19, 2024, is archived at https://web.archive.org/web/20241219075518/https://www.cdc.gov/contraception/hcp/provider-tools/index.html. The landing page, U.S. MEC and SPR Provider Tools" webpage, and linked-to guides remain down. *See* Ramachandran Decl. ¶ 7.

FDA has also removed several pages from its website. Among those are pages that provided important information for researchers who develop or study clinical trials, including:

- A webpage containing draft guidance on "Study of Sex Differences in the Clinical Evaluation of Medical Products." The page provided draft "recommendations for increasing enrollment of females in clinical trials, analyzing and interpreting sex-specific data, and including sex-specific information in regulatory submissions of medical products" in order "to help ensure the generalizability of results and facilitate exploration of potential differences in effects by sex." The webpage as of January 14, 2025, is archived at https://web.archive.org/web/20250114151146/https://www.fda.gov/regulatory-information/search-fda-guidance-documents/study-sex-differences-clinical-evaluation-medical-products. The webpage remains down. *See* Ramachandran Decl. ¶ 5.

- A webpage containing draft guidance on "Diversity Action Plans to Improve Enrollment of Participants from Underrepresented Populations in Clinical Studies." The page provided information on regulatory requirements for novel drugs and devices intended to improve enrollment of underrepresented populations across age, sex, and race and ethnicity in clinical studies in order to ensure the accuracy and reliability of results across demographic groups. The webpage as of January 25, 2025, is archived at https://web.archive.org/web/20250125170756/https://www.fda.gov/regulatory-

information/search-fda-guidance-documents/diversity-action-plans-improve-enrollment-participants-underrepresented-populations-clinical-studies.    The webpage remains down. *See* Ramachandran Decl. ¶ 5.

After CDC removed information from its website, it posted a statement on the remaining portions of its website that "CDC's website is being modified to comply with President Trump's Executive Orders." *See, e.g.*, https://web.archive.org/web/20250205035604/https://www.cdc.gov/.[6]    Defendants have provided no other explanation or justification for removal of the webpages and datasets.

Health professionals that constitute DFA's membership regularly relied on the webpages and datasets that have been removed in response to OPM's memorandum. DFA members relied on pages that related to current evidence and guidelines for providing clinical care, provided information to clinician-investigators on conducting clinical trials, and contained data that informed targeted public-health interventions. For example, DFA members had relied on a CDC webpage with guidelines on "PrEP for the Prevention of HIV Infection in the U.S." *See* Ramachandran Decl. ¶ 8; Decl. of Stephanie Liou (Liou Decl.) ¶ 7. DFA members used those webpages to "stay up to date with best practices," Liou Decl. ¶ 7, and to ensure they take account of important "considerations for administering various options of PrEP treatment to different patient populations," Ramachandran Decl. ¶ 8; *see also* Liou Decl. ¶ 7 ("I also provide

---

[6] The banner displaying CDC's statement may take several moments to load when accessing the archived version on the Internet Archive Wayback Machine.

patients with multilingual resources from the CDC regularly."). Without the removed information on PrEP, DFA members and other physicians will "have to identify other sources of information that might not be as physician-friendly, might be focused on specific populations rather than providing consideration for prescribing across multiple different populations, and might be from a non-independent source." Ramachandran Decl. ¶ 8; *see id.* ¶ 7 ("Other sources might not be as up-to-date or as comprehensive as the [CDC] guides, and reviewing those sources will take up a larger portion of a typical 20 minute visit with patients, leaving less time to discuss patients' other concerns during the visit and potentially causing delays to patients' access to appropriate contraception.").

Lack of access to CDC materials on infectious diseases not only harms DFA members' ability to treat individual patients but also hampers their ability to respond to broader disease outbreaks. For instance, a DFA member who is "a physician caring for adolescents, including at one of the most underserved high schools in Chicago," recently dealt with "an outbreak of Chlamydia at the high school where [she] work[s]." Liou Decl. ¶ 7. She is "actively meeting with school leadership to address increasing [their] efforts around STI testing and prevention," but "[w]ithout these crucial CDC resources, [she is] not able to do [her] job to help address this urgent situation that is affecting our youth." *Id.*

DFA members are also experiencing hardship from CDC's removal of data from the Youth Risk Behavioral Surveillance System (YRBSS) and the Data and Statistics for Adolescent and School Health (DSASH). For example, the same DFA member

"regularly rel[ies] upon [the YRBSS and DSASH] information to help [her] provide risk assessment screenings and counseling for [her] patients." *Id.* ¶ 4.

The agencies' unlawful actions also harm the many DFA members who are engaged in clinical and public health research. DFA's members have used publicly available datasets from the CDC and HHS websites, such as CDC's Social Vulnerability Index, to conduct groundbreaking research, including research "targeted at better understanding trends of where new community health centers emerge and where clinical trials for specific disease areas are located." *See, e.g.*, Ramachandran Decl. ¶ 6 (discussing use of the Social Vulnerability Index to "analyze connections between sociodemographic factors and health outcomes"). Without access to those datasets on the CDC website, DFA members "must seek out other datasets" to continue their research. *Id.* But because many CDC and HHS datasets are "uniquely useful and updated frequently using data collected by the federal government, alternative datasets are unlikely to provide as useful of insights." *Id.* The absence of the data "will ultimately harm the state of scientific knowledge and hinder the adoption of changes in urgently needed policies to ensure efficient and equitable allocation of resources to areas of greatest need." *Id.*

For those DFA physicians and trainees who perform research related to clinical trials on medical products, FDA webpages provide critical information around best practices in conducting their studies. DFA members have relied on FDA webpages, including those on "Study of Sex Differences in the Clinical Evaluation of Medical Products" and "Diversity Action Plans to Improve Enrollment of Participants from

14

Underrepresented Populations in Clinical Studies" in their research. For example, DFA members have relied on those FDA webpages in "evaluating the evidence underlying FDA approval of medical products to see whether sponsors are indeed following the recommendations and requirements outlined by the FDA within guidance documents" and in "examin[ing] whether FDA provides greater regulatory flexibility to some sponsors—that is, allowing for sponsors to not be subject to certain requirements or recommendations in their clinical trials of novel medical products." Ramachandran Decl. ¶ 9. Removing those documents from FDA's website threatens disruption to that research.

## LEGAL STANDARD

To obtain a temporary restraining order, "the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted; (3) that [such an order] would not substantially injure other interested parties; and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted); *see also Hall v. Johnson*, 559 F. Supp. 2d 1, 3 n.2 (D.D.C. 2008) ("[T]he same standard applies to both temporary restraining orders and to preliminary injunctions." (citation omitted)). "When the movant seeks to enjoin the government, the final two [temporary restraining order] factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

## ARGUMENT

All three factors favor granting Plaintiff's motion for a temporary restraining order. The Court is likely to find that CDC, FDA, and HHS have violated the APA because their actions have violated requirements set forth in the PRA and they failed to engage in reasoned decisionmaking. Plaintiff's members are currently suffering irreparable harm from the substantial disruptions the agencies' actions have caused to their clinical practice and work as researchers. And the balance of the equities and public interest weigh decidedly in Plaintiff's favor because there is no public interest in the perpetuation of the agencies' unlawful actions, and the interest in public health the agencies are supposed to serve is best served through public access to the webpages and datasets.

**I.    Plaintiff is likely to succeed on the merits.**

**A.    CDC and HHS violated the PRA's requirement to provide timely and equitable access to their information.**

The PRA requires agencies to "ensure that the public has timely and equitable access to the agency's public information." 44 U.S.C. § 3606(d)(1). "[T]he term 'public information' means any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public." *Id.* § 3502(12). Because CDC maintained all the datasets and webpages on its website—and, indeed, did so for years before it abruptly changed course—all the information removed from its website is "public information." And because CDC has revoked public access to the webpages and datasets by removing them from its website, it has violated the PRA's requirement of "timely and equitable access."

16

Agency actions that violate duties placed on the agency by statute are prototypical examples of action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 220 (2012) (referring to a claim that an agency has "violate[d] a federal statute" as "a garden-variety APA claim" (citing 5 U.S.C. §§ 706(2)(A), (C))). Here, Plaintiff is likely to succeed on its claims against CDC and HHS because the agencies' removal of webpages and datasets failed to comply with the PRA's requirement of timely and equitable access.

### B. CDC, FDA, and HHS's removal of webpages is arbitrary and capricious.

Plaintiff is also likely to succeed on its claim that Defendants' removal of information related to medical treatment and public health is arbitrary and capricious. The APA "requires agencies to engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan* v. *EPA*, 576 U.S. 743, 750 (2015)). To do so, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). If the agency "failed to consider an important aspect of the problem," its action is arbitrary and capricious. *Id.*

17

Here, the agencies' actions were completely unreasoned. When CDC removed the webpages and datasets, it posted a banner on portions of its website stating only that "CDC's website is being modified to comply with President Trump's Executive Orders." *See, e.g.*, Internet Archive Wayback Machine, CDC.gov, https://web.archive.org/web/20250205035604/https://www.cdc.gov/. CDC did not provide any explanation of why "comply[ing] with President Trump's Executive Orders" required removing certain pages and retaining others. And it did not grapple with an important aspect of the problem: that removing the webpages would harm the healthcare system, harm patients, increase the threat of disease outbreaks, and damage the development of scientific research.

The FDA provided no explanation for removing important information, such as pages that contained guidance about designing clinical trial designs, *see* Ramachandran Decl. ¶ 9. That is, it not only failed to offer a reasoned explanation for the removals, it "fail[ed] to offer any explanation at all." *See E. Texas Med. Ctr.– Athens v. Azar*, 337 F. Supp. 3d 1, 15 (D.D.C. 2018).

Moreover, removing webpages and datasets containing health information that CDC and FDA posted for use by and knew was used by health professionals because OPM purported to instruct agencies to remove information that relates in some way to gender is unreasonable—particularly in the context of healthcare and because OPM lacked authority to issue that instruction. As explained above, the purported basis for OPM to direct agencies to remove information, 5 U.S.C. §§ 1103(a)(1), (5), does not provide OPM authority to issue that directive. Again, those

provisions vest in the Director of OPM authority for "securing accuracy, uniformity, and justice in the functions of [OPM]," *id*. § 1103(a)(1), and "executing, administering, and enforcing—(A) the civil service rules and regulations of the President and the Office [of Personnel Management] and the laws governing the civil service; and (B) the other activities of the Office including retirement and classification activities; except with respect to functions for which the Merit Systems Protection Board or the Special Counsel is primarily responsible," *id*. § 1103(a)(5). Indeed, the cited statutory provision seems wholly inapposite. And because OPM plainly lacked authority to instruct Defendants to take down webpages and datasets, Defendants' action cannot be justified on that basis.

In short, because Defendants have not engaged with the glaringly obvious harmful consequences of removing access to public health information on their websites, and because the only reason noted is wholly inadequate to support the agencies' actions, their actions are arbitrary and capricious.

## C. CDC and HHS failed to observe procedures required by the PRA.

Where Congress has set out a procedural requirement, such as a requirement to provide notice or an opportunity to comment prior to agency action, and the agency fails to satisfy that requirement, this Court has found the action to be both "not in accordance with law and without observance of procedure required by law, in violation of Section 706 of the APA."[7] *United Steel, Paper & Forestry, Rubber, Mfg.,*

---

[7] Although agency action that fails to follow required procedures "[o]rdinarily … cannot be afforded the force and effect of law," the D.C. Circuit has occasionally permitted agency action to stand while an agency corrects procedural flaws if "equity

*Energy, Allied Indus. & Serv. Workers Int'l Union v. Fed. Highway Admin.*, 151 F. Supp. 3d 76, 93 (D.D.C. 2015) (internal quotation marks omitted). Here, Plaintiff is likely to succeed on its claims against CDC and HHS because the agencies' removal of webpages and datasets failed to observe procedures required by the PRA, which requires agencies to "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." 44 U.S.C. § 3506(d)(3).

Numerous agencies, including HHS, have promulgated guidance making clear that the term "information dissemination product" includes "any electronic document … or web page" that an agency disseminates to the public.[8] Because the datasets and webpages that Defendants removed are all "electronic document[s]" or "web page[s]," they are all information dissemination products.

Each of the datasets and webpages is also a "significant information dissemination product." Because the PRA does not define the terms "significant" or "significant information dissemination product," and context does not suggest a specialized meaning, the word "significant" should be provided its ordinary meaning. *See United States v. Montgomery*, 578 F. Supp. 3d 54, 70 (D.D.C. 2021). Merriam-Webster defines "significant" as "having meaning" or "having or likely to have

---

demands." *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (internal quotation marks omitted). As discussed below, the equities in this case weigh in favor of granting Plaintiff's motion.

[8]     https://aspe.hhs.gov/hhs-guidelines-ensuring-maximizing-disseminated-information.

influence or effect: important."[9] *See United States v. Seefried*, 639 F. Supp. 3d 8, 10 (D.D.C. 2022) (noting that courts look to dictionary definitions to discern plain meaning). The datasets and webpages the agencies removed are undoubtably "important." They guide medical practice, are essential to groundbreaking public health research, and are key to preventing disease outbreaks. *See* Ramachandran Decl. ¶¶ 6–9; Liou Decl. ¶¶ 4–10. Because these webpages and datasets have such a large impact on the actions their audience takes, the care patients receive, and the status of public health in the country, they easily qualify as "significant" information dissemination products.

Accordingly, the agencies were required to provide "adequate notice" before removing them. 44 U.S.C. § 3506(d)(3). Here, however, Defendants failed to provide *any* notice before removing the webpages and datasets. To state the obvious, if an agency fails to provide any notice at all, it has failed to provide adequate notice. Defendants thus failed to comply with the PRA's requirement that agencies must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." *Id.* Without that notice, Plaintiff's members had their clinical practices and research thrown into disarray. The PRA was intended to prevent just that type of disruption from unannounced government changes. And because CDC and HHS violated the PRA, their actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

---

[9] https://www.merriam-webster.com/dictionary/significant.

## II.    Plaintiff's members will suffer immediate, irreparable injury if Defendants do not restore their webpages and datasets.

Plaintiff's members are suffering, and will continue to suffer, irreparable injury from the removal of the public health-related webpages and datasets. *See Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009) ("An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate.").

When Defendants removed the pages and datasets on Friday, January 31, 2025, they unleashed immediate harm on Plaintiff, its members, and their patients. Defendants have hindered—and, in some instances, completely halted—the ability of health professionals to perform key functions of their jobs. By removing the webpages and datasets, Defendants made "it more difficult and time-consuming to provide updated recommendations and prescribe appropriate options to patients." Ramachandran Decl. ¶ 6. They have also forced physicians to treat their patients based on sources of information that "might not be as up-to-date or as comprehensive" as CDC resources or that "might be focused on specific populations rather than providing consideration for prescribing across multiple different populations, and might be from a non-independent source." *Id.* ¶¶ 6, 8. And by burdening or wholly eliminating access to trusted, free resources, Defendants have put the brakes on responses to disease outbreaks. Liou Decl. ¶¶ 3, 10. Those harms are particularly pronounced for DFA members who, because they work in underserved settings, "don't have access to many expensive clinical resources that require subscription fees." *Id.* ¶ 10.

Because DFA members who are clinician-investigators relied heavily on the removed datasets and webpages, they have seen their research projects particularly impacted. For example, "[b]ecause the Social Vulnerability Index is uniquely useful and updated frequently using data collected by the federal government," researchers who utilize the Social Vulnerability Index are unlikely to find alternative datasets that "provide as useful of insights into the effects of sociodemographic factors on that status of a particular location." Ramachandran Decl. ¶ 6. That means DFA members must either abandon their research projects altogether or accept that their research will be less effective because they must use other sources of data.

By undermining the vital work that DFA members carry out, Defendants have also undermined DFA's mission. "DFA's work focuses on access to affordable care, community health and prevention, and health justice and equity," and DFA seeks to "equip[] physicians and medical trainees with skills and resources to advocate for health care issues at the local, state, and federal level." *Id.* ¶ 2. By blocking DFA and its members from accessing resources that permit informed healthcare advocacy and that support efficient, effective provision of healthcare, Defendants are causing irreparable harm to DFA itself.

Only restoring the information removed by Defendants will ameliorate the harm to DFA and its members. Prior to its sudden reversal, CDC structured its website to ensure that health professionals had ready access to information in a central, well-organized location. CDC also built its resources so that each page was easier to navigate than alternative resources that may be similar on some

dimensions. *See id.* ¶ 8.  Any alternatives, therefore, are unlikely to serve as adequate substitutes. And even if some information may be found elsewhere, finding it would require health professionals to act as internet sleuths every time they need a piece of information, delaying the provision of care to their patients. *See id.* ¶ 7 (discussing the cost of slowdowns during "a typical 20 minute visit with patients").

## III.   The balance of equities and the public interest favor Plaintiff.

As against the certain and irreparable injury that innumerable members of the public—including Plaintiff's members—are presently experiencing due to Defendants' unlawful actions, Defendants would suffer no cognizable harm if required to restore their webpages and datasets. To begin with, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmties. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). Likewise, "[t]here is generally no public interest in the perpetuation of an unlawful agency action." *Open Cmties. Alliance*, 286 F. Supp. 3d at 179 (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *Id.* (citation omitted).

Moreover, in addition to the harm to DFA members, patients around the country are harmed by Defendants' actions, and the health of the country is put at risk. By removing resources from their websites, Defendants have made it harder for health professionals to communicate with their patients and to provide quick diagnosis and treatment options. That means patients are less likely to understand

their medical conditions or the treatment and care they are receiving, and that they may suffer consequences from delays in treatment that are forced by defendants' actions. Furthermore, by removing access to critical data systems that help monitor for outbreaks of diseases and help decisionmakers allocate resources to public health crises, Defendants are increasing the likelihood of a severe disease outbreak, and also making it more likely that individuals will fall ill from an outbreak, that people who fall ill will suffer more severe consequences, and that more people will die.

On the other side of the ledger, Defendants would suffer no injury from being required to host on their websites the same information that they hosted as recently as last week—and there is certainly no reason why Defendants would suffer injury from being temporarily barred from removing the information during the period in which this Court considers whether the removals are lawful.

Indeed, because hosting the information is so vital to public health, Plaintiff's request aligns with Defendants' missions of protecting public health.[10] That Defendants' actions are deleterious of health despite their missions to protect public

---

[10] *See* CDC, About CDC, https://www.cdc.gov/about/cdc/index.html (stating CDC's mission is "to protect America from health, safety and security threats, both foreign and in the U.S."); FDA, What We Do, https://www.fda.gov/about-fda/what-we-do (stating FDA's mission is to "protect[] the public health by ensuring the safety, efficacy, and security of human and veterinary drugs, biological products, and medical devices" and to "advance[] the public health by helping to speed innovations that make medical products more effective, safer, and more affordable and by helping the public get the accurate, science-based information they need to use medical products and foods to maintain and improve their health"); HHS, About HHS, https://www.hhs.gov/about/index.html (stating HHS's mission "is to enhance the health and well-being of all Americans, by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services").

health confirms both how extraordinary Defendants' actions are and how heavily the equities weigh in Plaintiff's favor.

The balance of equities thus tips decisively in favor of granting the requested relief. For the same reasons, a temporary restraining order would serve the public interest. In these circumstances, a temporary restraining order is vital to prevent harm to DFA members' healthcare practices and research, the health of DFA members' patients, and the health of the country as a whole, until this Court can undertake an orderly resolution of the dispute.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant its motion and enter a temporary restraining order (1) requiring Defendants CDC, FDA, and HHS to restore webpages and datasets they have unlawfully removed from their websites; and (2) enjoining CDC, FDA, and HHS from removing or substantially modifying other webpages and datasets in implementation of the unlawful Office of Personal Management (OPM) memorandum on "Initial Guidance Regarding President Trump's Executive Order *Defending Women*." Plaintiff further requests that the Court order Defendants to file a status report within forty-eight hours of the issuance of any temporary restraining order confirming compliance with the order.

Dated: February 6, 2025                Respectfully submitted,

/s/ Zachary R. Shelley
Zachary R. Shelley (DC Bar No. 90021549)
Adina H. Rosenbaum (DC Bar No. 490928)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
zshelley@citizen.org

*Counsel for Plaintiff*