## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DOCTORS FOR AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>OFFICE OF PERSONNEL MANAGEMENT, et al.<br><br>Defendants. | Civil Action No. 25-cv-322-JDB |

## REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

### INTRODUCTION

Plaintiff Doctors for America (DFA) brought this action to remedy the harm that its members are currently suffering from their lack of access to webpages and datasets that Defendants abruptly removed from public access. As DFA has explained, Defendants' removal of webpages containing vital information that Defendants have long provided for the benefit of healthcare professionals hinders the ability of DFA members to conduct their work; DFA is likely to succeed on the merits because Defendants' actions violate the Paperwork Reduction Act of 1995 (PRA) and the Administrative Procedure Act (APA); and the balance of the equities strongly favors granting a temporary restraining order because Defendants' actions impose substantial harm on DFA members, their patients, and the public health more broadly.

Defendants raise a host of arguments in response. Defendants' arguments are without merit, and they rely on case law that is inapposite. Their opposition cannot overcome the showing of significant irreparable harm suffered by DFA members and the public. This Court should grant Plaintiff's motion for a temporary restraining order.

## ARGUMENT

### I.    DFA members are currently suffering irreparable harm

As DFA has explained, a physician who lacks timely access to information is much more likely to be unable to decide on a course of treatment during a patient visit. *See* Supp. Ramachandran Decl. ¶¶ 6–7. And if a physician must delay decisions about which course of treatment to pursue until after the end of the patient's visit, "implementation of any treatment plan that [the physician] come[s] up with will [often] be delayed far beyond the additional hours or days that it takes [the physician] to develop an appropriate treatment plan." *Id.* ¶ 5. Because Defendants' actions have caused delays during patient visits, they have also slowed down the ability of DFA members and other physicians to make timely decisions about patient care and, in so doing, imposed risks that physicians cannot mitigate. *See id.* ¶¶ 4, 6–11 (discussing how delays cascade and lead to increased risks, such as increased risk of contracting HIV and developing AIDS). As Dr. Cohen's declaration explains, lack of access to Defendants' information also "may put patients at risk of not receiving evidence-based clinical care." Decl. of Dr. Stephanie Cohen (Cohen Decl.), ECF No. 8-1, ¶ 6. These consequences, once they occur, cannot be undone.

Likewise, if a public health official is unable to perform their job and direct resources to respond to disease outbreaks, there is no way in which to possibly compensate for that lost opportunity. DFA members are currently suffering exactly those harms now, as members seeking to prevent or mitigate disease outbreaks are "not able to do [their] job[s]" because they lack access to "crucial CDC resources." Liou Decl. ¶ 7.

Defendants contend that DFA members have not suffered irreparable harm because their injuries involve the expenditure of effort to mitigate the harm Defendants are causing. Response Mem. at 4. But they miss the point of the cases they cite. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay," do not qualify as irreparable harm. *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)). They omit, however, the following sentence from the quotation on which they rely, which goes on to say that loss of money, time, and energy do not constitute irreparable harm if there is a "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Id.* If compensatory or other corrective relief is not available for those injuries, then "legal remedies are inadequate," and the harm suffered is irreparable. *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). DFA members are not only losing time and energy as a result of Defendants' action. As described above and in the declarations of Dr. Ramachandran and Liou, Defendants' action has disrupted and is

disrupting DFA members' ability to effectively and efficiently treat their patients. Defendants offer no response.

Defendants' principal contention seems to be that DFA members have not suffered irreparable harm because they can access some of the removed information on the Internet Archive Wayback Machine. That argument both misunderstands the Wayback Machine and the reality of DFA members' work. Because pages archived on the Wayback Machine do not appear as search results, the only way to access an archived page is to go to the Wayback Machine webpage and then to enter the URL of the page one is looking for. Supp. Ramachandran Decl. ¶ 12. Defendants cannot reasonably expect that physicians have previously recorded the URLs of all the webpages on which they rely. And although Dr. Ramachandran "visited some webpages on the Internet Archive Wayback Machine since CDC took down the other websites," *id.*, Defendants' argument relies on the flawed assumption that all adversely affected DFA members and other physicians across the country, *see, e.g.*, Cohen Decl. ¶ 6; Declaration of Dr. Susan Philip, ECF No. 8-2, ¶¶ 5, 14–15, know not only the URLs for removed pages but also that the Wayback Machine exists at all. Even if a health professional cleared those hurdles, the Wayback Machine does not archive every webpage and does not archive each page every day, so removed pages may not be there at all or may be older versions. Moreover, relying on the Wayback Machine, even where it has the page as it recently existed on the CDC or FDA websites, would come at a time-cost that is prohibitive during patient visits. Supp.

Ramachandran Decl. ¶¶ 5–9, 11 (discussing myriad ways in which delays are harmful); Ramachandran Decl. ¶ 7.

## II. Plaintiff is likely to succeed on the merits.

**A.** The removal of webpages and datasets is a final agency action appropriate for this Court's review. "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Under the APA, "'order' means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). "In other words, an order is virtually any authoritative agency action other than a rule." *New York Stock Exch. LLC v. SEC*, 2 F.4th 989, 992 (D.C. Cir. 2021).

"Agency action is considered final to the extent that it imposes an obligation, denies a right, or fixes some legal relationship." *Reliable Automatic Sprinkler Co. v. CPSC*, 324 F.3d 726, 731 (D.C. Cir. 2003). "The mere possibility that an agency might reconsider ... does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *see Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is "subject to change" in the future.").

Defendants' removal of webpages and datasets were the agencies' final dispositions of the public's right to access those materials. First, whatever decisionmaking process Defendants engaged in, the removals were the end result of that process, and Plaintiff lacks any meaningful way to challenge Defendants' actions

outside of this lawsuit. Second, the agencies' decisions also determined—and denied—the right of public access to the removed webpages and datasets. *Cf.* 44 U.S.C. § 3506(d)(1) (guaranteeing the public "timely and equitable access to the agency's public information"). And to the extent that Defendants undertook the removals to implement a new policy, that policy is likewise a new final agency action. *See* 5 U.S.C. § 551(4) (including a statement of policy as a "rule" under the Administrative Procedure Act).

**B.** The PRA defines "public information" as "any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public." 45 U.S.C. § 3502(12). And it requires that agencies must "ensure that the public has timely and equitable access to" such information. *Id.* § 3506(d)(1). As DFA has explained, Defendants violated this requirement when it removed the health information from their websites.

Defendants seek to avoid this result by contending that DFA has "identifie[d] no statute that requires CDC and FDA to create or maintain webpages, guidance documents, and other content." Response Mem. at 7. But Defendants reach that conclusion by advancing an interpretation of the phrase "the agency's public information" in the PRA that would eviscerate Congress's command. More specifically, Defendants argue that, because they "removed certain pages from [their] websites," they have "not chosen to make [that information] public" and thus need not comply with the PRA. Response Mem. at 8. By that reasoning, an agency could always circumvent the PRA by eliminating access to public access.

"When a statutory construction thus renders an entire subparagraph meaningless, … the canon against surplusage applies with special force." *Pulsifer v. United States*, 601 U.S. 124, 143 (2024). Here, Defendant's reading would render the timely-and-equitable-access provision, not only surplusage, but nugatory. Under Defendant's reading, whenever the government denies timely and equitable access to information that has been public, it can claim that the information is not "public information" because it just eliminated access. That circular argument would effectively bar any plaintiff from succeeding on a claim that the government had denied timely and equitable access, rendering § 3506(d)(1) a dead letter.

Whether information is "public" can reasonably be assessed only before the government makes changes that impact accessibility. Here, the information that Defendants removed from their websites was "public information" for years or months before Defendants' abrupt removals. Because Defendants posted the removed information on their publicly accessible websites, the information was information that each agency "discloses, disseminates, or makes available to the public." 44 U.S.C. § 3506(d)(1). Therefore, the information was public information when Defendants took action to deny timely and equitable access to the information, and Plaintiff and its members had a right to equitable and timely access to that information.

Of course, the PRA and APA do not force the government to freeze webpages in amber. And most changes to websites cause no cognizable harm, so no plaintiff would have standing to sue over the vast majority of website changes. In the event that a change to a website does cause concrete, particularized harm, the PRA provides

agencies ample latitude. Many webpages do not qualify as "significant information dissemination products." 44 U.S.C. § 3506(d)(3). And even if a change impacts a webpage that qualifies as a significant information dissemination product, most changes will not "substantially modify[]" or "terminat[e]" such products and therefore do not require notice. *Id*. Further, reading the timely and equitable access provision in light of the rest of § 3506 also provides the government significant room to change websites. Portions of § 3506, including the notice of removal provision, reflect that agencies have the ability to modify information dissemination products, and even to make small modifications to those products without notice.

C.    Defendants offer no response to DFA's argument that removing this critical information from their public-facing websites was arbitrary and capricious. Mem. in Sppt. 17–19. Their failure to engage with the glaringly obvious harmful consequences of removing access to this vital health information reflects that the action is not defensible on its merit.

## III.  The balance of the equities and the public interest strongly favor granting Plaintiff's motion for a temporary restraining order.

The public interest in requiring the webpages and datasets to be restored is exceedingly strong. As the American Academy of Family Physicians, the American Academy of Pediatrics, American College of Obstetricians and Gynecologists, American College of Physicians, American Osteopathic Association and American Psychiatric Association explained in an extraordinary public statement, the removal of information from the CDC's website "puts the health and wellbeing of patients at risk and makes it more difficult for physicians to provide quality care." *Statement*

*from Leading Physician Groups on Removal of Data and Guidance from Federal Websites* (Leading Physician Groups Statement), ECF No. 8-3, at 1. "These resources are not just academic references—they are vital for real-time clinical decision-making in hospitals, clinics and emergency departments across the country." *Id*. The San Francisco Department of Health has reiterated the urgency of the problem. *See* Cohen Decl. ¶ 4 ("[W]e regularly rely on CDC's websites and data in our work."). Removal of the webpages has left health care providers "unsure how to proceed with the usual, standard of care practice," leaving "patients at risk of not receiving evidence-based clinical care." *Id*. ¶ 6; *see also* Leading Physician Groups Statement, at 1 ("Removal hamstrings [health care providers'] ability to provide factual, accurate information to [their patients]."). It also hinders preparedness for outbreaks of infectious diseases. *See* Cohen Decl. ¶¶ 8, 9.

The other side of the balance is exceedingly light. Defendants' claim only that granting DFA's motion "could" leave them unable to comply with Executive Order 14168. Response Mem. at 12. But even aside from whether that "harm" tips the balance even slightly, the Executive Order on which Defendants rely specifies that it must be implemented "consistent with applicable law," E.O. 14168, sec. 8(b), underscoring that the Executive Order does not authorize the Defendants' unlawful action. Moreover, even if Defendants justification for removal was later deemed sufficient by this Court, Defendants fail to identify harm to their interests from an order requiring them to restore the removed webpages and datasets—many of which

were on their websites for years—temporarily, to enable the Court more fully to evaluate the parties' arguments.

In short, "[a]t a time when emerging infectious diseases, antibiotic-resistant infections and evolving treatment protocols require rapid dissemination of knowledge, the removal of these resources place undue burdens on physicians and endangers patients." Leading Physician Groups Statement, at 1. The public interest in restoring the removed webpages and datasets far outweighs the asserted governmental interest in keeping them down.

## IV. Plaintiff has standing to challenge Defendants' removal of critical health information.

Plaintiff has standing to seek redress for the harms its members have suffered from Defendants' removal of webpages and datasets. To establish associational standing, Plaintiff must show that "(1) at least one of [its] members would have standing to sue; (2) the interests [DFA] seek[s] to protect are germane to [its] purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual members." *Sierra Club v. EPA*, 754 F.3d 995, 999 (D.C. Cir. 2014). Defendants do not suggest that DFA does not satisfy the latter requirements, and those requirements are plainly met here. Ensuring that health professionals have access to the resources they need to efficiently and effectively perform their jobs is germane to Plaintiff's mission of advancing "access to affordable care, community health and prevention, and health justice and equity," and of advocating for "improvements to health care delivery so that it better meets our

patients' needs." Ramachandran Decl. at ¶ 3. And the claims asserted do not require participation of individual members.

As to the first requirement, Defendants argue that Plaintiff's members themselves would lack standing. Yet those individuals are suffering and will continue to suffer injury from Defendants' actions. As the D.C. Circuit has recognized, plaintiffs may establish standing based on "alleged inhibition of their daily operations, an injury both concrete and specific to the work in which they are engaged." *Action All. of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1986); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (holding that the plaintiffs established standing where the defendant's conduct "perceptibly impair[ed]" the plaintiffs' ability to carry out their missions (internal quotation marks omitted)); *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1091 (D.C. Cir. 2015) (holding that the plaintiff established standing where the defendant's actions forced it to "expend resources to seek relief through other, less efficient and effective means"). Defendants' removal of vital health information has impaired the members' ability to carry out their work and serve their patients. *See* Ramachandran Dec. ¶ 7–8; Supp. Ramachandran Decl. ¶ 8 ("Without access to information about the requirements for prescribing and administering the medication PrEP … I must take additional time to discern whether and how to treat patients with PrEP."); *id.* ¶ 9 (discussing ways in which "delays imposed by CDC's removal of information [are] extremely harmful"); *id.* ¶ 6–7, 10–11 (discussing delays assessing patients and how that undermines how DFA members,

11

including Dr. Ramachandran, are able to perform their jobs). To offer one example, DFA member Dr. Liou has explained: "We recently had an outbreak of Chlamydia at the high school where I work and are actively meeting with school leadership to address increasing our efforts around STI testing and prevention. Without these crucial CDC resources, I am not able to do my job to help address this urgent situation that is affecting our youth." *See Liou* Decl. ¶ 7. Indeed, for her practice, "[i]t is devastating to lose access to these tools." *Id*. ¶ 10.

Nonetheless, Defendants argue that Plaintiff lacks standing because it has "identifie[d] no statute that requires CDC and FDA to create or maintain webpages, guidance documents, and other content…." Response Mem. at 7. That argument goes to Defendants' contention that they cannot be held accountable under the APA. It does not rebut the showing of concrete, redressable injury caused by the challenged actions.

Defendants also contend that health professionals are not injured because "the subject information from CDC and FDA remains available through archival copies on the Wayback Machine" and "alternative sources for this information indisputably exist." Response Mem. at 8.[1] And, to be sure, a plaintiff may lack standing to sue if

---

[1] In this regard, the cases on which Defendants rely are inapposite, addressing the different point that a plaintiff does not suffer an informational injury when they seek information that would provide no value. *See Wertheimer v. FEC*, 268 F.3d 1070, 1075 (D.C. Cir. 2001) (stating that the plaintiff lack standing where he failed to establish that the regulatory ruling he sought "would yield anything more than a legal characterization or duplicative reporting of information that under existing rules is already required to be disclosed"); *see People v. FEC*, 442 F. Supp. 3d 335, 343 (D.D.C. 2020) (finding that the plaintiff lacked standing in an action seeking to force the FEC to act on administrative complaint because the "Plaintiff desire[d] for the

access to the information it seeks provides no value beyond "the store of information about the transaction already publicly available." *Citizens for Resp. & Ethics in Washington v. FEC*, 475 F.3d 337, 340 (D.C. Cir. 2007). But the Wayback Machine or other resources are not an adequate substitute. First, as discussed above, *supra* at I, the pages on the Wayback Machine do not show up as search results, do not capture all pages, require health professionals to know the pre-removal URL of the resource they are seeking, and are only of use if health professionals know the Wayback Machine exists.

As for other sources of information needed by health professionals, "those alternatives do not compile the information as clearly and conveniently as the CDC has done." *Id.* ¶ 11. For example, CDC's resources on drug side-effects "compile information about many drugs in one place," while the main alternatives available to even DFA members at well-resourced institutions require significant "time searching the appropriate journal database for information about a single specific drug and then then scrolling through several pages of text for the exact information [the physician] need[s]." *Id.*; *see also* ¶ 8 (stating that substitute guidelines on which Dr. Ramachandran was forced to rely are "not fully equivalent to CDC's resources" and "gave information about PrEP treatment in populations that are not reflective of those that [she] typically see[s] in clinic"). In addition, alternate resources of health information

---

Commission to do no more than 'get the bad guys'; that is, Plaintiff [sought] a legal determination that the respondents engaged in a coordinated scheme to violate [the law]").

are expensive and therefore not accessible to health professionals working in underserved or underfunded areas. *See* Liou Decl. ¶ 10; Supp. Ramachandran Decl. ¶ 8. The harm is not a monetary injury; rather, the expense of alternative resources extends beyond mere monetary injury to a complete denial of access for many health professionals. *See* Liou Decl. ¶ 10; Supp. Ramachandran Decl. ¶ 8.

It also bears noting that, to support its contention that Plaintiff's members have suffered no harm from Defendants' removal of vital health information, Defendants quote Dr. Liou's declaration out of context to misrepresent her statements. Defendants' claim that Dr. Liou was not harmed by removal of webpages on Defendants' websites because Dr. Liou "admitt[ed] other 'clinical resources' exist." Response Mem. at 8 (quoting Liou Decl. ¶10). But Dr. Liou's statement about other clinical resources specifically expressed that she *could not access* those alternative resources, and that it was therefore "devastating to lose access to [the CDC] tools." Liou Decl. ¶ 10. She explained that because she "work[s] in an underserved setting," she doesn't "have access to many expensive clinical resources that require subscription fees." *Id.*

Third, Defendants claim that "the time and effort" that DFA members "may spend identifying alternative sources of information" does not qualify as an injury recognized by Article III "[t]he potential expenditure of time is not a concrete and particularized and actual or imminent injury." Response Mem. at 9 (internal quotation marks omitted). Neither of the two cases to which Defendants cite support

14

that claim. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), says nothing about whether expenditure of time and resources was sufficient to establish standing.

And in *Cigar Ass'n of America v. FDA*, 323 F.R.D. 54, 65 (D.D.C. 2017), the court found that intervenor professional associations lacked standing because they failed to explain how invalidating the regulation that they sought to intervene to defend would result in any expenditure of resources of time or effort. *Id.* at 65 (noting that the intervenors said "not a word" about the specifics of how keeping the rule intact would prevent their injuries).

Defendant also attempts to recast the harms suffered by Plaintiff's members as an uncertain risk of future harm. *See* Response Mem. at 9 (discussing "*potential* expenditure of time" (emphasis added)). Plaintiff's members, however, have already actually expended time and effort and experienced disruptions to their jobs, and they will be required to unless Defendants are ordered to reverse their actions. *See* Ramachandran Decl. ¶¶ 7–9; Supp. Ramachandran Decl. ¶ 4 ("Over the last nine days, my ability to treat my patients has been impeded by the loss of information previously publicly available on the CDC's website."); *id.* ¶ 8 (discussing instance in the past week in which lack of access to CDC webpage impacted patient visit). That harm is not speculative and is directly attributable to Defendants' unlawful actions, and therefore supports Plaintiff's standing

Last, Defendants briefly argue that Plaintiff "advances a theory of 'doctor standing,' which the Supreme Court recently rejected." Response Mem. at 9 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 391 (2024)). That argument ignores

the realities of this case. In *Alliance for Hippocratic Medicine*, the Supreme Court rejected the assertion that doctors could "challenge the government's loosening of general public safety requirements simply because more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries." *All. for Hippocratic Med.*, 602 U.S. at 391. There, the plaintiff alleged an attenuated chain of causation between changing regulations and the resulting remote possibility that doctors "may need to spend more time treating ... patients." *Id.* By contrast, Defendants' removal of information has already forced Plaintiff's members to change how they treat patients, monitor disease outbreaks, and perform important health research. Plaintiff's members have been directly harmed by Defendants' conduct and possess standing to seek relief from Defendants' unlawful actions.[2]

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant its motion and enter a temporary restraining order (1) requiring Defendants CDC, FDA, and HHS to restore webpages and datasets they have unlawfully removed from their websites; and (2) enjoining CDC, FDA, and HHS from removing or substantially modifying other webpages and datasets in implementation of the unlawful Office of Personal Management (OPM) memorandum on "Initial Guidance Regarding

---

[2] Defendants also spend much of their Response Memorandum discussing Plaintiff's claim against OPM. *See* Response Mem. at 9–11. While each of Defendant's arguments with respect to OPM are incorrect, none of those issues are relevant to the Court's consideration of the current motion because Plaintiff has not sought a temporary restraining order against OPM. *See* Plaintiff's Motion for Temporary Restraining Order, ECF 6.

President Trump's Executive Order *Defending Women*." Plaintiff further requests that the Court order Defendants to file a status report within forty-eight hours of the issuance of any temporary restraining order confirming compliance with the order.

Dated: February 10, 2025          Respectfully submitted,

/s/ Zachary R. Shelley
Zachary R. Shelley (DC Bar No. 90021549)
Adina H. Rosenbaum (DC Bar No. 490928)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
zshelley@citizen.org

*Counsel for Plaintiff*