UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Doctors for America,<br><br>Plaintiff,<br><br>v.<br><br>Office of Personnel Management, et al.,<br><br>Defendants. | Civil Action No. 25-cv-322 |

**SUPPLEMENTAL DECLARATION OF DR. RESHMA RAMACHANDRAN**

I, Reshma Ramachandran, declare as follows:

1. I previously submitted a declaration to the Court on February 6, 2025, and submit this declaration in further support of Doctors for America's motion for a temporary restraining order.

2. As stated in my earlier declaration, I am a board-certified family physician, health services researcher, and Assistant Professor at Yale School of Medicine. I see patients in a primary care practice at a federally qualified health center and co-direct an interdisciplinary research and policy program focused on medical product evaluation, approval, and coverage toward advancing policies that improve patient health and health care. I also lead several research projects using publicly available datasets to examine the impact of sociodemographic factors on health outcomes.

3. As I explained in my earlier declaration, I have for years have relied heavily on information on CDC's website to guide how I treat my patients. For example, I rely on webpages that provide guidance on contraception, including summary charts that are designed specifically to allow physicians to quickly evaluate contraindications for different contraceptives (i.e., factors

1

to indicate a patient should not receive a specific form of contraception) and summary charts that cover the signs and severity of symptoms that may be caused by different forms of contraception. I also rely on CDC online material about prescribing PrEP medication for HIV prevention.

    4.      Over the last nine days, my ability to treat my patients has been impeded by the loss of information previously publicly available on the CDC's website.

    5.      Because I work in a federally qualified health center, many of my patients are low income and lack access to transportation or have significant comorbidities that do not enable them to use public transportation. To access their appointments, those patients must schedule transportation, often with the assistance of the clinic and other contracted services. Patients with scheduled transportation are often on particularly tight timelines because of their preset transportation schedule, increasing the time pressures during such appointment. Moreover, because these patients lack regular access to transportation, it is particularly difficult to schedule follow-up care and visits for them. For that reason, when a patient who requires scheduled transportation has a visit, it is essential to address as many of their health needs in our short time together as possible. Otherwise, implementation of any treatment plan that I come up with will be delayed far beyond the additional hours or days that it takes me to develop an appropriate treatment plan. If I cannot provide all the care required during the patient visit, the patient may need to wait weeks before they can schedule transportation to get back to the office to receive the treatment that I chose after our initial visit. In some cases, difficulty obtaining transportation might mean that the patient never receives treatment at all.

    6.      Many of the contraceptives that I prescribe, such as IUDs, require in-office administration. CDC's resources about contraindications for different forms of contraception help me to quickly make choices about what form of contraception to prescribe. If I cannot both

prescribe and administer the contraception during the visit, the patient will need to schedule a subsequent office visit. The need for an additional appointment may lead to extended delays receiving care for patients facing standard scheduling difficulties, and it imposes particularly long costs or denial of care altogether on patients who struggle to obtain transportation to their visit. A delay in obtaining contraception poses a particular risk of serious health complications for patients with other comorbidities that would be further exacerbated during pregnancy or those who are on multiple other medications that may be contraindicated for a pregnant patient.

7. When patients visit with scheduled transportation, they are typically guaranteed transportation to a pharmacy immediately after their appointment. In practice, this means that when I lack access to sufficient information to issue a prescription during the short time when my patients are visiting my office, the patients are likely to experience delays receiving their prescriptions that far exceed any delay in me writing the prescription. While it may take me a few hours or a few days to finalize a treatment plan if I do not have access to resources that allow me to be confident in my choice of treatment during a visit, it may take patients days or weeks to fill their prescriptions if they leave my office without the prescription.

8. Without access to information about the requirements for prescribing and administering the medication PrEP, which helps to prevent the transmission of HIV, I must take additional time to discern whether and how to treat patients with PrEP. Just this past week, I was considering prescribing a new form of injectable PrEP to a patient with a complex medical history. Because the medication is relatively new, I am not as familiar with it as I am with other forms of PrEP and the frequency by which a patient on this medication would need to be monitored. I therefore had to research the list of requirements that physicians must check off before treatment. Normally, I would rely on CDC resources for that task because they provide the information in a

centralized, physician-friendly resource. Instead, I had to find a different resource that provided the information. Because I work at a clinic affiliated with a well-funded research university of which I am a faculty member, I had access to published clinical guidelines published elsewhere and was eventually able to access the information I needed. But doing so took additional time, and the resource that I found was not fully equivalent to CDC's resources. Specifically, CDC's resources centralize information about multiple forms of PrEP with consideration of administering these medications across diverse populations. In contrast, the guidelines I was able to find last week gave information about PrEP treatment in populations that are not reflective of those that I typically see in clinic; those guidelines are also not routinely updated. Therefore, although I was able to confirm (with some delay) that my patient met the prerequisites for me to prescribe injectable PrEP, I could not easily make comparisons to other forms of PrEP to discern whether an alternative treatment would offer more benefits—as I would have been able to do if I had access to the CDC resources.

9. When I prescribe patients PrEP, it is vital that they be able to start treatment right away in order to reduce the risk that they be infected with HIV, and developing Acquired Immune Deficiency Syndrome (AIDS), which would require lifelong treatment and a greater risk for other chronic conditions including chronic kidney disease, cardiovascular disease, or depression. Thus, the delays imposed by CDC's removal of information is extremely harmful.

10. CDC'S resources, before they were removed, provided information about whether symptoms that patients are suffering are likely to be side effects from the medicines or treatments they have received, and about whether those symptoms may be reflective of a more severe underlying problem that needs immediate treatment. When I have an ongoing relationship with my patients, such as when I see them in my office, prescribe them contraception, and then monitor

their well-being, I use CDC resources when those patients contact me with concerns about symptoms they are experiencing. For instance, CDC resources provide summaries of the symptoms that may relate to serious, even life-threatening, side effects of certain forms of contraception.

11.     If, for instance, I prescribe a patient a contraceptive and that patient later calls because they have been experiencing significant headaches, I often turn to CDC's resources that provide summaries of whether that symptom is likely to be caused by the contraceptive I prescribed, and if so, whether those side effects indicate a serious health risk that must be treated immediately. Although some of that information is available from other sources, such as clinical practice guidelines or medication labels, those alternatives do not compile the information as clearly and conveniently as the CDC has done. For example, while I can use a medication label to look up whether side effects might be attributed to a specific drug, CDC's resources compile information about many drugs in one place. So, when a patient calls, I can just go to the CDC resource and quickly find the answer, rather than needing to spend time searching the appropriate journal database for information about a single specific drug and then then scrolling through several pages of text for the exact information I need. Because every moment can count when a patient is experiencing symptoms that may be indicative of serious health concerns, the time saved by the CDC resources is essential to ensuring that my patients receive timely care when they are at their most vulnerable receive care.

12.     Before the CDC removed webpages and datasets that I use in my medical practice, I would typically access those materials by searching on Google for the name of the resource that I was looking for. Although some CDC webpages have been archived on the Internet Archive Wayback Machine, those pages do not appear as search results. Instead, to access an archived

5

webpage on the Internet Archive Wayback Machine, I must know the web address that existed before CDC took down its website. While I visited some webpages on the Internet Archive Wayback Machine since CDC took down the other websites, doing so has required substantial effort to find the correct webpage addresses. It would not be feasible for me to do this research during patient visits, and there is no guarantee that the Internet Archive Wayback Machine would have retained a copy of the specific webpage I was searching for. In addition, the Wayback Machine does not include copies of every webpage. And unlike CDC's resources that are updated in response to new evidence and epidemiological data collected by the agency, the pages on the Wayback Machine are static, which could lead to care that is not currently relevant or evidence-based.

     I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2025

_____
Dr. Reshma Ramachandran