**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| DOCTORS FOR AMERICA, |
| Plaintiff, |
| v. |
| OFFICE OF PERSONNEL MANAGEMENT et al., |
| Defendants. |

Civil Action No. 25-322 (JDB)

## MEMORANDUM OPINION

Doctors for America ("DFA") moves to temporarily restrain three agencies of the United States government from further removing or modifying health-related webpages and datasets—and to compel them to restore webpages and datasets that they have already removed or modified—because DFA and its members (physicians, medical trainees, and other health care professionals) use the webpages regularly in treating patients and conducting research. DFA argues that the removal of these webpages violates the Administrative Procedure Act ("APA") and, in some cases, the Paperwork Reduction Act ("PRA"), and that DFA and its members are and will continue to be irreparably harmed by the lack of access to the information. For the reasons that follow, the Court will grant plaintiff's motion for a temporary restraining order.

## BACKGROUND

DFA is a non-profit organization that "mobilizes doctors, other health care professionals, and medical trainees to be leaders who put patients over politics to improve the health of patients, communities, and the nation." Compl. [ECF No. 1] ¶ 6. "DFA's work focuses on access to affordable care, community health and prevention, and health justice and equity," and its members

include "clinicians who provide direct care to patients, those who provide education to other clinicians and trainees, and those who conduct clinical and public health research."  Id.

## I.    Legal Background

As relevant here, the PRA requires every federal agency to "ensure that the public has timely and equitable access to the agency's public information."  44 U.S.C. § 3506(d)(1).  It also requires agencies to "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products," id. § 3506(d)(3), which HHS and other agencies define to include "'any electronic document . . . or web page' that an agency has disseminated to the public."  See Compl. ¶ 13 (quoting HHS Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated to the Public, Off. of the Assistant Sec'y for Plan. & Evaluation, HHS, https://aspe.hhs.gov/hhs-guidelines-ensuring-maximizing-disseminated-information (last visited Feb. 10, 2025) (hereinafter "HHS Guidelines")).

## II.    Factual Background

On January 20, 2025, President Trump issued Executive Order 14168: Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government. Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025).  The order states that "[i]t is the policy of the United States to recognize two sexes, male and female," id. § 2, and provides that "[a]gencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications, or other messages," id. § 3(e).  Further, within 120 days of the order, agencies are required to "submit an update on implementation of this order to the President" addressing, inter alia, "changes to agency

documents, including regulations, guidance, forms, and communications, made to comply with this order." Id. § 7.

On January 29, 2025, the Office of Personnel Management ("OPM") issued a memorandum to all agencies titled "Initial Guidance Regarding President Trump's Executive Order Defending Women." Memorandum from Charles Ezell, Acting Dir., OPM to the Heads & Acting Heads of Dept's & Agencies (Jan. 29, 2025), https://www.opm.gov/media/yvlh1r3i/opm-memo-initial-guidance-regarding-trump-executive-order-defending-women-1-29-2025-final.pdf. OPM ordered all agencies, by "[n]o later than 5:00 pm EST on January 31, 2025," to take several actions to implement the executive order, including to "[t]ake down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology," "[w]ithdraw any final or pending documents, directives, orders, regulations, materials, forms, communications, statements, and plans that inculcate or promote gender ideology," and "[e]nsure that all applicable agency policies and documents, including forms, use the term 'sex' and not 'gender.'" Id. at 1–2.

"In response to OPM's memorandum," the Center for Disease Control ("CDC") and the Food and Drug Administration ("FDA") removed numerous webpages and datasets. See Mem. L. Supp. Pl.'s Mot. TRO [ECF No. 6-1] ("Mem.") at 6–12. DFA alleges that its members "relied on [these] pages that related to current evidence and guidelines for providing clinical care, provided information to clinician-investigators on conducting clinical trials, and contained data that informed targeted public-health interventions." Id. at 12. The webpages and datasets that CDC and FDA removed (hereinafter, "removed webpages") provided treatment guidance, datasets, and other information that healthcare providers used to provide treatment, conduct research, and inform public health responses on subjects such as youth risk behaviors, adolescent and school

health, social vulnerability and environmental justice, HIV, contraception, assisted reproductive technologies, and how to develop clinical trials, including improving the inclusion of women and underrepresented populations.  See id. at 6–12 (citing Decl. of Dr. Reshma Ramachandran [ECF No. 6-3] ¶¶ 5–9 ("Ramachandran Decl.").  The agencies did not provide any notice prior to the removals.  Mem. at 12.  Afterwards, CDC posted a statement that its "website is being modified to comply with President Trump's Executive Orders."  See Mem. at 12 (quoting Internet Archive Wayback Machine, CDC.gov, https://web.archive. org/web/20250205035604/https://www.cdc.gov/).

### III.    Procedural History

DFA filed this lawsuit on February 4, 2025, see Compl., and filed a motion for a temporary restraining order ("TRO") on February 6, 2025.  See Mot. TRO [ECF No. 6]; Mem.; Notice of Filing Ex. Supp. Mot. TRO [ECF No. 8].  To support its motion, DFA alleges that the Department of Health and Human Services ("HHS") and CDC removals violated the PRA, and CDC's, HHS's, and FDA's removals were arbitrary and capricious in violation of the APA.  See Mem. at 16–21. DFA further contends that its members are and will continue to be irreparably harmed by the lack of access to the removed webpages because DFA members regularly rely on the removed webpages to provide timely patient treatment, inform public health responses, and conduct health-related research.  See id. at 22–24.  Specifically, the lack of access has made "it more difficult and time-consuming to provide updated recommendations and prescribe appropriate options to patients," id. at 22 (quoting Ramachandran Decl. ¶ 6), and alternate resources may not be as comprehensive, up-to-date, relevant, and accessible to DFA's healthcare providers as the removed webpages, id.

The Court scheduled a hearing for February 10, 2025, providing time for the government to file an opposition, see Defs.' Mem. Opp'n Pls. Mot. TRO [ECF No. 9] ("Opp'n"), and DFA to file a reply, see Reply Supp. Mot. TRO [ECF No. 10] ("Reply").  The Court held the hearing as scheduled.

## ANALYSIS

"The standard for issuance of the 'extraordinary and drastic remedy' of a temporary restraining order . . . is by now well-established."  Aviles-Wynkoop v. Neal, 978 F. Supp 15, 21 (D.D.C. 2013) (quoting Munaf v. Geren, 553 U.S. 674, 689 (2008)).  "To prevail, the moving party must demonstrate: (1) a substantial likelihood of success on the merits; (2) that the moving party would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction."  Id.

### I.    Substantial Likelihood of Success on the Merits

Defendants raise three primary threshold reasons why DFA cannot ultimately succeed on the merits of its claims:  DFA lacks standing, the action of removing the webpages is neither an "agency action" nor "final" and hence is unreviewable under the APA, and DFA has not demonstrated irreparable harm.  See Opp'n at 6–11.  Each argument has substance, but none prevail.

### A.  Standing

"The first component of the likelihood of success on the merits prong usually examines whether the plaintiffs have standing."  Barton v. District of Columbia, 131 F. Supp. 2d 236, 243 n.6 (D.D.C. 2001).  In the TRO context, the plaintiff must "demonstrate a substantial likelihood of standing."  Gomez v. Trump, 485 F. Supp. 3d 145, 170 (D.D.C. 2020).

DFA asserts associational standing.  <u>See</u> Reply at 10.  To establish associational standing at this stage, it must show a substantial likelihood that "(1) at least one of [its] members would have standing to sue; (2) the interests [it] seek[s] to protect are germane to the organization's purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual members."  <u>Sierra Club v. EPA</u>, 754 F.3d 995, 999 (D.C. Cir. 2014).  Defendants do not dispute the latter two requirements, <u>see</u> Opp'n at 7, and the Court agrees that they are met. Preserving health professionals' access to important health-related resources is "germane" to DFA's mission of advancing "access to affordable care" and improving "health care delivery so that it better meets . . . patients' needs."  Ramachandran Decl. ¶ 3.  And the Court can think of no reason those professionals themselves must participate in the case rather than allowing their association to speak for them.

So the standing inquiry here settles on the first requirement, a DFA member's ability to sue.  In turn, that question breaks down into its own familiar three-pronged requirement: a DFA member must "demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."  <u>FDA v. All. for Hippocratic Med.</u>, 602 U.S. 367, 380 (2024).  Defendants dispute all three requirements.  <u>See</u> Opp'n at 6–10.

DFA meets its obligation to identify a particular member meeting these requirements, <u>see</u> <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 498–99 (2009), twice over: it identifies Dr. Reshma Ramachandran and Dr. Stephanie Liou, both members of the organization's board of directors, <u>see</u> Ramachandran Decl. ¶ 2; Decl. of Stephanie Liou [ECF No. 6-4] ("Liou Decl.") ¶ 2.  If either could bring this case, then so can DFA.

Dr. Liou works at a clinic "serving predominately low-income immigrant families in southwest Chicago" and "at one of the most underserved high schools in Chicago." Liou Decl. ¶¶ 1, 3. In her clinical work, she "regularly rel[ies]" on information the CDC publishes. Id. ¶ 3. And for Dr. Liou, access to that information is both routine and time-sensitive. For instance, until the websites went dark, Dr. Liou would have consulted CDC resources to combat a recent Chlamydia outbreak in her high school and to step up still-ongoing "efforts around STI testing and prevention" to ensure the outbreak doesn't recur. Id. ¶ 7. Because Dr. Liou "rel[ies] on [CDC] resources daily," their disappearance has "caused a huge disruption in [her] work." Id. ¶ 8. And her alternatives are limited: because her employers are under-resourced, she doesn't have "access to many expensive clinical resources" that might otherwise offer similar information. Id. ¶ 10. In sum, Dr. Liou describes the loss of these resources as "devastating." Id.

Dr. Ramachandran works in a primary care practice and research program at the Yale School of Medicine. Ramachandran Decl. ¶ 1. Like Dr. Liou, Dr. Ramachandran relies heavily on CDC resources about contraceptives and STIs. See id. ¶ 7–8. Without those resources, which are "designed for easy use in the clinical setting," Dr. Ramachandran is left scrambling for alternatives—a process that "will take up a larger portion of a typical 20 minute visit with patients, leaving less time" for other essential activities "and potentially causing delays to patients' access to appropriate contraception." Id. ¶ 7. Indeed, Dr. Ramachandran has already felt the impact of the resources' disappearance: "Over the last nine days, [her] ability to treat [her] patients has been impeded by the loss of information" because she has been unable to, for instance, consult CDC resources that would have guided her in prescribing new medications. Supp. Decl. of Dr. Reshma Ramachandran [ECF No. 10-1] ("Suppl. Ramachandran Decl.") ¶¶ 4, 8. And Dr. Ramachandran's research suffers a similar fate absent FDA resources that guide best practices in clinical trials. See

Ramachandran Decl. ¶ 9.  Without those resources, Dr. Ramachandran struggles to "evaluat[e] the evidence underlying FDA approval of medical products."  Id. ¶ 9.  In sum, their disappearance "makes [her] research more difficult."  Id.

These are injuries in fact.  These doctors' time and effort are valuable, scarce resources, and being forced to spend them elsewhere makes their jobs harder and their treatment less effective.  The denial of "information" these doctors "wish to use in their routine" activities has "inhibit[ed] . . . their daily operations" and thereby caused "an injury both concrete and specific to the work in which they are engaged."  People for the Ethical Treatment of Animals v. USDA ("PETA"), 797 F.3d 1087, 1094 (D.C. Cir. 2015) (quoting Action All. of Senior Citizens of Greater Phila. v. Heckler, 789 F.2d 931, 937–38 (D.C. Cir. 1986)); see also Flyers Rts. Educ. Fund v. DOT, 810 F. App'x 1, 2 (D.C. Cir. 2020) (per curiam) ("inconvenience in travel plans" supports injury in fact).

Defendants' counterarguments do not persuade the Court.  The meat of defendants' standing argument—that the PRA confers no legal right to the information that has disappeared, see Opp'n at 7–8—speaks not to standing but to the merits, the viability of which the Court must assume for standing purposes, see Tanner-Brown v. Haaland, 105 F.4th 437, 445 (D.C. Cir. 2024) (A court "must consider standing separately from the merits by assuming that the plaintiff will ultimately prevail on her legal theory.").  Meanwhile, defendants accuse DFA's members of advancing a theory of "doctor standing" rejected in FDA v. All. for Hippocratic Med., 602 U.S. 367 (2024).  See Opp'n at 9.  Not so.  That case rejected the notion that doctors might be able "to challenge the government's loosening of general public safety requirements simply because more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries." 602 U.S. at 391.  Here, by contrast, the doctor-members establish a direct line from action

(deprivation of materials) to injury (obstacles to treating their patients).  Indeed, <u>Alliance for Hippocratic Medicine</u> hurts defendants more than it helps them, as it suggested that the doctors could have bolstered their standing case there by showing that the challenged action "caused a resulting diversion of the doctors' time and resources." <u>Id.</u>  That is just what DFA contends here.

Finally, defendants briefly challenge the final two standing requirements, causation and redressability.  <u>See</u> Opp'n at 10.  But their arguments on this front go only to OPM—a defendant in this case, but not a subject of the TRO sought.  <u>See</u> Reply at 16 n.2.  In any event, causation and redressability—"often flip sides of the same coin," <u>All. for Hippocratic Med.</u>, 602 U.S. at 380 (cleaned up)—are straightforward here.  Defendants caused the alleged injury by removing important resource materials without warning.  As is "typically" true, then, "enjoining" that conduct will "redress that injury." <u>Id.</u>

Accordingly, DFA has shown a "substantial likelihood of standing." <u>Gomez</u>, 485 F. Supp. 3d at 170.

## B.  Final Agency Action

DFA asserts that it is likely to succeed on the merits of three claims, all of which rely on the APA.  <u>See</u> Mem. at 16–19.  The APA provides for judicial review of an agency action "made reviewable by statute" or a "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Since § 704 is the framework for each of DFA's claims, the first merits question the Court must ask is whether DFA has a substantial likelihood of success proving that the agencies' removal of the webpages constituted a final agency action.  <u>Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n</u>, 324 F.3d 726, 731 (D.C. Cir. 2003) ("If there was no final agency action . . . there is no doubt that appellant would lack a cause of action under

the APA.").  Defendants argue that the decision to remove the webpages was neither an "agency

action" nor "final."  See Opp'n at 10–12.

The APA defines an "agency action" as "the whole or part of an agency rule, order, license,

sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  This

definition "is expansive . . . [and] is meant to cover comprehensively every manner in which an

agency may exercise its power."  Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt., 460 F.3d

13, 20 (D.C. Cir. 2006) (internal quotation omitted).  The APA further defines "order" to be "the

whole or part of a final disposition, whether affirmative, negative, injunctive, or declaratory in

form, of an agency in a matter other than rule making but including licensing."  5 U.S.C. § 551(6).

Put simply, "an order is virtually any authoritative agency action other than a rule."  N.Y. Stock

Exch. LLC v. SEC, 2 F.4th 989, 992 (D.C. Cir. 2021).

Here, the respective agencies' decisions to remove certain webpages likely meet this broad

definition of "order."  The decision to remove myriad public-facing webpages, some of which had

been active for decades, is certainly a "form of agency power" or "action" that the APA reaches.

See Jud. Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp., 219 F. Supp. 2d 20, 38 (D.D.C. 2002).

Defendants claim that no category of agency action, including "order,"

 "obviously fits" the actions of "CDC's and FDA's maintenance of their websites."  See Opp'n at

11.  But a category need not be an obvious fit.  As this Circuit has acknowledged, the statute's

"categories are imprecise, and courts have made the threshold determination of reviewable agency

action on a case-by-case basis."  Jud. Watch, 219 F. Supp. 2d at 38 (quoting Industrial Safety

Equip. v. EPA, 837 F.2d 1115, 1118 (D.C. Cir. 1988)).  Moreover, unlike the case that defendants

cite, DFA does not challenge the pace at which defendants are updating or otherwise maintaining

a website.  See Opp'n at 11 (citing Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def., 990

F.3d 834, 841 (4th Cir. 2021)).  DFA instead seeks to remedy the complete removal of numerous webpages and datasets.  And the removal of webpages and datasets is likely such a "circumscribed" and "discrete" action that is an "agency action."  See Norton v. S. Utah Wilderness All., 542 U.S. 55, 62 (2004).  Hence, DFA has likely established that the removal decisions were "agency action[s]" within the meaning of the APA.

Turning to finality, an agency action is "final" if it meets two conditions.  "First, the action must mark the 'consummation' of the agency's decisionmaking process," meaning that it "must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (cleaned up).

On the first factor, DFA argues that although the exact course of the decisionmaking process is unclear, "the removals were the end result of that process."  Reply at 5.  Defendants disagree, arguing that DFA has not "explain[ed] what decisionmaking processes concluded" at the agencies, and the OPM memorandum "on its face[] contemplates an ongoing dialogue" between the agencies to comply with the executive order.  See Opp'n at 11.  Plus, the removals may not be final, because the agencies have not affirmatively reported their intent to keep the removed webpages down permanently and have since restored some.  See id. at 11–12.

Here, the removals were likely the consummation of each agency's decisionmaking process to comply with the President's executive order, the OPM memorandum, or both.  That a decisionmaking process occurred, even if DFA does not allege the particulars, is clear from the record.  On January 20, 2025, the President issued an executive order directing agencies to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology."  See Exec. Order 14168 at § 3(e).

11

Nine days later, OPM directed agencies to "[t]ake down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology" by not later than 5:00 pm on January 31, 2025.  <u>See</u> OPM Memo at 1–2.[1]  On or around January 31, 2025, defendants removed—without any explanation or advance notice—numerous webpages and datasets.  <u>See</u> Mem. at 6–15.  And finally, <u>after</u> the removal, the CDC placed on its website a statement that the "website is being modified to comply with President Trump's Executive Orders."  <u>See id.</u> at 18.

There is nothing in the Executive Order, the OPM memorandum, or even the CDC's website statement that indicates the removals were discretionary or interlocutory.  <u>Compare</u> Exec. Order 14168 at § 3(e) (directing agencies to "remove" certain information), <u>and</u> OPM Memo at 1 (directing agencies to "[t]ake down" information), <u>and</u> Mem. at 18 (quoting the CDC message that the "website is being modified to comply" with President Trump's executive orders), <u>with, e.g.,</u> <u>Franklin v. Massachusetts</u>, 505 U.S. 788, 798 (1992) (agency action was not final because it was a presentation to the President that served "more like a tentative recommendation than a final and binding determination").

Furthermore, that an agency may restore the removed webpages in the future does not mean that the agency's prior removal decision was not the consummation of an agency's decisionmaking process.  <u>See, e.g.,</u> <u>Sackett v. EPA</u>, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal."); <u>Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA</u>, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future.").

On the second finality factor, DFA contends that the removals constituted "the agencies' final dispositions of the public's right to access those materials" under the PRA.  <u>See</u> Reply at 5.

---

[1] DFA also challenges OPM's legal authority to issue the memorandum, but the Court need not address that issue at this stage.  <u>See</u> Compl. ¶¶ 32–36; Reply at 16 n.2.

The removals thus "determined" DFA's "right[]" as to the information—namely that DFA and others did not have a right to the removed webpages.  See Bennett, 520 U.S. at 177–78.

Judges, including at least one in this District, have recognized that an agency "determine[s] rights and obligations" when the statute creates a right to information and an agency "provides or fails to provide Plaintiffs with access to" information to which that right applies.  See, e.g., Env't Def. Fund v. Regan, Civ. A. No. 20-762 (LLA), 2024 WL 3887383, at *12 (D.D.C. Aug. 20, 2024); see also Jud. Watch, 219 F. Supp. 2d at 40 (concluding an agency's action that deprived the plaintiff from enforcing his statutory right to the information "had a legal consequence" under the Bennett test).  Thus, the question is whether the PRA likely provides DFA with a right to the information in the removed webpages.

DFA points to several provisions of the PRA that purportedly provide a right to the information in the CDC's removed webpages.  Defendants, by contrast, argue that no provision "requires CDC and FDA to create or maintain the webpages" or datasets.  See Opp'n at 7–8.  The Court concludes that DFA has demonstrated that its members likely have an information right at least under the PRA's notice requirement.[2]  Section 3605(d)(3) requires agencies to "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products," which HHS defines to include electronic documents and webpages.  See HHS Guidelines.  The provision on its face seems to require an agency to maintain an important webpage for the period between when the agency issues a notice of termination and when it

---

[2] Section 3605(d)(1) requires agencies to "ensure that the public has timely and equitable access to the agency's public information," 44 U.S.C. § 3605(d)(1), which is defined as "any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public," id. at § 3602(12).  In DFA's view, because the CDC maintained the removed webpages on its website "for years before it abruptly changed course," the removed pages constitute "public information" to which DFA's members have a right to "timely and equitable access."  See Mem. at 16–17.  At this stage, the Court need not tackle this argument.

actually terminates the webpage, and thus seems to provide individuals a right to that information for that time.

DFA has therefore shown that defendants' removals of the webpages and datasets likely constitute final agency actions.

### C. APA Claims

The Court now turns to DFA's likelihood of success on each APA claim.

1. PRA Notice Claim

DFA contends that HHS and CDC violated the APA by acting contrary to law—in this case, the PRA. See Mem. at 19–21; 5 U.S.C. § 706(2)(A), (D). Once again, § 3506(d)(3) requires agencies to "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." 44 U.S.C. § 3506(d)(3). The Court concludes that DFA is likely to succeed on its claim of a violation of that provision.

To start, DFA contends that the agencies provided no notice—and therefore not "adequate notice"— prior to terminating the CDC webpages, see Mem. at 21, and defendants do not disagree. DFA next asserts that the removed webpages constituted "information dissemination product[s]," pointing to HHS's own guidelines defining that term. See id. at 20–21 (citing HHS Guidelines defining "information dissemination product" to include "electronic document[s]" and "web page[s]"). Again, defendants do not really disagree. DFA finally argues that the removed webpages contain "significant" information under the term's ordinary meaning. See Mem. at 20.

The PRA does not define "significant," so the Court "must give it its ordinary meaning." Ass'n of Private Sector Colleges and Univs. v. Duncan, 681 F.3d 427, 443 (D.C. Cir. 2012) (citing FCC v. AT&T Inc., 562 U.S. 397, 403 (2011)). "Significant" is defined as "having meaning," or "having or likely to have influence or effect: important." See Merriam-Webster 1828 (11th ed.

2020) ("significant"); Am. Heritage Dictionary of the English Language (5th ed. 2011) ("significant") ( "having or expressing a meaning," and "having or likely to have a major effect; important"). The record explains that the removed webpages contained information and datasets that "guide medical practice, are essential to groundbreaking public health research, and are key to preventing disease outbreaks." Mem. at 21 (citing Ramachandran Decl. ¶¶ 16–19; Liou Decl. ¶¶ 4–10). So the removed webpages likely have influence or a major effect—in other words, they are important. Hence, they cannot be terminated without adequate notice. DFA has thus established a substantial likelihood of success as to its PRA-notice claim against CDC and HHS.

    2.  <u>Arbitrary and Capricious</u>

DFA also asserts that HHS, CDC, and FDA failed to perform reasoned decisionmaking and consider DFA members' (and others') reliance on the removed webpages, which rendered the removal decisions arbitrary and capricious. <u>See</u> Mem. at 17–19.

The APA requires agencies to engage in "reasoned decisionmaking," <u>Dep't of Homeland Sec. v. Regents of the Univ. of Cal.</u>, 591 U.S. 1, 16 (2020), meaning an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (internal quotation omitted). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." <u>Id.</u> The reviewing court must then "set aside" the agency action. <u>See</u> <u>Regents of the Univ. of Cal.</u>, 591 U.S. at 16 (quoting 5 U.S.C. § 706(2)(A)).

DFA's arbitrary and capricious argument is simple: the agencies' removal decisions were "completely unreasoned" and thus were not the product of reasoned decisionmaking.  Mem. at 18. Additionally, the agencies "failed to consider an important aspect of the problem"—medical providers' longstanding and continuing reliance on the removed webpages.  Id. at 17.

The Court agrees that DFA has demonstrated a likelihood of success on the merits as to this claim.  By removing long relied upon medical resources without explanation, it is likely that the each agency failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (internal quotation omitted).

Hand in hand with the lack of explanation, it is also likely that the agencies "failed to consider" the "important" issue of the substantial reliance by medical professionals on the removed webpages.[3]  See Mem. at 18–19.  Ramachandran and Liou attest that they "rely on webpages and datasets" from the CDC and FDA "to do [their] work," Ramachandran Decl. ¶ 3, and use such resources "regularly"—even "daily," see, e.g., Liou Decl. ¶¶ 3, 7–8.  They attest that "DFA members and other health care professionals" rely on these resources, as well.  Ramachandran Decl. ¶ 6; see Liou Decl. ¶¶ 4–6.  Medical providers' widespread and routine reliance on information is an identified and adequately alleged reliance interest.  See Solenex LLC v. Bernhard, 962 F.3d 520, 529 (D.C. Cir. 2020) (cautioning against finding reliance interests that are "unidentified and unproven").

DFA has thus shown a substantial likelihood of success on the merits as to its claims that CDC, HHS, and FDA acted arbitrary and capriciously in removing the webpages.

## II.    Irreparable Harm

---

[3] Hence, even if CDC's post-hoc rationalization provided an explanation for its removal, the removals were still likely arbitrary and capricious.

Irreparable harm is an independent prerequisite for preliminary relief with a "high standard." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). To establish irreparable harm, a plaintiff must show that it is suffering, or will suffer, a harm that is "both certain and great," "actual . . . not theoretical," and "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Wis. Gas Co. v. Fed. Energy Regul. Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985) (cleaned up). A harm is not irreparable if there will be adequate "corrective relief . . . available . . . in the ordinary course of litigation." Chaplaincy, 454 F.3d at 297–98 (quoting Wis. Gas, 758 F.2d at 674).

Here, DFA has "show[n] its members will suffer irreparable harm if" defendants' removal of the webpages and datasets "is not enjoined" at this stage.[4] See AARP v. EEOC, 226 F. Supp. 3d 7, 25 (D.D.C. 2016). Indeed, DFA has shown its members are already suffering such harm. To start, Dr. Liou serves the students of "one of the most underserved high schools in Chicago." Liou Decl. ¶ 3. In this work, she "regularly" relies on CDC's resources on sexually transmitted diseases ("STDs"). Id. ¶ 7. The harm she has suffered since CDC removed those pages is neither hypothetical nor far off. The high school "recently had an outbreak of Chlamydia," and now that she is "[w]ithout t[he] crucial CDC resources," she is "not able to do [her] job to help address this urgent situation."[5] Id.

---

[4] Defendants contend that the removal of the webpages does not constitute irreparable harm because DFA members can still access some of the removed webpages through the Wayback Machine, an archival website. See Opp'n at 4. The Court is not persuaded. The Wayback Machine does not capture every webpage, and there is no information to suggest that it has archived each removed webpage. Additionally, pages archived on the Wayback Machine do not appear on search engines. In other words, a particular archived webpage is only viewable to a provider if the provider knows that the Wayback Machine exists and had recorded the pre-removal URL of the requested webpage. See Reply at 3–4.

[5] Dr. Liou's statement necessarily implies she cannot access the STD information she needs on the Wayback Machine. Defendants don't argue to the contrary. See Opp'n at 4 (pointing out that Dr. Liou could access "a copy of the 'CDC Contraceptive Guidance for Health Care Providers,'" but not discussing STD resources); Reply at 4.

Because of defendants' actions, Dr. Liou is suffering and will continue to suffer a harm that is "certain[,] great," "actual," and "imminen[t]." <u>Wis. Gas.</u>, 758 F.2d at 674. It is not merely that the lack of information makes it harder for her to do her job.[6] Dr. Liou cannot effectively do her job to address a "time-sensitive" Chlamydia outbreak that is happening <u>now</u>. <u>Cf. Sai v. Trans. Sec. Admin.</u>, 54 F. Supp. 3d 5, 10 (D.D.C. 2014) (explaining that an informational injury can "be sufficient to establish irreparable harm if the information sought is time-sensitive" (citation omitted)). <u>But see</u> Opp'n at 3–4. If the Court enjoins CDC "in the ordinary course of litigation," there will be no adequate relief to redress Dr. Liou's inability to address the ongoing outbreak. <u>See</u> <u>Wash. Post v. Dep't of Homeland Sec.</u>, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) (finding a likelihood of irreparable harm when information sought was relevant to an ongoing event of a short duration). No amount of money or other legal relief could remedy the fact that Dr. Liou was unable to work effectively on containing and shortening that outbreak.

Similarly, Dr. Ramachandran's work has been and will continue to be irreparably impeded because of defendants' conduct. In addition to teaching and researching, Dr. Ramachandran sees patients at a federally qualified health center and relies on CDC materials to prescribe treatment. Suppl. Ramachandran Decl. ¶ 3 (explaining her reliance on CDC resources for "guidance on contraception" and "PrEP medications"). Because the facility is federally qualified, many of Dr. Ramachandran's "patients are low income and lack access to transportation" and thus must "schedule transportation" with the clinic and contractors. <u>Id.</u> ¶ 5. Dr. Ramachandran therefore does not have the luxury of extending some patients' appointments. A patient must leave at his or

---

[6] <u>But see</u> Opp'n at 4 (arguing that plaintiff's harm amounts to "'[m]ere injuries . . . in terms of money, time and energy necessarily expended in the absence of a' temporary restraining order" (alterations in original) (quoting <u>Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n</u>, 259 F.2d 921, 925 (D.C. Cir. 1958)). Here, however, Dr. Liou isn't simply spending more time and energy doing her job than she was before the agencies removed the websites and datasets. She is unable to effectively do work that, in the absence of an immediate injunction, she will never be able to do again.

her transportation's scheduled time.  See id.  If delays—such as those caused by her inability to rely on CDC materials—result in her failing to give "all the care required during the patient visit[s], the patient[s] may need to wait weeks before they can schedule transportation to get back to the office to receive the treatment that [they] chose after [their] initial visit"—or the patient[s] might "never receive[] treatment at all." Id. ¶ 5.  And this is not speculation.  In the days since defendants took down the webpages, Dr. Ramachandran's "ability to treat [her] patients has been impeded by the loss of information previously publicly available." Id. ¶ 4.

Put simply, just as Dr. Liou has a time-limited ability to assist the Chlamydia outbreak, Dr. Ramachandran has a time-limited ability to treat certain patients at her clinic.  No backend remedy could ameliorate the inability to provide all required care during an appointment time to a patient who cannot return in the future.  For those reasons, DFA has established that it will suffer irreparable harm absent a temporary restraining order, and that no subsequent action in their litigation will "correct" his harm.

### III.    Balance of Equities and the Public Interest

Finally, the balance of equities and the public interest strongly favor DFA.  See generally Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016).  This opinion has documented the harm DFA members have suffered and will continue to suffer absent intervention, but the harm extends beyond them.  DFA has also supplied declarations from doctors around the country who, although not DFA members themselves, are representative of the widespread disruption that defendants' abrupt removal of these critical healthcare materials has caused.

Take Stephanie Cohen, Director of the STI/HIV Prevention Section of the San Francisco Department of Public Health.  See Decl. of Stephanie Cohen [ECF No. 8-1] ("Cohen Decl.") ¶ 1. Dr. Cohen explains that her Department—and "the entire public health community"—relies on

CDC resources and has been "severely impacted" by their sudden removal.  Id. ¶¶ 4–5.  Without these resources, doctors risk failing to provide "evidence-based clinical care," and local health departments are hindered in their ability to prepare for local and global disease outbreaks.  Id. ¶¶ 6, 8.  Accordingly, the disappearance of these resources has not gone unnoticed: Dr. Cohen began receiving "messages from providers in San Francisco and throughout the United States asking [her] if [she] had downloaded PDFs to share" "[i]mmediately" after the websites went down.  Id. ¶ 6.  Without these important resources, her colleagues "were unsure how to proceed with the usual, standard of care practice."  Id.

Or to reach even further, take the statement from six leading physician groups, which together represent more than 600,000 physicians.  See Statement from Leading Physician Groups on Removal of Data and Guidance from Federal Websites [ECF No. 8-3].  As these groups attest, the lost materials are more than "academic references—they are vital for real-time clinical decision-making in hospitals, clinics and emergency departments across the country."  Id.  Without them, health care providers and researchers are left "without up-to-date recommendations on managing infectious diseases, public health threats, essential preventive care and chronic conditions."  Id.  And so the groups call restoring the webpages "a public health imperative."  Id.

Finally, it bears emphasizing who ultimately bears the harm of defendants' actions: everyday Americans, and most acutely, underprivileged Americans, seeking healthcare.  These individuals rely on the care of doctors like Liou and Ramachandran.  If those doctors cannot provide these individuals the care they need (and deserve) within the scheduled and often limited time frame, there is a chance that some individuals will not receive treatment, including for severe, life-threatening conditions.  The public thus has a strong interest in avoiding these serious injuries to the public health.

Defendants, meanwhile, face a minimal burden if required to restore the public's access to resources, many of which defendants made public for many years. There is nothing in either the OPM memorandum or the record, and indeed defendants proffered no information at the hearing, to suggest the restoration of the removed webpages would pose a burden on the agencies' ability to engage in their work. See, e.g., Lawyers' Comm. for C.R. Under L. v. Presidential Advisory Comm'n on Election Integrity, 265 F. Supp. 3d 54, 71 (D.D.C. 2017). Similarly, there is no information to suggest that restoring public access would even interfere with the agencies' ongoing efforts to conform those resources with the President's executive orders.

## CONCLUSION

For the reasons above, the Court grants DFA's motion for temporary restraining order.[7] A separate Order will issue on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: February 11, 2025

---

[7] The Court declines to award DFA the full scope of its requested relief but orders relief that, at the hearing, DFA's counsel agreed is adequate to address the irreparable harm.