# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DOCTORS FOR AMERICA, et al. | |
| Plaintiffs, | |
| v. | Civil Action No. 25-cv-322-JDB |
| OFFICE OF PERSONNEL MANAGEMENT, et al. | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND EXPEDITED SUMMARY JUDGMENT

David Chiu
  *San Francisco City Attorney*
Yvonne R. Meré (*pro hac vice*)
  *Chief Deputy City Attorney*
Sara J. Eisenberg (*pro hac vice*)
  *Chief of Complex and Affirmative Litigation*
Julie Wilensky (*pro hac vice*)
David S. Louk (DC Bar No. 90022039)
  *Deputy City Attorneys*
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102
(415) 505-0844

*Counsel for Plaintiff City and County
of San Francisco*

Zachary R. Shelley (DC Bar No. 90021549)
Adina H. Rosenbaum (DC Bar No. 490928)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
zshelley@citizen.org

*Counsel for All Plaintiffs*

# CONTENTS

Introduction ................................................................................................................... 1

Background ..................................................................................................................... 2

    Executive Order 14168 and OPM's Memorandum .................................................. 2

    Removal of Data and Webpages ............................................................................... 4

    Plaintiffs Doctors for America and City and County of San Francisco ..................... 7

    Procedural History ................................................................................................... 8

Legal Standard ............................................................................................................. 10

Argument ...................................................................................................................... 11

I.      Plaintiffs are likely to succeed on the merits. ................................................... 11

    A. OPM's memorandum was unlawful. ................................................................. 11

        1.   OPM's memorandum exceeded its statutory authority ................................. 11

        2.   OPM's memorandum was arbitrary and capricious ...................................... 13

    B. The Health Agency Defendants' removal of webpages and datasets was unlawful .... 14

        1.   Removal of webpages and datasets was arbitrary and capricious. ................. 15

        2.   Removal of the webpages and datasets violated the Paperwork
            Reduction Act. ............................................................................................. 18

            a.   The Health Agency Defendants violated the PRA's requirement to
                provide timely and equitable access to public information. .............. 18

            b.   The Health Agency Defendants failed to observe procedures
                required by the PRA ......................................................................... 20

        3.   HHS, as well as components CDC, SAMHSA, NCHS, and CBHSQ,
            violated their duties under the Evidence-Based Policymaking Act ............... 22

            a.   The Statistical Agency Defendants violated their duties under
                the EBP by removing statistical information. ..................................... 23

            b.   The Statistical Agency Defendants violated their duties under the
                EBP by undermining statistical information with inaccurate
                disclaimers. ...................................................................................... 25

C.  Defendants' adoption of a policy that restricts access to vital health information was arbitrary and capricious. ................................................................. 26

    1.  Defendants failed to provide any explanation for the new policy. ................. 28

    2.  Defendants failed to explain their departure from existing policy issued to implement the Information Quality Act. ........................................................ 28

    3.  Defendants failed to explain their departure from the PRA and EBP. ........... 30

II.  Plaintiffs are suffering and will suffer irreparable injury absent a preliminary injunction. ................................................................................................................. 31

III.  The balance of the equities and the public interest favor Plaintiffs. ................................ 34

IV.  This court should enjoin implementation of Defendants' unlawful policy. ..................... 36

V.  Expedited summary judgment is warranted. ........................................................................ 38

Conclusion ................................................................................................................................. 38

# TABLE OF AUTHORITIES

**Cases**

*American Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ...................................................................................... 10

*Ass'n of Private Sector Colleges and Universities v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012) ........................................................................................ 20

*C.G.B. v. Wolf*,
    464 F. Supp. 3d 174 (D.D.C. 2020) ................................................................................ 34

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ........................................................................................................ 10

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ........................................................................................ 10

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ........................................................................................................ 12

*D.A.M. v. Barr*,
    474 F. Supp. 3d 45 (D.D.C. 2020) .................................................................................. 10

\* *DHS v. Regents of the University of California*,
    591 U.S. 1 (2020) ..................................................................................................... passim

*District of Columbia v. USDA*,
    444 F. Supp. 3d 1 (D.D.C. 2020) .................................................................................... 36

*East Texas Medical Center–Athens v. Azar*,
    337 F. Supp. 3d 1 (D.D.C. 2018) .................................................................................... 15

\* *Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) .................................................................................................. 26, 27

\* *FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .................................................................................................. 27, 28

*Fertilizer Instute v. EPA*,
    935 F.2d 1303 (D.C. Cir. 1991) ...................................................................................... 20

*Hedgeye Risk Management, LLC v. Heldman*,
    196 F. Supp. 3d 40 (D.D.C. 2016) .................................................................................. 38

*Kirwa v. DoD*,
    285 F. Supp. 3d 21 (D.D.C. 2017) .................................................................................. 11

iv

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012).................................................................................... 18

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
    526 U.S. 172 (1999).................................................................................... 36

\* *Motor Vehicle Manufacturers Ass'n of the United States v.*
    *State Farm Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983)............................................................................... 13, 15

*National Ass'n for Fixed Annuities v. Perez*,
    217 F. Supp. 3d 1 (D.D.C. 2016)................................................................ 38

*National Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012).................................................................. 27

*National Environmental Development Ass'n's Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014).................................................................... 15

*Open Communities Alliance v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017)............................................................ 34

*Perez v. Mortgage Bankers Ass'n*,
    575 U.S. 92 (2015).................................................................................... 13

*Republic Airline Inc. v. DOT*,
    669 F.3d 296 (D.C. Cir. 2012).................................................................... 27

*Rigdon v. Perry*,
    962 F. Supp. 150 (D.D.C. 1997)................................................................ 38

*Sackett v. EPA*,
    566 U.S. 120 (2012).................................................................................. 15

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947).................................................................................. 11

*United States Sugar Corp. v. EPA*,
    113 F.4th 984 (D.C. Cir. 2024)................................................................... 11

*United States v. Seefried*,
    639 F. Supp. 3d 8 (D.D.C. 2022)............................................................... 19

*United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service*
    *Workers International Union v. Federal Highway Administration*,
    151 F. Supp. 3d 76 (D.D.C. 2015).............................................................. 20

\*   *Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)............................................................................................ 12, 36

**Statutes**

5 U.S.C. § 706(2) ............................................................................................................. 15, 36

5 U.S.C. § 706(2)(A) ........................................................................................................ passim

5 U.S.C. § 706(2)(C) ............................................................................................................... 2

5 U.S.C. § 706(2)(D) .............................................................................................................. 2

28 U.S.C. § 1657(a) .............................................................................................................. 38

44 U.S.C. 3501 ..................................................................................................................... 18

44 U.S.C. § 3501(2) .............................................................................................................. 18

44 U.S.C. § 3501(7) .............................................................................................................. 18

44 U.S.C. § 3502(12) ............................................................................................................ 18

44 U.S.C. § 3506(d)(1) ......................................................................................................... 18

44 U.S.C. § 3506(d)(3) ......................................................................................................... 18

44 U.S.C. § 3563(a)(1) ......................................................................................................... 22

44 U.S.C. § 3563(c) .............................................................................................................. 22

44 U.S.C. § 3563(d)(4) ......................................................................................................... 22

**Regulations**

5 C.F.R. § 1321 ..................................................................................................................... 22

5 C.F.R. § 1321.2 .................................................................................................................. 22

5 C.F.R. § 1321.5(c) .............................................................................................................. 23

5 C.F.R. § 1321.5(c)(1) ......................................................................................................... 23

5 C.F.R. § 1321.5(d) ......................................................................................................... 23, 24

5 C.F.R. § 1321.7(a)(1) ..................................................................................................... 23, 26

5 C.F.R. § 1321.7(a)(1)(ii) ................................................................................................ 24, 26

5 C.F.R. § 1321.7(b) ............................................................................ 23, 24

**Federal Rules of Civil Procedure**

Rule 56(a) ................................................................................................ 10

Rule 56(c) ................................................................................................ 10

Rule 65(a)(2) ........................................................................................... 38

**Other Authorities**

AHRQ, About AHRQ, https://www.ahrq.gov/cpi/about/index.html ............................................. 35

American Heritage Dictionary of the English Language (2025),
      https://ahdictionary.com/ .................................................. 18, 21, 26

CBHSQ, CBHSQ Mission and Vision,
      https://www.samhsa.gov/data/about-us/our-mission ........................................ 35

CDC PrEP for the Prevention of HIV Infection in the U.S.: 2021 Guideline Summary,
      https://www.cdc.gov/hivnexus/media/pdfs/2024/04/cdc-hiv-together-brochure-prep
      guidelineupdate2021-provider.pdf ........................................................ 5

CDC, About CDC,
      https://www.cdc.gov/about/cdc/index.html ........................................... 35

CDC, About HIV Surveillance and Monitoring,
      https://www.cdc.gov/hiv-data/about/index.html ......................................... 5

CDC, About YRBSS,
      https://www.cdc.gov/yrbs/about/index.html ......................................... 4

CDC, Data and Statistics,
      https://www.cdc.gov/healthy-youth/data-statistics/index.html ......................... 5

CDC, Infection Control: Guidelines and Guidance Library,
      https://www.cdc.gov/infection-control/hcp/guidance/index.html ..................... 14, 15, 19

CDC, Mpox Infection Control,
      https://www.cdc.gov/mpox/hcp/infection-control/index.html ..................... 14, 15, 19

CDC, Social Vulnerability Index,
      https://www.atsdr.cdc.gov/place-health/php/svi/index.html ............................. 5

CMS, About Us,
      https://www.cms.gov/about-cms .................................................... 35

Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring
     Biological Truth to the Federal Government (Jan. 20, 2025),
     https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-
     gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-
     government/. ..................................................................................................... 3, 12, 13

FDA, Study of Sex Differences in the Clinical Evaluation of Medical Products,
     https://www.fda.gov/regulatory-information/search-fda-guidance-documents/
     study-sex-differences-clinical-evaluation-medical-products ............................................ 6

FDA, What We Do,
     https://www.fda.gov/about-fda/what-we-do ...................................................... 35

Fundamental Responsibilities of Recognized Statistical Agencies and Units,
     89 Fed. Reg. 82453 (Oct. 11, 2024)................................................................ 22

Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of
     Information Disseminated by Federal Agencies; Republication, 67 Fed. Reg. 8452 (Feb.
     22, 2002) ...................................................................................................... 28

HHS, About HHS,
     https://www.hhs.gov/about/index.html.............................................................. 35

HHS, Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and
     Integrity of Information Disseminated to the Public, https://aspe.hhs.gov/hhs-guidelines-
     ensuring-maximizing-disseminated-information ...................................................... passim

HRSA, About HRSA,
     https://www.hrsa.gov/about ............................................................................... 35

HRSA, About TargetHIV,
     https://targethiv.org/about.................................................................................. 6

HRSA, Caring for Women with Opioid Use Disorder,
     https://www.hrsa.gov/sites/default/files/hrsa/owh/caring-women-opioid-disorder.pdf ..... 7

Memorandum Re: Initial Guidance Regarding President Trump's Executive Order Defending
     Women, Charles Ezell, Acting Director, U.S. Office of Personnel Management
     (Jan. 29, 2025), https://www.opm.gov/media/yvlh1r3i/opm-memo-initial-guidance-
     regarding-trump-executive-order-defending-women-1-29-2025-final.pdf. .............. passim

Merriam-Webster (2025),
     https://www.merriam-webster.com/ ......................................................... 18, 21

NCHS, NCHS Mission and Vision,
     https://www.cdc.gov/nchs/about/mission.html............................................... 36

NIH, Abortion,
    https://medlineplus.gov/abortion.html ............................................................... 7

NIH, About the NIH,
    https://www.nih.gov/about-nih/what-we-do/nih-almanac/about-nih ............................... 36

NIH, Disparidades de la salud,
    https://medlineplus.gov/spanish/healthdisparities.html ....................................... 7

SAMHSA, Our Mission and Vision,
    https://www.samhsa.gov/about/mission-vision ............................................... 36

Websters Dictionary 1828 (2025),
    https://webstersdictionary1828.com/ ............................................................ 26

**INTRODUCTION**

On January 29, 2025, the Office of Personnel Management (OPM) issued a memorandum requiring agencies to take down webpages that "inculcate[d] or promote[d] gender ideology" by 5:00 p.m. on Friday, January 31. By 5:00 p.m. on January 31, the Department of Health and Human Services (HHS) and its agency components, including the Centers for Disease Control and Prevention (CDC), the Food and Drug Administration (FDA), the Agency for Healthcare Research and Quality (AHRQ), the Center for Behavioral Health Statistics and Quality (CBHSQ), the Centers for Medicare & Medicaid Services (CMS), the Health Resources and Services Administration (HRSA), the National Center for Health Statistics (NCHS), the National Institutes of Health (NIH), and the Substance Abuse and Mental Health Services Administration (SAMHSA), (collectively Health Agency Defendants) had removed from publicly accessible websites a broad range of health-related webpages and datasets. The Health Agency Defendants provided no public warning that the resources would disappear, and they provided no reasoned explanation for denying access to the information.

The webpages that Defendants took down are essential to ensuring that doctors can provide timely care to patients, that researchers can make breakthroughs that improve the health of the nation, and that local governments and public health officials can respond to disease outbreaks. Defendants' sudden take-down of webpages left health professionals—including healthcare providers, researchers, and public health practitioners—scrounging for alternative resources, but alternatives either take more time to access, do not provide the same quality of information, or do not exist at all.

Defendants' actions were unlawful and reflect a dangerous new policy adopted in violation of the Administrative Procedure Act (APA). OPM's memorandum was issued in excess of its

statutory authority and was arbitrary and capricious. *See* 5 U.S.C. §§ 706(2)(A), (C). The Health Agency Defendants' removal of the webpages was arbitrary, capricious, and not in accordance with law, including the Paperwork Reduction Act of 1995 (PRA) and the Foundations for Evidence-Based Policymaking Act of 2018 (EBP)—statutes enacted to ensure that agencies do not abruptly and arbitrarily revoke access to important resources and to ensure that the public has timely access to reliable, unbiased information. *See id.* § 706(2)(A). The removal was also undertaken without observance of required procedures. *See id*. § 706(2)(D). Defendants' adoption of their new policy, which precipitated the removals, was also arbitrary and capricious. *See id.* § 706(2)(A).

This Court should act immediately to enter a preliminary injunction requiring Defendants to restore the webpages and datasets taken down in response to the OPM memorandum and Defendants' new policy. In addition, because the merits of this action are clear, this Court should enter a final order granting summary judgment for Plaintiffs without delay, setting aside Defendants' unlawful actions, ordering Defendants to restore public access to all the webpages and datasets that were removed pursuant to Defendants' unlawful policy, and enjoining Defendants from further implementing their unlawful policy.

## BACKGROUND

### Executive Order 14168 and OPM's Memorandum

On January 20, 2025, President Donald Trump issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Executive Order 14168, Defending Women from Gender Ideology

Extremism and Restoring Biological Truth to the Federal Government (Jan. 20, 2025). [1] The Order directed agencies to combat what the President described as "gender ideology," including by requiring agencies to "use the term 'sex' and not 'gender' in all applicable Federal policies and documents." *Id*.

On January 29, 2025, Charles Ezell, the Acting Director of OPM, issued a memorandum titled "Initial Guidance Regarding President Trump's Executive Order *Defending Women*." Memorandum Re: Initial Guidance Regarding President Trump's Executive Order Defending Women, Charles Ezell, Acting Director, U.S. Office of Personnel Management (Jan. 29, 2025) (OPM Mem.).[2] The memorandum directed that "[n]o later than 5:00 p.m. EST on Friday, January 31, 2025," agency heads must, among other things, "terminate any [agency programs] that promote or inculcate gender ideology" and "[t]ake down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology." *Id*. It also directed agency heads to "report to OPM on all steps taken to implement" the memorandum. *Id.*

The OPM memorandum states that 5 U.S.C. §§ 1103(a)(1), (5) provided OPM statutory authority to issue the directive. *Id.* Those statutory provisions state that the Director of OPM is responsible for "securing accuracy, uniformity, and justice in the functions of" OPM, 5 U.S.C. § 1103(a)(1), and for "executing, administering, and enforcing: (A) the civil service rules and regulations of the President and the Office and the laws governing the civil service; and (B) the other activities of the Office including retirement and classification activities; except with respect

---

[1]     https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/.

[2]     https://www.opm.gov/media/yvlh1r3i/opm-memo-initial-guidance-regarding-trump-executive-order-defending-women-1-29-2025-final.pdf.

to functions for which the Merit Systems Protection Board or the Special Counsel is primarily responsible." *Id*. § 1103(a)(5).

**Removal of Data and Webpages**

HHS and its component agencies adopted OPM's memorandum as their own policy. *See* AR HHS0031 ("The Office of Personnel Management has provided initial guidance … and HHS and divisions are acting accordingly to execute."); *id.* HHS0056 (listing OPM "directives" that HHS officials were to follow); *id.* HHS0059 (adopting OPM's timeline for compliance); *id.* HHS0062 (requiring "immediate actions" to comply with January 31 deadline).[3] Following OPM's directions, the Health Agency Defendants took down numerous webpages and databases related to medical treatment and public health that served as resources for clinicians, researchers, and the general public. *See, e.g.*, AR HHS001–29, 33–55; Second Declaration of Dr. Susan Philip (Philip Decl.) ¶ 8; Declaration of Dr. Reshma Ramachandran (Ramachandran Decl.) ¶¶ 5. After CDC did so, it posted a statement on remaining pages throughout its website that "CDC's website is being modified to comply with President Trump's Executive Orders." First Declaration of Dr. Susan Philip ¶ 5, ECF 8-2. The Health Agency Defendants have provided no other explanation or justification for removal of the webpages and datasets.

For instance, the CDC took down a webpage titled "The Youth Risk Behavioral Surveillance System" that "identifie[d] emerging issues, and plans and evaluates programs to support youth health" and "g[ave] the best picture of what is going on at national, state, and local levels." CDC, About YRBSS, https://www.cdc.gov/yrbs/about/index.html;[4] *see* AR HHS0004;

---

[3] "AR" refers to the Administrative Record submitted by Defendants.

[4] This and other webpages cited in this subsection are currently active because Defendants restored the pages following the Court's Temporary Restraining Order, and they contain a disclaimer to that effect. *See id.*

Declaration of Dr. Daniel Debowy (Debowy Decl.) ¶¶ 4–6. The CDC had noted that this information was "used by health departments, educators, lawmakers, doctors, and community organizations to inform school and community programs, communications campaigns, and other efforts." *Id.* Among the other pages that the CDC took down are webpages titled "Data and Statistics" for "Adolescent and School Health," CDC, Data and Statistics, https://www.cdc.gov/healthy-youth/data-statistics/index.html; AR HHS0006.1; webpages titled "The Social Vulnerability Index" that provided information and datasets that "help public health officials and local planners better prepare for and respond to emergency events with the goal of decreasing human suffering, economic loss, and health inequities," CDC, Social Vulnerability Index, https://www.atsdr.cdc.gov/place-health/php/svi/index.html; *see* AR HHS0006; a report on "PrEP for the Prevention of HIV Infection in the U.S.: 2021 Guideline Summary" that gave "health care providers the latest information on prescribing pre-exposure prophylaxis (PrEP) for HIV prevention to their patients and increasing PrEP use by people who could benefit from it," CDC PrEP for the Prevention of HIV Infection in the U.S.: 2021 Guideline Summary, https://www.cdc.gov/hivnexus/media/pdfs/2024/04/cdc-hiv-together-brochure-prepguideline update2021-provider.pdf; *see* AR HHS0008; webpages on "HIV Surveillance and Monitoring" that provided information and datasets gathered from public health labs, healthcare systems, and population surveys on, among other things, risk behaviors, testing behaviors, and prevention to help guide research and local public health efforts to reduce HIV transmission, CDC, About HIV Surveillance and Monitoring, https://www.cdc.gov/hiv-data/about/index.html; AR HHS0009; and a webpage titled "Interim Clinical Considerations for Use of Vaccine for Mpox Prevention in the United States" that provided vaccine guidelines for clinicians. AR HHS0015.

Among the pages that the FDA took down were pages that provided important information for researchers who develop or study clinical trials, including a webpage titled "Study of Sex Differences in the Clinical Evaluation of Medical Products" that provided "recommendations for increasing enrollment of females in clinical trials, analyzing and interpreting sex-specific data, and including sex-specific information in regulatory submissions of medical products" in order "to help ensure the generalizability of results and facilitate exploration of potential differences in effects by sex." FDA, Study of Sex Differences in the Clinical Evaluation of Medical Products, https://www.fda.gov/regulatory-information/search-fda-guidance-documents/study-sex-differences-clinical-evaluation-medical-products; AR HHS0034. As another example, the FDA removed a webpage titled "Diversity Action Plans to Improve Enrollment of Participants from Underrepresented Populations in Clinical Studies" that provided information on regulatory requirements for novel drugs and devices intended to improve enrollment of underrepresented populations across age, sex, and race and ethnicity in clinical studies to ensure the accuracy and reliability of results across demographic groups. *Id.*

HHS components AHRQ, HRSA, CMS, NIH, SAMHSA, and SAMHSA's subcomponent CBHSQ likewise removed numerous webpages and datasets that served as resources to clinicians, researchers, and government public health agencies. Among those removed from AHRQ's website is a webpage on "Endometriosis: A Common and Commonly Missed and Delayed Diagnosis." HHS0002. Among those removed from HRSA's website are a report on "Caring for Women with Opioid Use Disorder" and a website that provided a "one-stop shop for technical assistance (TA) and training resources for HRSA's Ryan White HIV/AIDS Program (RWHAP), the federal program that funds local and state agencies to deliver HIV care for people with HIV who do not have full health insurance." HRSA, About TargetHIV, https://targethiv.org/about; *see* HRSA,

Caring for Women with Opioid Use Disorder, https://www.hrsa.gov/sites/default/files/hrsa/ owh/caring-women-opioid-disorder.pdf; AR HHS0047. Among those removed from NIH's website are webpages that provide physicians, patients, and researchers with information about abortion and webpages that provide physicians, patients, and researchers with information about health disparities in Spanish. *See* NIH, Abortion, https://medlineplus.gov/abortion.html; NIH, Disparidades de la salud, https://medlineplus.gov/spanish/healthdisparities.html. And among those removed from SAMHSA and CBHSQ's website are webpages for the 2023 Adolescent LGB+ Behavioral Health Report, which derives from CBHSQ's National Survey on Drug Use and Health (NSDUH). AR HHS0050–51.

**Plaintiffs Doctors for America and City and County of San Francisco**

Plaintiff Doctors for America (DFA) is a membership organization of doctors, other health professionals, and medical trainees. Ramachandran Decl. ¶¶ 3–4. Plaintiff the City and County of San Francisco (the City) is a municipal corporation organized and existing under and by virtue of the laws of the State of California. The San Francisco Department of Public Health (SFDPH) is a constituent department of the City, with the mission of protecting and promoting the health of all San Franciscans. Philip Decl. ¶ 2.

DFA members and the City relied on webpages and datasets on the websites of HHS and its component agencies. For many DFA members and healthcare providers and public health practitioners at City agencies, the removal of webpages and datasets have forced them to scramble (often unsuccessfully) in search of alternative resources to guide how they treat patients; slowed their clinical practices or reduced the amount of information they can convey to patients in time-limited visits; and paused or slowed their vital research or public health efforts. *See* Ramachandran Decl. ¶ 7–20; Declaration of Dr. Han Yu Stephanie Liou (Liou Decl.) ¶ 3–11; Second Declaration

of Dr. Stephanie Cohen (Cohen Decl.) ¶¶ 4, 6–14; Philip Decl. ¶¶ 13–21; Debowy Decl. ¶ 5; Declaration of Dr. Eugenia Siegler (Siegler Decl.) ¶¶ 5–7; Declaration of Dr. Kathryn Harris (Harris Decl.) ¶¶ 5–7. The lack of access harms patients whose care is entrusted to DFA members or the City's employees by delaying care, making it harder to detect and respond to disease outbreaks that place the patients at risk, and hindering communications between doctors and their patients. *See* Ramachandran Decl. ¶¶ 7–9, 12–20; Liou Decl. ¶ 3–11; Cohen Decl. ¶ 4, 8–10, 12, 14; Philip Decl. ¶ 12; Debowy Decl. ¶¶ 5–6; Declaration of Dr. McKayla E. Saine (Saine Decl.) ¶ 3–5; *see also infra* II–III.

**Procedural History**

DFA filed this action on February 4, 2025. Complaint, ECF 1. On February 11, 2025, this Court entered a Temporary Restraining Order (TRO), requiring Defendants "by not later than 11:59 pm on February 11, 2025, [to] restore to their versions as of January 30, 2025, each webpage and dataset identified by [DFA] on pages 6–12 of its Memorandum of Law in Support of the Motion for a Restraining Order" and "in consultation with [DFA], identify any other resources that DFA members rely on to provide medical care and that defendants removed or substantially modified on or after January 29, 2025, without adequate notice or reasoned explanation; and defendants shall, by February 14, 2025, restore those resources to their versions as of January 30, 2025." Order, ECF 11.

The Health Agency Defendants restored the webpages and datasets identified by DFA as of February 14, 2025. Joint Status Report, ECF 13; Joint Status Report, ECF 23, ¶ 2. After that date, Plaintiffs continued to discover webpages that the Health Agency Defendants had removed and on which Plaintiffs rely. *See* Declaration of Angie Bakke (Bakke Decl.) ¶¶ 5–6; Cohen Decl. ¶ 13–14. Because those webpages were not identified by February 14, 2025, HHS has not restored

them. In addition, the Health Agency Defendants added to the webpages that it did restore a disclaimer stating:

> Per a court order, HHS is required to restore this website as of February 14, 2025 at 11:59 p.m. Any information on this page promoting gender ideology is extremely inaccurate, and disconnected from the immutable biological reality that there are two sexes, male and female. The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation, and to women, by depriving them of their dignity, safety, well-being, and opportunities. This page does not reflect biological reality and therefore the Administration and this Department rejects it.

*See, e.g.*, SAMHSA, 2023 Adolescent LGB+ Behavioral Health Report, https://www.samhsa.gov/ data/report/lgb-adolescent-behavioral-health-2023; Philip Decl., Ex. A (screenshot of disclaimer on restored webpage).

On February 18, 2025, Plaintiffs filed their First Amended Complaint, which added the City as a plaintiff, identified additional HHS component agencies that had removed webpages and datasets, and elaborated on Plaintiffs' claims. *See* First Amended Complaint, ECF 20.

Defendants have represented that they are reviewing the webpages restored pursuant to the TRO or specifically identified in the amended complaint "to determine the applicability of" the PRA, the Information Quality Act (IQA), and the EBP. Joint Status Report, ECF 23 at 3. Defendants further represented that "[o]nce a website or dataset has been reviewed, Defendants will promptly take the necessary measures to comply with the [PRA, IQA, and EBP], *if Defendants determine such statutes apply to a particular website or dataset, while implementing Executive Order 14168*." *Id.* (emphasis added). Thus, at this time, Defendants have agreed to restore *only* webpages and datasets identified by February 14 or in the amended complaint and, as to those, *only* if Defendants agree that the law requires them to do so. As of the date of this filing, Defendants have provided no further updates on their compliance review.

## LEGAL STANDARD

"To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted). "When the movant seeks to enjoin the government, the final two … factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 where the moving party "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party carries that initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The nonmoving party's opposition must consist of competent evidence setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. In a challenge under the APA, "the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote omitted) (collecting cases).

## ARGUMENT

### I.    Plaintiffs are likely to succeed on the merits.

OPM's directive to remove webpages with certain characteristics and HHS's removal of such webpages and datasets are unlawful for several independent reasons. Plaintiffs "need only show likelihood of success on one claim to justify [preliminary] injunctive relief." *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 35 (D.D.C. 2017) (internal quotation marks and citation omitted). Here, however, Plaintiffs are entitled, not just likely, to succeed on the merits of each claim.

### A.  OPM's memorandum was unlawful.

#### 1.  OPM's memorandum exceeded its statutory authority.

OPM's memorandum directed the "Heads and Acting Heads of Departments and Agencies" to "[t]ake down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology" and to "report to OPM on all steps taken to implement this guidance." OPM Mem. The memorandum stated that 5 U.S.C. §§ 1103(a)(1), (5) gave OPM authority to issue this direction to other agencies. *See* OPM Mem. Those statutory provisions, however, which concern the OPM Director's authority over OPM's internal operations and authority with respect to execution of civil service rules for government personnel, do not provide authority for OPM's action. OPM's direction to HHS (and other agencies) therefore exceeded its statutory authority. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding that a "reviewing court … must judge the propriety of [agency] action solely by the grounds invoked by the agency" at the time of the action); *see also United States Sugar Corp. v. EPA*, 113 F.4th 984, 997 (D.C. Cir. 2024) ("To determine 'whether an agency has acted within its statutory authority,' [courts]

use 'the traditional tools of statutory construction.'" (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024))).

Moreover, to the extent that OPM purported to be effectuating Executive Order 14168, reliance on that Executive Order cannot assist OPM here. An executive order cannot expand authority beyond that delegated to an agency by Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952) (holding that the President may not usurp Congress's lawmaking power by issuing an order that "directs that a presidential policy be executed in a manner prescribed by the President" rather than "direct[ing] that a congressional policy be executed in a manner prescribed by Congress"); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) ("The legislative power of the United States is vested in the Congress, and the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by the Congress and subject to limitations which that body imposes."). Indeed, the Executive Order specifically disclaimed any intention to do so. *See* EO 14168, sec. 8(a) ("Nothing in this order shall be construed to impair or otherwise affect … the authority granted by law to an executive department or agency, or the head thereof[.]").[5]

In short, OPM had no authority to direct other agencies to remove information from their websites. Its memorandum requiring the agencies to do so exceeded its statutory authority and should be set aside. *See* 5 U.S.C. § 706(2)(C).

---

[5] The Executive Order also does not even arguably vest OPM with authority to instruct other agencies with respect to web content. With respect to OPM, the Executive Order states only that OPM "shall implement changes to require that government-issued identification documents … accurately reflect the holder's sex, as defined under section 2 of this order" and that OPM "shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order." EO 14168, sec. 3(d).

### 2. OPM's memorandum was arbitrary and capricious.

OPM's memorandum is also arbitrary and capricious. 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious when it is not the product of "reasoned decisionmaking." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan* v. *EPA*, 576 U.S. 743, 750 (2015)). Thus, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). If the agency "failed to consider an important aspect of the problem," its action is arbitrary and capricious. *Id.*

When it issued the memorandum, OPM did not explain why it was directing that "each agency" take certain actions. OPM Mem.; *see* AR OPM 0001–0012 (OPM's administrative record consisting exclusively of Executive Order 14168 and OPM's memorandum). To the extent that the OPM memorandum suggests that Executive Order 14168 justifies its direction, mere reference to the Executive Order is not a reasoned explanation for several reasons. First, as explained above, the Executive Order did not instruct OPM to give direction to other agencies with respect to their webpages. Second, section 8(b) of the Executive Order directed that the "order shall be implemented consistent with applicable law," but the only law cited by OPM was wholly inapposite. And the short deadline it provided left no space for agency heads to take proper consideration of the impacts and legality of their actions.

The memorandum also failed to address the significant reliance interests on the webpages that OPM directed to be removed. Where an agency's actions have "engendered serious reliance interests," the agency must provide a "more substantial justification" than usual. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015) (internal quotation marks and citation omitted); *see*

*Regents of the Univ. of California*, 591 U.S. at 33 (holding that where an agency is "not writing on a blank slate, it [is] required to assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns" (internal quotation marks and citation omitted)). Here, OPM directed agencies to take down webpages, many of which the agencies had maintained for years. And the Health Agency Defendants had developed resources specifically intended for use by individuals like DFA members and the City. *See* Ramachandran Decl. ¶¶ 9, 17; *see, e.g.*, CDC, Infection Control: Guidelines and Guidance Library, https://www.cdc.gov/infection-control/hcp/guidance/index.html ("Infection control guidelines and recommendations for healthcare settings."); CDC, Mpox Infection Control, https://www.cdc.gov/mpox/hcp/infection-control/index.html ("See guidelines for infection control in healthcare settings, at home, and when handling human remains."). That target audience incorporated the webpages and datasets into their daily work and relied heavily on the resources to keep their patients, and the public, healthy. Ramachandran Decl. ¶¶ 7–9, 12–20; Liou Decl. ¶ 3–11; Cohen Decl. ¶¶ 4, 6–14; Philip Decl. ¶ 13–21; Debowy Decl. ¶ 5; Siegler Decl. ¶¶ 5–7; Harris Decl. ¶ 3–7. Yet OPM made no mention of how the required removal would impact any reliance interests. Likewise, nothing in the Administrative Record shows any such consideration.

Because OPM failed to consider important issues raised by its memorandum and the actions it directed, its instruction was arbitrary and capricious.

**B. The Health Agency Defendants' removal of webpages and datasets was unlawful.**

The removal of the webpages and datasets was likewise arbitrary, capricious, and not in accordance with law. *See* 5 U.S.C. § 706(2)(A). As this Court has noted, nothing in the Executive Order, the OPM memorandum, or any website statement by Defendants "indicates the removals were discretionary or interlocutory." Mem. Op., ECF 12 at 12. And that HHS "may restore the

removed webpages in the future does not mean that the agency's prior removal decision was not the consummation of an agency's decisionmaking process." *Id.* (citing *Sackett v. EPA*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might reconsider … does not suffice to make an otherwise final agency action nonfinal."); *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future.") (citation omitted)). In addition, Plaintiffs have a right to the information. *See* Pltf. Reply, ECF 10 at 5. Accordingly, the APA requires that the unlawful decisions to remove the webpages and datasets "shall" be set aside, 5 U.S.C. § 706(2), and that the information be restored.

**1.    Removal of webpages and datasets was arbitrary and capricious.**

Like OPM, the Health Agency Defendants failed to offer a reasoned explanation for their actions. *See Regents of the Univ. of Cal.*, 591 U.S. at 16; *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43. Indeed, with few exceptions, neither HHS nor any of its components provided any explanation for taking webpages and datasets offline. They therefore not only failed to offer a reasoned explanation for the removals, they "fail[ed] to offer *any* explanation at all." *See E. Texas Med. Ctr.–Athens v. Azar*, 337 F. Supp. 3d 1, 15 (D.D.C. 2018).

HHS and its components posted the webpages and datasets to fulfill their roles as public health agencies and to serve individuals like DFA members and local governments like the City, and they understood that the webpages were widely used by those target audiences. *See* Ramachandran Decl. ¶ 9, 17; *see, e.g.*, CDC, Infection Control: Guidelines and Guidance Library, https://www.cdc.gov/infection-control/hcp/guidance/index.html ("Infection control guidelines and recommendations for healthcare settings."); CDC, Mpox Infection Control, https://www.cdc.gov/mpox/hcp/infection-control/index.html ("See guidelines for infection

control in healthcare settings, at home, and when handling human remains."). Health professionals regularly relied on removed webpages that provided current evidence and guidelines for providing clinical care, provided information to clinician-investigators on conducting clinical trials, and contained data that informed targeted public-health interventions. For example, health professionals had relied on a CDC webpage with guidelines on "PrEP for the Prevention of HIV Infection in the U.S" to "stay up to date with best practices," Liou Decl. ¶ 7, and to ensure they take account of important "considerations for administering various options of PrEP treatment to different patient populations," Ramachandran Decl. ¶ 9; *see also* Saine Decl. ¶ 5. When these webpages were removed, healthcare "providers were unsure how to proceed with the usual, standard of care practice." Cohen Decl. ¶ 4. The record includes no evidence suggesting that, when they removed those materials, the Health Agency Defendants gave any consideration to the harm that doing so would inflict. *See* AR HHS0001–0066;[6] *see also* Mem. Op., ECF 12 at 16 ("By removing long relied upon medical resources without explanation, it is likely that … each agency failed to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43)).

In this regard, the paucity of the Administrative Record itself is telling. The portion of the Administrative Record submitted by the Health Agency Defendants provides no indication that they gave any thought to the consequences of their actions or engaged in reasoned decisionmaking. For example, the Administrative Record shows that the entire "Getting Tested for HIV" webpage was removed merely because one paragraph on the page "says pregnant people," AR HHS0011,

---

[6] The one limited exception is an FDA email stating that officials should "hold off on making any changes" temporarily if compliance would "impact a mission-critical activity." AR HHS0063.

and that other pages were removed merely because the pages included the terms "gender" or "gender identity." AR HHS0036; *see id.* HHS0062 ("Scrub your sections of content on FDA.gov for any mentions of 'pronouns' and remove this content immediately."). Aside from these brief (and inadequate) explanations, the Administrative Record shows only that the Health Agency Defendants took down webpages and datasets because OPM "has provided initial guidance on both Executive Orders and HHS and divisions are acting accordingly to execute." *Id*. HHS0031. But reliance on the OPM memorandum does not make the removals reasonable, both because OPM lacked authority to direct the Health Agency Defendants to take any such action and, in any event, because the pages taken down were not a reasonable response to the OPM memorandum.

Like the other Health Agency Defendants, CDC typically provided no explanation for the removals. *See, e.g.*, AR HHS0002–10, 12–21, 23–29 (stating only that specific webpages were removed). On some portions of its website, though, when CDC removed webpages and datasets it posted a banner stating that "CDC's website is being modified to comply with President Trump's Executive Orders." First Declaration of Dr. Susan Philip ¶ 5, ECF 8-2. But it did not explain why "comply[ing] with President Trump's Executive Orders" required removing certain pages, and it did not grapple with an important aspect of the problem: that removing the webpages would harm the healthcare system, harm patients, increase the threat of disease outbreaks, impede development of scientific research, and damage physicians, public health professionals, researchers, and patients who relied on the information.

That the Health Agency Defendants failed to produce even a single document from the Administrative Record showing that they gave any thought to what they were doing beyond very broadly following OPM's unlawful directive is telling. In short, because the Health Agency Defendants did not engage with the obvious harmful consequences of removing access to public

health information on its websites, and because the only reason noted is wholly inadequate, the agencies' removal of the webpages and datasets was arbitrary and capricious.

    **2.    Removal of the webpages and datasets violated the Paperwork Reduction Act.**

The APA provides that a reviewing court "shall" hold unlawful and set aside agency actions "not in accordance with law." 5 U.S.C. § 706(2)(A); *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 220 (2012) (referring to a claim that an agency has "violate[d] a federal statute" as "a garden-variety APA claim"). Here, HHS's removal of webpages and datasets failed to comply with two distinct requirements of the PRA.

    **a.  The Health Agency Defendants violated the PRA's requirement to provide timely and equitable access to public information.**

Congress enacted the PRA to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government" and to "provide for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public and makes effective use of information technology." 44 U.S.C. §§ 3501(2), (7). To accomplish these goals, Congress mandated that every agency "ensure that the public has timely and equitable access to the agency's public information." *Id.* § 3506(d)(1).

The PRA defines "public information" as "any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public." *Id.* § 3502(12). While the PRA does not define the term "timely," the word's ordinary meaning is "[o]ccuring at a suitable or opportune time; well-timed." Am. Heritage Dictionary of the English Language (2025) ("timely"), https://ahdictionary.com/word/search.html?q=timely; *see* Merriam-Webster (2025) ("timely"), https://www.merriam-webster.com/dictionary/timely ("coming early or at the right

time"; "appropriate or adapted to the times or occasion"; "in time"); *see United States v. Seefried*, 639 F. Supp. 3d 8, 10 (D.D.C. 2022) (noting that courts look to dictionary definitions to discern plain meaning). Here, HHS's removal of webpages and datasets denies "timely" access to "public information" for two reasons.

First, because HHS revoked all public access to the webpages and datasets by removing them from its websites, it effectively revoked access to that information. And to state the obvious, access to information cannot be "at the right time" if there is no access at all.

Second, whether access to information is timely depends in part on whether the information is intended to be accessed and used on an as-needed basis. Here, many of the webpages compile recommendations for healthcare providers and are therefore uniquely useful in the clinical setting. Ramachandran Decl. ¶¶ 9, 17; *see, e.g.*, CDC, Infection Control: Guidelines and Guidance Library, https://www.cdc.gov/infection-control/hcp/guidance/index.html ("Infection control guidelines and recommendations for healthcare settings."); CDC, Mpox Infection Control, https://www.cdc.gov/mpox/hcp/infection-control/index.html ("See guidelines for infection control in healthcare settings, at home, and when handling human remains."). In that setting, it is critical for information to be accessible as quickly as possible. Ramachandran Decl. ¶¶ 13–17. If information takes even just a few extra minutes to access, that delay could mean the denial of care. *Id.* That same principle also applies to webpages that were designed to assist in responding to disease outbreaks and to support communications between healthcare providers and their patients. In the settings when those documents are used—during public health responses and in standard patient visits with healthcare providers—time is of the essence, and delays accessing the information impose serious health risks. *See* Liou Decl. ¶ 7; Cohen Decl. ¶ 9. By eliminating the

19

ability to access the information via a simple internet search, Ramachandran Decl. ¶ 21, HHS has denied Plaintiffs' right of timely access.

### b. The Health Agency Defendants failed to observe procedures required by the PRA.

Through the PRA, Congress mandated agencies to "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." 44 U.S.C. § 3506(d)(3). When Congress has set out a procedural requirement, such as a requirement to provide notice or an opportunity to comment prior to agency action, and the agency fails to satisfy that requirement, this Court has found the action to be both "not in accordance with law and without observance of procedure required by law, in violation of Section 706 of the APA."[7] *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Fed. Highway Admin.*, 151 F. Supp. 3d 76, 93–94 (D.D.C. 2015) (internal quotation marks omitted). Here, the removal of webpages and datasets failed to observe the PRA's adequate notice requirement.

HHS, like numerous agencies, has explained that the term "information dissemination product" includes "any electronic document … or web page" that an agency disseminates to the public. HHS, Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated to the Public (HHS Guidelines), https://aspe.hhs.gov/hhs-guidelines-ensuring-maximizing-disseminated-information. Here, the datasets and webpages that

---

[7] Although agency action that fails to follow required procedures "[o]rdinarily … cannot be afforded the force and effect of law," the D.C. Circuit has occasionally permitted agency action to stand while an agency corrects procedural flaws if "equity demands." *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (internal quotation marks and citations omitted). As discussed below, the equities do not weigh in favor of allowing the agencies' unlawful actions to stand while HHS undertakes required procedures.

HHS removed are all "electronic document[s]" or "web page[s]" that the agency had disseminated to the public, *id.*, and, therefore, are all information dissemination products.

Each of the datasets and webpages is also a "significant information dissemination product." Although the PRA does not define the terms "significant" or "significant information dissemination product," the ordinary meaning of "significant" is "having or likely to have influence or effect: important." Merriam-Webster (2025) ("significant"), https://www.merriam-webster.com/dictionary/significant; *see* Am. Heritage Dictionary of the English Language (2025) ("significant"), https://ahdictionary.com/word/search.html?q=significant ("having or expressing a meaning," and "having or likely to have a major effect; important").

The datasets and webpages that the agencies removed are undoubtably "important." Many of the webpages guide medical practice, are essential to groundbreaking public health research, and are key to preventing disease outbreaks. *See* Ramachandran Decl. ¶¶ 7–20; Liou Decl. ¶¶ 3–11; Debowy Decl. ¶¶ 4–6; Saine Decl. ¶¶ 3–5; Siegler Decl. ¶¶ 5–7; Harris Decl. ¶¶ 3–7; Cohen Decl. ¶¶ 4, 8–10, 12, 14; Philip Decl. ¶ 12. Other pages are focused principally on communicating with broader populations or on providing physicians with background information on health disparities that will inform their practice. Liou Decl. ¶¶ 8, 10; Saine Decl. ¶ 4. Those materials facilitate communication between health professionals and the people whose health they are entrusted with protecting. Liou Decl. ¶¶ 8–10; Saine Decl. ¶ 4. Because the removed pages have a substantial impact on the success of the healthcare system, they qualify as significant information dissemination products.

Accordingly, the agencies were required to provide "adequate notice" before removing them. 44 U.S.C. § 3506(d)(3). HHS, however, failed to provide *any* notice at all. Without notice, DFA members' clinical practices and research were thrown into disarray, and the City experienced

disruptions to its health clinics and public health efforts. *See* Ramachandran Decl. ¶¶ 9, 12–13, 17; Liou Decl. ¶ 7–9, 11; Cohen Decl. ¶ 4. The PRA was intended to prevent just that type of disruption from unannounced government changes. Because HHS violated the PRA, its actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### 3. HHS, as well as components CDC, SAMHSA, NCHS, and CBHSQ, violated their duties under the Evidence-Based Policymaking Act.

The EBP states that each "statistical agency" "shall (A) produce and disseminate relevant and timely statistical information; (B) conduct credible and accurate statistical activities; [and] (C) conduct objective statistical activities." 44 U.S.C. § 3563(a)(1). "[R]elevant" statistical information encompasses statistical information that is "likely to be useful to policymakers and public and private sector data users." *Id.* § 3563(d)(4). The EBP directs OMB to prescribe regulations to carry out the statute, *see id.* § 3563(c), and, in accordance with that directive, OMB promulgated a rule specifying requirements for statistical agencies with respect to dissemination of "statistical products," 5 C.F.R. § 1321. The rule applies to "recognized statistical agencies," including NCHS and CBHSQ, and their parent agencies, including HHS, CDC, and SAMHSA. *See* 89 Fed. Reg. 82453, 82455 (Oct. 11, 2024) (listing "Recognized Statistical Agencies"). And it defines "statistical products" as "information dissemination products that are published or otherwise made available for public use that describe, estimate, forecast, or analyze the characteristics of groups." 5 C.F.R. § 1321.2. "Statistical products include general-purpose tabulations, analyses, projections, forecasts, or other statistical reports" and "include products of any form, including both printed and electronic forms." *Id.*

HHS, CDC, SAMHSA, NCHS, and CBHSQ (collectively, Statistical Agency Defendants) violated their duties under the EBP and the regulations thereunder when they denied public access

to statistical information and when they added inaccurate disclaimers to the pages restored in response to this Court's TRO.

### a. The Statistical Agency Defendants violated their duties under the EBP by removing statistical information.

The OMB rule charges each statistical agency with "maximiz[ing] the timeliness of statistical products by minimizing the time interval between the release of statistical products and the reference date" and by "publicly announc[ing] and adher[ing] to a schedule for the release of statistical products." 5 C.F.R. §§ 1321.5(c)–(d). It further requires statistical agencies to "[p]roduce statistical products that are impartial and free from undue influence and the appearance of undue influence by … disseminating impartial statistical products in a clear and complete manner, without limitation or selection to promote a particular policy position or group interest." *Id.* § 1321.7(a)(1).

The OMB Rule also imposes on parent agencies of statistical agencies, like HHS (for NCHS and CBHSQ), CDC (for NCHS), and SAMHSA (for CBHSQ), correlate duties to "[a]llow the publication of statistical products without requiring clearance of the content from offices or officials outside of the Recognized Statistical Agency" and to "[s]upport the impartiality of the Recognized Statistical Agency and Unit in its production and dissemination of statistical products by ensuring it is permitted to determine the methods for conducting statistical activities for statistical purposes and for disseminating statistical products." *Id.* § 1321.7(b).

The Statistical Agency Defendants acted in violation of each of these duties. NCHS, for instance, removed from public access statistical products including the National Health and Nutrition Examination Survey (NHANES) – National Cardiovascular Disease Surveillance System, and the National Health Interview Survey (NHIS) – Vision and Eye Health Surveillance. CBHSQ removed from public access statistical products including a webpage on the "2023

Adolescent LGB+ Behavioral Health Report," which provided a report derived from CBHSQ's National Survey on Drug Use and Health. Cohen Decl. ¶ 11. By denying public access to those webpages and datasets after they had already been posted, NCHS and CBHSQ failed to "adhere to a schedule for the release of statistical products," 5 C.F.R. § 1321.5(d), and to "maximize the timeliness of statistical products," *id.* § 1321.5(c)(1).

In addition, by failing to disseminate those statistical products, NCHS and CBHSQ failed to "disseminat[e] impartial statistical products in a clear and complete manner." *Id.* § 1321.7(a)(1)(ii). And because they suppressed access to those statistical products due to views that certain words constitute an unacceptable "ideology," OPM Mem.; AR HHS0031, they failed to "produce statistical products that are impartial and free from undue influence and the appearance of undue influence." 5 C.F.R. § 1321.7(a)(1).

As parent agencies of NCHS and CBHSQ, HHS, CDC, and SAMHSA were likewise subject to the EBP requirements with respect to NCHS and CBHSQ. Despite its duties, HHS directed that its components remove the webpages as ordered by OPM. *See* AR HHS0031. By permitting these statistical products to be withheld from public access based on OPM's memorandum and by directing their removal, HHS, CDC, and SAMHSA failed to "[a]llow the publication of statistical products without requiring clearance of the content from offices or officials outside of the Recognized Statistical Agency" and to "[s]upport the impartiality of the Recognized Statistical Agency and Unit in its production and dissemination of statistical products by ensuring it is permitted to determine the methods for conducting statistical activities for statistical purposes and for disseminating statistical products." *Id.* § 1321.7(b).

In short, the EBP and applicable regulations required NCHS and CBHSQ to maintain their statistical products, and required HHS, CDC, and SAMHSA to take steps to ensure NCHS and

CBHSQ had the independence necessary to publish and maintain impartial statistical products. Because they failed to do so, their actions were contrary to law.

### b. The Statistical Agency Defendants violated their duties under the EBP by undermining statistical information with inaccurate disclaimers.

CBHSQ, SAMHSA, and HHS also failed to live up to their duties relating to the dissemination of statistical products in a "clear and complete manner" that is "impartial and free from undue influence and the appearance of undue influence."[8] Specifically, although they restored various pages to their websites in response to this Court's TRO, they added inaccurate, inflammatory disclaimers. Those disclaimers state:

> Per a court order, HHS is required to restore this website as of 11:59PM ET, February 14, 2025. Any information on this page promoting gender ideology is extremely inaccurate and disconnected from the immutable biological reality that there are two sexes, male and female. The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation, and to women, by depriving them of their dignity, safety, well-being, and opportunities. This page does not reflect biological reality and therefore the Administration and this Department rejects it.

Philip Decl., Exh. A.

HHS and its components have offered no explanation of the content of the disclaimer, which is "not supported by scientific evidence, … highly inflammatory and likely to mislead, and [likely] to undermine the credibility of [the agencies'] authority to speak to matters of public health." Philip Decl. ¶ 11. "Among other things, it does not account for the 'biological reality' of the existence of intersex traits." Cohen Decl. ¶ 8. Nor does it utilize terminology with a meaning relevant to the field of healthcare. *Id*. Health professionals, even health professionals whose job it is to educate other healthcare providers, "do not use the term 'gender ideology,'" and have not

---

[8] DFA had not identified NCHS webpages on which its members rely prior to the deadline for compliance with the TRO. NCHS has therefore not restored webpages at this time and has not placed a disclaimer on restored pages.

"encountered that term in [their] medical and public health training and practice." *Id.* Moreover, the disclaimer is likely to harm dissemination of information on which health professionals rely because the health professionals are "hesitant to share materials that have this inaccurate and stigmatizing disclaimer with transgender and nonbinary patients, who already encounter discrimination and barriers to accessing healthcare that contribute to disparities in health outcomes." *Id.*

Because the disclaimer is factually inaccurate and provides misleading representations about the statistical products, it is not "clear." 5 C.F.R. § 1321.7(a)(1)(ii); *see* Websters Dictionary 1828 (2025) ("clear"), https://webstersdictionary1828.com/Dictionary/clear ("[o]pen; free from obstruction"; "[f]ree from any thing that creates doubt or uncertainty"; and "[f]ree from bias"); Am. Heritage Dictionary of the English Language (2025) ("clear"), https://ahdictionary.com/word/search.html?q=clear ("Not obscured or darkened"; "Free from doubt or confusion"; and "Free from qualification or limitation"). And by stating that HHS "rejects" the statistical products, HHS is exerting "undue influence" on the dissemination of the statistical products. 5 C.F.R. § 1321.7(a)(1). By adding to the restored webpages an inaccurate, inflammatory disclaimer, the agencies have violated their duties under the EBP and its implementing regulations.

### C. Defendants' adoption of a policy that restricts access to vital health information was arbitrary and capricious.

OPM's issuance of its memorandum and HHS's subsequent removal of webpages and datasets reflect both individual agency actions and a policy change that restricts public access to vital health information. When an agency adopts a new policy, it must "engage in 'reasoned decisionmaking,'" just as it must when undertaking any other action. *Regents of the Univ. of Cal.*,

591 U.S. at 16 (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). The agencies here failed to do so.

The APA does not bar an agency from "rely[ing] on the incumbent administration's views of wise policy" or from reversing course on that basis after due deliberation. *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1043 (D.C. Cir. 2012) (internal quotation marks and citation omitted). But the APA does demand that, when an agency adopts a new approach, it candidly weigh the relevant factors, including the "facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). The APA also requires that "the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (internal quotation marks omitted). Accordingly, when reversing course, an agency has a "duty to explain why it deemed it necessary to overrule its previous position." *Id.* at 222. That duty is particularly weighty when an agency's position "has engendered serious reliance interests." *Fox Television*, 556 U.S. at 515. As the Supreme Court has reaffirmed time after time, "an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars*, 579 U.S. at 221 (quotation marks and original alteration omitted); *see Regents of the Univ. of California*, 591 U.S. at 30 ("It would be arbitrary and capricious to ignore such matters." (quoting *Fox Television*, 556 U.S. at 515)). As the D.C. Circuit summed it up, "[o]ne of the core tenets of reasoned decision-making is that an agency when changing its course is obligated to supply a reasoned analysis for the change." *Republic Airline Inc. v. DOT*, 669 F.3d 296, 299 (D.C. Cir. 2012) (quotation marks and original alterations omitted). Here, Defendants neither acknowledged their existing policy nor provided a reasoned explanation for their new policy.

27

## 1. Defendants failed to provide any explanation for the new policy.

When Defendants adopted their new policy, they did not mention their prior policy regarding access to information, much less explain their about-face. Their decision to "simply disregard" their prior positions—expressed by the longstanding public access to the removed webpages—confirms that they did not undertake a reasoned analysis of the complex issues at stake. *Fox Television*, 556 U.S. at 515.

Likewise, the agencies failed even to acknowledge, much less take into account, the substantial reliance interests that they have upset by changing course. And they provided no discussion of "good reasons" for their new policy. *Fox Television*, 556 U.S. at 515. Indeed, nothing in the Administrative Record provides any discussion of the reasons for the new policy. Their adoption of the new policy was therefore arbitrary and capricious.

## 2. Defendants failed to explain their departure from existing policy issued to implement the Information Quality Act.

In addition, the agencies failed to explain why they were taking action that contradicts their existing guidance regarding public access to information. In 2002, as required by the IQA, OMB issued Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies; Republication, 67 Fed. Reg. 8452 (Feb. 22, 2002). Pursuant to the IQA and OMB guidance, HHS issued Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated to the Public, which "apply to information disseminated by HHS agencies on or after October 1, 2002," HHS Guidelines, and HHS component agencies issued guidelines that generally track the HHS Guidelines.

HHS's Guidelines "apply to a wide range of government information dissemination activities across HHS and are generic enough to fit all types of media, including print, electronic,

28

and other forms within HHS." HHS Guidelines. Noting that HHS's programs include "most of the

nation's federal capacity for public health protection and preparedness," the Guidelines recognize

that "development and dissemination of timely and high quality data and information is … critical"

to "HHS partners in the health and human services communities" because "HHS agencies are

responsible for dissemination of authoritative health, medical and safety information on a real time

basis in order to protect the health of the public against urgent and emerging threats." *Id*. In this

way, the HHS Guidelines set parameters to ensure that nothing will "limit or delay the timely flow

of vital information from agencies to medical providers, patients, health agencies, and the public."

*Id.* In particular, the Guidelines explain that HHS agencies' quality assurance methods must ensure

information is objective ("presented in an accurate, clear, complete, and unbiased manner"), useful

("by staying informed of information needs and developing new data"), and maintained with

integrity (to protect information against "alteration, loss, or destruction"). *Id*.

        The HHS Guidelines also provide specific guidance for HHS agencies that "develop and

disseminate authoritative health and human services information intended for consumers and the

professional community" and for "[p]ublic health surveillance and epidemiological information"

where "the primary information is developed by State and local government agencies ... and

reported to CDC for national aggregation and analysis." *Id.* And "[w]hen transparency of

information is relevant for assessing the information's usefulness from the public's perspective,"

the HHS Guidelines make clear that "the agency must take care to ensure that transparency has

been addressed in its review of the information." *Id.* HHS's Guidelines further affirm the agency's

"commitment to making data and information supported with public funds available to the public."

*Id*. And the HHS Guidelines, as well as those established by its component agencies, emphasize

29

the steps that the agencies take to ensure information disseminated by the agencies meets requisite standards, and recognize that information undergoes rigorous review before release. *See id*.

In short, HHS's IQA guidelines set forth its longstanding policy recognizing the importance of the information it is tasked with disseminating; prioritizing ensuring the timely, accurate, and unbiased flow of information; and acknowledging that providing access to information is particularly important when the information is directed towards an audience of health professionals, consumers, and local government health agencies. Removal of vital health information and the addition of inaccurate disclaimers in response to the Court's TRO results from adoption of a new policy that runs directly contrary to that longstanding policy. In this way as well, HHS's failure to acknowledge the change in policy and provide reasons for the change renders its action arbitrary and capricious.

### 3. Defendants failed to explain their departure from the PRA and EBP.

The agencies also failed to contend with statutory and regulatory duties that forbid their new policy. As evidenced by the Health Agency Defendants' violations of the PRA, *see supra* I.B.2, and the Statistical Agency Defendants' violations of the EBP and its implementing regulations, *see supra* I.B.3, their new policy regarding public access to information directs actions that run roughshod over their duties under the PRA and EBP. Those agencies had previously complied with the PRA by providing timely access to vital health information, and had complied with the EBP by disseminating statistical products in a manner that was timely and ensured the statistical products were timely, complete, impartial, and free from undue influence. When adopting their new policy and changing their stance on whether and how they disseminate health information and statistical products, the agencies provided no explanation of how their decision would impact their ability to comply with their duties under the PRA or EBP and no explanation

of the reasons for their about-face. For this reason as well, the new policy is arbitrary and capricious.

## II.    Plaintiffs are suffering and will suffer irreparable injury absent a preliminary injunction.

As the Court recognized in issuing the TRO, the loss of access to webpages on which health professionals rely imposes irreparable harm on DFA and other health professionals. *See* Mem. Op., ECF 12 at 17–19. When the Health Agency Defendants removed the webpages and datasets on January 31, 2025, they unleashed immediate harm on DFA's members and the City. Defendants have hindered—and, in some instances, completely halted—the ability of health professionals to perform key functions of their jobs. By removing the webpages and datasets, Defendants made "it more difficult and time-consuming to provide updated recommendations and prescribe appropriate options to patients." Ramachandran Decl. ¶ 8; *see* Siegler Decl. ¶ 5. They also forced physicians to treat their patients based on sources of information that "might not be as up-to-date or as comprehensive" as CDC resources or that "might be focused on specific populations rather than providing consideration for prescribing across multiple different populations, and might be from a non-independent source." Ramachandran Decl. ¶¶ 9, 13. And by burdening or wholly eliminating access to trusted, free resources, Defendants have put the brakes on responses to disease outbreaks. Liou Decl. ¶ 7; Cohen Decl. ¶ 9. Those harms are particularly pronounced for the DFA members who, because they work in underserved settings, "don't have access to many expensive clinical resources that require subscription fees." Liou Decl. ¶ 11.

Because DFA members who are clinician-investigators and the City's employees who are public health practitioners relied heavily on the removed datasets and webpages, their research projects have been negatively impacted. *See* Ramachandran Decl. ¶ 10–12; Cohen Decl. ¶ 11; Saine Decl. ¶¶ 3–5. As a result, they must either abandon their research projects altogether or

accept that their research will be less effective because they must rely on less useful sources of data. Ramachandran Decl. ¶ 10–12. Importantly, as to CDC in particular, prior to its sudden take-down of the materials, the agency structured its website to ensure that health professionals had ready access to information in a central, well-organized location. CDC also built its resources so that each page was easier to navigate than alternative resources that may be similar on some dimensions. *See id.* ¶¶ 9, 17. Any alternatives, therefore, are unlikely to serve as adequate substitutes. And even if some information may be found elsewhere, finding it would require health professionals to act as internet sleuths every time they need a piece of information, delaying the provision of care to their patients. *See id.* ¶ 20 (discussing the cost of slowdowns during "a typical 20 minute visit with patients"); *id.* ¶¶ 13–19, 21.

Pursuant to the Court's TRO, Defendants restored webpages and datasets that DFA identified by February 14. *See* Joint Status Report, ECF 13; Joint Status Report, ECF 23, ¶ 2. Since then, Defendants have represented that they will maintain that set of webpages and webpages "specifically identified in [Plaintiffs'] First Amended Complaint" while Defendants decide whether they think removal complies with the PRA, IQA, and EBP. Joint Status Report, ECF 23. At this time, therefore, Defendants have not committed to leaving in place any of the webpages DFA has identified, much less any additional pages needed by health professionals. This state of play is insufficient to prevent further irreparable harm for two reasons.

First, Defendants' representations covered only a subset of the relevant pages. This Court's TRO ordered that:

> Defendants shall, in consultation with [DFA], identify any other resources that DFA members rely on to provide medical care and that defendants removed or substantially modified on or after January 29, 2025, without adequate notice or reasoned explanation; and defendants shall, by February 14, 2025, restore those resources to their versions as of January 30, 2025.

That TRO was extremely valuable but insufficient to prevent further irreparable harm. By then, the Health Agency Defendants had taken down hundreds or thousands of webpages. Due to the scope of their actions, DFA could not in that timeframe identify, on behalf of its approximately 27,000 members, all webpages on which its members rely. The First Amended Complaint lists some of the additional webpages identified since. *See* First Amended Complaint, ECF 20, ¶ 40–44. But Plaintiffs did not include in the Amended Complaint an exhaustive list of every webpage they had identified as of that filing, and Plaintiffs have continued to find that additional webpages on which they rely were removed. *See, e.g.*, Bakke Decl. ¶¶ 5–6; Cohen Decl. ¶¶ 13–14; First Amended Complaint, ECF 20, ¶ 40 (listing pages "[a]mong those recently removed" by HHS and its components); Joint Status Report, ECF 23 at 2. That Plaintiffs continue to uncover the harms that Defendants have caused reflects the remarkable scope of Defendants' actions, and the need for injunctive relief that covers the full scope of health-related pages taken down by HHS and its component agencies.

Second, Defendants' promises amount to a promise to marginally delay—not to stop—Plaintiffs' irreparable harm. Defendants have represented that they "have begun a review to determine the applicability of" the PRA, IQA, and EBP to webpages covered by the Temporary Restraining Order and will maintain those webpages in their current state until they complete their review. Joint Status Report, ECF 23 at 3.[9] But in this litigation, Defendants have adopted the position that Plaintiffs are unlikely to succeed on the merits. *See* Defs. Mem. in Opposition, ECF 9 at 6, 10–12. Without an injunction, HHS could at any moment take down the restored webpages.

---

[9] To the extent Defendants' representation about their ongoing review reflects that they failed to undertake that review before engaging in the wholesale removal of webpages, that admission reinforces that their actions were unlawful. *See supra* Section I.

The only way in which to prevent the imminent harm to Plaintiffs is to enjoin Defendants' unlawful actions.

### III.    The balance of the equities and the public interest favor Plaintiffs.

As against the certain and irreparable injury that Plaintiffs DFA and the City are presently experiencing due to Defendants' unlawful actions, Defendants would suffer no cognizable harm if required to restore the webpages and datasets. To begin with, "[i]t is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Communities Alliance*, 286 F. Supp. 3d at 179 (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws." *Id.* (citation omitted).

Moreover, in addition to the harm to DFA members and the City, patients around the country are harmed by Defendants' actions, and the health of the country is put at risk. By removing resources from their websites, Defendants have made it harder for health professionals to communicate with their patients and to provide quick diagnosis and treatment options. *See* Liou Decl. ¶ 7–9; Ramachandran Decl. ¶¶ 13, 17; Saine Decl. ¶ 3; Harris Decl. ¶ 6. That means patients are less likely to understand their medical conditions or the treatment and care they are receiving, and that they may suffer consequences from delays in treatment that are forced by Defendants' actions. Liou Decl. ¶¶ 8, 10; Ramachandran Decl. ¶ 13–20. Furthermore, by removing access to critical data systems that help decisionmakers respond to public health crises, Defendants are increasing the likelihood of a severe disease outbreak and also making it more likely that

34

individuals will fall ill from an outbreak, that people who fall ill will suffer more severe consequences, and that more people will die. Cohen Decl. ¶ 9; Philip Decl. ¶¶ 13, 21.

As this Court has observed, a statement from six leading physician groups, which together represent more than 600,000 physicians, attests that the removed "materials are more than 'academic references—they are vital for real-time clinical decision-making in hospitals, clinics and emergency departments across the country.'" Mem. Op., ECF 12 at 20 (quoting Statement from Leading Physician Groups on Removal of Data and Guidance from Federal Websites, ECF 8-3). "Without them, health care providers and researchers are left 'without up-to-date recommendations on managing infectious diseases, public health threats, essential preventive care and chronic conditions.'" *Id.* (quoting Statement). These groups have called restoration of the webpages "a public health imperative." *Id.* Further, as the Court found, the burden of the harm caused by Defendants' actions will ultimately fall on "everyday Americans, and most acutely, underprivileged Americans, seeking healthcare." *Id.*

On the other side of the ledger, Defendants would suffer no injury from being required to host on their websites the same information that they hosted just a few weeks ago. Indeed, because hosting the information is so vital to public health, Plaintiffs' request aligns with Defendants' missions of protecting public health.[10] That Defendants' actions are deleterious to health confirms

---

[10] *See* HHS, About HHS, https://www.hhs.gov/about/index.html (stating that HHS's mission "is to enhance the health and well-being of all Americans, by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services"), CDC, About CDC, https://www.cdc.gov/about/cdc/index.html (stating that CDC's mission is "to protect America from health, safety and security threats, both foreign and in the U.S."); FDA, What We Do, https://www.fda.gov/about-fda/what-we-do; AHRQ, About AHRQ, https://www.ahrq.gov/cpi/about/index.html; CBHSQ, CBHSQ Mission and Vision, https://www.samhsa.gov/data/about-us/our-mission; CMS, About Us, https://www.cms.gov/about-cms; HRSA, About HRSA, https://www.hrsa.gov/about; NCHS,

both how extraordinary Defendants' actions are and how heavily the equities weigh in Plaintiffs' favor.

The balance of equities thus weighs decisively in favor of granting a preliminary injunction. The requested relief is vital to prevent irreparable harm to DFA members, the City, patients nationwide, and the health of the country as a whole.

**IV.    This court should enjoin implementation of Defendants' unlawful policy.**

The relief that Plaintiffs seek would require Defendants to restore the webpages and datasets that they removed from their websites in response to the OPM memorandum and Defendants' new policy. Absent that full relief, Plaintiffs and others will continue to suffer irreparable harm. *See supra* II.

The remedy for an agency action that is arbitrary, capricious, or contrary to law is to have that action "set aside" pursuant to the APA. 5 U.S.C. § 706(2). Similarly, an unlawful executive order is "ineffective" and without legal effect. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 193 (1999); *see Youngstown Sheet and Tube Co.*, 343 U.S. at 583–84 (affirming an injunction that restrained the executive from "acting under the purported authority" of an "invalid" executive order). Courts in this Circuit have accordingly recognized that "[w]hen a reviewing court determines that [executive actions] are unlawful, the ordinary result is that the [actions] are vacated—not that their application to the individual petitioners is proscribed"—because the executive action itself is treated as a nullity. *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 47 (D.D.C. 2020) (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409

---

NCHS Mission and Vision, https://www.cdc.gov/nchs/about/mission.html; NIH, About the NIH, https://www.nih.gov/about-nih/what-we-do/nih-almanac/about-nih; SAMHSA, Our Mission and Vision, https://www.samhsa.gov/about/mission-vision.

(D.C. Cir. 1998)). This reasoning applies in the "preliminary injunction context" just as much as it applies upon the entry of final judgment. *Id.* at 49 (collecting cases).

This Court should apply that default rule here. Plaintiffs have challenged both the removal of webpages and datasets, and the unlawful policy that precipitated the removals. Because Plaintiffs did not use every webpage every day, they continue, as they go about their work, to identify new pages that are no longer available. *See* Bakke Decl. ¶¶ 5–6; Cohen Decl. ¶¶ 13–14; *supra* II. Reversal of the policy itself and restoration of each page removed under it is therefore warranted to provide full relief. Under these circumstances, if this Court concludes—as it should— that Defendants' actions were likely unlawful, the appropriate course is to restore order by enjoining the unlawful actions that have injured (and continue to injure) Plaintiffs and the public health.

Entering an artificially narrow form of relief that would apply only to the webpages that Plaintiffs specifically identified would court judicial inefficiency, requiring a host of follow-on suits to challenge the same kinds of executive action whose unlawfulness has already been established. That approach would also enable Defendants to continue to use the unlawful policy to inflict injury on Plaintiffs and other health professionals, patients, and the public health.

Rather than permit those harms, upon concluding that the Defendants' actions are likely unlawful, this Court should order Defendants to restore all webpages removed or modified pursuant to their unlawful actions and to enjoin them from further implementing their unlawful policy. Importantly, the relief requested is readily administrable: As evidenced by the Administrative Record, Defendants maintain spreadsheets or similar files that list the webpages that have been removed or modified in response to their unlawful policy. *See*, *e.g.*, AR HHS0001– 29.

## V.    Expedited summary judgment is warranted.

Although the preliminary injunction that Plaintiffs seek is necessary to prevent imminent irreparable injury, Plaintiffs seek prompt final resolution of the merits of their claims to ensure continued access to vital health information. *See* 28 U.S.C. § 1657(a) (stating that "each court of the United States … shall expedite the consideration of any action … if good cause therefor is shown"). Courts in this circuit have often considered motions for a preliminary injunction and for summary judgment jointly. *See, e.g.*, *Nat'l Ass'n for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 58 (D.D.C. 2016); *Hedgeye Risk Mgmt., LLC v. Heldman*, 196 F. Supp. 3d 40, 46-47 (D.D.C. 2016); *Rigdon v. Perry*, 962 F. Supp. 150, 165 (D.D.C. 1997); *see also* Fed. R. Civ. P. 65(a)(2) (authorizing consolidated hearing of preliminary injunction and trial on the merits).

Here, the parties' briefing at this time can fully address the merits issues that will determine the final disposition of the case. An additional round of briefing will not benefit the parties or the Court. Moreover, expeditious final disposition will benefit physicians, health researchers, and public health authorities, so that they can be assured of access to the vital information at issue in this case or begin the uncertain process of figuring out how to effectively perform their crucial work without access to the wealth of information held by federal health authorities.[11]

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant a preliminary injunction ordering restoration of all webpages that were removed pursuant to the OPM Memorandum or Defendants' new policy. Plaintiffs also request that the Court enter summary judgment on their claims, declare Defendants' actions and newly adopted policy unlawful,

---

[11] Should the Court grant summary judgment, Plaintiffs request that the Court provide both the injunctive relief discussed above and a declaration that Defendants' actions have violated the PRA, EBP, and APA.

permanently enjoin the implementation of their unlawful policy, and order restoration of all webpages that were removed pursuant to the OPM memorandum or Defendants' new policy, in violation of the PRA, EBP, and the APA.

Dated: March 11, 2025

Respectfully submitted,
/s/ Zachary R. Shelley
Zachary R. Shelley (DC Bar No. 90021549)
Adina H. Rosenbaum (DC Bar No. 490928)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
zshelley@citizen.org

*Counsel for All Plaintiffs*

/s/ *David S. Louk*
David Chiu
    *San Francisco City Attorney*
Yvonne R. Meré (*pro hac vice*)
    *Chief Deputy City Attorney*
Sara J. Eisenberg (*pro hac vice*)
*Chief of Complex and Affirmative Litigation*
Julie Wilensky (*pro hac vice*)
David S. Louk (DC Bar No. 90022039)
    *Deputy City Attorneys*
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102
(415) 505-0844
david.louk@sfcityatty.org

*Counsel for Plaintiff City and County of San Francisco*

39