UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Doctors for America, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Office of Personnel Management, et al., <br><br> Defendants. | Civil Action No. 25-cv-322-JDB |

**DECLARATION OF DR. RESHMA RAMACHANDRAN**

I, Reshma Ramachandran, declare as follows:

1.      I am a board-certified family physician, health services researcher, and Assistant Professor at Yale School of Medicine. I see patients in a primary care practice and co-direct an interdisciplinary research and policy program focused on medical product evaluation, approval, and coverage toward advancing policies that improve patient health and health care. I also lead several research projects using publicly available datasets to examine the impact of sociodemographic factors on health outcomes. I received my M.D. from the Alpert Medical School at Brown University and an M.P.P. at the Harvard Kennedy School of Government. I completed my family medicine residency at Kaiser Permanente Los Angeles Medical Center and health services research and policy fellowship at the National Clinician Scholars Program at Yale University.

2.      I see patients in a primary care practice at a federally qualified health center and co-direct an interdisciplinary research and policy program focused on medical product evaluation, approval, and coverage toward advancing policies that improve patient health and health care. I

also lead several research projects using publicly available datasets to examine the impact of sociodemographic factors on health outcomes.

3.       I am a member and member of the board of directors of Doctors for America (DFA). DFA is a nonpartisan, not-for-profit, 501(c)(3) organization of over 27,000 physicians and medical trainees including medical residents and students in all 50 states, representing all medical specialties. DFA mobilizes doctors, other health professionals, and medical trainees to be leaders who put patients over politics to improve the health of patients, communities, and the nation. DFA equips physicians and medical trainees with skills and resources to advocate for health care issues at the local, state, and federal level. Members that comprise DFA include clinicians who provide direct care to patients, those who provide education to other clinicians and trainees, and those who conduct clinical and public health research.

4.       DFA's work focuses on access to affordable care, community health and prevention, and health justice and equity. We advocate at the national and state levels for comprehensive health system reform, expansion of health insurance coverage, and improvements to health care delivery so that it better meets our patients' needs. We also advocate on a diverse array of issues that affect our communities, including firearm violence, substance use disorder, homelessness, nutrition, and infrastructure funding, and we work to make our health care system more just and equitable for all, acting to erase inequities based on race, ethnicity, sex, gender, sexuality, age, immigration status, and more.

5.       DFA members and other health care professionals rely on webpages and datasets on the websites of the Department of Health and Human Services (HHS), the Centers for Disease Control and Prevention (CDC), the Food and Drug Administration (FDA), the Agency for Healthcare Research and Quality (AHRQ), the Center for Behavioral Health Statistics and Quality

(CBHSQ), the Centers for Medicare & Medicaid Services (CMS), the Health Resources and Services Administration (HRSA), the National Center for Health Statistics (NCHS), the National Institutes of Health (NIH), and the Substance Abuse and Mental Health Services Administration (SAMHSA), (collectively, Health Agency Defendants) to do our work.

6.     After the Office of Personnel and Management (OPM) issued its memorandum entitled "Initial Guidance Regarding President Trump's Executive Order *Defending Women*" on January 29, 2025, the Health Agency Defendants removed from their websites numerous webpages and datasets that served as resources for DFA members.

7.     The removal of these webpages makes it harder for DFA members, including me, to do our clinical, research, and advocacy work. For years, I have relied heavily on information on CDC's website to guide how I treat my patients and to support my work as a researcher.

8.     For example, CDC removed from its website the webpage for "Contraceptive Guidance for Health Care Providers," which provided a landing page for various clinical recommendations and tools available for clinicians to provide high-quality reproductive health care. Although CDC did not remove its lengthier report regarding medical eligibility criteria for contraceptive use, the lack of the removed landing page as well as linked pages including the "U.S. MEC and SPR Provider Tools" made it more difficult and time-consuming to provide updated recommendations and prescribe appropriate options to patients. For example, links to the "Summary Chart of U.S Medical Eligibility Criteria for Contraceptive Use" and to download the application "Contraception" that are designed for easy use in the clinical setting were no longer available. Other provider guides from the removed "U.S. MEC and SPR Provider Tools" page were also no longer available, including guides on "When to Start Contraceptive Methods and Routine Follow-Up," "What to Do If Late, Missed, or Delayed Combined Hormonal

Contraception," "What to Do If Late or Missed Progestin-Only Pills," and "Management of Bleeding Irregularities While Using Contraception and Management of IUDs When Pelvic Inflammatory Disease (PID) Is Found." Like a number of my colleagues within Doctors for America, I take care of female patients of reproductive age, many of whom have other medical conditions making it imperative to select the appropriate contraceptive that would not interfere with their existing co-morbidities and other medications. To provide care to those patients, I rely on the webpages CDC removed, including the summary charts that are designed specifically to allow physicians to quickly evaluate contraindications for different contraceptives (i.e., factors to indicate a patient should not receive a specific form of contraception) and the summary charts that cover the signs and severity of symptoms that may be caused by different forms of contraception.

9.       I also rely on CDC online material about prescribing PrEP medication for HIV prevention, which detail in a clinician-friendly format considerations for administering various options of PrEP treatment to different patient populations. The document also includes information about what laboratory testing is needed ahead of initiating PrEP treatment as well as what is needed for ongoing assessment of patients if they are on oral or injectable PrEP medications. Without this information, written specifically for clinicians, I and other DFA members will, in our clinical practice, have to identify other sources of information that might not be as physician-friendly, might be focused on specific populations rather than providing consideration for prescribing across multiple different populations, and might be from a non-independent source, raising questions as to whether reliance on the documents will lead to bias in our prescribing behavior.

10.       In addition, I rely on CDC datasets, including CDC's Social Vulnerability Index. The index utilizes data from the U.S. Census Bureau to identify communities at various geographic levels that would be especially vulnerable to disease outbreaks and natural disasters. It also

provides a holistic metric of various structural determinants of health to inform policies that allow for equitable allocation of resources. Before these webpages were taken down, other DFA members and I regularly relied on them to analyze connections between sociodemographic factors and health outcomes. For instance, I am currently using the Social Vulnerability Index in research projects targeted at better understanding trends of where new community health centers emerge and where clinical trials for specific disease areas are located. Without access to the Social Vulnerability Index, I must seek out other datasets that contain an alternative metric or other variables that reflect the social vulnerability of areas by county, zip code, and census tract. Because the Social Vulnerability Index is uniquely useful and updated frequently using data collected by the federal government, other datasets are unlikely to provide as useful of insights into the effects of sociodemographic factors on that status of a particular location. The absence of the Social Vulnerability Index data will ultimately harm the state of scientific knowledge and hinder the adoption of urgently needed policies to ensure efficient and equitable allocation of resources to areas of greatest need.

11.    FDA removed from its website webpages for critical guidance documents including the "Study of Sex Differences in Clinical Evaluation of Medical Products" and "Diversity Action Plans to Improve Enrollment of Participants from Underrepresented Populations in Clinical Studies." These documents provide recommendations for the parameters by which sponsors of clinical trials for medical products should collect data across different demographic subpopulations to ensure that these products are tested in representative populations of patients who would be prescribed the treatments once authorized by the FDA. FDA also removed webpages on "Health Equity for Medical Devices" and "Identifying and Measuring Artificial Intelligence (AI) Bias for Enhancing Health Equity," which provide insights into practices to reduce health disparities caused

by bias in medical devices. A core area of my work is in evaluating the evidence underlying FDA approval of medical products to see whether sponsors are indeed following the recommendations and requirements outlined by the FDA within guidance documents. We also examine whether FDA provides greater regulatory flexibility to some sponsors—that is, allowing for sponsors to not be subject to certain requirements or recommendations in their clinical trials of novel medical products. The removed webpages provide me and other regulatory researchers within DFA with important information to shape our studies and determine whether there may be opportunities for policy change. Not being able to access this information on the FDA's website, where I have accessed it in the past, will make my research more difficult.

12.     When Defendants removed publicly available information from their websites, it impeded my ability to treat my patients and to perform my research.

13.     Without updated guides tailored to clinicians means that my colleagues and I will have to rely on alternative sources of information for managing patients. Other sources might not be as up-to-date or as comprehensive as the guides, and reviewing those sources will take up a larger portion of a typical 20 minute visit with patients, leaving less time to discuss patients' other concerns during the visit and potentially causing delays to patients' access to appropriate contraception.

14.     Because I work in a federally qualified health center, many of my patients are low income and lack access to transportation or have significant comorbidities that do not enable them to use public transportation. To access their appointments, those patients must schedule transportation, often with the assistance of the clinic and other contracted services. Patients with scheduled transportation are often on particularly tight timelines because of their preset transportation schedule, increasing the time pressures during such appointment. Moreover,

because these patients lack regular access to transportation, it is particularly difficult to schedule follow-up care and visits for them. For that reason, when a patient who requires scheduled transportation has a visit, it is essential to address as many of their health needs in our short time together as possible. Otherwise, implementation of any treatment plan that I come up with will be delayed far beyond the additional hours or days that it takes me to develop an appropriate treatment plan. If I cannot provide all the care required during the patient visit, the patient may need to wait weeks before they can schedule transportation to get back to the office to receive the treatment that I chose after our initial visit. In some cases, difficulty obtaining transportation might mean that the patient never receives treatment at all.

15.    Many of the contraceptives that I prescribe, such as IUDs, require in-office administration. CDC's resources about contraindications for different forms of contraception help me to quickly make choices about what form of contraception to prescribe. If I cannot both prescribe and administer the contraception during the visit, the patient will need to schedule a subsequent office visit. The need for an additional appointment may lead to extended delays receiving care for patients facing standard scheduling difficulties, and it imposes particularly long costs or denial of care altogether on patients who struggle to obtain transportation to their visit. A delay in obtaining contraception poses a particular risk of serious health complications for patients with other comorbidities that would be further exacerbated during pregnancy or those who are on multiple other medications that may be contraindicated for a pregnant patient.

16.    When patients visit with scheduled transportation, they are typically guaranteed transportation to a pharmacy immediately after their appointment. In practice, this means that when I lack access to sufficient information to issue a prescription during the short time when my patients are visiting my office, the patients are likely to experience delays receiving their prescriptions that

far exceed any delay in me writing the prescription. While it may take me a few hours or a few days to finalize a treatment plan if I do not have access to resources that allow me to be confident in my choice of treatment during a visit, it may take patients days or weeks to fill their prescriptions if they leave my office without the prescription.

17.    Without access to information about the requirements for prescribing and administering the medication PrEP, which helps to prevent the transmission of HIV, I must take additional time to discern whether and how to treat patients with PrEP. In the period between when CDC removed webpages and restored them pursuant to the Court's Temporary Restraining Order, I was considering prescribing a new form of injectable PrEP to a patient with a complex medical history. Because the medication is relatively new, I am not as familiar with it as I am with other forms of PrEP and the frequency by which a patient on this medication would need to be monitored. I therefore had to research the list of requirements that physicians must check off before treatment. Normally, I would rely on CDC resources for that task because they provide the information in a centralized, physician-friendly resource. Instead, I had to find a different resource that provided the information. Because I work at a clinic affiliated with a well-funded research university of which I am a faculty member, I had access to clinical guidelines published elsewhere and was eventually able to access the information I needed. But doing so took additional time, and the resource that I found was not fully equivalent to CDC's resources. Specifically, CDC's resources centralize information about multiple forms of PrEP with consideration of administering these medications across diverse populations. In contrast, the guidelines I was able to find gave information about PrEP treatment in populations that are not reflective of those that I typically see in clinic; those guidelines are also not routinely updated. Therefore, although I was able to confirm (with some delay) that my patient met the prerequisites for me to prescribe injectable PrEP, I could

not easily make comparisons to other forms of PrEP to discern whether an alternative treatment would offer more benefits—as I would have been able to do if I had access to the CDC resources.

18.     When I prescribe patients PrEP, it is vital that they be able to start treatment right away in order to reduce the risk of them becoming infected with HIV, and developing Acquired Immune Deficiency Syndrome (AIDS), which would require lifelong treatment and add greater risk for other chronic conditions including chronic kidney disease, cardiovascular disease, or depression. Thus, the delays imposed by CDC's removal of information are extremely harmful.

19.     CDC's resources, before they were removed, provided information about whether symptoms that patients are suffering are likely to be side effects from the medicines or treatments they have received, and about whether those symptoms may be reflective of a more severe underlying problem that needs immediate treatment. When I have an ongoing relationship with my patients, such as when I see them in my office, prescribe them contraception, and then monitor their well-being, I use CDC resources when those patients contact me with concerns about symptoms they are experiencing. For instance, CDC resources provide summaries of the symptoms that may relate to serious, even life-threatening, side effects of certain forms of contraception.

20.     If, for instance, I prescribe a patient a contraceptive and that patient later calls because they have been experiencing significant headaches, I often turn to CDC's resources that provide summaries of whether that symptom is likely to be caused by the contraceptive I prescribed, and if so, whether those side effects indicate a serious health risk that must be treated immediately. Although some of that information is available from other sources, such as clinical practice guidelines or medication labels, those alternatives do not compile the information as clearly and conveniently as the CDC has done. For example, while I can use a medication label to

look up whether side effects might be attributed to a specific drug, CDC's resources compile information about many drugs in one place. So, when a patient calls, I can just go to the CDC resource and quickly find the answer, rather than needing to spend time searching the appropriate journal database for information about a single specific drug and then then scrolling through several pages of text for the exact information I need. Because every moment can count when a patient is experiencing symptoms that may be indicative of serious health concerns, the time saved by the CDC resources is essential to ensuring that my patients receive timely care when they are at their most vulnerable.

21.    Before the CDC removed webpages and datasets that I use in my medical practice and research, I would typically access those materials by searching on Google for the name of the resource that I was looking for. Although some CDC webpages have been archived on the Internet Archive Wayback Machine, those pages do not appear as search results. Instead, to access an archived webpage on the Internet Archive Wayback Machine, I must know the exact web address that existed before CDC took down its website. While I visited some webpages on the Internet Archive Wayback Machine since CDC took down the other websites, doing so has required substantial effort to find the correct webpage addresses. It would not be feasible for me to do this research during patient visits, and there is no guarantee that the Internet Archive Wayback Machine would have retained a copy of the specific webpage I was searching for. In addition, the Wayback Machine does not include copies of every webpage. And unlike CDC's resources that are updated in response to new evidence and epidemiological data collected by the agency, the pages on the Wayback Machine are static, which could lead to care that is not currently relevant or evidence-based.

10

22.     Following the Court's Temporary Restraining Order, the Health Agency Defendants have restored some of the pages they removed. However, if Defendants again remove those pages, it will again be more difficult or impossible to provide the same level of care to my patients and to carry out my health research. The possibility that I could download current versions of the webpages from Defendants' websites does not prevent the harm I will experience if the webpages are removed again. I rely on the Defendants' websites to ensure I have timely access to this essential information and to ensure that I am aware of any key updates. Even if I could access downloaded copies of the webpages, doing so would require more time and effort than finding them on the internet, and I would lose the benefit of accessing dynamic webpages that can provide notice of updates.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 11, 2025.

_____

Dr. Reshma Ramachandran