# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Doctors for America, *et al.*,

        Plaintiffs,

  v.

Office of Personnel Management, *et al.*,

        Defendants.

Case No. 1:25-cv-00322-JDB

## Combined Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction and Expedited Summary Judgment, and in Support of Defendants' Cross-Motion for Summary Judgment

YAAKOV M. ROTH
Acting Assistant Attorney General

AMANDA N. LISKAMM
Director

LISA K. HSIAO
Deputy Director, Civil Litigation

JAMES W. HARLOW
Acting Assistant Director
GABRIEL I. SCHONFELD
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC  20044-0386

## TABLE OF CONTENTS

Introduction ............................................................................................................. 1

Background ............................................................................................................... 3

   I.   The Executive Orders ............................................................................... 3

   II.   Implementation of the Executive Orders ............................................. 4

   III.   This lawsuit ............................................................................................... 7

Legal Standard ........................................................................................................ 9

Argument .................................................................................................................. 9

   I.   This Court lacks subject-matter jurisdiction ..................................... 9

     A.   Plaintiffs lack standing .................................................................. 10

       1.   Setting aside OPM's guidance and Defendants' "policy" will not redress any purported injury to Plaintiffs ........................................... 11

       2.   Plaintiffs have no cognizable injury traceable to the removal of a website or the addition of the policy banner ....................... 14

     B.   Count II is largely moot due to subsequent HHS action .................................... 20

   II.   Plaintiffs' APA claims are meritless ................................................... 21

     A.   No "agency action" and "final agency action" is challenged here ................. 21

       1.   OPM's initial guidance did not consummate a process or confer legal obligations on other agencies .......................................... 22

       2.   HHS did not issue "orders" when maintaining its own websites ................. 23

       3.   Plaintiffs cannot broadly attack implementation of EO 14168 ...................... 24

     B.   Defendants acted within the zone of reasonableness ................................. 25

       1.   OPM permissibly provided guidance to other agencies ............................ 25

       2.   HHS did not violate the Paperwork Reduction Act by simply making information unavailable to the public .................................. 27

       3.   Defendants did not violate the Evidence-Based Policymaking Act ............... 28

       4.   Plaintiffs cannot enforce the Information Quality Act ..................... 30

       5.   HHS reasonably complied with EO 14168 ................................. 32

   III.   Plaintiffs are not entitled to extraordinary relief before a merits ruling ........... 32

Conclusion ............................................................................................................. 34

# TABLE OF AUTHORITIES

## Cases

*Action All. of Senior Citizens of Greater Phila. v. Heckler,*
  789 F.2d 931 (D.C. Cir. 1986) ............................................................................................ 19

*Already, LLC v. Nike, Inc.,*
  568 U.S. 85 (2013) ............................................................................................................... 20

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) ............................................................................................ 9

*Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.,*
  738 F.3d 387 (D.C. Cir. 2013) ............................................................................................ 24

*Amneal Pharms. LLC v. FDA,*
  285 F. Supp. 3d 328 (D.D.C. 2018) .................................................................................... 32

*Anderson v. U.S. Dep't of Hous. & Urb. Dev.,*
  731 F. Supp. 3d 19 (D.D.C. 2024) ...................................................................................... 21

*Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.,*
  573 F.3d 815 (D.C. Cir. 2009) ............................................................................................ 33

*Ass'n of Admin. L. Judges v. U.S. OPM,*
  640 F. Supp. 2d 66 (D.D.C. 2009) ...................................................................................... 22

*AT&T Co. v. EEOC,*
  270 F.3d 973 (D.C. Cir. 2001) ............................................................................................ 23

*Bark v. U.S. Forest Serv.,*
  37 F. Supp. 3d 41 (D.D.C. 2014) ........................................................................................ 25

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................................................. 22

*Biden v. Texas,*
  597 U.S. 785 (2022) ..................................................................................................... 14, 25

*Bird v. Barr,*
  No. 19-CV-1581 (KBJ), 2020 WL 4219784 (D.D.C. July 23, 2020) .................................... 33

*\*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh,*
  295 F.3d 28 (D.C. Cir. 2002) ....................................................................................... 12, 32

*Blum v. Yaretsky,*
  457 U.S. 991 (1982) ............................................................................................................. 17

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974) ............................................................................................................. 32

*Bridgeport Hosp. v. Becerra,*
  108 F.4th 882 (D.C. Cir. 2024) ............................................................... 12

*Cal. Comtys. Against Toxics v. EPA,*
  934 F.3d 627 (D.C. Cir. 2019) ................................................................. 22

*California v. Texas,*
  593 U.S. 659 (2021) .................................................................................. 11

*Cboe Futures Exch., LLC v. SEC,*
  77 F.4th 971 (D.C. Cir. 2023) ................................................................. 26

*City of Scottsdale v. FAA,*
  37 F.4th 678 (D.C. Cir. 2022) ................................................................. 14

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) .................................................................................. 18

*Cobell v. Kempthorne,*
  455 F.3d 301 (D.C. Cir. 2006) ................................................................. 25

*Competitive Enter. Inst. v. FCC,*
  970 F.3d 372 (D.C. Cir. 2020) ................................................................. 14

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
  No. 22-CV-01716 (TSC), 2023 WL 7182041 (D.D.C. Nov. 1, 2023) ................. 14

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) .............................................................................. 9, 10

*Detroit Int'l. Bridge Co. v. Canada,*
  192 F. Supp. 3d 54 (D.D.C. 2016) ........................................................... 32

*Drs. for Am. v. OPM,*
  No. CV 25-322 (JDB), 2025 WL 452707 (D.D.C. Feb. 11, 2025) ........ 14, 19, 23, 24

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
  878 F.3d 371 (D.C. Cir. 2017) ................................................................. 10

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) .................................................................................. 25

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) .................................................................................. 17

*Fla. Audubon Soc'y v. Bentsen,*
  94 F.3d 658 (D.C. Cir. 1996) ................................................................... 12

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) .................................................................................... 9

*Flyers Rts. Educ. Fund, Inc. v. U.S. Dep't of Transp.,*
  810 F. App'x 1 (D.C. Cir. 2020) ............................................................. 19

iii

*Food & Water Watch, Inc. v. Vilsack,
808 F.3d 905 (D.C. Cir. 2015)................................................. 17, 18, 19, 20

Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.,
528 U.S. 167 (2000).......................................................................... 15

Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,
460 F.3d 13 (D.C. Cir. 2006)..................................................... 21, 22, 27

FW/PBS, Inc. v. City of Dall.,
493 U.S. 215 (1990).......................................................................... 17

*Hearst Radio, Inc. v. FCC,
167 F.2d 225 (D.C. Cir. 1948)....................................................... 21, 24

Hollingsworth v. Perry,
570 U.S. 693 (2013).......................................................................... 16

*Int'l Tel. & Tel. Corp. v. Loc. 134, Int'l Bhd. of Elec. Workers, AFL-CIO,
419 U.S. 428 (1975).......................................................................... 23

Jones v. U.S. Secret Serv.,
701 F. Supp. 3d 4 (D.D.C. 2023)........................................................ 25

Louie v. Dickson,
964 F.3d 50 (D.C. Cir. 2020)......................................................... 20, 21

Louisiana v. Salazar,
170 F. Supp. 3d 75 (D.D.C. 2016)......................................................... 9

*Lujan v. Defs. of Wildlife,
504 U.S. 555 (1992).................................................................. 10, 11, 13

Lujan v. Nat'l Wildlife Fed'n,
497 U.S. 871 (1990).......................................................................... 22

Mexichem Specialty Resins, Inc. v. EPA,
787 F.3d 544 (D.C. Cir. 2015)........................................................... 33

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983)...................................................................... 25, 29

Multicultural Media, Telecom & Internet Council v. FCC,
873 F.3d 932 (D.C. Cir. 2017)........................................................... 26

Muslim Advocs. v. U.S. Dep't of Justice,
No. 18-cv-02137, 2019 WL 3254230 (N.D. Cal. July 19, 2019).......................... 31

Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n,
680 F.2d 810 (D.C. Cir. 1982)........................................................... 20

Nken v. Holder,
556 U.S. 418 (2009)........................................................................... 9

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004) ................................................................................................. 25

*N.Y. Stock Exchange LLC v. SEC,*
2 F.4th 989 (D.C. Cir. 2021) ................................................................................. 24

*Or. Nat. Res. Council v. Thomas,*
92 F.3d 792 (9th Cir. 1996) ................................................................................... 32

*Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.,*
879 F.3d 339 (D.C. Cir. 2018) ............................................................................... 16

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
797 F.3d 1087 (D.C. Cir. 2015) ............................................................................ 19

*Pursuing Am.'s Greatness v. FEC,*
831 F.3d 500 (D.C. Cir. 2016) ............................................................................... 33

*Raines v. Byrd,*
521 U.S. 811 (1997) ................................................................................................... 9

*RCM Techs., Inc. v. U.S. Dep't of Homeland Sec.,*
614 F. Supp. 2d 39 (D.D.C. 2009) ....................................................................... 25

*Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.,*
489 F.3d 1267 (D.C. Cir. 2007) ............................................................................ 13

*Renne v. Geary,*
501 U.S. 312 (1991) ................................................................................................ 10

*Sai v. Transp. Sec. Admin.,*
54 F. Supp. 3d 5 (D.D.C. 2014) ............................................................................ 33

*Salt Inst. v. Thompson,*
345 F. Supp. 2d 589 (E.D. Va. 2004) ................................................................... 31

*San Luis Obispo Mothers forPeace v. U.S. Nuclear Regul. Comm'n,*
789 F.2d 26 (D.C. Cir. 1986) ................................................................................... 9

*Scenic Am., Inc. v. U.S. Dep't of Transp.,*
836 F.3d 42 (D.C. Cir. 2016) ................................................................................. 13

*Sec. Indus. & Fin. Markets Ass'n v. CFTC,*
67 F. Supp. 3d 373 (D.D.C. 2014) ....................................................................... 14

*\*Shurtleff v. City of Boston,*
596 U.S. 243 (2022) ............................................................................................ 1, 34

*Sierra Club v. EPA,*
754 F.3d 995 (D.C. Cir. 2014) ............................................................................... 15

*Simon v. E. Ky. Welfare Rights Org.,*
426 U.S. 26 (1976) ............................................................................................. 9, 13

*Singh v. Berger,*
    56 F.4th 88 (D.C. Cir. 2022) ................................................................................. 9

*Solenex LLC v. Bernhardt,*
    962 F.3d 520 (D.C. Cir. 2020) .............................................................................. 27

*Soundboard Ass'n v. FTC,*
    888 F.3d 1261 (D.C. Cir. 2018) ............................................................................ 22

*\*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ........................................................................... 10, 18, 19

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ...................................................................................... 11, 17

*\*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ..................................................................................... 11, 15

*Sw. Airlines Co. v. U.S. Dep't of Transp.,*
    832 F.3d 270 (D.C. Cir. 2016) .............................................................................. 22

*Tanner-Brown v. Haaland,*
    105 F.4th 437 (D.C. Cir. 2024) ............................................................................. 11

*\*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ...................................................................................... 10, 19

*United Pub. Workers of Am. v. Mitchell,*
    330 U.S. 75 (1947) ................................................................................................ 12

*Univ. of Texas v. Camenisch,*
    451 U.S. 390 (1981) .............................................................................................. 19

*Valero Energy Corp. v. EPA,*
    927 F.3d 532 (D.C. Cir. 2019) .............................................................................. 23

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) .............................................................................................. 16

*Wagdy v. Sullivan,*
    316 F. Supp. 3d 257 (D.D.C. 2018) ...................................................................... 24

*\*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015) .............................................................................................. 34

*\*Watts v. SEC,*
    482 F.3d 501 (D.C. Cir. 2007) ....................................................................... 23, 24

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................ 9, 33

vi

**Statutes**

Information Quality Act,
  Pub. L. 106-554, § 515, 114 Stat. 2763A-153 (2000) ............................................................ 31

5 U.S.C. §
  551(6) ............................................................................................................................ 23
  551(13) .......................................................................................................................... 22
  702 ................................................................................................................................ 21
  704 ................................................................................................................................ 21
  706 .................................................................................................................................. 9

44 U.S.C. §
  3502(12) ........................................................................................................................ 27
  3506(d)(1) ..................................................................................................................... 27
  3506(d)(3) ................................................................................................................. 27, 28
  3518(e) ........................................................................................................................... 28
  3561(11) ........................................................................................................................ 28
  3563(a) ........................................................................................................................... 28

**Rules**

Fed. R. Civ. P. 65(c) ......................................................................................................... 34

**Regulations**

5 C.F.R. §
  1321 ............................................................................................................................... 28
  1321.2 ....................................................................................................................... 29, 30
  1321.5(a) ........................................................................................................................ 29
  1321.5(c)(1) ................................................................................................................... 29
  1321.5(d) ........................................................................................................................ 29
  1321.7(a)(1)(i) ............................................................................................................... 30

89 Fed. Reg. 82453 (Oct. 11, 2024) ................................................................................ 28

**Other Authorities**

Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ............................................. passim

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ............................................. passim

INTRODUCTION

"When the government wishes to state an opinion," "formulate policies," or "implement programs, it naturally chooses what to say and what not to say." *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022). "That must be true for government to work." *Id.* This case threatens that basic operating principle.

On January 20, 2025, the President issued Executive Order 14168, which required agencies to remove statements promoting or inculcating gender ideology, and Executive Order 14151, which directed agencies to terminate all actions, initiatives, or programs regarding diversity, equity, and inclusion. Several days later, the Acting Director of the Office of Personnel Management (OPM) issued initial guidance to fellow agency heads about steps they should take to comply with Executive Order 14168. At the Department of Health and Human Services (HHS), the Acting Secretary instructed all HHS components to implement Executive Order 14168 generally and the measures suggested by OPM. HHS components, including the Centers for Disease Control and Prevention (CDC) and Food and Drug Administration (FDA), responded promptly.

As part of that effort, on or about January 31, 2025, HHS components pulled down pages on their websites containing information that appeared inconsistent with Administration policy. For example, under Executive Order 14168, webpages could no longer use the word "gender" or contain language promoting gender ideology. And pursuant to Executive Order 14151, webpages could no longer address issues regarding diversity, equity, and inclusion.

Plaintiffs Doctors for America (DFA), an association of healthcare practitioners, and the City and County of San Francisco object to OPM's guidance and to the January removals of certain webpages. (However, they do not challenge the underlying executive orders.) Plaintiffs say some practitioners found the removed information useful and convenient. So Plaintiffs demand that HHS restore all removed webpages

and never change them, regardless of inconsistency with current policy or any legal duty to provide or maintain the webpages.

Neither Article III nor the Administrative Procedure Act (APA) permit Plaintiffs to moderate the content on HHS's websites. For starters, Plaintiffs lack standing to press the three APA claims alleged in the First Amended Complaint. Setting aside OPM's guidance would not redress Plaintiffs' alleged injuries, which derive from the removal of specific websites, because removal is required by Executive Orders 14168 and 14151—both unchallenged here. Plaintiffs also have not established beyond dispute that they suffered a cognizable injury traceable to the January removals of specific webpages or those pages' restoration with a banner stating current Administration policy. Moreover, any injury from the January removals was mooted by HHS's voluntary decision on February 20, 2025 to maintain the webpages pending a review and to comply, as necessary, with the Paperwork Reduction Act, the Information Quality Act, and Title III of the Foundations of Evidence-Based Policymaking Act of 2018—the three statutes underpinning Plaintiffs' claims—while implementing Executive Order 14168.

Should the Court reach the merits, the APA arguments fail as a matter of law. OPM's issuance of guidance and HHS's curation of its own websites are not "agency action" or "final agency action," the threshold requirements for every APA claim. And at bottom, OPM, HHS, and HHS components lawfully and reasonably implemented the President's policies. The Paperwork Reduction Act does not compel an agency to continue disclosing information against its wishes. Nor do the Evidence-Based Policymaking Act or the Information Quality Act.

Lastly, the Court need not entertain Plaintiffs' request for a preliminary injunction given the parties' simultaneous briefing of summary judgment. The ruling on summary judgment will obviate the matter of interim relief. In any event, extraordinary relief is unwarranted here. Plaintiffs have no likelihood of success on the merits. Nothing has changed since the Court found that irreparable harm is no longer present. On the other

hand, forcing HHS to host websites with information contrary to current policy would severely impinge the government's authority to choose what to say and not to say.

The Court should grant Defendants' cross-motion for summary judgment.

BACKGROUND

## I.    The Executive Orders

Two Executive Orders issued by the President on January 20, 2025, set in motion the events leading to this case. The first is Executive Order 14168, entitled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.* Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (EO 14168). This Order provides that "[i]t is the policy of the United States to recognize two sexes, male and female." *Id.* § 2. To ensure consistent implementation of this policy, the Order defines key terms, including "Sex" and "Gender ideology." *Id.* § 2(a), (f). These definitions "govern all Executive interpretation of and application of Federal law and administration policy." *Id.* § 2.

EO 14168 requires federal agencies to take various steps. *See id.* §§ 3-5, 7. Agencies must use the Order's definitions "when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications." *Id.* § 3(b). In particular, "every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term 'sex' and not 'gender' in all applicable Federal policies and documents." *Id.* § 3(c). Further, "[a]gencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages." *Id.* § 3(e); *see id.* § 2(f) (defining "Gender ideology"). And they "shall promptly rescind all guidance documents inconsistent with the requirements of" the

3

Executive Order, "or rescind such parts of such documents that are inconsistent in such manner." *Id.* § 7(c).

By May 20, 2025, "each agency head shall submit an update on implementation of [EO 14168] to the President." *Id.* § 7(a). The report "shall address . . . changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order." *Id.*

The second presidential action pertinent to this case is Executive Order 14151, entitled *Ending Radical and Wasteful Government DEI Programs and Preferencing*. Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) (EO 14151).[1] EO 14151 directs "the termination of all discriminatory programs, including illegal [diversity, equity, and inclusion] and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." *Id.* § 2(a). By March 21, 2025, all agencies were required to "terminate . . . all 'equity action plans,' 'equity' actions, initiatives, or programs." *Id.* § 2(b)(i).

## II. Implementation of the Executive Orders

As the President intended, OPM and HHS—like every other federal agency— promptly began to implement his orders. On January 29, 2025, the Acting Director of OPM sent a memorandum to fellow "[h]eads and [a]cting [h]eads of [d]epartments and [a]gencies." OPM0001. The memorandum provided "initial guidance" about steps "agency heads should take" to "end all agency programs that use taxpayer money to promote or reflect gender ideology as defined in Section 2(f)" of EO 14168. *Id.* Examples included:

- "Take down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology";

---

[1] Plaintiffs do not mention EO 14151, *see* Pls.' Mem., ECF No. 37-1, but the record reveals that several websites were removed under this order, rather than EO 14168.

- "Withdraw any final or pending documents, directives, orders, regulations, materials, forms, communications, statements, and plans that inculcate or promote gender ideology";
- "Review all agency forms that require entry of an individual's sex and ensure that all list male or female only, and not gender identity"; and,
- "Ensure that all applicable agency policies and documents, including forms, use the term 'sex' and not 'gender.'"

OPM0001-02. OPM said agencies "should take" these steps by January 31, 2025, and provide information about "actions taken in response to this guidance and [Executive Order 14168]" by February 7, 2025. OPM Mem. 1-2.

Two days later, on January 31, 2025, HHS, through the Acting Secretary, issued "Initial Guidance Regarding President Trump's Executive Order *Defending Women*." HHS0065-68. "All HHS Operating and Staff Divisions," the memorandum stated, "are expected to comply with [EO 14168] and OPM guidance by taking prompt actions to end all agency programs that use taxpayer money to promote or reflect gender ideology as defined in Section 2(f) of" EO 14168. *Id.* Also, HHS components had to "submit a report bi-weekly regarding implementation," including "programmatic information related but not limited to statutes, regulations, guidance, intramural research, policies, public education documents and campaigns, communications, and events (internal to HHS and external to HHS)." HHS0067.

Between January 30 and 31, 2025, HHS staff worked diligently to comply with the President's and the Acting Secretary's directions. For example, on January 30, "a top priority" at FDA was reviewing "content on FDA.gov for the use of the term 'Gender' and replac[ing] with the term 'Sex', per paragraph [3]c" of EO 14168. HHS0062. Beyond changing "gender" to "sex," the HHS Assistant Secretary for Public Affairs reminded staff on January 31 to "[t]ake down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology" and "[w]ithdraw any final or

5

pending documents, directives, orders, regulations, materials, forms, communications, statements, and plans that inculcate or promote gender ideology." HHS0031. And if the media inquired about these activities, HHS would respond: "All changes to the HHS website and HHS division websites are in accordance with President Trump's January 20 Executive Orders, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* and *Ending Radical And Wasteful Government DEI Programs And Preferencing*." HHS0031.

The February 2025 reports of HHS components illuminate, by webpage, the specific actions taken to implement EO 14168. *See* HHS0001-30, HHS0034, HHS00036-55. For instance:

- CDC "[r]emoved" https://www.cdc.gov/ hiv/data- research/facts-stats/transgender-people.html (HHS0014);

- CDC "[e]dited [the] URL" and "updated, Pregnant people [to] pregnant women" in https://www.cdc.gov/rsv/hcp/vaccine-clinical-guidance/pregnant-people.html (HHS0022);

- FDA removed the draft guidance, "Diversity Action Plans to Improve Enrollment of Participants from Underrepresented Populations in Clinical Studies" (HHS0034);

- FDA removed a webpage on "Identifying and Measuring Artificial Intelligence (AI) Bias for Enhancing Health Equity" (HHS0033); and,

- HHS Office of Public Affairs "conducted a comprehensive review of our website, youtube, and social media accounts" and "removed several documents that weren't aligned with the EO on the website as well as on the youtube channel" (HHS0045).

The reports also indicated that many webpages were only temporarily removed and would be reposted after modification. Among these were CDC's Youth Risk Behavioral Survey and Contraception provider tools. *See* HHS0004 ("Will edit/

republish later"); HHS0013 (same). Other examples included FDA's "Draft Guidance" on "Study of Sex Differences in the Clinical Evaluation of Medical Products," HHS0034 ("Removed from FDA website pending revision"), and various pages overseen by the Assistant Secretary for Public Affairs, *see* HHS0036 (reporting that, after "careful analysis and review," webpages "will be reloaded after removal of the term 'gender' or 'gender identity' and replacement by the term 'sex'"); HHS0044 ("Health People 2030" updates were "In process," including "removing 'gender' related language from materials" and "[w]orking with CDC NCHS to update data reporting to align").

At the same time, agencies endeavored to comply with other executive orders, including EO 14151. FDA reports flagged "DEIA Content Removals" undertaken to implement EO 14151. HHS0035; *see also* HHS0033.

## III.  This lawsuit

On February 4, 2025, DFA filed this suit challenging OPM's guidance and "the removal by CDC, FDA, and HHS of webpages and datasets." Compl., ECF No. 1, ¶ 3. On February 6, 2025, DFA moved for a temporary restraining order to require HHS "to restore webpages and datasets" it removed. TRO Mot., ECF No. 6, at 1. The Court granted the motion on February 11, 2025, ordering Defendants to "restore to their versions as of January 30, 2025, each webpage and dataset identified by Plaintiff on pages 6–12 of its Memorandum of Law in Support of the Motion for a Restraining Order [ECF No. 6-1]," as well as "any other resources that DFA members rely on to provide medical care and that defendants removed or substantially modified on or after January 29, 2025, without adequate notice or reasoned explanation." TRO, ECF No. 11, at 1. Defendants fully complied with the Temporary Restraining Order. *See* J. Status R., ECF No. 23, at 1.

On February 18, 2025, DFA and San Francisco, which joined this suit as a plaintiff, filed the First Amended Complaint. *See* First. Am. Compl., ECF No. 20 (FAC). Plaintiffs

assert three APA claims variously against OPM, HHS, and named HHS components. *See id.* ¶¶ 61-74 (challenging OPM's issuance of the initial guidance, HHS's removal of certain webpages on or about January 31, 2025, and "Defendants' adoption of a policy requiring removal or modification of the webpages and datasets").

On February 21, 2025, Defendants announced that they "have begun a review to determine the applicability of the Paperwork Reduction Act, the Information Quality Act, and Title III of the Foundations of Evidence-Based Policymaking Act of 2018 for each website and dataset subject to paragraphs 1 and 2 of the Temporary Restraining Order, as well as the additional websites specifically identified in the First Amended Complaint." J. Status R., ECF No. 23, at 3 (citing ECF No. 20, ¶¶ 37-44). During this review, if "Defendants determine that the Paperwork Reduction Act, the Information Quality Act, or Title III of the Foundations of Evidence-Based Policymaking Act of 2018 applies to a particular website, Defendants will take the steps necessary to comply therewith when implementing Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025)." *Id.* Furthermore, until a covered website is reviewed, Defendants agreed to maintain it, "in its current state" and even after "the Temporary Restraining Order expires on February 25, 2025." *Id.*

On February 24, 2025, the Court declined to extend the Temporary Restraining Order and allowed it to expire the following day. *See* Order, ECF No. 26, at 2-3. "[P]laintiffs have not demonstrated," the Court found, "that the same irreparable harm persists or is substantially likely to occur under the defendants' proposed course of action." *Id.* 2.

On March 11, 2025, Plaintiffs moved for a preliminary injunction and expedited summary judgment. *See* ECF No. 37. Defendants now oppose Plaintiffs' motions and cross-move for summary judgment.

LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The movant must "make a 'clear showing' that (1) it has a likelihood of success on the merits, (2) the balance of equities favors preliminary relief, (3) an injunction is in the public interest, and (4) it will likely suffer irreparable harm before the district court can resolve the merits of the case." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022). Because "the Government is the opposing party," the factors of "harm to the opposing party and weighing the public interest" are merged. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The summary judgment standard in Rule 56 does not apply to APA claims "because of the limited role of a court in reviewing agency action." *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). The district court "sits as an appellate tribunal" and "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quotation omitted). Plaintiffs, as those "challenging an agency's action," bear "the burden of proof." *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc).

ARGUMENT

## I.    This Court lacks subject-matter jurisdiction

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)). This Court presumes to "lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v.*

*Cuno*, 547 U.S. 332, 342 (2006) (quoting *Renne v. Geary,* 501 U.S. 312, 316 (1991)). As "the part[ies] asserting federal jurisdiction," Plaintiffs have "the burden of establishing it." *Cuno*, 547 U.S. at 342. At summary judgment, they "can no longer rest on . . . 'mere allegations'" to show jurisdiction "but must 'set forth' by affidavit or other evidence 'specific facts'" that satisfy Article III's requirements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)).[2] Plaintiffs have not borne their burden. They have not demonstrated standing to press any claim. Moreover, their challenge in Count II to the removal of certain webpages on January 31, 2025, is moot.

### A.   Plaintiffs lack standing

Article III standing "doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). That's because "Federal courts do not exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). Rather, "under Article III," courts "may resolve only a real controversy with real impact on real persons." *Id.* at 424 (quotation omitted).

For standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. Also, "standing is not dispensed in gross." *TransUnion*, 594 U.S. at 431. Plaintiffs separately "must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.*; *see Elec. Priv. Info. Ctr.*, 878 F.3d at 377 (addressing "seriatim" the plaintiff's standing "on each of its two APA claims") (quotation omitted). Here, none of Plaintiffs' standing theories survives scrutiny.

---

[2] The same evidentiary standard applies on a motion for preliminary injunction. *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017).

1. **Setting aside OPM's guidance and Defendants' "policy" will not redress any purported injury to Plaintiffs**

Counts I and III challenge, respectively, OPM's issuance of the guidance and "Defendants' adoption of a policy requiring removal or modification of [certain] websites and datasets." FAC ¶¶ 61-65, 73-74. These actions "neither require nor forbid any action on the part of" Plaintiffs. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The OPM memorandum, on its face, provides "initial guidance" from one agency to others. OPM0001. Likewise, Plaintiffs do not claim Defendants' purported website "policy" required anything of them or forbade any of their conduct. FAC ¶ 74.[3] Because Plaintiffs are "not [themselves] the object of the government action" challenged in Counts I and III, the elements of causation and redressability are "'substantially more difficult' to establish.'" *Summers*, 555 U.S. at 493-94 (quoting *Lujan*, 504 U.S. at 562). Indeed, given the edicts in EO 14168 and EO 14151, causation and redressability are lacking here.

Causation requires "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). OPM's guidance exclusively addresses EO 14168. *See* OPM0001. Because HHS's purported "policy" simply "adopted OPM's memorandum," Pls.'s Mem. 4, it too is so limited. But some of the webpages were removed to comply with *EO 14151*, not EO 14168. *See* HHS0035; HHS0033. No connection exists between Plaintiffs' alleged injuries from removal of these webpages under EO 14151, and OPM's guidance or HHS's "policy." *See California v. Texas*, 593 U.S. 659, 678 (2021) (no traceability where "other provisions," unchallenged in lawsuit, "impose these other requirements" that cause plaintiffs' alleged injury).

---

[3] Solely for purposes of standing, Defendants assume, as they must, such a policy exists. *See Tanner-Brown v. Haaland*, 105 F.4th 437, 445 (D.C. Cir. 2024).

"Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996) (en banc)). If Plaintiffs prevail on the APA claims in Counts I and III, "vacatur is the normal remedy" in this Circuit. *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (quotation omitted). However, because Plaintiffs do not challenge EO 14168 or EO 14151, setting aside the OPM guidance and Defendants' "policy" is not likely to remedy Plaintiffs' alleged injury. After all, the mere "existence of the" OPM guidance and the "policy" does not injure them, *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 91 (1947), only the actual removal or modification of certain webpages.

Setting aside the OPM memorandum and the "policy" would not affect HHS's obligation to remove or modify those webpages to comply with EO 14168 and EO 14151. *See Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (recognizing that "if an executive agency . . . may lawfully implement the Executive Order, then it must do so"). Again, EO 14168 requires that agencies:

- "use the term 'sex' and not 'gender' in all applicable Federal policies and documents," EO 14168, at § 3(c);

- "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," *id.* § 3(e);

- "cease issuing such statements, policies, regulations, forms, communications or other messages," *id.*; and,

- "promptly rescind all guidance documents inconsistent with the requirements of" the Order, "or rescind such parts of such documents that are inconsistent in such manner," *id.* § 7(c).

And EO 14151 requires agencies to "terminate . . . all 'equity action plans,' 'equity' actions, initiatives, or programs." EO 14151, § 2(b)(i).

There is no doubt that HHS intends to follow the President's instructions. *See* HHS0065 ("All HHS Operating and Staff Divisions are expected to comply with [EO 14168] . . . by taking prompt actions to end all agency programs that use taxpayer money to promote or reflect gender ideology as defined in Section 2(f) of [EO 14168]."). And compliance with EO 14168 and EO 14151 requires revisions to the agency's web presence. *See, e.g.*, HHS0062 (discussing "two of the paragraphs that are included in the EO" and updates "of content on FDA.gov"); HHS0031 (explaining that "[a]ll changes to the HHS website and HHS division websites are in accordance with President Trump's January 20 Executive Orders, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government and Ending Radical And Wasteful Government DEI Programs And Preferencing"). The reports of individual HHS components bear this out, identifying changes that correlate to the policies and requirements of the executive orders. *See* HHS0001-0030, HHS0033-55.1.

Plaintiffs apparently assume that vacatur of the OPM guidance and the "policy" would revert the websites to their pre-January 29, 2025 statuses. This "assumption is nothing more than 'unadorned speculation.'" *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 52 (D.C. Cir. 2016) (quoting *Simon*, 426 U.S. at 44). Such speculation is especially improper here because the record demonstrates how "the new status quo is held in place by other forces"—the executive orders, which are not challenged in this case. *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007). When "undoing of the governmental action will not undo the harm," even if the challenged conduct was "a substantial contributing factor in bringing about a specific harm," no likelihood of redressability exists. *Id.; see, e.g., Lujan*, 504 U.S. at 571 (no redressability when "any relief the District Court could have provided in this suit against the Secretary was not likely to produce th[e] action" necessary to redress alleged injury); *Scenic Am.*, 836 F.3d at 52–53 (no redressability when petitioner "has not established that invalidating the" agency action "would improve or ease" injury).

**2.    Plaintiffs have no cognizable injury traceable to the removal of a website or the addition of the policy banner**

Count II challenges the removal, on or about January 31, 2025, of certain HHS webpages, as well as the posting of a banner with current Administration policy "on webpages that were restored following the Court's temporary restraining order." FAC ¶¶ 1, 68-72. Before diving into the standing analysis, the generic way Plaintiffs pleaded Count II raises two preliminary questions that must be addressed. For precisely which actions must standing be demonstrated? And whose evidence counts towards that showing? A proper standing inquiry into Count II turns on the answers.

"[P]laintiffs must prove separate standing as to each agency action challenged." *Sec. Indus. & Fin. Markets Ass'n v. CFTC*, 67 F. Supp. 3d 373, 400 (D.D.C. 2014). Yet the First Amended Complaint and Plaintiffs' summary judgment brief conspicuously fail to identify the "specific agency action, as defined in the APA," challenged in Count II. *Biden v. Texas*, 597 U.S. 785, 809 (2022). Defendants presume that Plaintiffs' theory remains that each decision to remove or modify a website was an "order" under the APA. *See Drs. for Am. v. OPM*, No. CV 25-322 (JDB), 2025 WL 452707, at *5 (D.D.C. Feb. 11, 2025). Thus, Plaintiffs must demonstrate standing separately for each decision to remove or modify an individual website. *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, No. 22-CV-01716 (TSC), 2023 WL 7182041, at *3 (D.D.C. Nov. 1, 2023) (holding that "Plaintiffs must demonstrate standing to challenge the individual [permit] approvals enumerated in their Complaint," which totaled "4,000 agency actions"); *cf. Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 382 (D.C. Cir. 2020) (court must "separately assess [plaintiffs'] standing to challenge each of the disputed conditions" in order).

Having fixed the unit of standing analysis, the next question is who must make that showing. San Francisco must itself satisfy the three elements of standing. *See, e.g., City of Scottsdale v. FAA*, 37 F.4th 678, 679 (D.C. Cir. 2022). Suing on behalf of its members, DFA must prove "(1) at least one of [its] members would have standing to sue; (2) the

14

interests [DFA] seek[s] to protect are germane to [its] purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual members." *Sierra Club v. EPA*, 754 F.3d 995, 999 (D.C. Cir. 2014). Because DFA must "identify [the] members who have suffered the requisite harm," *Summers*, 555 U.S. at 499, its standing depends on Drs. Debowy, Harris, Liou, Ramachandran, Saine, and Siegler, who are the only identified DFA members. *See* ECF Nos. 37-5, 37-6, 37-7, 37-9, 37-10, 37-11. These members must show that they "(1) suffered an 'injury in fact' that is 'concrete and particularized,' and 'actual or imminent, not conjectural or hypothetical,' (2) the injury is 'fairly traceable to the challenged action,' and (3) 'it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable [judicial] decision.'" *Sierra Club*, 754 F.3d at 999 (quoting *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).

Neither San Francisco nor any identified DFA member carries their burden of establishing standing for any agency action challenged in Count II. For the sake of simplicity, we first address the posting of a banner with current Administration policy on restored websites, *see* FAC ¶ 71, and then turn to the individual website removals that occurred on or about January 31, 2025, *see id.* ¶¶ 68-70, 72.

**Posting of Banner with Administration Policy.** There is no dispute that Defendants complied with the Temporary Restraining Order and restored the webpages identified by DFA. *See* J. Status R., ECF No. 23, at 1. The restored webpages display the following banner:

15

Per a court order, HHS is required to restore this website as of
11:59PM ET, February 11, 2025. Any information on this page
promoting gender ideology is extremely inaccurate and
disconnected from the immutable biological reality that there are
two sexes, male and female. The Trump Administration rejects
gender ideology and condemns the harms it causes to children, by
prompting their chemical and surgical mutilation, and to women,
by depriving them of their dignity, safety, well-being, and
opportunities. This page does not reflect biological reality and
therefore the Administration and this Department rejects it.

Cohen Decl., ECF No. 37-4, ¶ 7. Two officials with the San Francisco Department of
Public Health question the accuracy and wisdom of the Administration policy
discussed in the banner. *See id.* ¶ 8; Philip Decl., ECF No. 37-8, ¶ 11.

But "the mere existence of" allegedly "inaccurate information" on the banner "is
insufficient to confer Article III standing." *Owner-Operator Indep. Drivers Ass'n, Inc. v.
U.S. Dep't of Transp.*, 879 F.3d 339, 345 (D.C. Cir. 2018). Similarly, the officials' policy
"disagreement, however sharp and acrimonious it may be, is insufficient by itself to
meet Art. III's requirements." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (quotation
omitted). So is the "psychological consequence presumably produced by observation of
conduct with which one disagrees." *Valley Forge Christian Coll. v. Ams. United for
Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). Divorced from any cognizable
injury, the mere posting of the banner cannot support standing for Count II.

***January Removal of Individual Websites.*** The First Amended Complaint discusses,
to varying degrees of specificity and outside of Count II, certain HHS webpages that
were "removed" at the end of January 2025. *Compare* FAC ¶¶ 66-72, *with id.* ¶¶ 37-44.
Yet Plaintiffs' declarations only address a subset of those webpages. No declarant
discusses, for instance, "Endometriosis: A Common and Commonly Missed and
Delayed Diagnosis," "'Copy and Paste' Notes and Autopopulated Text in the Electronic
Health Records," and "CMS removed webpages." *See id.* ¶¶ 40, 42.

At summary judgment, "standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record." *FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 231 (1990) (internal citations and quotations omitted). Therefore, Plaintiffs necessarily lack sufficient evidence of injury "fairly traceable" to the removal of any webpage apart from the ones discussed in the declarations. *Steel Co.*, 523 U.S. at 103; *cf. Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject.").

Focusing on the webpage removals for which Plaintiffs purport to offer evidence, the declarations generally advance three theories of injury: risk of future harm to patients, risk of future harm to scientific knowledge, and increased professional burden. We take each in turn.

Several declarants assert that the removal of a particular webpage increased the risk to patients. *See* Cohen Decl., ECF No. 37-4, ¶ 4; Harris Decl., ECF No. 37-6, ¶ 5; Liou Decl., ECF No. 37-7, ¶ 5; Philip Decl., ECF No. 37-8, ¶ 15; Ramachandran Decl., ECF No. 37-9, ¶ 13. However, the Supreme Court "has repeatedly rejected" the notion that "doctors [can] shoehorn themselves into Article III standing simply by showing that their patients have suffered injuries or may suffer future injuries." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 n.5 (2024). And even if the theory were legally permissible, Plaintiffs lack the necessary evidentiary support. They must "show *both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (internal quotations omitted) (emphases in original). The declarations, however, contain no evidence whatsoever to satisfy this Circuit's "very strict understanding of what increases in risk and overall risk levels . . . count as 'substantial.'" *Id.* at 915 (quoting *Pub. Citizen*, 489 F.3d at 1296). At most, they allude to

17

"[a]n ambiguous increase in risk," which "is hardly a substantial increase in risk." *Id.* at 917. Therefore, Plaintiffs' theory of standing based on a risk of harm to patients fails.

The theory premised upon a risk of "harm [to] the state of scientific knowledge" fares even worse. Ramachandran Decl., ECF No. 37-9, ¶ 10; *see* Cohen Decl., ECF No. 37-4, ¶ 11; Debowy Decl., ECF No. 37-5, ¶¶ 4-5; Harris Decl., ECF No. 37-6, ¶ 7; Liou Decl., ECF No. 37-7, ¶ 6; Philip Decl., ECF No. 37-8, ¶ 17; Saine Decl., ECF No. 37-10, ¶ 3; Siegler Decl., ECF No. 37-11, ¶ 5. A feared degradation in global knowledge is the height of abstraction; it is not a "real" harm that qualifies as a "concrete injury." *Spokeo*, 578 U.S. at 340. Beyond the ineligibility of "the ultimate alleged harm," the declarations also lack any evidence that "the increased risk of such harm" is "sufficiently imminent." *Food & Water Watch*, 808 F.3d at 915 (quotation omitted). To the contrary, this theory "relies on a highly attenuated chain of possibilities" about the future activities of third-party researchers and the data available to them, which does not satisfy the imminence requirement of standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

The final theory of injury described in the declarations essentially is one of professional inconvenience. After a particular webpage was removed, some declarants spent "time and effort" finding alternative sources of information which was not always presented as "conveniently." Ramachandran Decl., ECF No. 37-9, ¶¶ 9, 11, 20, 22; *see* Debowy Decl., ECF No. 37-5, ¶ 5; Harris Decl., ECF No. 37-6, ¶¶ 5-6; Liou Decl., ECF No. 37-7, ¶ 9; Philip Decl., ECF No. 37-8, ¶ 15. But Plaintiffs do not explain how mere expenditures of time and effort constitute "tangible harms, such as physical harms and monetary harms," or "intangible harms" that qualify as concrete injuries. *TransUnion*, 594 U.S. at 425.[4] Nor do they address how their purported difficulty in accessing certain

_____

[4] Although the Court suggested a bare "inconvenience in travel plans supports injury in fact," *Drs. for Am.*, 2025 WL 452707, at *4, the D.C. Circuit decision it cited involved "expensive [flight] change fees" to a traveler, a pocketbook injury, *Flyers Rts. Educ. Fund, Inc. v. U.S. Dep't of Transp.*, 810 F. App'x 1, 2 (D.C. Cir. 2020) (per curiam).

information bears "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (quoting *Spokeo*, 578 U. S. at 341).

When issuing the Temporary Restraining Order, the Court found that "[t]he denial of 'information' these doctors 'wish to use in their routine' activities has 'inhibit[ed] . . . their daily operations' and thereby caused 'an injury both concrete and specific to the work in which they are engaged.'" *Drs. for Am.*, 2025 WL 452707, at *4 (quoting *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)). This finding is "not binding" at summary judgment, *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), and should be revisited because its foundation is flawed.

The sole legal support cited by the Court was the D.C. Circuit's *PETA* decision. However, *PETA* involved the distinct doctrine of *organizational* standing, *see* 797 F.3d at 1093-94,[5] which neither DFA nor San Francisco has asserted here. Indeed, DFA's executive director, *see* Bakke Decl, ECF No. 37-3, does not contend its "organizational activities have been perceptibly impaired in any way," *Food & Water Watch*, 808 F.3d at 921. Likewise, San Francisco's declarants do not demonstrate "an inhibition" of the city government's "daily operations." *Id.* at 919 (quotation omitted); *see* Cohen Decl., ECF No. 37-4; Philip Decl., ECF No. 37-8.

There is no basis to extend *PETA* and the unique standards for organizations to individual DFA members like Drs. Liou and Ramachandran. *See Drs. for Am.*, 2025 WL 452707, at *4. As a legal matter, the Court cited no prior case in which an individual plaintiff established standing by importing a theory of injury for organizations. Defendants have not subsequently unearthed one either. The facts here do not warrant breaking new standing ground. Drs. Liou and Ramachandran, and the other DFA

---

[5] So did the case on which *PETA* relied. *See Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986) (discussing "organizational interests").

members, all work for organizations. *See, e.g.*, Liou Decl., ECF No. 37-7, ¶ 1 (Alivio Medical Center and the University of Chicago); Debowy Decl., ECF No. 37-5, ¶ 1 (university mental health clinic); Ramachandran Decl., ECF No. 37-9, ¶ 1 (Yale School of Medicine). So those organizations, which include well-resourced universities and health systems, are the proper reference point for any organizational standing inquiry—not a single employee. And of course, none of these entities contends their "organizational activities have been perceptibly impaired in any way" or their "daily operations" have been inhibited. *Food & Water Watch*, 808 F.3d at 919, 921. Accordingly, Plaintiffs have not established any viable theory of standing for Count II.

### B.    Count II is largely moot due to subsequent HHS action

Even if, based on their declarations, Plaintiffs have shown standing to challenge the January removal of a particular webpage, that claim is moot to the extent it regards a webpage restored under the Temporary Restraining Order. *Louie v. Dickson*, 964 F.3d 50, 54 (D.C. Cir. 2020) (assessing mootness "claim by claim"). A claim becomes moot "when the issues presented are no longer 'live.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). "Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue." *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 680 F.2d 810, 814 (D.C. Cir. 1982). And "when one agency action supersedes another, prospective challenges to the superseded agency action generally become moot" because "vacating the old agency action will not deliver the plaintiff any relief." *Anderson v. U.S. Dep't of Hous. & Urb. Dev.*, 731 F. Supp. 3d 19, 31 (D.D.C. 2024).

On February 21, 2025, HHS announced its new decision to "maintain, in [their] current state, any website and dataset subject to paragraphs 1 and 2 of the Temporary Restraining Order, as well as any additional websites specifically identified in paragraphs 37-44 of the First Amended Complaint," even "[a]fter the Temporary Restraining Order expires on February 25, 2025," while it reviewed each website and

20

determined whether "the Paperwork Reduction Act, the Information Quality Act, or Title III of the Foundations of Evidence-Based Policymaking Act of 2018 applies." J. Status R., ECF No. 23, at 3. If HHS subsequently determines that one or more of those statutes does apply, the agency then "will take the steps necessary to comply therewith when implementing Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025)." *Id.* Thus, for webpages restored under the Temporary Restraining Order, HHS "has already done administratively" what Plaintiffs could have obtained under the APA on "a remand to the" agency. *Louie*, 964 F.3d at 55. Accordingly, these issues are no longer live and Count II is moot. *See id.* ("challenge seeking an agency's withdrawal of" an action "becomes moot when the agency withdraws the" action).

To the extent the Court finds that Plaintiffs' declarations support standing as to removal of a webpage that was not restored under the Temporary Restraining Order, that claim will become moot upon completion of HHS's ongoing review. *See infra* p. 28.

## II. Plaintiffs' APA claims are meritless

Even if the Court finds that Plaintiffs established subject-matter jurisdiction, their APA claims are, at bottom, meritless.

### A. No "agency action" and "final agency action" is challenged here

It is blackletter law that the APA "does not provide judicial review for everything done by an administrative agency." *Hearst Radio, Inc. v. FCC,* 167 F.2d 225, 227 (D.C. Cir. 1948). Two "threshold questions" for every APA claim are "[w]hether there has been 'agency action'" and then "'final agency action' within the meaning" of 5 U.S.C. §§ 702 and 704. *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006). "[I]f these requirements are not met," the APA claim "is not reviewable." *Id.* Plaintiffs flunk both tests for every claim.

1.  **OPM's initial guidance did not consummate a process or confer legal obligations on other agencies**

For the APA claim in Count I, Plaintiffs "must identify some 'agency action'" within the meaning of 5 U.S.C. § 551(13). *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). Yet Plaintiffs do not explain which category of "agency action" in 5 U.S.C. § 551(13) applies to OPM's issuance of the interim guidance. Precedent indicates none fits. *See Ass'n of Admin. L. Judges v. U.S. OPM*, 640 F. Supp. 2d 66, 73 (D.D.C. 2009) (finding that "OPM's memo to agencies" was "not part of a rule, order, sanction or relief"). The lack of "agency action" alone defeats Count I.

Also, OPM's guidance does not rise to the level of *final* agency action. A final agency action "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted). Agency action "must satisfy *both* prongs of the *Bennett* test to be considered final." *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) (emphasis added).

Looking "at finality from [OPM's] perspective," the guidance did not "represent[] the culmination of the agency's decisionmaking." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1271 (D.C. Cir. 2018). The face of the document reveals that OPM contemplated an ongoing dialogue with other agencies about compliance with EO 14168. *See* OPM0001-OPM0002; *see also Ass'n of Admin. L. Judges*, 640 F. Supp. 2d at 73 (OPM memo to agency heads "did not mark the consummation of a decision-making process").

Shifting to the perspective of the agency recipients, the guidance did not determine any agencies' "rights or obligations." *Soundboard Ass'n*, 888 F.3d at 1271. In this "specific regulatory context," *Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019), Plaintiffs agree that OPM could not "direct other agencies to remove information from their websites," Pls.' Mem. 12.

"[A]n agency works no legal effect 'merely by expressing its view of the law.'" *Valero Energy Corp. v. EPA*, 927 F.3d 532, 536 (D.C. Cir. 2019) (quoting *AT&T Co. v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001)). That's all OPM did here, "provid[e] . . . initial guidance" about actions agencies should take to implement EO 14168. OPM0001 (discussing "the President's Executive Order" 14168). HHS understood this. It's why the Acting Secretary issued a memorandum that "[a]ll HHS Operating and Staff Divisions are expected to comply with [EO 14168] and OPM guidance by taking prompt actions to end all agency programs that use taxpayer money to promote or reflect gender ideology." HHS0065; *see* Pls.' Mem. 4 ("HHS and its component agencies adopted OPM's memorandum *as their own policy*.") (emphasis added). Thus, the OPM guidance satisfies neither of *Bennett*'s finality requirements, and Count I fails for this reason too.

### 2.    HHS did not issue "orders" when maintaining its own websites

Regarding the conduct challenged in Count II, the Court previously opined that the "agencies' decisions to remove certain webpages likely meet" the APA's definition of "order." *Drs. for Am.*, 2025 WL 452707, at *5. Defendants submit that stretches the scope of an "order" far beyond the APA's text. An "'order' means the whole or a part of a final disposition . . . of an agency in a matter other than rule making." 5 U.S.C. § 551(6). "[W]hen Congress defined 'order' in terms of a 'final disposition,' it required that 'final disposition' to have some determinate consequences for the party to the proceeding." *Int'l Tel. & Tel. Corp. v. Loc. 134, Int'l Bhd. of Elec. Workers, AFL-CIO*, 419 U.S. 428, 443 (1975). In updating its web presence, HHS did not "order anybody to do anything." *Id.*

To hold otherwise, "it would follow that the steps the agency took in generating its response would be an APA 'adjudication,' which is defined as 'agency process for the formulation of an order.'" *Watts v. SEC*, 482 F.3d 501, 506 (D.C. Cir. 2007) (quoting 5 U.S.C. § 551(7)). But an agency's review and modification of web content "is not typically or comfortably described as an 'adjudication.'" *Id.* A contrary view would

result in private parties and the courts becoming the *de facto* webmasters, superintending all manner of updates that agencies wish to make to their websites. Such "odd analytical and practical consequences . . . confirm that the agency's action is not an 'order.'" *Id.*

The Court's earlier ruling quoted the D.C. Circuit that "an order is virtually any authoritative agency action other than a rule." *Drs. for Am.*, 2025 WL 452707, at *5 (quoting *N.Y. Stock Exchange LLC v. SEC*, 2 F.4th 989, 992 (D.C. Cir. 2021)). However, it is "the statutory definition" that governs the scope of "judicial review," *Hearst Radio*, 167 F.2d at 227, not a gloss of that language. And courts have held that other types of agency conduct, arguably at least as "authoritative" as modifying websites, were not reviewable under the APA. *See, e.g.*, *Watts*, 482 F.3d at 501 (determination not to comply with subpoena was not an "order"); *Hearst Radio*, 167 F.2d at 226-27 (publication of a report was not "agency action"); *Wagdy v. Sullivan*, 316 F. Supp. 3d 257, 262 (D.D.C. 2018) ("An agency's decision to collect and store information in a government database, without more, is clearly not a 'rule,' 'order,' 'license,' 'relief,' or 'the equivalent thereof.'") (quoting 5 U.S.C. § 551(4), (6), (8), (11), (13)).

### 3.    Plaintiffs cannot broadly attack implementation of EO 14168

Count III purportedly challenges "Defendants' adoption of a policy requiring removal or modification of the webpages and datasets." FAC ¶ 74. However, general policy statements "are not subject to judicial review under the APA." *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013) (quotation omitted). Plaintiffs try to argue around that bar, saying the "removal of webpages and datasets reflect[s] both individual agency actions and a policy change." Pls.' Mem. 26. But the Court cannot "review[] an abstract decision apart from specific agency action, as defined in the APA." *Biden*, 597 U.S. at 809. That means Plaintiffs cannot challenge an abstract "policy" separate and apart from the specific actions taken pursuant thereto.

*See Bark v. United States Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (noting that while "Plaintiffs appear to have attached a 'policy' label to their own amorphous description of the Forest Service's practices," "a final agency action requires more").

Clearly, Plaintiffs object to the agencies' general implementation of EO 14168. Yet an "on-going program or policy is not, in itself, a final agency action under the APA." *Cobell v. Kempthorne,* 455 F.3d 301, 307 (D.C. Cir. 2006) (quotation omitted). And "'broad programmatic attack[s]' that seek 'wholesale improvement' of an agency's work are not reviewable" under the APA. *Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 17 (D.D.C. 2023) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)). Count III's challenge to a nebulous "policy" cannot proceed. *See, e.g.*, *RCM Techs., Inc. v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 45 (D.D.C. 2009) (challenge to "an alleged 'policy,' not the specific denial of a visa application made pursuant to that policy, . . . is not justiciable").

## B.    Defendants acted within the zone of reasonableness

Plaintiffs' APA arguments also are substantively meritless. The APA standard of review "is narrow," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "deferential," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* Defendants have stayed within those bounds.

### 1.    OPM permissibly provided guidance to other agencies

Plaintiffs argue that OPM's memorandum exceeded that agency's statutory authority and failed to consider relevant issues. *See* Pls.' Mem. 11-14. Both arguments are misplaced. Plaintiffs incorrectly presume that OPM ordered "other agencies to remove information from their websites." Pls.' Mem. 12. As explained above, OPM could not—and did not—do so. OPM merely provided "initial guidance" about what "the President's Executive Order" required of agencies. OPM0001. Those agencies,

25

including HHS, then issued their own instructions to employees to fulfill their independent obligations to comply with EO 14168. *See* HHS0065. Resting on a misunderstanding about the effect and intent of OPM's guidance, Plaintiffs' statutory objection misses the mark.

Plaintiffs fare no better when quibbling with the basis and reasonableness of OPM's recommendations. OPM explicitly cited EO 14168 as the impetus for the guidance. *See* OPM0001; *see* OPM0003-12 (containing EO 14168 in record). And the ensuing items correspond to provisions in the Executive Order. *Compare* OPM0001-02 ("Take down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology"; "Withdraw any final or pending documents, directives, orders, regulations, materials, forms, communications, statements, and plans that inculcate or promote gender ideology"; "Ensure that all applicable agency policies and documents, including forms, use the term 'sex' and not 'gender'"), *with* EO 14168, at §§ 3(c), 3(e), 7(c) ("use the term 'sex' and not 'gender' in all applicable Federal policies and documents"; "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," "promptly rescind all guidance documents inconsistent with the requirements of" the Order). Though the "explanation was not lengthy," the APA "does not require a word count." *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 939 (D.C. Cir. 2017).

Relatedly, "[a]n agency need not address every conceivable implication of its decision." *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 980 (D.C. Cir. 2023). Here, OPM understandably did not address potential reliance interests of third parties in websites maintained by HHS because no evidence of such interests was before OPM. And "unidentified and unproven reliance interests are not a valid basis on which to undo agency action." *Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020).

26

### 2.    HHS did not violate the Paperwork Reduction Act by simply making information unavailable to the public

Plaintiffs claim that HHS "failed to comply with two distinct requirements of the" Paperwork Reduction Act: (1) public access to information and (2) advance notice of modification or removal. Pls.' Mem. 18-20. The first argument overstates the disclosure obligations of the Paperwork Reduction Act. The second issue will become moot.

Plaintiffs argue that "HHS's removal of webpages and datasets denies 'timely' access to 'public information.'" *Id.* 19. The Paperwork Reduction Act though simply says that an agency "shall . . . ensure timely and equitable access to the agency's public information." 44 U.S.C. § 3506(d)(1). It defines "public information" as "any information . . . that an agency discloses, disseminates, or makes available to the public." *Id.* § 3502(12). In other words, *if* the agency decides to make information public, it should do so in a way that ensures timely and equitable access to the public. So a monthly jobs report, for example, cannot be provided to a few preferred news organizations and then a week later to everyone else.

But the Paperwork Reduction Act does not preclude an agency from changing its mind about what information to make public. Congress expressly permitted agencies to "terminat[e]" the dissemination of information, at least so long as they provide adequate notice beforehand. 44 U.S.C. § 3506(d)(3). Once that information is withdrawn, any right to "timely and equitable access" automatically terminates. *See id.* §§ 3502(12), 3506(d)(1).

Plaintiffs' contrary view—that "timely and equitable access" is a permanent right— leads to absurd results. Taken to its logical conclusion, Plaintiffs' position means that once an agency adds policy information to its website, the agency must continue to host and promote that information for all time, regardless of whether the information is later discredited, debunked, or becomes inconsistent with the current Administration's policies. That cannot possibly be what Congress intended when it stated that agencies

27

should "ensure that the public has timely and equitable access to the agency's public information." *Cf.* 44 U.S.C. § 3518(e) ("Nothing in this subchapter shall be interpreted as . . . decreasing the authority of the President . . . with respect to the substantive policies and programs of departments, agencies and offices . . . ."). Accordingly, HHS did not fail to provide "timely and equitable access" because it had permissibly decided the subject information should no longer be public.

Next, Plaintiffs ding HHS for removing the information without "provid[ing] adequate notice." Pls.' Mem. 20 (quoting 44 U.S.C. § 3506(d)(3)). However, HHS will "take the steps necessary to comply" with the Paperwork Reduction Act "when implementing Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025)." J. Status R., ECF No. 23, at 3.

### 3.    Defendants did not violate the Evidence-Based Policymaking Act

The Evidence-Based Policymaking Act (EBPA) provides, in relevant part, that a "statistical agency or unit shall . . . produce and disseminate relevant and timely statistical information," "conduct credible and accurate statistical activities," and "conduct objective statistical activities," in accordance with rules promulgated by the Office of Management and Budget (OMB). 44 U.S.C. § 3563(a), (c); *see also* 5 C.F.R. Part 1321. OMB also must designate the agencies that qualify as a "statistical agency or unit." 44 U.S.C. § 3561(11). Of the Defendants, only two HHS components are so designated: the Center for Behavioral Health Statistics and Quality, and the National Center for Health Statistics. 89 Fed. Reg. 82453, 82455 (Oct. 11, 2024).

Plaintiffs argue that the Center for Behavioral Health Statistics and Quality, the National Center for Health Statistics, and HHS as their parent agency violated the EBPA by removing from their public websites certain "statistical products" and then by restoring those publications with the addition of a disclaimer stating the executive branch's policy regarding "gender ideology." Pls.' Mem. 22-26; *see also id.* 30-31

28

(reframing same claims in terms of failure to explain this purported violation); 5 C.F.R. § 1321.2 (defining "Statistical products"). Those arguments fail for two reasons.

First, nothing in the EBPA or its implementing regulations prohibits an agency from removing statistical products from its website after their initial public release. To the contrary, agencies have broad discretion to "determine: (1) What statistical products to disseminate . . . (2) The content of [their] statistical products; and (3) the timing of disseminations." 5 C.F.R. § 1321.5(a). When an agency *does* choose to disseminate a statistical product, it generally must do so on equal terms to all "person[s] or group[s]." *See id.* § 1321.2 (defining "Equitable access"); § 1321.7(a)(2) (specific equitable access requirements). But there is no legal requirement that such dissemination continue indefinitely or without interruption. Indeed, each statistical agency's discretion to *cease* publication is implicit in OMB's definition of the "[s]tatistical product[s]" that are subject to EBPA requirements in the first instance. *See id.* § 1321.2. That definition is limited to products "that *are* published or otherwise made available for public use." *Id.* (emphasis added). The EBPA regulates the quality and distribution of published statistical products—not the decision of whether or not they should be published at all.

Plaintiffs briefly identify several EBPA requirements they contend the Center for Behavioral Health Statistics and Quality, and the National Center for Health Statistics failed to follow here. *See* Pls.' Mem. 23-24 (citing 5 C.F.R. §§ 1321.5(c)-(d), 1321.7(a)(1) and (b)). Those citations do not move the needle. For one thing, the decision to *remove* statistical products from publication could not have violated timing regulations that by their terms apply only to such products' initial "release." *Cf.* 5 C.F.R. §§ 1321.5(c)(1), (d). By the same token, the decision to *stop disseminating* a statistical product did not implicate rules regarding how such products are "[p]roduce[d]" or the "manner" of their dissemination. *Cf. id.* § 1321.7(a)(1)(i)-(ii), § 1321.7(b) (discussing "methods" of producing and disseminating statistical products). Nor did HHS, as parent agency, improperly condition publication of a statistical product on "clearance of [its] content"

29

by "offices or officials" outside of the statistical agency. *Cf. id.* § 1321.7(b)(1). The Center for Behavioral Health Statistics and Quality, and the National Center for Health Statistics, as "[a]gencies" of the Executive Branch, were independently responsible, as was their parent HHS, for compliance with EO 14168. EO 14168, § 3(e).

Plaintiffs are also incorrect that adding to certain websites a banner with current Administration policy regarding "gender ideology" violated the EBPA. *See* Pls.' Mem. 25-26. As previously explained, Plaintiffs lack standing to challenge inclusion of the disclaimer. But even if Plaintiffs did have standing, their argument is meritless. Neither the EBPA nor the implementing regulations prohibit an agency from appending to a statistical product a statement that the agency rejects its premises or conclusions as a matter of policy. Those regulations recognize a separate category of agency publication—a "[s]tatistical press release"—that provides only a "policy neutral description of the data" available in a statistical product, "and does not include policy pronouncements." 5 C.F.R. § 1321.2. "Statistical products," by contrast, are subject to no such limitation. *See id.*

In other words, the bare expression of a government-wide policy cannot show that the statistical products themselves are not "impartial and free from undue influence" under the EBPA. *Cf. id.* § 1321.7(a)(1); Pls.' Mem. 26. Such a statement does not make the "methods" used in "producing" the underlying statistical products any less "transparent and reproducible." 5 C.F.R. § 1321.7(a)(1)(i). Nor does it result in the dissemination of the statistical products in a "limit[ed]" or "select[ive]" fashion. *See id.* § 1321.7(a)(1)(ii). Stating the "[t]he Trump Administration['s]" policy with respect to "gender ideology" on an Executive Branch agency webpage does not violate the EBPA.

### 4.    Plaintiffs cannot enforce the Information Quality Act

The Information Quality Act (IQA), Pub. L. 106-554, § 515, 114 Stat. 2763A-153 (2000), requires agencies to adopt "guidelines ensuring and maximizing the quality,

objectivity, utility, and integrity of information . . . disseminated by the agency," IQA § (b)(2)(A), and to "establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply" with government-wide guidelines issued by OMB, *id.* § (b)(2)(B). Plaintiffs argue that HHS arbitrarily and capriciously failed to consider its IQA guidelines in implementing EO 14168. Pls.' Mem. 28-30.

Courts that have "squarely addressed IQA-based APA claims," however, have uniformly concluded that the statute "creates no enforceable legal rights to information or its correctness" that may be vindicated through the APA. *See, e.g.*, *Muslim Advocs. v. U.S. Dep't of Justice*, No. 18-cv-02137, 2019 WL 3254230, at *7-11 (N.D. Cal. July 19, 2019) (collecting cases). Congress intended that "challenges to the quality of information disseminated by federal agencies should take place in [the] administrative [correction] proceedings" that the IQA requires each agency to make available. *Salt Inst. v. Thompson*, 345 F. Supp. 2d 589, 601 (E.D. Va. 2004), *aff'd on other grounds* 440 F.3d 156 (4th Cir. 2006). That is enough to reject Plaintiffs' IQA-based theory.

Moreover, even if Plaintiffs could enforce the IQA, their argument is meritless. Much like the EBPA rules discussed *supra*, nothing in HHS's IQA guidelines prohibits agencies from removing content from a government website following its initial publication. Those guidelines describe "policies and procedures that HHS agencies employ to ensure the *quality* of the information they *disseminate*"—they are silent on the decision of whether to disseminate at all. *See* HHS, *HHS Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated to the Public* (last visited Mar. 24, 2025), https://perma.cc/ZFH5-AQSB. Whether HHS acted arbitrarily and capriciously by "overlook[ing] an important aspect of the problem turns on what a relevant substantive statute makes 'important.'" *Detroit Int'l. Bridge Co. v. Canada*, 192 F. Supp. 3d 54, 78 (D.D.C. 2016) (modifications and quotations omitted) (quoting *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996)). An agency is

not required to "consider properly a factor that Congress did not identify for consideration," and does not overlook anything important when it sets an inapplicable statute aside. *Id.*

### 5. HHS reasonably complied with EO 14168

Finally, Plaintiffs argue at length that HHS violated the APA because HHS generally "failed to offer a reasoned explanation for" removing content from public websites under EO 14168. Pls.' Mem. 15-18, 27-28. But "the agency's path may reasonably be discerned" from the record. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). HHS implemented the sweeping, mandatory directives in EO 14168, including that agencies "use the term 'sex' and not 'gender' in all applicable Federal policies and documents," and "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology." EO 14168, at § 3(c), (e); *see also* HHS0031, HHS0065. Plaintiffs may find this unsatisfactory, but "if an executive agency . . . may lawfully implement the Executive Order, then it must do so." *Allbaugh*, 295 F.3d at 33.

### III. Plaintiffs are not entitled to extraordinary relief before a merits ruling

Not satisfied with expedited summary judgment briefing, Plaintiffs say the Court "should act immediately to enter a preliminary injunction." Pls.' Mem. 2. But the near completion of summary judgment briefing undercuts any reason to consider interim relief. The Court's forthcoming ruling on summary judgment will moot the issue of a preliminary injunction. *See, e.g.*, *Amneal Pharms. LLC v. FDA*, 285 F. Supp. 3d 328, 332 (D.D.C. 2018) ("[H]aving resolved the case on the merits, the Court will deny Amneal's motion for a preliminary injunction . . . as moot.").

In any event, Plaintiffs have not clearly shown their entitlement to "extraordinary" relief. *Winter*, 555 U.S. at 24. For all the reasons discussed above, Plaintiffs have no

likelihood of success on the merits, so the Court "need not proceed to review the other three preliminary injunction factors" before denying the motion. *Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009).

Should the Court examine these other factors, Plaintiffs have not proven injury "both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotations omitted). Nothing has changed since February 24, 2025, when the Court found that "the irreparable harm that justified the Court's first TRO is no longer present." Order, ECF No. 26, at 3. Plaintiffs invite the Court to consider webpages they "did not include in the Amended Complaint" as a basis for irreparable harm. Pls.' Mem. 33. That flouts the "general rule" that "a preliminary injunction may not issue when it is not of the same character as that which may be granted finally and when it deals with matter outside the issues in the underlying suit." *Sai v. Transp. Sec. Admin.*, 54 F. Supp. 3d 5, 8–9 (D.D.C. 2014) (quoting in part 11A C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure*: *Civil* § 2947 (3d ed.)); *see, e.g.*, *Bird v. Barr*, No. 19-CV-1581 (KBJ), 2020 WL 4219784, at *2 (D.D.C. July 23, 2020) ("this Court only possesses the power to afford preliminary injunctive relief that is *related* to the claims at issue in the litigation").

On the other hand, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. Here, "the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis added). At a minimum, the public interest favors the government's ability to function, which it cannot do without "the freedom to select the messages it wishes to convey." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015) (cleaned up).

Plaintiffs demand HHS "host on [its] websites the same information that they hosted just a few weeks ago." Pls.' Mem. 35. That ignores the change in presidential administration. Since then, the new Administration has announced new policies pursuant to which HHS revisited the information it chooses to host on its websites. Plaintiffs may disagree with these policies, but they "cannot force" the government to broadcast information it no longer wishes—and is not required—to convey. *Walker*, 576 U.S. at 219. Indeed, Defendants must retain the ability to "choose[] what to say and what not to say." *Shurtleff*, 596 U.S. at 251. A preliminary injunction that interferes with the government's freedom to select what messages to convey significantly harms the public interest.[6]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions for a preliminary injunction and expedited summary judgment, and grant Defendants' cross-motion for summary judgment.

March 24, 2025                    Respectfully submitted,

                                 /s/ James W. Harlow
                                 JAMES W. HARLOW
                                 Acting Assistant Director
                                 Consumer Protection Branch

---

[6] A preliminary injunction also would impose financial costs on Defendants. To identify, restore, and maintain all removed webpages, as Plaintiffs demand, Defendants must redirect personnel and technical resources from their normal duties, effectively losing any benefit from their compensation during that time. These expenses are unrecoverable even if Defendants ultimately prevail in this action. Defendants thus request that any preliminary injunction be accompanied by a bond under Federal Rule of Civil Procedure 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

Civil Division
U.S. Department of Justice
PO Box 386
Washington, DC  20044-0386
(202) 514-6786
(202) 514-8742 (fax)
james.w.harlow@usdoj.gov