**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DOCTORS FOR AMERICA, et al.

      Plaintiffs,

      v.

OFFICE OF PERSONNEL
MANAGEMENT, et al.

      Defendants.

Civil Action No. 25-cv-322-JDB

**PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION AND EXPEDITED SUMMARY
JUDGMENT AND MEMORANDUM IN OPPOSITION TO DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT**

David Chiu
  *San Francisco City Attorney*
Yvonne R. Meré (*pro hac vice*)
  *Chief Deputy City Attorney*
Sara J. Eisenberg (*pro hac vice*)
  *Chief of Complex and Affirmative Litigation*
Julie Wilensky (*pro hac vice*)
David S. Louk (DC Bar No. 90022039)
  *Deputy City Attorneys*
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102
(415) 505-0844

*Counsel for Plaintiff City and County
of San Francisco*

Zachary R. Shelley (DC Bar No. 90021549)
Adina H. Rosenbaum (DC Bar No. 490928)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
zshelley@citizen.org

*Counsel for All Plaintiffs*

## TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Argument ............................................................................................................................... 1

I.    Plaintiffs have standing. ............................................................................................... 1

    A.  Plaintiffs have suffered harm from Defendants' unlawful actions. ............................ 2

    B.  Plaintiffs' injuries are traceable directly to Defendants' unlawful conduct. ............... 5

    C.  Plaintiffs' injuries will be redressed by an order setting aside the OPM memorandum, Defendants' unlawful policy, and the webpage removals. ........................................... 6

    D.  Defendants have provided no relief that could moot Plaintiffs' claims....................... 8

II.    Defendants' actions are unlawful. ................................................................................ 10

    A.  OPM's memorandum was unlawful. .......................................................................... 10

        1.  OPM's memorandum was final agency action. .............................................. 10

        2.  OPM's memorandum was arbitrary and capricious, and in excess of statutory authority. ...................................................................................................... 13

    B.  The Health Agency Defendants' removal of webpages was unlawful. ...................... 15

        1.  The Health Agency Defendants' removal of webpages was final agency action. ....................................................................................................... 15

        2.  The Health Agency Defendants' removal of webpages was arbitrary and capricious. ...................................................................................................... 18

        3.  The Health Agency Defendants failed to explain their non-compliance with the Paperwork Reduction Act. ...................................................................... 18

        4.  The Health Agency Defendants failed to explain their non-compliance with the Evidence-Based Policymaking Act....................................................... 19

    C.  Adoption of the new policy was unlawful. ................................................................ 21

        1.  Adoption of the new policy was final agency action. .................................... 21

        2.  Adoption of a policy restricting access to vital health information was arbitrary and capricious. ............................................................................... 22

III.     Plaintiffs satisfy the requirements for preliminary injunctive relief. ............................... 23

Conclusion .................................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Slater*,
  528 U.S. 216 (2000) ............................................................................................ 8

*American Tort Reform Ass'n v. OSHA*,
  738 F.3d 387 (D.C. Cir. 2013) ........................................................................ 21

*Ass'n of Administrative Law Judges v. OPM*,
  640 F. Supp. 2d 66 (D.D.C. 2009) .................................................................. 13

*Bark v. USFS*,
  37 F. Supp. 3d 41 (D.D.C. 2014) ..................................................................... 21

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................... 10, 17

*Biden v. Texas*,
  597 U.S. 785 (2022) .......................................................................................... 21

*California Communities Against Toxics v. EPA*,
  934 F.3d 627 (D.C. Cir. 2019) ........................................................................ 10

*California v. EPA*,
  72 F.4th 308 (D.C. Cir. 2023) ........................................................................... 7

*Chafin v. Chafin*,
  568 U.S. 165 (2013) ............................................................................................ 8

*City of Sausalito v. O'Neill*,
  386 F.3d 1186 (9th Cir. 2004) ........................................................................... 2

*Clarke v. United States*,
  915 F.2d 699 (D.C. Cir. 1990) ........................................................................... 8

*CSI Aviation Services, Inc. v. DOT*,
  637 F.3d 408 (D.C. Cir. 2011) ........................................................................... 8

*DHS v. Regents of the University of California*,
  591 U.S. 1 (2020) .................................................................................. 5, 14, 15

*Does 1–26 v. Musk*,
  No. 25-cv-0462-TDC, 2025 WL 840574 (D. Md. Mar. 18, 2025) .................. 24

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999) ........................................................................... 24

iv

*Duncan v. Walker*,
533 U.S. 167 (2001)...................................................................................................... 12

*Environmental Defense Fund v. Regan*,
No. 20-cv-762-LLA, 2024 WL 3887383 (D.D.C. Aug. 20, 2024)........................................... 15

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024)..................................................................................................... 3

*Fund for Animals, Inc. v. BLM*,
460 F.3d 13 (D.C. Cir. 2006)........................................................................................ 10

*Hearst Radio, Inc. v. FCC*,
167 F.2d 225 (D.C. Cir. 1948)...................................................................................... 17

*In re Financial Oversight and Management Board for Puerto Rico*,
110 F.4th 295 (1st Cir. 2024)....................................................................................... 2

*Judicial Watch, Inc. v. National Energy Policy Development Group*,
219 F. Supp. 2d 20 (D.D.C. 2002)................................................................................ 16

*Larsen v. United States Navy*,
525 F.3d 1 (D.C. Cir. 2008)......................................................................................... 8

*Lovo v. Miller*,
107 F.4th 199 (4th Cir. 2024)...................................................................................... 11

*Magruder v. Capital One, National Ass'n*,
540 F. Supp. 3d 1 (D.D.C. 2021)................................................................................. 3

*Martin v. Franklin Capital Corp.*,
546 U.S. 132 (2005).................................................................................................. 11

*Maryland v. USDA*,
No. 25-cv-0748-JKB, 2025 WL 800216 (D. Md. Mar. 13, 2025)......................................... 24

*McGary v. Crowley*,
266 F. Supp. 3d 254 (D.D.C. 2017)............................................................................. 16

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v.
State Farm Mutual Automobile Insurance*,
463 U.S. 29 (1983).............................................................................. 14, 15, 22

*National Ass'n of Diversity Officers in Higher Education v. Trump*,
No. 25-cv-333, 2025 WL 573764 (D. Md. Feb. 21, 2025)................................................. 24

*National Council of Nonprofits v. OMB*,
No. 25-cv-239-LLA, 2025 WL 368852 (D.D.C. Feb. 3, 2025)............................................ 17

*National Council of Nonprofits v. OMB*,
   No. 25-cv-239-LLA, 2025 WL 597959 (D.D.C. Feb. 25, 2025)................................ 24

*National Environmental Development Ass'n's Clean Air Project v. EPA*,
   752 F.3d 999 (D.C. Cir. 2014) ................................................................. 13

*Natural Resources Defense Council, Inc. v. Morton*,
   337 F. Supp. 167 (D.D.C. 1971) ................................................................ 24

*New York Stock Exchange LLC v. SEC*,
   2 F.4th 989 (D.C. Cir. 2021) ............................................................. 10, 16

*Open Communities Alliance v. Carson*,
   286 F. Supp. 3d 148 (D.D.C. 2017) ............................................................ 17

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
   502 F. Supp. 3d 492 (D.D.C. 2020) ........................................................... 24

*Pacito v. Trump*,
   No. 2:25-cv-255-JNW, 2025 WL 893530 (W.D. Wash. Mar. 24, 2025) ............................. 24

*Parker v. District of Columbia*,
   478 F.3d 370 (D.C. Cir. 2007) .................................................................. 7

*People for the Ethical Treatment of Animals v. USDA*,
   797 F.3d 1087 (D.C. Cir. 2015) ................................................................. 2

*Perez v. Mortgage Bankers Ass'n*,
   575 U.S. 92 (2015) ............................................................................ 14

*Reeve Aleutian Airways, Inc. v. United States*,
   889 F.2d 1139 (D.C. Cir. 1989) ................................................................. 8

*RFE/RL, Inc. v. Lake*,
   No. 1:25-cv-799-RCL, 2025 WL 900481 (D.D.C. Mar. 25, 2025) ................................ 7, 20

*Sackett v. EPA*,
   566 U.S. 120 (2012) ....................................................................... 13, 17

*Sierra Club v. EPA*,
   754 F.3d 995 (D.C. Cir. 2014) .................................................................. 1

*Steel Co. v. Citizens for a Better Environment*,
   523 U.S. 83 (1998) ............................................................................ 6

*Thompson v. Clifford*,
   408 F.2d 154 (D.C. Cir. 1968) ................................................................. 11

vi

*Uzuegbunam v. Preczewski,*
   592 U.S. 279 (2021) ........................................................................................ 6

*Wagdy v. Sullivan,*
   316 F. Supp. 3d 257 (D.D.C. 2018) ............................................................... 17

*Watts v. SEC,*
   482 F.3d 501 (D.C. Cir. 2007) ................................................................. 16, 17

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) .................................................................................. 7, 20

*Zadvydas v. Davis,*
   533 U.S. 678 (2001) ...................................................................................... 11

**Statutes**

5 U.S.C. § 551(6) .............................................................................................. 10

5 U.S.C. § 551(13) ............................................................................................ 10

5 U.S.C. § 706(2) ............................................................................................... 7

5 U.S.C. § 706(2)(C) .................................................................................. 12, 13

44 U.S.C. § 3502(12) ........................................................................................ 18

44 U.S.C. § 3506(d)(1) ................................................................................ 16, 18

44 U.S.C. § 3506(d)(3) ................................................................................ 18, 19

44 U.S.C. § 3563(a) ..................................................................................... 19, 23

**Regulations**

5 C.F.R. § 1321.2 .............................................................................................. 20

5 C.F.R. § 1321.7(a)(1) ..................................................................................... 21

**Federal Rules of Civil Procedure**

Federal Rule of Civil Procedure 65(c) .............................................................. 24

**Treatises**

Charles A. Wright, Arthur R. Miller & Edward H. Cooper, 13C Federal Practice & Procedure,
   Jurisdiction § 3533.7 (3d ed. 2024) .............................................................. 8, 9

**Other Authorities**

HHS, Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated to the Public, https://aspe.hhs.gov/hhsguidelines-ensuring-maximizing-disseminated-information ................................................................................................ 23

**INTRODUCTION**

Plaintiffs Doctors for America (DFA) and the City and County of San Francisco (the City) brought this action to remedy the harm that DFA members and the City are suffering from their lack of access to webpages and datasets that Defendants abruptly removed from public access. As Plaintiffs have explained, Defendants' removal of webpages containing vital information that Defendants have long provided for the benefit of health professionals hinders the ability of DFA members and the City to conduct their work and requires them to expend time and effort. Plaintiffs are entitled to summary judgment because Defendants' actions violate the Paperwork Reduction Act of 1995 (PRA), the Foundations for Evidence-Based Policymaking Act of 2018 (EBP), and the Administrative Procedure Act (APA). And should the Court determine that preliminary relief is more appropriate at this time, the balance of the equities strongly favors granting a preliminary injunction because Defendants' actions continue to impose substantial harm on Plaintiffs, patients around the country, and public health.

Defendants' arguments in response are without merit. Defendants rely on case law that is inapposite, and their framing of the challenged actions mischaracterizes the case. This Court should therefore grant Plaintiffs' motion.

**ARGUMENT**

**I.    Plaintiffs have standing.**

DFA has standing to seek redress for the injuries its members are suffering because "(1) at least one of [its] members would have standing to sue; (2) the interests [DFA] seek[s] to protect are germane to [its] purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual members." *Sierra Club v. EPA*, 754 F.3d 995, 999 (D.C. Cir. 2014). For its part, the City "may sue to protect its own 'proprietary 'interests' that might be 'congruent'

1

with those of its citizens." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004); *see In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*, 110 F.4th 295, 308 (1st Cir. 2024).

Defendants argue that both DFA's members and the City lack a concrete injury that is traceable to Defendants' conduct and redressable by this Court. But DFA's members and the City are suffering and will continue to suffer harm as a direct result of Defendants' actions, and that harm will be remedied only by setting aside Defendants' unlawful actions.

### A.    Plaintiffs have suffered harm from Defendants' unlawful actions.

As Plaintiffs have explained, Defendants' removal of webpages that provided immediate access to critical public health data and guidance has caused them injury. *See* Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction and Expedited Summary Judgment (Pltfs. Mem.), ECF 37-1, at 7–8, 31–34. DFA members and the City relied on those webpages, and their removal has forced DFA members and the City to expend additional time and effort to scrounge for alternative resources, hindered their ability to provide evidence-based quality care, slowed their clinical practices, impeded patient treatment and communication, and paused or slowed their vital research or public health efforts. *See id.* As this Court recognized in granting a temporary restraining order, "[t]hese are injuries in fact." Mem. Op., ECF 12, at 8. "These doctors' time and effort are valuable, scarce resources, and being forced to spend them elsewhere makes their jobs harder and their treatment less effective." *Id.*

In reaching this conclusion, the Court explained that the "denial of 'information' that the doctors 'wish to use in their routine' activities has 'inhibit[ed] … their daily operations' and thereby caused 'an injury both concrete and specific to the work in which they are engaged." *Id.* at 8 (quoting *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)).

2

Arguing that the Court's reasoning was flawed because the opinion relied on *PETA*, a case concerning organizational standing, Defendants contend that *PETA* applied "unique standards for organizations" that do not apply here. Defs. Opp. 19. But the core Article III inquiry—injury in fact—applies to both individual and organizational plaintiffs, as well as governmental plaintiffs. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024) (stating that, to establish standing, "organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals"); *City of Sausalito*, 386 F.3d at 1198 (stating that municipality met its burden of establishing concrete "injury in fact" to its proprietary interests). And Defendants offer no support for the notion that an individual, unlike an organization, cannot suffer injury in fact when the government takes unlawful action that impedes her ability to do her job. *Cf. All. for Hippocratic Med.*, 602 U.S. at 391 (indicating that a "diversion of … doctors' time and resources" would be sufficient to support standing); *Magruder v. Cap. One, Nat'l Ass'n*, 540 F. Supp. 3d 1, 13 (D.D.C. 2021) (concluding that "stress and inconvenience" are cognizable harms for purposes of Article III (quoting *Frank v. Autovest, LLC*, 961 F.3d 1185, 1188 (D.C. Cir. 2020))). Defendants also fail to acknowledge the breadth of harm to the City, which relied on the removed webpages to make decisions about local programs, policies, and public health interventions. *See* Cohen Decl. ¶ 5; Philip Decl. ¶¶ 15–16.

Defendants also assert that Plaintiffs are not injured by the addition of inaccurate, inflammatory disclaimers to restored webpages. *See* Defs. Opp. 15–16. Those disclaimers, however—which characterize the CDC's own data and guidance as "extremely inaccurate"— impose on Plaintiffs the same type of harms. As part of the process of treating patients, healthcare providers frequently provide information to their patients. *See* Liou Decl. ¶ 8; Cohen Decl. ¶ 12. Defendants' webpages are "essential" for fostering effective communication between healthcare

providers and their patients. Cohen Decl. ¶ 12. Without webpages that foster that communication, healthcare providers "will have greater difficulty communicating with [their] patients, and [patients] are less likely to understand the treatments that [healthcare providers] recommend[]." Liou Decl. ¶ 8; *see* Cohen Decl. ¶ 12 (stating that the webpages are "an essential resource for fostering communication with patients"); *id.* ¶ 8 (stating that she is unlikely to use the webpages to communicate with at least some patients because of the added language). By negating an important way in which the webpages provided value, Defendants' addition of the inaccurate, inflammatory disclaimer will impede Plaintiffs' communication with patients and require them to expend additional time and effort.

In addition to disparaging Plaintiffs' injury, Defendants erect and attack two strawmen: that Plaintiffs assert standing based on risk of harm to their patients, and that Plaintiffs assert standing based on risk of harm to scientific knowledge. *See* Defs. Opp. 17–18. To be sure, Defendants' unlawful actions harm patients and hinder and halt scientific research that would otherwise improve public health.[1] But Plaintiffs have been clear that they assert standing based on harm to DFA members and the City itself. Plaintiffs' injury is based on harm to their *own* ability to do their jobs caring for patients, protecting public health, and carrying out scientific research. *See, e.g.*, Ramachandran Decl. ¶ 11 ("Not being able to access this information on the FDA's website, where I have accessed it in the past, will make *my* research more difficult." (emphasis added)); *id.* ¶ 17 ("*I* could not easily make comparisons to other forms of PrEP to discern whether an alternative treatment would offer more benefits—as *I* would have been able to do if *I* had access to the CDC resources." (emphasis added)); Liou Decl. ¶ 7 ("Without these crucial CDC resources,

---

[1] Harms to patients and public health are relevant considerations for the balance of the equities prong of preliminary injunctive relief. *See* Pltfs. Mem., ECF 37-1, at 34–36.

4

*I* am not able to do *my* job[.]" (emphasis added)); Cohen Decl. ¶ 8 ("As a provider, *I* am hesitant
to share materials that have this inaccurate and stigmatizing disclaimer." (emphasis added)); *id.*
¶ 5 ("The removal of these resources has negatively impacted *our* [i.e., the City's] research
efforts." (emphasis added)).

**B.    Plaintiffs' injuries are traceable directly to Defendants' unlawful conduct.**

A direct line leads from OPM's memorandum, through the Health Agency Defendants'
new policy, to the removal of webpages that has harmed Plaintiffs. OPM's memorandum was
issued on January 29, 2025. AR OPM0001–02. The next day, the Health Agency Defendants
adopted their new policy as a direct result of OPM's "directives." AR HHS0031, 56. And the
following day, the webpages came down—just as OPM had ordered. *See* AR HHS0062 (requiring
"immediate actions" to comply with OPM's January 31, 2025, deadline); Philip Decl. ¶ 8;
Ramachandran Decl. ¶ 5. Because Plaintiffs' harm flows directly from that line of action, their
injuries are traceable to the removal of webpages, and to the unlawful policy and OPM
memorandum that prompted the removals.

Defendants do not disagree with respect to webpages identified in the declarations. They
argue, though, that Plaintiffs' injuries are not traceable "to the removal of any webpage apart from
the ones discussed in the declarations." Defs. Opp. 17. To be sure, Plaintiffs suffered harm when
those pages were taken down. But the injuries discussed in the declarations also serve as examples
of the harm traceable to OPM's memorandum, the Defendants' unlawful policy, and their unlawful
action. Because those examples of harm are traceable to OPM's memorandum and the Defendants'
unlawful policy, Plaintiffs have standing to challenge the memorandum and policy themselves. *Cf.*
*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) (addressing a policy challenge brought by

an individual plaintiff). And relief as to the memorandum and policy are necessary to ensure that the injury caused by taking down individual webpages does not recur again and again.

**C.    Plaintiffs' injuries will be redressed by an order setting aside the OPM memorandum, Defendants' unlawful policy, and the webpage removals.**

An injury is redressable if there is "a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998); *see Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (recognizing that even "the ability 'to effectuate a partial remedy' satisfies the redressability requirement" (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992))). Because Plaintiffs are harmed by the removal of webpages, their requested relief—restoration of the webpages (i.e., setting aside the unlawful removals) and vacatur of the unlawful memorandum and policy that directed the removals—would remedy that injury. *See* Pltfs. Mem. 31–34, 36–37.

Defendants make two arguments in response. First, they argue that the injunctive relief that Plaintiffs seek would not redress their injuries from removal of *two* specific webpages that Defendants took down pursuant to Executive Order 14151.[2] Because the webpages were removed pursuant to Executive Order 14151, they contend, restoration of the webpages would not redress Plaintiffs' injuries. That argument is nonsensical. Regardless of the reason for removing the two pages, their removal was arbitrary and capricious and in violation of the APA and PRA.[3] *See* First Amended Complaint, ECF 20, ¶¶ 66–72. Executive Order 14151 does not excuse those legal defects.

---

[2] Defendants do not contest that restoration of the remaining webpages would redress Plaintiffs' injuries.

[3] Because the two webpages Defendants identify are maintained by FDA, *see* AR HHS0033, 35, Plaintiffs have not asserted that those removals violate the EBP. *See* Pltfs. Mem. 22–26.

Because "an executive order is not 'law' within the meaning of the Constitution or the APA," *California v. EPA*, 72 F.4th 308, 318 (D.C. Cir. 2023), executive orders do not provide a basis on which to ignore applicable law. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952) (holding that the President may not usurp Congress's lawmaking power by issuing an order that "directs that a presidential policy be executed in a manner prescribed by the President" rather than "direct[ing] that a congressional policy be executed in a manner prescribed by Congress"); *RFE/RL, Inc. v. Lake*, No. 1:25-cv-799-RCL, 2025 WL 900481, at *5 (D.D.C. Mar. 25, 2025) (stating that an agency may not ignore statutory obligations "even if the President has told them to do so"). Whether the two webpages to which the Health Agency Defendants point were removed based on policy preferences expressed in EO 14168 or EO 14151 therefore makes no difference here. Regardless of which executive order prompted Defendants' actions, the appropriate remedy for the unlawful removal is to "set aside" the removals and order the pages restored. 5 U.S.C. § 706(2). That remedy will redress Plaintiffs' injuries from lack of access to those webpages.

Second, Defendants argue that, because EO 14168 included some instructions about "gender ideology," Defendants were required to take exactly the set of actions that they took. *See* Defs. Opp. 12–13. Building on this premise, they assert that the removals would occur even without the OPM memorandum and without their unlawful policy change and, thus, that setting aside the memorandum and policy would provide no relief. In making this standing argument, Defendants assume that Plaintiffs will not prevail on the merits. But "when considering whether a plaintiff has Article III standing, a federal court must assume, arguendo, the merits of his or her legal claim." *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007). If, as Defendants must accept for the purpose of standing, OPM's memorandum and Defendants' new policy are unlawful,

then setting aside the memorandum, policy, and unlawful actions will lead to restoration of the webpages, remedying the harm to Plaintiffs.

Further, Defendants wrongly assume that EO 14168 required the exact unlawful conduct in which Defendants engaged. Plaintiffs previously explained the ways in which OPM's memorandum and Defendants' new policy failed to follow the commands in the Executive Order, including its requirement not to violate otherwise applicable law. *See* Pltfs. Mem. 11–31.

**D.    Defendants have provided no relief that could moot Plaintiffs' claims.**

"A case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox v. Serv. Emps. Int'l Union, Loc.* 1000, 567 U.S. 298, 306 (2012)). When a defendant asserts that a case is moot because it has voluntarily ceased its unlawful activity, it bears the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (cleaned up).

A defendant may moot a case by committing itself to a course of action that provides full relief to the plaintiff. *E.g.*, *Larsen v. U.S. Navy*, 525 F.3d 1, 5 (D.C. Cir. 2008). But "[a]n incomplete response to the plaintiff's demands does not moot the action." Charles A. Wright, Arthur R. Miller & Edward H. Cooper, 13C Fed. Prac. & Proc. Juris. § 3533.7 (3d ed. 2024) (hereinafter Wright & Miller); *see CSI Aviation Services, Inc. v. DOT*, 637 F.3d 408, 414 (D.C. Cir. 2011). And when the government equivocates about the relief it will provide or defends its unlawful course of action, it fails to provide complete relief. *See Reeve Aleutian Airways, Inc. v. United States*, 889 F.2d 1139, 1143 (D.C. Cir. 1989) (rejecting mootness argument because the government's "very defense" of the basis for its conduct indicated a "possibility of recurrence" of the harmful conduct); *Clarke v. United States*, 915 F.2d 699, 702 (D.C. Cir. 1990) (distinguishing

cases in which the government engages in "deliberate equivocation" from those in which it offers material "concession[s]"); Wright & Miller, § 3533.7, at nn. 25–26 (collecting cases).

Here, Defendants assert that this case is moot as to webpages that they temporarily restored pursuant to the Court's Temporary Restraining Order—pages that they have stated will remain posted while they undertake "a review to determine the applicability of the [PRA, Information Quality Act (IQA), and EBP]." Joint Status Report, ECF 23, at 2. To start, Defendants' argument ignores that numerous other webpages were taken down pursuant to their unlawful policy and remain down. Moreover, absent further order of this Court, whether the restored pages will remain online depends on whether "*Defendants* determine" that "such statutes apply to a particular website or dataset." *Id*. at 3 (emphasis added); *see* Defs. Opp. 20–21. That representation would offer Plaintiffs relief only if Defendants, sitting as the judges of their own actions, decide that they agree with Plaintiffs' merits arguments. But Defendants have already made clear that they do not agree with Plaintiffs on the merits. *See* Defs. Opp. 21–34. Because their representation is both contingent and inconsistent with their litigating position, it does not moot the ongoing controversy between the parties. *See* Pltfs. Mem. 32–33.

With respect to the PRA's notice requirement, Defendants do not assert that Plaintiffs' claims *are* moot but that they "will become moot" because of their representation that, as to presently restored webpages (but not other webpages), they will comply with *their* view of the PRA. Defs. Opp. 27. Here, however, the question is whether Plaintiffs' claims *are* moot, not whether—contingent on uncertain future actions—they might become moot in the future. *See Reeve Aleutian Airways*, 889 F.2d at 1143 (rejecting mootness argument due to the "possibility of recurrence"). At this time, as Defendants appear to agree, the claims are not moot.

9

II.    **Defendants' actions are unlawful.**

    A.    **OPM's memorandum was unlawful.**

        1.    **OPM's memorandum was final agency action.**

OPM's memorandum was a final agency action appropriate for this Court's review. "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). This definition "is expansive . . . [and] is meant to cover comprehensively every manner in which an agency may exercise its power." *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 20 (D.C. Cir. 2006) (internal quotation omitted). Under the APA, "'order' means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). "In other words, an order is virtually any authoritative agency action other than a rule." *New York Stock Exch. LLC v. SEC*, 2 F.4th 989, 992 (D.C. Cir. 2021). OPM's memorandum easily fits this definition. It was an order that marked the consummation of OPM's decisionmaking process, and it directed other agencies to take action, including removal of webpages within two days of when OPM issued the memorandum. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

Defendants offer two counterarguments. First, Defendants argue that OPM's memorandum is not agency action at all but mere pontification, or friendly "guidance," about OPM's view of EO 14168. Defs. Opp. 22. Neither the memorandum itself nor the Health Agency Defendants' understanding of the memorandum supports that position. *See Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019) (recognizing that whether an agency memorandum is final agency action must be "viewed in its specific regulatory context").

OPM's memorandum did not simply offer suggestions of steps that agencies might take to comply with EO 14168, and it did not simply list the actions OPM itself planned to take to comply with the Executive Order. Rather, the memorandum stated that agencies "should take" a specific list of actions, that those actions were to be taken within two days, and that other agencies should "report to OPM on all steps taken to implement" the memorandum. AR OPM0001–02. In the ordinary course, "should" is understood to be equivalent to "shall." *See Martin v. Franklin Capital Corp.*, 546 U.S. 132, 136 (2005) (contrasting "may" with "'shall' or 'should'"). Although in some contexts the word "should" may be permissive, the context here makes clear that OPM's memorandum mandated other agencies to act. *See Thompson v. Clifford*, 408 F.2d 154, 158 (D.C. Cir. 1968) (holding that when assessing whether language is permissive or mandatory, "the conclusion to be reached 'depends on the context'" (quoting *United States ex rel. Siegel v. Thoman*, 156 U.S. 353, 359 (1895))); *Lovo v. Miller*, 107 F.4th 199, 212 (4th Cir. 2024) ("[T]he impact of seemingly mandatory or permissive language depends heavily on the context in which it appears."); *Zadvydas v. Davis*, 533 U.S. 678, 697 (2001) (recognizing that the term "may" is often, but not always, permissive).

To begin with, OPM's memorandum opened with an attempt to establish "its authority." AR OPM0001. OPM would have had no reason to establish its authority had it been offering advice, rather than directing agency action. Next, the memorandum set deadlines for agency action that did not exist in the Executive Order. *Compare* AR OPM0001–02 (memorandum setting deadline to act on January 31, 2025, and deadline to report to OPM on February 7, 2025), *with* AR OPM0009 (EO 14168 setting deadlines for "Agency Implementation and Reporting" 120 days after the order was issued). That OPM bolded and underlined those deadlines, *see id.*, strengthens the conclusion that it was directing other agencies to treat the deadlines as binding. Finally, OPM

11

directed other agencies to "report to OPM on all steps taken to implement" the memorandum. AR OPM0002. OPM's exercise of oversight—which has no basis in EO 14168—indicates that it was seeking to exercise authority over other agencies. The combination of OPM's expression of authority, its independent imposition of deadlines for action, and its exercise of oversight makes plain that it was mandating other agencies to act.

Like OPM, the Health Agency Defendants understood OPM's memorandum as a command. HHS described OPM's memorandum as containing "directives," AR HHS0056, and stated that "HHS and [its] divisions are acting accordingly to execute" the OPM memorandum, AR HHS0031.

Defendants also argue that OPM's memorandum could not be agency action because, as Plaintiffs pointed out, OPM lacks authority to issue orders like those contained in the memorandum. *See* Defs. Opp. 22. That argument misunderstands the APA's "final agency action" requirement. The APA permits judicial review of "agency action … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Interpreting "final agency action" to exclude actions taken in excess of statutory authority would render section 706(2)(C) void. Because courts must "give effect, if possible, to every clause and word of a statute," *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks and citation omitted), Defendants' reading is not only wrong but absurd.

Last, Defendants argue that OPM's memorandum was not final agency action because "OPM contemplated an ongoing dialogue with other agencies about compliance with EO 14168." Defs. Opp. 22. Regardless of whether discussions might occur, however, there was nothing tentative about OPM's memorandum. Rather, the memorandum marked the conclusion of whatever scant deliberations OPM engaged in. Even if future "dialogue" could lead to additional

directions, the possibility that OPM might order further action does not render the memorandum and instruction that it issued on January 29, 2025, non-final. *See Sackett v. EPA*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might reconsider ... does not suffice to make an otherwise final agency action nonfinal."); *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future.").

The decision in *Association of Administrative Law Judges v. OPM*, 640 F. Supp. 2d 66 (D.D.C. 2009), to which Defendants cite, is not to the contrary. In that case, the court concluded that a "notice that [OPM] planned to post an ALJ vacancy announcement 'within the next few days' does not constitute final agency action." *Id*. at 73. Although the announcement itself could be final agency action, the notice of a future announcement was merely "an anticipatory step, … and not the final step in a decision-making process." *Id.* Here, by contrast, OPM's memorandum itself directed exactly how other agencies were to act and the timeline by which that action was to be completed. Because, when it issued its memorandum, OPM had consummated its deliberative process and set forth a course of action other agencies were required (albeit unlawfully) to follow, its memorandum is final agency action subject to judicial review.

### 2. OPM's memorandum was arbitrary and capricious, and in excess of statutory authority.

Defendants appear to concede that OPM lacked authority to issue its memorandum. *See* Defs. Opp. 22 ("Plaintiffs agree that OPM could not 'direct other agencies to remove information from their websites.'" (quoting Pltfs. Mem. 12)). That alone is sufficient to conclude that OPM's memorandum was unlawful. *See* 5 U.S.C. § 706(2)(C). Because the Health Agency Defendants acted pursuant to OPM's memorandum, it is also enough to conclude that their new policy and the removals it prompted are unlawful and should be set aside. *See* Pltfs. Mem. 17.

13

Moreover, even apart from OPM's lack of authority, its issuance of the memorandum violates the APA. Defendants argue that OPM did not need to consider or address reliance interests or the various ways in which the memorandum would direct other agencies to act unlawfully and on a timeline that did not permit them to consider the lawlessness of their actions. *See* Defs. Opp. 26. Yet they fail to cite, much less engage with, the Supreme Court precedent requiring agencies to engage in "reasoned decisionmaking," *Regents of the Univ. of Cal.*, 591 U.S. at 16 (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)), and to address "important aspect[s] of the problem" that their actions seek to address, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Instead, Defendants note that "[a]n agency need not address every conceivable implication of its decision." Defs. Opp. 26 (quoting *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 980 (D.C. Cir. 2023)). That is true but beside the point. Webpages that the government developed for use by health professionals and public health departments necessarily created reliance interests. *See* Pltfs. Mem. 13. And reliance interests are quintessential considerations that agencies must take into account when they do an about face. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015). To the extent that Defendants suggest that Plaintiffs are nitpicking a thoughtful decisionmaking process, the administrative record belies that characterization. The administrative record with respect to OPM includes only Executive Order 14168 and OPM's memorandum itself. *See* AR OPM0001–12. The striking paucity of the record displays that OPM gave no thought to myriad relevant considerations that should have been obvious from the face of its order.

Indeed, Defendants do not suggest that OPM's reasoning extended beyond the Executive Order. They state that OPM gave adequate explanation because "OPM explicitly cited EO 14168 as the impetus for the guidance." Defs. Opp. 26. As discussed above, OPM apparently failed to

14

consider that EO 14168 directed agencies to act in accordance with existing law, that EO 14168 did not grant (or even purport to grant) OPM the authority that it asserted, and that its memorandum directed other agencies to take unlawful action. *See* Pltfs. Mem. 12.

Finally, Defendants assert that "unidentified and unproven reliance interests are not a valid basis on which to undo agency action." Defs. Opp. 26 (quoting *Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020)). Plaintiffs, however, do not ask this Court to act without identifying the reliance interests at stake. Plaintiffs have identified those interests, as has the Court. *See* Pltfs. Mem. 13–14, 27–28; Mem. Op. 16. And in the first instance, before taking action, OPM had a duty to consider them. *See Regents of the Univ. of California*, 591 U.S. at 33 (holding that where an agency is "not writing on a blank slate, it [is] required to assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns" (internal quotation marks and citation omitted)).

In short, neither the administrative record nor Defendants' opposition memorandum reveal "consideration of the relevant factors." *State Farm*, 463 U.S. at 43. They thus cannot show a "rational connection between the facts found and the choice made." *Id.*

**B.    The Health Agency Defendants' removal of webpages was unlawful.**

**1.    The Health Agency Defendants' removal of webpages was final agency action.**

The Health Agency Defendants' removal of webpages and datasets were final dispositions of the public's right to access those materials. *See* AR HHS0031, 56 (directing removal of webpages); AR HHS0001–29, 33–56 (identifying specific removed webpages). Those dispositions determined—and denied—the right of public access to the removed webpages and datasets, and disrupted the substantial interests in maintaining public access. *See Env't Def. Fund v. Regan*, No. 20-cv-762-LLA, 2024 WL 3887383, at *12 (D.D.C. Aug. 20, 2024) (recognizing that an agency

"determine[s] rights and obligations" when it "provides or fails to provide … access to" information to which the plaintiff is entitled); *Jud. Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.*, 219 F. Supp. 2d 20, 40 (D.D.C. 2002) ("The decisions to hold meetings without public access to the meetings or the records created indeed had a legal consequence—the denial of the public's right of access to that information."); *cf.* 44 U.S.C. § 3506(d)(1) (guaranteeing the public "timely and equitable access to the agency's public information").

Defendants argue that removal is not final agency action because the actions were not "orders." *See* Defs. Opp. 23–24. Congress, however, broadly crafted the APA's definition of agency action, including the definition of "order," to "assure the complete coverage of every form of agency power, proceeding, action, or inaction." *Jud. Watch*, 219 F. Supp. 2d at 38 (quoting S. Doc. No. 248, 79 Cong., 2d Sess., 255 (1946)). In line with that understanding, courts have explained that "order" covers "virtually any authoritative agency action other than a rule." *New York Stock Exch.*, 2 F.4th at 992. And while Defendants ask that the Court disregard D.C. Circuit precedent, *see* Defs. Opp. 24, that request plainly cannot be granted. *See McGary v. Crowley*, 266 F. Supp. 3d 254, 261 (D.D.C. 2017).

Thus, under the APA and the cases applying it, because the Health Agency Defendants determined the right of public access when they removed the webpages, their actions fall comfortably within the definitions of "agency action" and "order." Seeking to avoid this result, Defendants cite cases in which courts concluded that the challenged agency actions were not agency action within the meaning of the APA. Each is inapt here. In *Watts v. SEC*, 482 F.3d 501 (D.C. Cir. 2007), the D.C. Circuit held that an agency's decision not to comply with a subpoena in ongoing litigation was not an "order" within the meaning of the APA. *Id.* at 506. The court reasoned that the decision not to comply with the subpoena was "simply an ordinary litigation

decision, not an agency's 'final disposition' of the kind referenced in the APA." *Id.* In *Hearst Radio, Inc. v. FCC*, 167 F.2d 225 (D.C. Cir. 1948), the D.C. Circuit held that a potentially defamatory statement in an FCC publication was not an agency action. *Id.* at 262. And in *Wagdy v. Sullivan*, 316 F. Supp. 3d 257 (D.D.C. 2018), a visa applicant opted not to challenge the denial of her application and instead challenged the "decision" to enter information about her in a government database. *Id.* at 262. The court held the "decision to collect and store information in a government database, without more," was not challengeable final agency action because "[t]he alleged storage of 'false and derogatory information' about [the plaintiff] in government databases does not, in and of itself, compel or restrict her in any way." *Id.* None of the cases Defendants cite is at all analogous to the facts here.

Finally, Defendants assert that *some* of the removals were not "final" because notes in the administrative record regarding a handful of webpages indicated that the webpages may be reposted with modifications. *See* Opp. at 6–7. The measure of final agency action, however, is not whether the agency may at some undefined point change course, but rather whether the action is the "'consummation' of the agency's decisionmaking process" and carries with it legal consequences. *Bennett*, 520 U.S. at 177–78; *see Sackett*, 566 U.S. at 127; *cf. Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 158 (D.D.C. 2017) (treating as final agency action a two-year suspension of an agency rule); *Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) (holding that a "temporary" pause of funds was final agency action). Even if the Health Agency Defendants may eventually restore access to a modified version of this subset of removed webpages, it is undeniable that they made a final decision to deny access to the versions of the webpages as they previously existed and to deny access to any version of the webpages for the foreseeable future. That determination is final agency action under the APA.

17

## 2. The Health Agency Defendants' removal of webpages was arbitrary and capricious.

As Plaintiffs have explained, the Health Agency Defendants' removal of webpages is arbitrary and capricious because, among other things, they failed to provide a reasoned explanation for the removals and to account for reliance interests that were upended by the removals. Pltfs. Mem. 15–18. Defendants' only argument in this regard is that they "implemented the sweeping, mandatory directives in EO 14168." Defs. Opp. 32. They wrongly assume, however, that they complied with EO 14168 by following OPM's memorandum and that OPM's memorandum was itself lawful. And as with their defense of OPM's memorandum, they ignore their duty to ensure that their actions were lawful. *See supra* II.A.2.

## 3. The Health Agency Defendants failed to explain their non-compliance with the Paperwork Reduction Act.

The PRA requires that agencies must "ensure that the public has timely and equitable access to the agency's public information," 44 U.S.C. § 3506(d)(1), and that agencies must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products," *id.* § 3506(d)(3). The Health Agency Defendants failed to satisfy either requirement and failed to explain how their new policy accounted for those requirements. *See* Pltfs. Mem. 18–22, 30–31. They offer no defense of their failure to comply with the PRA's notice requirement.

The Health Agency Defendants argue that they did not need to provide "timely or equitable access" because, once they took down the pages, the information on them was no longer "public information." Therefore, they reason, the timely and equitable access requirement no longer applies. When an agency first "discloses, disseminates, or makes [information] available to the public," however, that information becomes "public information," 44 U.S.C. § 3502(12), and the

18

requirement to provide timely and equitable access attaches to it. Here, without doubt, the webpages were public information on January 30, and the PRA's requirements thus were applicable when Defendants took down those pages on January 31.

That said, that information is "public information" does not mean that the PRA requires an agency to post the information on its website. It does, though, mean that the agency must make the information available through timely and equitable means. And if the public information is a significant information dissemination product, the agency must also provide notice of changes. *See id.* § 3506(d)(3). As Plaintiffs have explained, whether access to information is timely and equitable depends on context. *See* Pltfs. Mem. 19–20. For some public information, availability through the Freedom of Information Act or other mechanisms may well be timely. But for vital health information that is designed to be, and in practice long has been, accessed on an as-needed basis, the only way for access to be timely is for Defendants to maintain the information on their websites. *See id.*

Defendants also suggest that the "timely and equitable" access requirement means only that *if* an agency opts to maintain public information, it must provide equal access to that information. *See* Defs. Opp. 27 ("So a monthly jobs report, for example, cannot be provided to a few preferred news organizations and then a week later to everyone else."). While that reading provides meaning to the term "equitable," it saves nothing for the word "timely." By contrast, Plaintiffs' reading provides meaning to each of the key terms.

### 4. The Health Agency Defendants failed to explain their non-compliance with the Evidence-Based Policymaking Act.

The EBP requires statistical agencies and their parents to "produce and disseminate relevant and timely statistical information." 44 U.S.C. § 3563(a). The statute applies to "information dissemination products that are published or otherwise made available for public use

that describe, estimate, forecast, or analyze the characteristics of groups." 5 C.F.R. § 1321.2. As Plaintiffs have explained, HHS, CDC, SAMHSA, NCHS, and CBHSQ violated their duties under the EBP by denying public access to statistical information and by adding inaccurate disclaimers to the pages restored in response to this Court's Temporary Restraining Order. *See* Pltfs. Mem. 22–26.

Defendants offer three arguments in response. First, they argue that the EBP does not bar eliminating public access to relevant statistical information after the agency first disseminates it. To the extent that Defendants read the EBP to be satisfied by a brief posting, their reading is not in accordance with the statute. The EBP requires agencies to disseminate the statistical information so long as the information is "relevant and timely." Notably, Defendants do not argue that the removed statistical information is no longer "relevant and timely," and, in any event, Plaintiffs have provided evidence that the information is relevant and timely. *See, e.g.*, Liou Decl. ¶ 7 (discussing immediate need for information in a public health crisis).

Next, the Health Agency Defendants repeat their assertion that, because they are "independently responsible … for compliance with EO 14168," Defs. Opp. 30, any action they take that they view as complying with the Executive Order is necessarily lawful. That assertion is incorrect. *See Youngstown Sheet & Tube Co.*, 343 U.S. at 588; *RFE/RL, Inc.*, 2025 WL 900481, at *5; *supra* I.C.

Last, Defendants assert that their addition of inaccurate, inflammatory disclaimers to statistical products does not violate the EBP because the statistical products themselves were originally produced in an impartial manner. *See* Defs. Opp. 30. That explanation ignores the requirement that statistical products be "impartial and free from undue influence and the appearance of undue influence" and that the covered agencies "disseminat[e] impartial statistical

products in a clear and complete manner, without limitation or selection to promote a particular policy position or group interest." 5 C.F.R. § 1321.7(a)(1). By adding a disclaimer that is factually inaccurate and provides misleading representations about the statistical products, the Health Agency Defendants have violated these requirements. *See* Pltfs. Mem. 26.

### C.    Adoption of the new policy was unlawful.

#### 1.    Adoption of the new policy was final agency action.

The adoption of a policy requiring removal of webpages was the consummation of Defendants' deliberations regarding public access. *See* AR HHS0031. The new policy had the legal effect of denying public access to webpages purportedly related to "gender ideology," AR HHS0031, and it is final agency action subject to judicial review. *See Biden v. Texas*, 597 U.S. 785, 808 (2022) (concluding agency memorandum was final agency action).

Although Defendants frame this case as a challenge to "abstract" "general policy statements," Defs. Opp. 24–25, the cases on which they rely are a mismatch for the facts here. For example, in *American Tort Reform Ass'n v. OSHA*, 738 F.3d 387 (D.C. Cir. 2013), the D.C. Circuit held that a policy statement is "subject to review when it is relied upon or applied to support an agency action in a particular case." *Id*. at 395 (internal quotation marks omitted). Here, Defendants adopted and immediately applied the new policy. Because the Health Agency Defendants relied on the new policy when they undertook their mass removal of webpages, the policy itself is subject to judicial review. *See id.* By contrast, in *Bark v. USFS*, 37 F. Supp. 3d 41 (D.D.C. 2014), also cited by Defendants, the "[p]laintiffs appear to have attached a 'policy' label to their own amorphous description of the Forest Service's practices," which were never put into any "written rules, orders, or even guidance documents." *Id*. at 50. Here, Defendants issued authoritative

guidance setting forth the policy and directing action under that policy. *See* AR OPM0001–02, HHS0031, 56–58.

### 2. Adoption of a policy restricting access to vital health information was arbitrary and capricious.

The new policy is arbitrary and capricious because Defendants failed to provide any explanation for the new policy and to account for reliance interests that were upended by the new policy. Pltfs. Mem. 28. Their only argument in this regard is the same one they offered with respect to the webpage removals: that they "implemented the sweeping, mandatory directives in EO 14168." Defs. Opp. 32. Just as that is an insufficient basis on which to justify the webpage removals, *see supra* II.B.2, it is insufficient to justify their new policy.

Defendants' new policy is also arbitrary and capricious because it fails to account for Defendants' duties under the PRA, EBP, *see supra* II.B, and IQA. With respect to the IQA, Defendants begin by arguing that Plaintiffs cannot enforce the IQA. Plaintiffs do not seek to do so. Rather, as Plaintiffs have explained, when the Health Agency Defendants implemented the new policy, they failed to account for their duties under the IQA. While an administrative claim may be the proper remedy for individual violations of the IQA, an agency action taken without consideration of its statutory duty is arbitrary and capricious, reflecting a "fail[ure] to consider an important aspect of the problem" before the agency. *State Farm*, 463 U.S. at 43. None of the cases to which Defendants cite suggests otherwise.

Defendants also argue that the IQA applies only to the initial decision to publish information, not to their ongoing duty to ensure public access to information that meets the standards that Congress has set. HHS's IQA guidelines apply to the "development and dissemination of timely and high quality data and information." HHS, Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated to the

Public (HHS Guidelines), https://aspe.hhs.gov/hhsguidelines-ensuring-maximizing-disseminated-information. That requirement parallels the EBP's requirement to "produce and disseminate relevant and timely statistical information." 44 U.S.C. § 3563(a). Defendants' argument regarding the IQA parrots their argument with respect to the EBP, and it is flawed for the same reasons. *See supra* II.B.4.

**III.    Plaintiffs satisfy the requirements for preliminary injunctive relief.**

Because Defendants agree that the Court should proceed to summary judgment, *see* Defs. Opp. 32, this Court can grant Plaintiffs' motion without addressing the factors for preliminary injunctive relief. Should the Court choose to address preliminary injunctive relief, however, all three factors weigh in Plaintiffs' favor: They are likely to prevail on the merits. They suffer irreparable harm absent this Court's intervention. And equity and the public interest weigh in favor of immediate relief.

To the limited extent that Defendants address the latter two preliminary injunctive factors, they do so by pretending that this lawsuit is limited to a challenge to a list of removed webpages enumerated by Plaintiffs and therefore that Plaintiffs' request for preliminary injunctive relief extends beyond the permanent relief they could seek. In fact, this case challenges the removal by HHS and its components of any webpages pursuant to the OPM memorandum and the new policy. *See* Pltfs. Mem. 1–2. Plaintiffs continue to be harmed by Defendants' unlawful policy because they rely on removed webpages that have not yet been restored, because Defendants' representation about temporarily restoring webpages is insufficient to eliminate both Plaintiffs' ongoing harm and the imminent risk of additional harm, and because additional pages may be taken down at any time under the OPM memorandum and policy. *See* Pltfs. Mem. 31–34; Bakke Decl. ¶¶ 5–6; Cohen Decl. ¶ 13–14.

On the equities, Defendants assert that denying public access to webpages is in the public interest because there has been a "change in presidential administration," and "the new Administration has announced new policies." Defs. Opp. 34. The current administration is entitled to its policy preferences, but its actions are constrained by the requirements Congress has set forth through the APA, PRA, and EBP, including the requirement of reasoned decisionmaking.

Because nothing in Defendants' memorandum draws into question the merits of Plaintiffs' claims, the harms Plaintiffs are suffering, or where the balance of the equities falls, the Court, if it does not grant summary judgment, should grant a preliminary injunction ordering restoration of all webpages that were removed pursuant to the OPM memorandum or Defendants' new policy.[4]

---

[4] Defendants briefly suggest that, if the Court issues a preliminary injunction, it should require Plaintiffs to post security under Federal Rule of Civil Procedure 65(c). The Court should deny that request. Rule 65(c) "vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)); *see Maryland v. USDA*, No. 25-cv-0748-JKB, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) ("District courts have discretion to set the required security at a nominal amount, and this approach has long been followed in public-interest litigation cases." (citation omitted) (collecting cases)). Here, where Plaintiffs' claims do not concern the expenditure of money or monetary damages, and the balance of equities strongly favors Plaintiffs, a bond would not be appropriate. *See Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (imposing nominal bond where substantial security "would have the effect of denying the plaintiffs their right to judicial review of administrative action"); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-333, 2025 WL 573764, at *29 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review"); *Pacito v. Trump*, No. 2:25-cv-255-JNW, 2025 WL 893530, at *14 (W.D. Wash. Mar. 24, 2025) (denying injunction bond in a case involving expenditure of money); *Does 1–26 v. Musk*, No. 25-cv-0462-TDC, 2025 WL 840574, at *32 (D. Md. Mar. 18, 2025) (requiring $100 bond because Defendants would not "necessarily have to expend materially significant resources"); *Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239-LLA, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (denying request for injunction bond).

**CONCLUSION**

This Court should grant Plaintiffs' motion for summary judgment, deny Defendants' cross-motion, declare Defendants' actions and newly adopted policy unlawful, permanently enjoin the implementation of their unlawful policy, and order restoration of all webpages that were removed pursuant to the OPM memorandum or Defendants' new policy, in violation of the PRA, EBP, and the APA. In the alternative, the Court should grant a preliminary injunction enjoining the implementation of their unlawful policy and ordering restoration of all webpages that were removed pursuant to the OPM memorandum or Defendants' new policy, in violation of the PRA, EBP, and the APA.

Dated: April 3, 2025                                  Respectfully submitted,

/s/ *David S. Louk*                                   /s/ *Zachary R. Shelley*
David Chiu                                            Zachary R. Shelley (DC Bar No. 90021549)
  *San Francisco City Attorney*              Adina H. Rosenbaum (DC Bar No. 490928)
Yvonne R. Meré (*pro hac vice*)                       Allison M. Zieve (DC Bar No. 424786)
  *Chief Deputy City Attorney*               Public Citizen Litigation Group
Sara J. Eisenberg (*pro hac vice*)                    1600 20th Street NW
  *Chief of Complex and Affirmative Litigation*  Washington, DC 20009
Julie Wilensky (*pro hac vice*)                       (202) 588-1000
David S. Louk (DC Bar No. 90022039)                   zshelley@citizen.org
  *Deputy City Attorneys*
Fox Plaza                                             *Counsel for All Plaintiffs*
1390 Market Street, 7th Floor
San Francisco, CA 94102
(415) 505-0844

*Counsel for Plaintiff City and County*
*of San Francisco*