# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Doctors for America, *et al.*,

          Plaintiffs,

  v.

Office of Personnel Management, *et al.*,

          Defendants.

Case No. 1:25-cv-00322-JDB

### Reply Memorandum in Support of
### Defendants' Cross-Motion for Summary Judgment

<div style="margin-left: 40%;">

YAAKOV M. ROTH
Acting Assistant Attorney General

AMANDA N. LISKAMM
Director

LISA K. HSIAO
Deputy Director, Civil Litigation

JAMES W. HARLOW
Acting Assistant Director
GABRIEL I. SCHONFELD
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386

</div>

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

ARGUMENT.....................................................................................................................2

    I.    Plaintiffs Have Not Met Their Burden of Establishing Subject-Matter Jurisdiction.
.........................................................................................................................2

       A.    Plaintiffs' Lone Theory of Injury Is Not Viable. ...................................................3

       B.    Plaintiffs Cannot Paper Over Their Traceability and Redressability Flaws. .......8

       C.    Any Procedural Challenge to the Removal of Webpages That HHS Restored
Pending Further Review is Moot.............................................................................10

    II.    The APA's Finality Requirement Prevents Plaintiffs From Micromanaging the
Contents of Executive Branch Websites..................................................................10

    III.    Defendants' Implementation of the Executive Orders Was Not Arbitrary,
Capricious, or Contrary to Law................................................................................15

       A.    Agencies Can Stop Disseminating Previously Public Information. ...................15

       B.    Agencies May State the Executive Branch's Policy Regarding a Statistical
Product......................................................................................................................19

       C.    Defendants' Implementation of a Lawful Executive Order According to Its
Terms Was Not Arbitrary and Capricious.............................................................20

CONCLUSION.................................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Architects & Eng'rs for 9/11 Truth v. Raimondo,*
    2023 WL 6439491 (D.C. Cir. Oct. 3, 2023) ......................................................6, 18

*Att'y Gen. v. Wynn,*
    104 F.4th 348 (D.C. Cir. 2024) ......................................................................16

*Bark v. U.S. Forest Serv.,*
    37 F. Supp. 3d 41 (D.D.C. 2014) ..................................................................14

*Bennett v. Spear,*
    520 U.S. 154 (1997)......................................................................................13

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh,*
    295 F.3d 28 (D.C. Cir. 2002)...................................................................14, 22

*Campaign Legal Ctr. v. FEC,*
    2024 WL 4263853 (D.D.C. Sept. 23, 2024) ....................................................6

*CBOE Futures Exch., LLC v. SEC,*
    77 F.4th 971 (D.C. Cir. 2023) .......................................................................21

*Craig v. City of Los Angeles,*
    2023 WL 9319237 (C.D. Cal. Dec. 15, 2023)...................................................6

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006).....................................................................................4, 5

*Detroit Int'l Bridge Co. v. Canada,*
    192 F. Supp. 3d 54 (D.D.C. 2016) .................................................................21

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
    878 F.3d 371, 433 U.S. App. D.C. 394 (D.C. Cir. 2017) ....................................5

*Envt'l Def. Fund v. Regan,*
    2024 WL 3887383 (D.D.C. Aug. 20, 2024) ....................................................11

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024)...................................................................................4, 5, 6

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015)....................................................................4, 5, 8

*Found. on Econ. Trends v. Lyng,*
    943 F.2d 79 (D.C. Cir. 1991)...........................................................................7

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992).....................................................................................22

*Friends of Animals v. Jewell*,
  828 F.3d 989, 424 U.S. App. D.C. 167 (D.C. Cir. 2016) .......................................................5

*Fuller v. Winter*,
  538 F. Supp. 2d 179 (D.D.C. 2008) ....................................................................................13

*Hearst Radio, Inc. v. FCC*,
  167 F.2d 225 (D.C. Cir. 1948) ............................................................................................12

*Int'l Tel. & Tel. Corp. v. Loc. 134, Int'l Bhd. of Elec. Workers, AFL-CIO*,
  419 U.S. 428 (1975) ............................................................................................................12

*Jud. Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.*,
  219 F. Supp. 2d 20 (D.D.C. 2002) ......................................................................................11

*Kushner v. Ill. State Toll Highway Auth.*,
  575 F. Supp. 2d 919 (N.D. Ill. 2008) ....................................................................................6

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ............................................................................................................17

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ..............................................................................................................7

*Magruder v. Capital One, N.A.*,
  540 F. Supp. 3d 1 (D.D.C. 2021) ..........................................................................................5

*\*Marino v. Nat'l Oceanic and Atmospheric Admin.*,
  451 F. Supp. 3d 55 (D.D.C. 2020) ........................................................................................6

*\*Muslim Advocs. v. U.S. Dep't of Justice*,
  2019 WL 3254230 (N.D. Cal. July 19, 2019) ...............................................................18, 19

*N.Y. Stock Exch. LLC v. SEC*,
  2 F.4th 989 (D.C. Cir. 2021) ..........................................................................................11, 12

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015) .............................................................................................4

*Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
  489 F.3d 1267 (D.C. Cir. 2007) .............................................................................................9

*Scenic Am., Inc. v. Dept. of Transp.*,
  836 F.3d 42 (D.C. Cir. 2016) ................................................................................................9

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ...........................................................................................................6, 8

*Sussman v. U.S. Marshals Serv.*,
  494 F.3d 1106 (D.C. Cir. 2007) ...........................................................................................13

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ..............................................................................................................7

*Valero Energy Corp. v. EPA,*
     927 F.3d 532 (D.C. Cir. 2019) ............................................................................. 12

*Wagdy v. Sullivan,*
     316 F. Supp. 3d 257 (D.D.C. 2018) ..................................................................... 12

*Citizens for Resp. & Ethics in Washington v. U.S. Off. of Special Couns.,*
     480 F. Supp. 3d 118 (D.D.C. 2020) ........................................................................4

*Watts v. SEC,*
     482 F.3d 501 (D.C. Cir. 2007) ................................................................... 11, 12

**Statutes**

*Information Quality Act,
     Pub. L. 106-554, § 515, 114 Stat. 2763A-153 (2000) ...................................... 15, 18

5 U.S.C. §
     551 ........................................................................................................................ 11
     552 ................................................................................................................. 11, 16

44 U.S.C. §
     *3502 ............................................................................................................. 15, 16
     *3506 ............................................................................................................. 15, 16
     *3563 ..................................................................................................................... 17

**Rules**

Fed. R. Civ. P. 65(c) ...................................................................................................... 22

**Regulations**

5 C.F.R. §
     *1321.2 ..................................................................................................... 15, 17, 19
     *1321.7 ............................................................................................................ 17, 20

**Other Authorities**

*Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ......................................... passim

*Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20,2025) ......................................... passim

HHS, *HHS Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and
     Integrity of Information Disseminated to the Public* (last visited Apr. 14, 2025),
     https://perma.cc/ZFH5-AQSB ................................................................... 18, 19

\* Indicates those cases or authorities on which counsel chiefly relies. Local Civ. R. 7(a).

## INTRODUCTION

Plaintiffs have suffered no injury, have made no case on the merits, and have shown no entitlement to relief. This Court should enter summary judgment for Defendants.

At the outset, Plaintiffs have not met their burden of establishing this Court's subject-matter jurisdiction. Their lone theory of injury-in-fact—that individual declarants' jobs would be more convenient if HHS[1] disseminated certain information via agency websites—fails for multiple reasons. It fails as a matter of law because it applies *organizational* standing concepts in a case where no Plaintiff asserts a right to sue on that basis, and because it improperly seeks to avoid the D.C. Circuit's strict standards for standing based on *informational* injury. And it fails as a matter of fact because under *any* legal standard, Plaintiffs' vague allegations of professional inconvenience do not show an injury cognizable under Article III. Moreover, even if these were cognizable injuries, they would not be traceable to any guidance or policy other than EO 14168[2] and 14151[3] themselves, and Plaintiffs' claims would be moot to the extent they have already obtained relief through HHS's decision to restore certain web content pending further administrative review.

Plaintiffs have also failed to identify a final agency action subject to challenge under the APA. HHS's removal and modification of certain web content does not suffice because it has no *legal* consequences. Plaintiffs' attempts to show otherwise only

---

[1] All acronyms and other shorthand have the same meaning as in Defendants' opening brief. Unless otherwise specified, references in this brief to "HHS" refer collectively to all components of the Department of Health and Human Services named as defendants in this litigation.

[2] *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*. Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (EO 14168).

[3] *Ending Radical and Wasteful Government DEI Programs and Preferencing*. Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) (EO 14151).

highlight the weakness of their claims. Because Plaintiffs do not rely on any statute which confers a legal right to information, the mere limitation of their access to the same is not the sort of legally consequential action for which the APA provides review. Holding otherwise would have significant harmful consequences, allowing courts and private litigants to superintend agency websites under statutes that Congress plainly never meant to authorize such intrusive oversight. OPM's issuance of non-binding guidance to agencies implementing EO 14168 was also not a final agency action. All parties agree that OPM had no power to issue a more authoritative command, and the record does not come close to rebutting the presumption that the agency acted within the limits of its authority.

Lastly, even if this Court were to reach the merits of their APA claims, Plaintiffs still could not prevail. None of the federal statues on which Plaintiffs rely—not the Paperwork Reduction Act, not the Evidence-Based Policymaking Act, and not the Information Quality Act—prohibited HHS from deciding that previously-public information should no longer be disseminated on its websites, or from adding a statement of Executive Branch policy to certain agency webpages. The bottom line is this: HHS in this case explained that it was removing web content based directly on the President's instructions, and it did not violate any statute in doing so. Because an agency does not act arbitrarily or capriciously by implementing a lawful Executive Order according to its terms, Defendants are entitled to summary judgment.

<div align="center">ARGUMENT</div>

## I.    Plaintiffs Have Not Met Their Burden of Establishing Subject-Matter Jurisdiction.

At the summary judgment stage, Plaintiffs have the burden of producing actual evidence establishing this Court's jurisdiction. They have failed to do so for multiple reasons.

*First* and most fundamentally, Plaintiffs lack Article III standing to pursue *any* of their claims because they have not shown that either they or their members were injured by the removal or modification of content from HHS websites. Neither their declarants' professional inconvenience, nor their disagreement with the views of the Executive Branch, amount to a cognizable injury.

*Second*, even if Plaintiffs had been harmed by those specific removals or modifications, they would still lack standing to challenge other agency conduct that has no causal relationship to those injuries. Because the removals and modifications of which Plaintiffs complain were independently required by the plain terms of EO 14168 and EO 14151, Plaintiffs' injuries cannot be traced to—and would not be redressed by relief regarding—either OPM's guidance or HHS's so-called "policy" of complying with Presidential directives.

*Third*, Plaintiffs' claims are moot to the extent they assert that HHS failed to provide adequate notice of, or explanation for, removal of web content that the agency previously committed to restoring pending further review. *See* J. Status R., ECF No. 23, at 3. Were Plaintiffs to prevail on the merits of those claims, they could (at most) obtain an order vacating the original removal decisions and remanding to HHS for further consideration. Since HHS has already *reversed those decisions*, there is no more relief for this Court to grant. This is classic, straightforward, mootness—notwithstanding the possibility that the agency may later make a *new* decision with which Plaintiffs disagree.

### A.    Plaintiffs' Lone Theory of Injury Is Not Viable.

Out of Plaintiffs' original theories of injury-in-fact, *see* Defs.' Mem., ECF No. 47, at 14-20, they now disavow "standing based on risk of harm to their patients" and "risk of harm to scientific knowledge," Pls.' Opp'n, ECF No. 49, at 4. That leaves only their assertion that the removal of certain webpages and addition of a notice of Executive

Branch policy "harm[ed]" their declarants' "ability to do their jobs." *Id.* Plaintiffs have not carried their burden to establish the legal and factual bases for this theory.

*First*, Plaintiffs cannot rely on cases addressing organizational standing theories—which are not alleged here—or otherwise invoke the test for organizational standing in this case simply because "the core Article III inquiry . . . applies to both individual and organizational plaintiffs." Pls.' Opp'n. 3. Without a doubt, individuals and organizations alike are subject to Article III standing requirements. *See, e.g., FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024). It is equally true, though Plaintiffs ignore it, that a distinct "organizational-standing doctrine" exists "in our Circuit" to assess whether an organizational plaintiff satisfies those requirements. *Citizens for Resp. & Ethics in Washington v. U.S. Off. of Special Couns.*, 480 F. Supp. 3d 118, 127 (D.D.C. 2020). *PETA* is explicitly part of that line of precedent. *See People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093-94 (D.C. Cir. 2015) (discussing "when an organization's purported injury is *not* sufficiently concrete and demonstrable to invoke our jurisdiction"); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (describing "a two-part inquiry" from *PETA* to determine whether an organization suffered a concrete injury for standing). But neither the DFA member-declarants nor San Francisco assert standing as organizations. *See* Defs.' Mem. 19. Thus, *PETA* is simply inapposite.

Furthermore, Plaintiffs effectively concede that there is "no prior case in which an individual plaintiff established standing by importing a theory of injury for organizations," as they attempt here. *See* Defs.' Mem. 19. To evade this obvious problem, Plaintiffs try to shift responsibility onto Defendants to negate their theory. Pls.' Opp'n 3. But it is always *Plaintiffs'* burden to "make the showings required for standing," including the necessary legal support, and the Court must "presume" it "lack[s] jurisdiction" unless and until they do. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).

Neither of the two cases Plaintiffs cite validates their claim to standing based on allegations of professional inconvenience to individual persons. *See* Pls.' Opp'n 3. Contrary to Plaintiffs' assertion, *id.*, the Court in *FDA v. Alliance for Hippocratic Medicine* did not hold that a "'diversion of . . . doctors' time and resources' would be sufficient to support standing." Rather, the Court held that those allegations were insufficient to confer standing because they were too speculative and attenuated to establish causation. 602 U.S. 367, 390 (2024).

Similarly inapposite is *Magruder v. Capital One, N.A.*, 540 F. Supp. 3d 1 (D.D.C. 2021). At the pleading stage, the *Magruder* court accepted that "'stress and inconvenience' might be cognizable harms'" for a Fair Debt Collection Practices Act claim that has "analogs in the common-law unjustifiable-litigation torts." *Id.* at 13-14 (quotations omitted). Of course, no such claim is alleged here, so no analogy to the common-law unjustifiable-litigation torts is possible. Thus, contrary to Plaintiffs' suggestion, *Alliance for Hippocratic Medicine* and *Magruder* did not expand the bounds of concrete injuries under Article III to include abstract increases in the subjective difficulty of one's job.

Additionally, Plaintiffs cannot invoke the organizational standing concept of operational impairment, *see Food & Water Watch*, 808 F.3d at 919-20, to evade the D.C. Circuit's strict limits on informational standing—limits which they do not even attempt to meet. Standing based upon an informational injury requires that a plaintiff show that: "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378, 433 U.S. App. D.C. 394 (D.C. Cir. 2017) (internal quotation marks omitted) (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992, 424 U.S. App. D.C. 167 (D.C. Cir. 2016)).

Although Plaintiffs avoid saying so explicitly, there is no question that their claimed injury is at bottom an informational one. They assert that their jobs are more difficult when the government withdraws on-demand access to certain information, and less difficult when such access is provided. *Alliance for Hippocratic Medicine* rejected a similar theory of standing based on allegations that plaintiffs' professional activities had been impaired by an agency's supposed failure to publicize information. *See* 602 U.S. at 395-96. The Supreme Court held that the *Alliance* plaintiffs could not show standing by asserting that their operations were made "more difficult" by FDA's alleged failure to "properly collect[] and disseminat[e] information" about a drug. The Court also recognized that, although plaintiffs' allegations suggested an informational injury, they had not claimed informational injury as a basis for standing, or shown "that federal law require[d] FDA to disseminate such information upon request by members of the public." *Id.* Judges in this circuit have likewise rejected "attempt[s] to repackage . . . [an] otherwise incognizable informational injury" in terms of organizational impairment. *Architects & Eng'rs for 9/11 Truth v. Raimondo*, 2023 WL 6439491 (D.C. Cir. Oct. 3, 2023) (per curiam); *see also Marino v. Nat'l Oceanic and Atmospheric Admin.*, 451 F. Supp. 3d 55, 61-64 (D.D.C. 2020); *Campaign Legal Ctr. v. FEC*, 2024 WL 4263853, at *7-8 (D.D.C. Sept. 23, 2024). Again, Plaintiffs have not tried to satisfy (and presumably, cannot reach) the high bar for informational standing.

*Second*, the handful of declaration excerpts cited by Plaintiffs confirm that there is no cognizable harm to any identified DFA member or to San Francisco from the removal of certain webpages. *See* Pls.' Opp'n 3-4 (quoting Drs. Liou, Ramachandran, Cohen, and Philip). The risk that Dr. Ramachandran's research may become "more difficult," Ramachandran Decl., ECF No. 37-9, ¶ 11, is purely "abstract" and not concrete, *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). So is the claim that Dr. Ramachandran cannot as "easily make comparisons" between data. Ramachandran Decl. ¶ 17; *see Craig v. City of Los Angeles*, 2023 WL 9319237, at *2–3 (C.D. Cal. Dec. 15,

2023) (inferring that plaintiff "dealt with some inconvenience" in producing paperwork, but "this is not enough to establish a concrete harm"); *Kushner v. Ill. State Toll Highway Auth.*, 575 F. Supp. 2d 919, 922-23 (N.D. Ill. 2008) (finding that "subjection to a five-day busy signal" that delayed "request [for] a hearing," "[w]hile no doubt annoying," was a "limited inconvenience" that "d[id] not constitute a concrete injury in fact").

As for Dr. Liou's purported inability "to do [her] job," Liou Decl., ECF No. 37-7, ¶ 7, that sort of "conclusory allegation[] [in] an affidavit" is facially insufficient to establish standing at summary judgment, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). What's more, the contention is untethered to any "tangible" or "intangible harm[]" which is "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). Dr. Liou, for instance, has not suffered any adverse economic or employment consequences. (And Plaintiffs foreswear "standing based on risk of harm to their patients." Pls.' Opp'n 4.) At most, Dr. Liou wants CDC to continue maintaining certain data, but Article III is not satisfied "whenever federal agencies are not creating information a member of the public would like to have." *Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 85 (D.C. Cir. 1991).

Turning to San Francisco, Plaintiffs' rhetoric about "the breadth of harm to the City" does not match the evidence. Pls.' Opp'n 3 (citing Cohen Decl., ECF No. 37-4, ¶ 5; Philip Decl., ECF No. 37-8, ¶¶ 15-16). Dr. Cohen's statement that San Francisco "uses" certain webpages "to make decisions about local programs, policies, and resources," Cohen Decl. ¶ 5, is so conclusory that it describes no harm at all, *see Nat'l Wildlife Fed'n*, 497 U.S. at 888. And Dr. Philip simply says that without the Youth Risk Behavior Surveillance Study, the public health department "would not be able to design public

health policies and interventions as effectively." Philip Decl. ¶¶ 15-16.[4] But the risk that an unknown, future policy may be marginally less effective is a textbook example of harm that is "abstract" rather than "real." *Spokeo*, 578 U.S. at 340. At bottom, no declarant carries the evidentiary burden of establishing a concrete injury from the removal of any webpage.

*Third*, Plaintiffs also have not proved injury from HHS's addition of policy disclaimers to restored webpages, which Plaintiffs assert "impose . . . the same type of harms" that are deficient for the reasons discussed above. Pls.' Opp'n 3. As Defendants have explained, such harms are merely derivative of certain declarants' disagreement with the disclaimer. *See* Defs.' Mem. 15.[5] Plaintiffs conspicuously decline to distinguish Defendants' supporting authorities. Indeed, they confirm the real dispute: Dr. Cohen and Dr. Philip believe the disclaimer is "inaccurate" and "inflammatory." Pls.' Opp'n 4. However, the law is clear that Plaintiffs cannot elevate a disagreement with Executive Branch policy into a cognizable, concrete injury. *See* Defs.' Mem. 15.

### B.   Plaintiffs Cannot Paper Over Their Traceability and Redressability Flaws.

Beyond the fatal flaws in Plaintiffs' theory of injury lurk even more obstacles to standing, specifically the elements of traceability and redressability. The biggest problem is that the relief Plaintiffs seek—"setting aside the OPM guidance and [HHS's] 'policy'—will not remedy their alleged injury." Defs.' Mem. 12. As Defendants demonstrated, any removal of a webpage or addition of a disclaimer is directly and

---

[4] Dr. Philip further speculates that a less effective policy may place certain youth "at greater risk" of physical harm. Philip Decl. ¶ 16. But Plaintiffs do not assert standing "based on risk of harm to their patients." Pls.' Opp'n 4. Plus, naked speculation about future harm cannot "satisfy this Circuit's 'very strict understanding of what increases in risk and overall risk levels . . . count as 'substantial.'" Defs.' Mem. 17 (quoting *Food & Water Watch*, 808 F.3d at 915).

[5] Plaintiffs incorrectly suggest Dr. Liou discussed the disclaimers in her declaration. *See* Pls.' Opp'n 3-4. She did not. The only two declarants who discuss the disclaimers are Drs. Cohen and Philip. *See* Defs.' Mem. 15.

independently required by EO 14151 and EO 14168. *See id.* 12-13. In response, Plaintiffs vaguely suggest that the Executive Orders might not require the "exact" actions that Defendants took. Pls.' Opp'n 7-8. But they do not identify any relevant webpage that did not need to be modified or removed pursuant to one of those Executive Orders. Nor do they discuss any way in which OPM's guidance or HHS's so-called "policy" of compliance with Executive Orders meaningfully differs from the requirements of the Executive Orders themselves.

Plaintiffs are wrong to say Defendants' redressability argument "assume[s] that Plaintiffs will not prevail on the merits." Pls.' Opp'n 7. Defendants expressly assumed the opposite. *See* Defs.' Mem. 11 n.3. Defendants' point is that even if Plaintiffs are right on the merits of their challenge to OPM's guidance and HHS's so-called "policy," setting aside those actions will not redress their injuries because "'the new status quo is held in place by other forces'—the executive orders." Defs.' Mem. 13 (quoting *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007)).

At most, Plaintiffs show that the OPM memorandum and so-called HHS "policy" were contributing factors in their purported injuries. *See* Pls.' Opp'n 5. But that is not enough to establish a likelihood of redressability here because, even if this Court were to vacate those actions of subordinate Executive Branch officials, the same webpage modifications and removals would have to be made pursuant to the President's existing commands. *See* Defs.' Mem. 13. When the record fails to establish that a plaintiff's requested relief would result in a different outcome, the plaintiff has not established standing. *Scenic Am., Inc. v. Dept. of Transp.*, 836 F.3d 42, 50-53 (D.C. Cir. 2016) (holding that the court would not rely on outcomes that were "'speculative,' rather than 'likely'" and that, based upon the evidence before the court, vacating guidance was unlikely to redress plaintiff's injuries).

Plaintiffs also misapprehend Defendants' argument with respect to the two webpages removed under EO 14151. The point is not that the Executive Order under which they were removed affects whether "*restoration of the webpages would* . . . redress Plaintiffs' injuries." Pls.' Opp'n 6-7 (emphasis added). Rather, relief as to a guidance and "policy" implementing *EO 14168* would not lead to the restoration of websites removed under the separate *EO 14151*.

### C. Any Procedural Challenge to the Removal of Webpages That HHS Restored Pending Further Review is Moot.

Lastly in terms of subject-matter jurisdiction, Defendants explained why Count II is largely moot: HHS committed to maintaining certain webpages even after expiration of this Court's Temporary Restraining Order, and to complying with all applicable statutory procedures before removing or modifying them in the future. *See* Defs.' Mem. 20-21; J. Status R., ECF No. 23, at 3. Plaintiffs resist mootness because they may disagree with any action Defendants might subsequently take regarding these webpages. *See* Pls.' Opp'n 9. But the prospect of such a future dispute does not change the fact that, as to the webpages which HHS has committed to maintaining pending further review, the *particular January 2025 decisions that Plaintiffs challenge* have been withdrawn and will be superseded in the future (if at all) by new actions. Put another way, for these webpages this is not a case of mootness based on voluntary cessation. As to Plaintiffs' claim that Defendants needed to follow certain procedures or consider certain issues prior to removing these webpages, the agency's voluntary action has already afforded Plaintiffs all the relief—effectively vacatur and reconsideration by the agency—that they could hope to obtain from this Court under the APA.

## II. The APA's Finality Requirement Prevents Plaintiffs From Micromanaging the Contents of Executive Branch Websites.

Even if Plaintiffs had proved standing, their claims still fail at the threshold for lack of final agency action. *See* Defs.' Mem. 21-25. HHS's removal or modification of its own

webpages does not suffice because that conduct had no legal consequences. And Plaintiffs cannot overcome this shortcoming by targeting OPM's non-binding guidance or a so-called HHS "policy" of complying with an Executive Order.

**Webpage Removals and Modifications.** Holding that an agency issues a reviewable "order" when it alters the contents of its own website would have harmful and far-reaching consequences, installing courts and private litigants as *de facto* webmasters over the Executive Branch. *See id.* 23-24 (citing *Watts v. SEC*, 482 F.3d 501, 506 (D.C. Cir. 2007)). The APA does not require such an "odd" result in this case, *id.*, because HHS's removal and modification of certain web content—which did not order anyone to do anything—was not a "final disposition" of any legal right, *see* 5 U.S.C. § 551(6).

Plaintiffs respond that HHS made a "final disposition[] of the public's right to access those materials." Pls.' Opp'n 15-16. That only begs the question, however, of whether the public actually possesses such a right. Plaintiffs' authorities show as much—denial of access to information "determine[s] rights and obligations" only if Congress has created a "freestanding [statutory] right" to obtain it. *Envt'l Def. Fund v. Regan*, 2024 WL 3887383, at *12 (D.D.C. Aug. 20, 2024); *see also Jud. Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.*, 219 F. Supp. 2d 20, 31, 40 (D.D.C. 2002) (finding final agency action in denial of access to information "that members of the public possess enforceable rights to obtain . . . under [the Federal Advisory Committee Act]"). No such right exists here.

As discussed in greater detail *infra*, at 15-20, the statutes upon which Plaintiffs rely govern the quality of information disseminated by an agency and the means by which such dissemination takes place. Those statutes do not, however, give any person the right to demand that an agency continue to publicly disclose information against its wishes. Put another way, this is not a case under FOIA or similar statutes, where Congress has commanded agencies to "make [information] available to the public," and a definitive failure or refusal to do so is final agency action subject to review. *See* 5

U.S.C. § 552(a); *see also, e.g.*, *id.* § 1009(c). Because the statutes at issue here govern *how*, not *whether*, agencies make information publicly accessible, HHS's adjustment of such access was not a reviewable "final disposition." *See id.* § 551(6).

Contrary to Plaintiffs' suggestion, Defendants do not ask this Court to "disregard," Pls.' Opp'n 16, the D.C. Circuit's statement that "an order is virtually any authoritative agency action other than a rule," *N.Y. Stock Exch. LLC v. SEC*, 2 F.4th 989, 992 (D.C. Cir. 2021). To be sure, the webpage removals at issue here were not "a rule." *Id.* But it does not necessarily follow that website management is "an order." As Defendants noted, one could characterize all manner of official agency conduct as "authoritative" in a colloquial sense (like declining to respond to a subpoena, collecting and storing information in a database, or publishing a report); yet, courts have held such conduct does not constitute, legally, an "order" under the APA. *See* Defs.' Mem. 24 (collecting cases). Plaintiffs entirely neglect this critical point, ignoring the forest for the trees.

Even then, Plaintiffs briskly declare "inapt" each case Defendants cited without explaining why. *See* Pls.' Opp'n 16. But the similarities are not so easily denied. It is hard to see how HHS's implementation of the Executive Orders truly differs from "internal agency meetings and consultations" regarding a subpoena that could not be "comfortably described as an 'adjudication.'" *Watts*, 482 F.3d at 506. Likewise, Plaintiffs' allegation that the disclaimer added to HHS websites is "inaccurate [and] inflammatory" does not carry any more definitive legal consequences than an accusation that publication of a report in the Federal Register was "defamatory." *Compare* Pls.' Opp'n 4, 17, *with Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 226-27 (D.C. Cir. 1948). And if an agency's "decision to collect and store information in a government database" was "clearly not a[n] . . . 'order,'" *Wagdy v. Sullivan*, 316 F. Supp. 3d 257, 262 (D.D.C. 2018), then there is no good reason for a different result regarding the decision to *stop* maintaining information on a government website. Put simply, HHS's website curation decisions are not a "final disposition" of a proceeding with "some determinate

consequences for the party to the proceeding." Defs.' Mem. 23 (quoting *Int'l Tel. & Tel. Corp. v. Loc. 134, Int'l Bhd. of Elec. Workers, AFL-CIO*, 419 U.S. 428, 443 (1975)).

**OPM Guidance.** As Defendants explained, OPM's "initial guidance" was not final agency action because it merely "express[ed] [OPM's] view" of what agencies *should* do with their websites in the near term to comply with the requirements of EO 14168. Defs.' Mem. 22-23 (quoting *Valero Energy Corp. v. EPA*, 927 F.3d 532, 536 (D.C. Cir. 2019)). At minimum, this was not an action "by which rights or obligations [were] determined, or from which legal consequence . . . flowe[d]." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Nor *could* it have been. All parties agree that, with respect to the modification and removal of webpages at issue here, OPM lacked authority to tell HHS what it *must* do. *See* Defs.' Mem. 22; Pls.' Opp'n 12.

Because OPM's guidance was not self-executing, HHS took separate action to adopt it as the agency's own view of what was required by EO 14168. *See* HHS0065. The record clearly shows that the agency understood its "actions related to" web content and "gender ideology" to be "required *by the EO*"—not by OPM. *See* HHS0031 (emphasis added). Plaintiffs' response—flyspecking the language of the OPM memo and certain record documents as if it were interpreting a statute—misses the point. *See* Pls.' Opp'n 11-12.

The President directed that all agencies "shall" remove certain public statements and communications. *See generally* EO 14168. His authority to issue that Executive Order is not challenged in this case. All parties agree that OPM, by contrast, lacked authority to order HHS to remove or modify any such materials. It issued a guidance document that on its face advised agencies what they "should" do—language that Plaintiffs concede may be read as permissive. *See* Pls.' Opp'n 11. Though HHS adopted OPM's suggestions, HHS maintained that at bottom it was acting as *required* by the President's Executive Order.

This record more than supports the conclusion that HHS and OPM regarded the guidance as advisory, rather than as a binding directive that concededly would have exceeded OPM's authority to issue. But at a minimum, it does not provide "the sort of 'substantial evidence to the contrary' required to overcome" the ordinary presumption that "public officers . . . have properly discharged their official duties." *Fuller v. Winter*, 538 F. Supp. 2d 179, 193 n.9 (D.D.C. 2008); (citation omitted) *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

**HHS "Policy" of Compliance With EO 14168.** Plaintiffs' argument that HHS removed webpages pursuant to an agency "policy" existing independent of EO 14168 is a transparent attempt to obtain relief that is broader than they have standing to seek and that covers more webpages than they have opted to identify. *See* Pls.' Opp'n 5-6. That is reason enough to reject it.

This argument also fails on the merits. Plaintiffs do not disagree that they cannot show final action merely by attaching a "'policy' label to their own amorphous description of [HHS]'s practices." *See* Defs.' Mem. 24-25 (quoting *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014)). But the only purported evidence of an independent "policy" that Plaintiffs identify are documents that merely recognize the commands of EO 14168 and confirm HHS's intent to comply. Pls.' Opp'n 22 (citing OPM001-02, HHS0031, HHS0056-58). An agency hardly adopts a "policy" of its own simply by acknowledging and complying with the President's directives. Executive Orders are binding on the Executive Branch not because agencies have decided to comply of their own accord, but because the Constitution vests the "executive Power in a President." U.S. Const. Art. II § 1; *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32-33 (D.C. Cir. 2002). Plaintiffs' contrary argument is nothing more than a thinly veiled attack on EO 14618 itself, recast as a challenge to HHS's so-called "policy" of complying with presidential directives. Neither the Executive Order, nor the fact that

14

HHS was obligated to comply with it to the extent permitted by law, is final action subject to APA review.

### III.  Defendants' Implementation of the Executive Orders Was Not Arbitrary, Capricious, or Contrary to Law.

Assuming Plaintiffs could overcome these threshold jurisdictional and finality hurdles, three claims would remain. *First*, Plaintiffs contend that the Paperwork Reduction Act (PRA), the Evidence-Based Policymaking Act (EBPA), and the Information Quality Act (IQA) flatly prohibited HHS from removing the webpages identified in Plaintiffs' declarations.[6] *See* Pls.' Opp'n 18-20, 22-23. *Second*, Plaintiffs claim that HHS violated the EBPA and IQA by adding to certain webpages a banner conveying Executive Branch policy. *Id.* 20-21, 22-23. *Third*, Plaintiffs believe the actions that HHS and OPM took to implement EO 14168 were arbitrary and capricious because Defendants did not provide an adequate explanation or address any impact on Plaintiffs' reliance interests. *Id.* 13-15, 18, 22. None of these three arguments withstands scrutiny.

### A.  Agencies Can Stop Disseminating Previously Public Information.

No statute requires HHS to fix its public communications and webpages in amber. Rather, the federal laws relevant to this case regulate the *quality* of information that HHS publicly distributes, and the *means* by which it does so, but leave HHS to decide whether particular information should be distributed *at all*. *See* Defs.' Mem. 27-32. That is true of the PRA, which requires "timely and equitable access" to information only during the time that an agency "discloses, disseminates, or makes [it] available to the

---

[6] Plaintiffs also assert Defendants violated a separate provision of the PRA by removing a subset of those webpages *without notice*. Pls.' Opp'n 18 (discussing 44 U.S.C. § 3506(d)(3)). As explained *supra* at 10, this claim is either already moot (as to webpages HHS previously committed to restoring pending further review, *see* J. Status R., ECF No. 23, at 3.) or will shortly become moot upon completion of HHS's ongoing review (as to all other webpages identified in Plaintiffs' declarations).

public," 44 U.S.C. §§ 3502(12), 3506(d)(1), and which expressly permits an agency to "terminat[e]" such dissemination, *id.* § 3506(d)(3). It is true of the EBPA, which applies only to statistical products that "are published or otherwise made available for public use," 5 C.F.R. § 1321.2, and which expressly directs agencies to "determine . . . [w]hat statistical products to disseminate," *id.* § 1321.5(a)(1). And it is true of the IQA, which instructs agencies to develop guidelines regarding the quality of information they disseminate but does not require them, as an initial matter, to engage in any such dissemination. Pub. L. 106-554, § 515(b)(2)(A), 114 Stat. 2763A-154 (2000). Plaintiffs conclude the opposite only by misreading these statutes and regulations.

*Paperwork Reduction Act.* Plaintiffs agree that the PRA's requirement of "timely and equitable access" only applies to "public information." Pls.' Opp'n 18-19; *see* 44 U.S.C. § 3506(d)(1). They insist, however, that any information an agency makes public must permanently retain that status for PRA purposes following its "first" disclosure. Pls.' Opp'n 18. That view is at odds with the statutory text.

The PRA's definition of "public information" does not depend on whether information was disclos*ed* in the past. The opposite is true—"public information" is information "that an agency disclos*es*, disseminat*es*, or mak*es* available to the public." 44 U.S.C. § 3502(12) (emphases added). "Congress's use of the present tense indicates that it meant to refer to present and future [disclosures], not past ones." *Att'y Gen. v. Wynn*, 104 F.4th 348, 354 (D.C. Cir. 2024) (holding that statutory reference to person who "fails to comply" with federal law did not include persons who "who 'failed' to comply in the past"). If Congress wants to require the present dissemination of information based on a past disclosure, it knows how to say so. For example, the Freedom of Information Act requires agencies "make available for public inspection," on an ongoing basis, certain records that have previously "*been* releas*ed*" in response to a request under that statute. 5 U.S.C. § 552(a)(2)(D)(i) (emphases added). Congress's

16

choice of different language in the PRA (as well as the EBPA and IQA, *see infra*) is powerful evidence that it intended a different result.

Plaintiffs' belief that the PRA makes disclosure a one-way ratchet also cannot be squared with the fact that the statute expressly permits agencies to "terminat[e]" the dissemination of information. *See* 44 U.S.C. § 3506(d)(3). Plaintiffs' failure to even acknowledge this express authority is telling. *Cf.* Pls.' Opp'n 18-19. In short: the PRA does not require HHS to provide public access—timely, equitable, or otherwise—to information that it decides should no longer be disseminated at all.

**Evidence-Based Policymaking Act.** Plaintiffs' interpretation of the EBPA rests on essentially the same logic and fails for essentially the same reasons. Plaintiffs dedicate just three sentences to arguing that once a statistical product is "first disseminate[d]," the EBPA requires dissemination to continue "so long as the information is 'relevant and timely.'" Pls.' Opp'n 20 (quoting 44 U.S.C. § 3563(a)(1)(A)). But the statute says no such thing. It merely provides that the statistical information a statistical agency[7] disseminates to the public must be "relevant and timely"—not that all relevant and timely statistical information must be publicly disseminated. 44 U.S.C. § 3563(a)(1)(A).

OMB's implementing regulations (which Plaintiffs ignore) are even clearer on this point. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (when construing

---

[7] Plaintiffs' EBPA claim applies only to the Center for Behavioral Health Statistics and Quality, and the National Center for Health Statistics—the two defendants that OMB designated as statistical agencies. *See* Defs.' Mem. 28. Plaintiffs previously argued that those components' parent agencies—HHS, CDC, and SAMHSA—also violated an EBPA requirement to "[a]llow the publication of statistical products without requiring clearance of the content from offices or officials outside of the Recognized Statistical Agency" Pls.' Mem. 24 (quoting 5 C.F.R. § 1321.7(b)). They now appear to have abandoned that argument, *see* Pls.' Opp'n 19-21, and rightly so. As Defendants explained, the removal or modification of statistical products was directly attributable to EO 14168—with which the two statistical agencies were independently required to comply—rather than any clearance requirement imposed by HHS, CDC, or SAMHSA. Defs.' Mem. 29-30.

statutes, courts may "seek aid from the interpretations of those responsible for implementing particular statutes"). Like the PRA, the EBPA regulations apply to products "that *are* published" in the present—not ones that *were* in the past. 5 C.F.R. § 1321.2 (defining "Statistical Products") (emphasis added). And also like the PRA, the EBPA regulations expressly permit agencies to decide if information should be disseminated at all. *Id.* § 1321.5(a)(1) (providing that statistical agencies "must determine . . . [w]hat statistical products to disseminate."). The bottom line: Like the PRA, an agency does not violate the EBPA by deciding that information should no longer be disseminated.

**Information Quality Act.** As a threshold matter, Defendants' compliance with the IQA is not subject to judicial review because that statute "creates no enforceable legal rights to information or its correctness." *Muslim Advocs. v. U.S. Dep't of Justice*, 2019 WL 3254230, at *7-11 (N.D. Cal. July 19, 2019); Defs.' Mem. 30. Plaintiffs do not argue otherwise beyond a bald assertion that they "do not seek" to enforce the IQA. Pls.' Opp'n 22. Not true. The First Amended Complaint asserts that Defendants violated "their duties under . . . the IQA," ECF No. 20, ¶ 74, and they maintain the statute imposes an "ongoing duty to ensure public access to information," Pls.' Opp'n 22-23. Plaintiffs' invocation of the IQA can only be understood as a request that this Court assert jurisdiction and enforce remedies that are not available under the plain language of that statute.

In any event, Plaintiffs' IQA argument is meritless. The IQA requires agencies to develop guidance that maximizes the quality of "information disseminated," but on its face does not require dissemination. Pub. L. 106-554, § 515(b)(2)(A), 114 Stat. 2763A-154 (2000); *see also Architects & Eng'rs for 9/11 Truth*, 2023 WL 6439491, at *2 ("The IQA does not entitle plaintiffs to the disclosure of any information—indeed, it makes no mention of required disclosure at all."). Plaintiffs respond that "HHS's IQA guidelines apply to the 'development and dissemination of timely and high quality data and information.'"

Pls.' Opp'n 22-23 (quotation omitted). They take that language out of context. The full statement from which Plaintiffs quote reads: "[t]he development and dissemination of timely and high quality data and information is a critical component of the missions of many HHS programs." HHS, *HHS Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated to the Public* (last visited Apr. 14, 2025), https://perma.cc/ZFH5-AQSB. Descriptive rather than prescriptive, the guidance merely acknowledges that HHS generally disseminates information without purporting to require dissemination of any information in particular.

That is not surprising. To the extent the IQA guidelines contain "policies and procedures," they are meant to "ensure the *quality* of the information [HHS agencies] *disseminate*," not to independently mandate that those components create and publicly maintain particular webpages. *Id.* (emphasis added). So, like their analogues in the PRA and EBPA, the IQA's quality provisions apply only to "the information that *is* disseminated" in the present—not all information that *has been* disseminated in the past. *Id.* (emphasis added). They present no barrier to an agency determining that it should remove or modify the content of its own webpages.

### B.  Agencies May State the Executive Branch's Policy Regarding a Statistical Product.

Plaintiffs maintain that two HHS statistical agencies violated the EBPA by appending to certain statistical products a statement of the Executive Branch's policy regarding "gender ideology." Pls.' Opp'n 20-21. They believe this disclaimer is "inaccurate" and "inflammatory," and renders the statistical products not "impartial," "free from undue influence," or "disseminate[d] . . . in a clear and complete manner, without limitation or selection to promote a particular policy position or group

interest." *Id.* (quoting 5 C.F.R. § 1321.7(a)(1)(ii)).[8] Apart from Plaintiffs' lack of standing to pursue it, *see supra* at 8, this argument also fails because it is pure *ipse dixit* that ignores Defendants' analysis of the relevant EBPA regulations. *Compare id.*, *with* Defs.' Mem. 30.

Most fundamentally, the regulations permit "statistical products" to "include policy pronouncements," and do not require that such products be "policy neutral." Defs.' Mem. 30 (quoting 5 C.F.R. § 1321.2). Nor are Plaintiffs correct that adding such a policy statement here affected any statistical product's "impartial[ity] and free[dom] from undue influence." Pls.' Opp'n 20-21. Plaintiffs disregard the specific regulatory criteria for making that assessment. *See* 5 C.F.R. § 1321.7(a)(1) (stating that statistical agencies meet standards "by" satisfying specific criteria set out in subsections (a)(1)(i)-(iii)). They also fail to rebut Defendants' explanation, *see* Defs.' Mem. 30, that those criteria were not affected by addition of a disclaimer that did not alter the "methods" used in "producing" the underlying statistical products, 5 C.F.R. § 1321.7(a)(1)(i), or result in those products being "disseminat[ed] in a "limit[ed] or select[ive]" fashion," *id.* § 1321.7(a)(1)(ii). HHS's statistical agencies do not violate the EBPA by stating the Executive Branch's policy with respect to "gender ideology."

### C.  Defendants' Implementation of a Lawful Executive Order According to Its Terms Was Not Arbitrary and Capricious.

The record leaves no doubt as to why Defendants acted as they did—to facilitate compliance (for OPM) and to comply (for HHS) with the sweeping requirements of EO 14168. OPM expressly stated that it was "providing . . . initial guidance to agencies

---

[8] Plaintiffs' opening brief also briefly suggested that appending an "inaccurate" disclaimer violated the IQA as well. Pls.' Opp'n. 30. They now appear to have abandoned that argument. *See* Pls.' Opp'n 22-23. Regardless, it fails because an IQA-based challenge to the disclaimer's substantive accuracy is plainly a claim for "correction of information" that may not be pursued via the APA. *See Muslim Advocates*, 2019 WL 3254230, at *12.

regarding" EO 14168, OPM0001, and the substance of its guidance hewed closely to that of the Executive Order itself, Defs.' Mem. 26 (comparing texts). HHS likewise instructed all "Operating and Staff Divisions . . . to comply with [EO 14168] and OPM guidance by taking prompt actions to end all agency programs that use taxpayer money to promote or reflect gender ideology as defined in Section 2(f) of [the EO]." HHS0065. The agency took down certain web content as was "required *by the EO* to be compliant." HHS0031 (emphasis added). "All [these] changes to the HHS website and HHS division websites [were] in accordance with [EO 14168]." *Id.*

None of this is meaningfully in dispute. Aside from two unexplained (and erroneous) suggestions that EO 14168 somehow might not have required Defendants to act precisely as they did, *see* Pls.' Opp'n 7-8, 18, Plaintiffs do not disagree: (1) that each removed or modified webpage identified in their declarations was a "statement[] . . ., communication[], or other . . . external message[] that promote[d] or otherwise inculcate[d] gender ideology" within the meaning of Sections 2(f) and 3(e) of EO 14168; (2) that HHS was required by Section 2(f) to remove every webpage fitting that description; and (3) that the record identifies this requirement (or the requirements of EO 14151)[9] as the basis for the challenged actions.

To sum up: Defendants considered the provisions of EO 14168, and either took or facilitated actions that were required by its terms. Plaintiffs do not say any different. Instead, they argue Defendants should have considered two *additional* factors. Neither argument shows that Defendants' implementation of EO 14168 violated the APA.

*First*, Plaintiffs argue that OPM and HHS failed to consider whether removing or modifying agency webpages would violate the PRA, EBPA, or IQA. Pls.' Opp'n 14, 18, 19, 22. Defendants have shown, however, that those statutes address only the quality of information that agencies opt to disseminate and the means by which they do so—not

---

[9] *See* Defs.' Mem. 4 & n.1, 11, 12-13.

whether information should be disseminated at all. *See supra* at 15-20. Because these statutes did not apply to the decisions challenged here, they were not an "important aspect of the problem" that the APA required Defendants to consider. Defs.' Mem. 31-32 (quoting *Detroit Int'l Bridge Co. v. Canada*, 192 F. Supp. 3d 54, 78 (D.D.C. 2016)).

*Second*, Plaintiffs renew their claim that Defendants violated the APA by "do[ing] an about face" as to whether certain information should be disseminated without considering potential reliance interests. Pls.' Opp'n 14-15, 18, 22. They argue that Defendants—including OPM, which does not administer the webpages on which any reliance interests would hypothetically turn—were required to consider such interests *sua sponte*, apparently on a page-by-page basis. *See id.* 15-18. For one thing, that is not the law—"[a]n agency need not address every conceivable implication of its decision." *CBOE Futures Exch., LLC v. SEC*, 77 F.4th 971, 980 (D.C. Cir. 2023).

It also misses a more fundamental point. "[I]f an executive agency . . . may lawfully implement [an] Executive Order, then it *must* do so." *Allbaugh*, 295 F.3d at 33 (emphasis added); *see also* Defs.' Mem. 12, 32. EO 14168 and EO 14151 unambiguously required HHS to remove the webpages identified in Plaintiffs' declarations, and no statute prohibited them from doing so.[10] To the extent these lawful directives reversed prior agency decisions to disseminate information, the choice to do so was the President's—whose "actions are not subject to [APA] requirements." *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). And no private reliance interest in a particular webpage, which HHS had voluntarily published, could overcome the President's directive to lawfully

---

[10] To be clear: Defendants' position is *not* that "any action they take . . . complying with the Executive Order is necessarily lawful." Pls.' Opp'n 7, 20. Defendants' actions were lawful because they did not violate any provision of substantive law, *see supra* at 15-20, separate and apart from whether they were taken at the President's direction or on Defendants' own initiative. Indeed, EO 14168, at § 8(b) and EO 14151, at § 4(b), expressly provide that they "shall be implemented consistent with applicable law."

remove it. Accordingly, Plaintiffs have not established that Defendants' actions implementing EO 14168 and EO 14151 were arbitrary or capricious.

## CONCLUSION

For the foregoing reasons, and those in Defendants' opening brief, the Court should grant Defendants' cross-motion for summary judgment.[11]

April 16, 2025                    Respectfully submitted,

                                 /s/ Gabriel I. Schonfeld
                                 GABRIEL I. SCHONFELD
                                 Trial Attorney
                                 Consumer Protection Branch
                                 Civil Division
                                 U.S. Department of Justice
                                 PO Box 386
                                 Washington, DC  20044-0386
                                 (202) 353-1531
                                 (202) 514-8742 (fax)
                                 gabriel.i.schonfeld@usdoj.gov

---

[11] This reply in support of Defendants' cross-motion for summary judgment does not further address the preliminary injunction factors or the propriety of a bond under Federal Rule of Civil Procedure 65(c), which are relevant only to Plaintiffs' motion for a preliminary injunction. Defendants' position on those issues remains the same as stated in their brief opposing preliminary relief. Defs.' Mem. 32-34 & n.6.