**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DOCTORS FOR AMERICA, et al.,

     Plaintiffs,

        v.

OFFICE OF PERSONNEL
MANAGEMENT, et al.,

     Defendants.

Civil Action No. 25-322 (JDB)

## <u>MEMORANDUM OPINION</u>

This case involves government officials acting first and thinking later. On January 20, 2025, the President issued Executive Order 14168, which instructs agencies to ensure that government materials are consistent with the President's view of biological sex and government funds do not support what the executive order calls "gender ideology." Over approximately two weeks, a group of agency subdivisions within the Department of Health and Human Services ("HHS defendants") then removed or modified without notice what the plaintiffs estimate number in the hundreds or even thousands of health care webpages and datasets.

The HHS defendants claim they removed the webpages and datasets lawfully in furtherance of the executive order, causing harm to no one. The plaintiffs disagree. They claim the defendants' removals violated several federal laws, including the Administrative Procedure Act ("APA"), and acutely harmed health care providers, policymakers, local governments, and others who have long relied on the webpages and datasets in their daily work—reliance that stemmed from the defendants' development of these high-quality resources specifically for use by these groups. The plaintiffs also sue the Office of Personnel Management ("OPM"), claiming that

1

its January 29 directive to agencies to "[t]ake down" webpages promoting gender ideology within 48 hours was unlawful and spurred the sudden removals and modifications.

The problem here is not so much the underlying policy decision but rather compliance with the law in effectuating that decision. When the President issues an executive order, an agency's exercise of discretion in implementing the order is cabined by the agency's statutory obligations, including those imposed by the APA. Because the agencies failed to adhere to those obligations here, the Court will vacate their directives.

## Background

On the day of his second inauguration, President Donald Trump issued Executive Order 14168 titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("E.O."). The E.O. makes it "the policy of the United States to recognize two sexes, male and female," id. § 2, and directs agencies to combat what the order labels "gender ideology," see id. § 2(f).[1] The order instructs agencies to "us[e] the term 'sex' and not 'gender' in all applicable Federal policies and documents," id. § 3(c), and to "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology," id. § 3(e). The order gives only one directive to OPM: "implement

---

[1] The executive order defines "gender ideology" as:

"[R]eplac[ing] the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body."

E.O. § 2(f).

changes to require that government-issued identification documents" and "applicable personnel records accurately" reflect the individual's sex. See id. § 3(d).

As many do, this executive order also states that it "shall be implemented consistent with applicable law." See id. § 8(b). With two exceptions not relevant here, the order does not impose a clear timeline for implementation. Although it indicates agencies should act promptly, the only deadline it imposes is to provide "an update on implementation of [the] order to the President, through the Director of the Office of Management and Budget" ("OMB"), within 120 days. Id. § 7(a).

Nine days later, on January 29, acting director of OPM Charles Ezell issued a memorandum addressed to the heads and acting heads of all federal agencies titled "Initial Guidance Regarding President Trump's Executive Order Defending Women" ("OPM Memo"). See J.A. [ECF No. 54-2] at 71–72. "Pursuant to [OPM's] authority under 5 U.S.C. § 1103(a)(1) and (a)(5)," the OPM Memo purports to provide agencies "initial guidance" on the implementation of the E.O. See id. at 71. The memo states that "agency heads should take" eleven steps by "[n]o later than **5:00 p.m. EST on Friday, January 31, 2025**." Id. (emphasis in original). The eleven steps—most of which bear little to no connection to OPM's obligations under the E.O.—include:

- "Send an email to all agency employees announcing that the agency will be complying with Defending Women and this guidance";

- "Take down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology"; and

- "Withdraw any final or pending documents," "materials," "communications, statements, and plans that inculcate or promote gender ideology."

See id. at 71–72.

In addition to laying down action items unmentioned by the E.O. and drastically shortening the E.O.'s only perceptible timeline from 120 days to 48 hours, the OPM Memo further states that

agencies "should" report to OPM on all steps they have taken and future plans to implement the memo and E.O. by "[n]o later than **12:00 p.m. EST on Friday, February 7, 2025**." See id. (emphasis in original).

The OPM Memo's deadlines garnered swift follow-through at HHS. Agency leadership sent a flurry of emails to staff flagging the memo and its new deadlines. For example, on January 30, a Food and Drug Administration ("FDA") director disseminated the OPM Memo to staff emphasizing that although HHS had not intended to issue guidance on the E.O. for several weeks, the OPM Memo had "an additional reporting tim[eline]" and "entail[ed] several . . . directives" that staff had to complete by the next day. See id. at 58, 61.

Around noon on January 30, another FDA director sent a similar, urgent email to staff. Flagged as high importance, the email conveyed that the director "was just informed that [they] need to take immediate action on the" E.O. See id. at 64. He explained that he had received "guidance" to "immediate[ly] . . . [s]crub [all] sections of content on FDA.gov for any mention of 'pronouns' and remove this content immediately," and "replace [the term 'gender'] with the term 'Sex.'" Id. The director acknowledged the "tight deadline" of noon on January 31. Id.

On January 31, the then-acting secretary of HHS memorialized the agencies' understanding of the OPM Memo, issuing "Action: Initial Guidance Regarding President Trump's Executive Order Defending Women" ("HHS Guidance"). See id. at 67–70. The guidance instructed all HHS operating and staff divisions—including HHS defendants the Centers for Disease Control and Prevention ("CDC"), FDA, Agency for Healthcare Research and Quality ("AHRQ"), Center for Behavioral Health Statistics and Quality ("CBHSQ"), Centers for Medicare & Medicaid Services ("CMS"), Health Resources and Services Administration ("HRSA"), National Center for Health Statistics ("NCHS"), National Institutes of Health ("NIH"), and Substance Abuse and Mental

Health Services Administration ("SAMHSA")—to take "prompt actions" to "comply with [the executive order] and OPM guidance." Id. at 67. It also required staff to complete and submit a reporting template by noon on February 6—exactly 24 hours before HHS's second deadline to report back to OPM—and to submit bi-weekly reports "regarding implementation until all necessary actions have been completed." See id. at 67, 72. Furthermore, just after 5:00 p.m. on January 31, HHS's then-assistant secretary for public affairs emailed staff highlighting four of the OPM Memo's action items related to communications and emphasizing that they "must be completed by end of day today." See id. at 32.

With this guidance, HHS staff was hard at work on January 30 and 31 implementing the OPM Memo, HHS Guidance, and E.O. Some simply replaced what they deemed to be verboten terms (such as "gender" and "pregnant people") with suitable alternatives, otherwise leaving webpages intact. See, e.g., id. at 23. Others took a slapdash approach, removing an entire webpage because of one offending term and noting an intent to publish a modified version at an unspecified later date. See, e.g., id. at 4, 7–8. Many opted for the most extreme approach: fully removing any webpage with any offending language, no matter how minimal, without any stated intent to modify and republish the webpage. See, e.g., id. at 12 (fully removing "Getting Tested for HIV" because it "says pregnant people"); see also id. at 46 (stating the agency "did a comprehensive review of our website and removed documents that referred to gender"); id. at 9–11, 15–20, 24 (resources on transgender individuals, HIV, and the Mpox vaccine removed without explanation).

The result was that within approximately 48 hours, the HHS defendants had removed a broad swath of webpages, including:

- HHS webpages on the HHS Healthy People 2030 program and gender-affirming care, see Pls.' First Am. Compl. [ECF No. 20] ("Am. Compl.") ¶ 37;

- CDC and NCHS webpages providing:

  o The Youth Risk Behavioral Surveillance System data, which has provided insights into issues such as youth mental health, bullying, and vaping—and their potential effects on youth mortality and disability—since 1999;

  o The Social Vulnerability Index, which has helped public health officials comprehensively respond to emergency events since at least 2020;

  o HIV resources, including the patient-facing fact sheet titled "Getting Tested for HIV" and a report that guides clinicians in determining whether to prescribe pre-exposure prophylaxis, or "PrEP," an HIV preventative medication; and

  o Guidelines for administering the Mpox vaccination, see, e.g., id. ¶ 38;

- FDA:

  o Instructions for clinicians on how to prescribe and administer FDA-approved drugs for which there are serious risks; and

  o Videos posted to YouTube on topics such as ovarian cancer, sickle cell disease, sexually transmitted infections ("STIs"), osteoporosis, morning sickness, menopause, Polycystic Ovarian Syndrome, and the use of medication during pregnancy and lactation, see, e.g., id. ¶ 39; J.A. at 31;

- HRSA guidance for providers on caring for patients with opioid use disorder and for local governments and policymakers on implementing the Ryan White HIV/AIDS Program, a federal program that funds local and state agencies to provide HIV treatment to individuals who lack full health insurance, see Am. Compl. ¶ 41; and

- CMS datasets, see id. ¶ 42; NIH Spanish-language resources and information on abortion, see id. ¶ 43; AHRQ clinician guidance on endometriosis and managing electronic health records, see id. ¶ 40; and SAMHSA and CBHSQ information from the 2023 Adolescent LGB+ Behavioral Health Report, see id. ¶ 44.

The defendants did not provide any notice prior to rescinding these materials. See id. ¶ 45. The only explanation came later, when CDC posted on its remaining webpages that "CDC's website is being modified to comply with President Trump's Executive Orders." See id. ¶ 46; cf. J.A. at 32 (circulating similar talking points for responding to media inquiries).

### Procedural History

Doctors for America ("DFA") is an organization of more than 27,000 medical professionals working across all 50 states and medical specialties. See Decl. of Reshma Ramachandran [ECF No. 37-9] ("Ramachandran Decl.") ¶ 3. DFA members routinely use the HHS defendants' webpages in their daily work, including to guide physicians' treatment of patients with conditions such as HIV, STIs, or opioid dependency; develop clinical trials and evaluations; conduct health-related research; combat outbreaks of infectious diseases; and inform public health responses to issues such as youth behavioral and mental health challenges and social and environmental inequality in health care. See, e.g., Am. Compl. ¶¶ 48–60.

DFA members immediately noticed the removal or modification of these resources on which they had long relied in their daily work. See, e.g., Decl. of Angie Bakke [ECF No. 37-3] ("Bakke Decl.") ¶¶ 3–6. Without the resources—and without notice prior to their removal—DFA members began "scrounging for alternative resources [that] . . . either take more time to access, do not provide the same quality of information, or do not exist at all." See Mem. L. Supp. Pls.' Mot. P.I. & Expedited Summ. J. [ECF No. 37-1] ("Mot.") at 1.

As a result, DFA sued OPM, HHS, CDC, and FDA over the removals on February 4, bringing three claims grounded in the APA. See Compl. [ECF No. 1] ¶¶ 32–43. Two days later, DFA moved for a temporary restraining order ("TRO"). See Mot. TRO [ECF No. 6]. In its motion, DFA identified numerous webpages that the three HHS defendants had removed and asked the Court to order the HHS defendants to restore all "unlawfully removed" webpages and datasets and to "enjoin[] [them] from removing or substantially modifying other webpages and datasets in implementation of the unlawful [OPM Memo]." See Mem. L. Supp. Mot. TRO [ECF No. 6-1] at 26.

After briefing and a hearing, the Court granted DFA's motion. See Order [ECF No. 11] ("TRO"); Mem. Op. [ECF No. 12] ("TRO Mem. Op."). The Court determined that DFA had demonstrated, among other requirements, a substantial likelihood of associational standing and success on the merits at least as to its claims that the defendants' webpage removals violated the notice provision of the Paperwork Reduction Act ("PRA") and were arbitrary and capricious in violation of the APA. See TRO Mem. Op. at 6–9, 14–16. The Court also concluded that DFA had demonstrated irreparable harm through two members' declarations that explained how the removals had impeded their ability to provide time-sensitive patient care—or do their jobs. See id. at 16–19.

But the Court did not order the full scope of DFA's requested relief. Rather than ordering the defendants to restore all removed webpages and datasets, the Court, mindful of the high standard for relief at the TRO stage, limited its temporary relief to the restoration of the identifiable webpages and datasets on which DFA members relied. Paragraph one of the Court's order compelled HHS, CDC, and FDA to, "by not later than 11:59 pm on February 11, 2025, restore to their versions as of January 30, 2025, each webpage and dataset" identified in DFA's TRO motion.

TRO at 1.  And paragraph two modestly expanded the relief to require DFA to identify "any other resources that DFA members rely on to provide medical care and that defendants removed or substantially modified on or after January 29, 2025, without adequate notice or reasoned explanation" and ordered the defendants to similarly restore those resources to their January 30 versions by not later than February 14.  See id.

A few days later, the parties filed a joint status report detailing their compliance with the Court's order.  See Joint Status Report (Feb. 13, 2025) [ECF No. 13].  In addition to complying with paragraphs one and two, upon DFA's representation that it would soon file an amended complaint adding additional HHS subdivisions as defendants, the defendants also restored a handful of webpages that the future defendants had removed or substantially modified.  See id. at 1–2 & n.1.

On each restored webpage,[2] the government included the following "disclaimer" repeating the view on "gender ideology" set out in E.O. 14168:

> Per a court order, HHS is required to restore this website as of 11:59PM ET, February 14, 2025.  Any information on this page promoting gender ideology is extremely inaccurate and disconnected from the immutable biological reality that there are two sexes, male and female.  The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation, and to women, by depriving them of their dignity, safety, well-being, and opportunities.  This page does not reflect biological reality and therefore the Administration and this Department rejects it.

See Am. Compl. ¶ 47.

---

[2] In this opinion, the Court often uses "removed webpages" to refer to the universe of webpages and datasets that the defendants either wholly removed or substantially modified pursuant to the Gender Ideology E.O.  The Court's references to the defendants' removal of webpages similarly encompasses the removal or substantial modification of webpages and datasets.  The Court separately uses "restored webpages" to refer to a subset of removed webpages that the defendants subsequently restored pursuant to this Court's TRO on February 11, 2025, see TRO; Joint Status Report at 1–2, and those identified in the plaintiffs' amended complaint, see Am. Compl. ¶¶ 38–44.

As expected, the plaintiffs filed an amended complaint on February 18. <u>See generally</u> <u>id.</u> The complaint adds the City and County of San Francisco as a plaintiff and seven HHS subdivisions as defendants. <u>See id.</u> ¶¶ 7, 9. The complaint lays out three counts.

Count I focuses on the OPM Memo. The plaintiffs assert OPM exceeded its statutory authority—and therefore ran afoul of the APA—by issuing the OPM Memo directing other federal agencies to, in relevant part, "[t]ake down . . . websites . . . that inculcate or promote gender ideology," J.A. at 71, because OPM's statute confers no such authority, <u>see</u> Am. Compl. ¶¶ 61–65.

Count II zooms in on the individual webpage removals and substantial modifications as distinct from the overarching directives. The plaintiffs claim the removals violated the PRA and the Evidence-Based Policymaking Act ("EBPA"), and the HHS defendants' failure to comply with—and even consider—these laws rendered the removals and modifications not in accordance with law and arbitrary and capricious, again running afoul of the APA. <u>See id.</u> ¶¶ 66–72.

The PRA regulates how federal agencies collect information from and disseminate information to the public. As relevant here, the law requires federal agencies to "ensure that the public has timely and equitable access to the agency's public information," 44 U.S.C. § 3506(d)(1), and "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products," <u>id.</u> § 3506(d)(3). The plaintiffs argue that the removed webpages are "significant information dissemination products" whose removal or substantial modification required—and did not receive—adequate notice under § 3506(d)(3), and that the removal contravened the agencies' obligation to provide "timely . . . access" to the webpages under § 3506(d)(1).

The EBPA, passed in 2016, seeks to improve the government's creation, use, and dissemination of data.  See H. Rep. 115-411, Foundations for Evidence-Based Policymaking Act of 2017 at 2.  As is relevant here, that act provides that statistical agencies shall "produce and disseminate relevant and timely statistical information," "conduct credible and accurate statistical activities," and "conduct objective statistical activities."  44 U.S.C. § 3563(a)(1)(A)–(C).  The plaintiffs argue that a subset of HHS defendants—HHS, CDC, SAMHSA, NCHS, and CBHSQ—acted arbitrarily and capriciously and violated the EBPA twice over: first by substantially modifying or removing webpages containing "statistical products" as defined in the act, and second by including an "inaccurate disclaimer[]" to the statistical products restored under the TRO.  See Am. Compl. ¶¶ 70–72.

Count III zooms back out to the OPM Memo and HHS Guidance.  The plaintiffs assert that the defendants' directives required the removal or substantial modification of webpages, and those decisions were arbitrary and capricious because they lacked reasonable justification and failed to consider both the plaintiffs' substantial reliance on the webpages and the defendants' statutory obligations under PRA, EBPA, and the Information Quality Act ("IQA").  See id. ¶¶ 73–74.

The IQA, passed in 2001, directed OMB to issue government-wide guidelines "to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by federal agencies."  See Pub. L. No. 106-554-App'x C, 114 Stat. 2763-154 (§ 515(a)).  OMB promulgated guidelines in 2001 and agencies followed suit, including HHS with the HHS IQA Guidelines.[3]

---

[3] See Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies, 67 Fed. Reg. 8452 (Feb. 22, 2002); HHS Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated to the Public, Off. of the Assistant Sec'y for Plan. & Evaluation, HHS, https://aspe.hhs.gov/hhs-guidelines-ensuring-maximizing-disseminated-information [https://perma.cc/9GRF-N8A3] (last visited June 30, 2025) ("HHS IQA Guidelines").

Plaintiffs seek multiple forms of relief. ***First***: declarations that the OPM Memo, HHS Guidance, and resulting webpage removals were unlawful. ***Second***: orders directing the HHS defendants to restore to their states as of January 29, 2025, all webpages and datasets removed or modified in response to the OPM Memo or without reasoned justification; and to remove the disclaimers on the restored webpages containing "statistical products" as defined by the EBPA. ***Third***: an order enjoining the HHS defendants from "further enforcing a policy requiring removal of all outward facing media, including webpages and datasets, in whole or in part, that the agencies identify as promoting 'gender ideology.'" See Pls.' Proposed Order [ECF No. 37-2] at 2; Am. Compl. at 26–28.

On February 21, a few days before the TRO was set to expire, the parties filed a joint status report. See Joint Status Report (Feb. 21, 2025) [ECF No. 23]. They agreed that the defendants had fully complied with the Court's TRO. See id. ¶ 2. The plaintiffs asked the Court to extend the TRO or convert it into a preliminary injunction until the resolution of the merits, claiming the TRO's relief did "not reach every removed resource"—namely, the additional webpages that the plaintiffs alleged the defendants had removed or substantially modified pursuant to the E.O. and OPM Memo but that the plaintiffs had not identified prior to the Court's restoration order—and so the plaintiffs required continued and additional relief. See id. at 2.

The defendants asked the Court to let the TRO expire in light of the following representations: the defendants had "begun a review to determine the applicability" of the PRA, IQA, and EPBA for each restored webpage; they committed to "maintain[ing], in [their] current state," those webpages pending this individualized review; and "[t]o the extent Defendants determine that the [PRA], [IQA], or [EBPA] applies to a particular website, Defendants [would] take the steps necessary to comply" with those acts. See id. at 3–4.

In reliance on these representations and the fact that the plaintiffs now had notice that the restored webpages could be removed or substantially modified in the future—the lack of which was an important factor for the plaintiffs' showing of irreparable harm—the Court concluded that the plaintiffs had not met their heavy burden of showing continued irreparable harm as required for extended interim relief.  See Order [ECF No. 26] at 2–3.  The Court permitted the TRO to expire on February 25 but did not preclude the plaintiffs from seeking additional emergency relief with a different basis for irreparable harm.  See id. & n.1.  At the parties' request, the Court then set a joint summary judgment and preliminary injunction briefing schedule.  Id. at 3–4.  The Court also ordered the defendants to file a status report detailing their individualized review of the restored webpages and whether they further modified or removed any of the restored webpages. See id. at 3.

The parties then briefed the instant motions.  The plaintiffs filed a combined motion for a preliminary injunction and expedited summary judgment, see Mot., to which the defendants filed an opposition and their own cross-motion for summary judgment, see Combined Mem. Opp'n Mot. & Supp. Defs.' Cross-Mot. Summ. J. [ECF No. 47] ("Opp'n").  As at the TRO stage, the defendants primarily contend the plaintiffs lack standing, neither the OPM Memo nor the HHS Guidance nor the individual webpage removals were final agency actions, and the defendants acted reasonably in enacting and implementing the removal directives.  Both parties filed replies.  See Pls.' Reply Mem. Supp. Mot. & Mem. Opp'n Defs.' Cross-Mot. [ECF No. 49] ("Pls.' Reply"); Reply Mem. Supp. Defs.' Cross-Mot. Summ. J. [ECF No. 52] ("Defs.' Reply").

After briefing concluded, the defendants completed their individualized review of the restored webpages and submitted their final status report.  See Status Report (May 16, 2025) [ECF No. 56] ("Final Status Report").  In the defendants' judgment, no restored webpage is a "significant

information dissemination product" entitled to notice under the PRA, the IQA is "inapplicable," and the EBPA applies only to two defendants, NCHS and CBHSQ. See id. at 3–4. Hence, the defendants stated their intent to begin further modifying or removing the restored webpages "as necessary to comply with" the Gender Ideology E.O. and other executive orders. Id. at 5 & n.4. But "out of an abundance of caution and as a courtesy to the public," the defendants committed to providing a two-week notice prior to removing or substantially modifying four of the restored webpages. Id. at 4–5.

## Legal Standards

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." Blue Ocean Inst. v. Gutierrez, 585 F. Supp. 2d 36, 41 (D.D.C. 2008); see, e.g., Richards v. Immigr. & Naturalization Serv., 554 F.2d 1173, 1177 (D.C. Cir. 1977); see also Fed. R. Civ. P. 56(a). Yet a court resolving APA claims on summary judgment does not employ all the traditional summary judgment standards set forth in Federal Rule of Civil Procedure 56(c). "[B]ecause of the limited role of a court in reviewing the administrative record," Brodie v. Dep't of Health & Hum. Servs., 796 F. Supp. 2d 145, 150 (D.D.C. 2011), "the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law," Am. Biosci. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (internal quotation marks omitted). The question is "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995) (internal citations omitted), amended on other grounds, 967 F. Supp. 6 (D.D.C. 1997). If the plaintiffs prevail on any of their APA claims, then they "are entitled to relief under that statute, which normally will be a vacatur of the agenc[ies'] order[s]." See Am. Biosci., 269 F.3d at 1084.

**Analysis**

## I.    Standing

As at the TRO stage, the plaintiffs at summary judgment cannot "rest on . . . mere allegations but must set forth by affidavit or other evidence specific facts," which the Court "take[s] to be true," that demonstrate standing.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992) (cleaned up).  And because standing "is not dispensed in gross," Town of Chester v. Laroe Ests., Inc., 581 U.S. 433, 439 (2017) (internal quotation marks omitted), at least one plaintiff "must demonstrate standing for each claim . . . and for each form of relief that is sought," id. (quoting Davis v. FEC, 554 U.S. 724, 734 (2008)); see In re Navy Chaplaincy, 697 F.3d 1171, 1178 (D.C. Cir. 2012).

### A.  The Plaintiffs Have Standing to Sue OPM

DFA has standing to sue OPM for both APA claims.  See Am. Compl. ¶¶ 61–65, 73–74. As an organization, DFA can assert either associational standing—relying on its members' injuries—or organizational standing—relying on its own.  See Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 914, 919–20 (D.C. Cir. 2015).  Associational standing requires that (1) at least one of the association's members would have standing in her own right, (2) the interests that the association seeks to protect in the lawsuit are germane to the association's purposes, and (3) the claims the association asserts and the relief it requests do not require an individual member's participation.  Sierra Club v. EPA, 754 F.3d 995, 999 (D.C. Cir. 2014).

The defendants do not dispute that DFA meets the second and third requirements, see Opp'n at 15, and the Court again concludes they are met.  Preserving health professionals' access to important health-related resources is "germane" to DFA's mission of advancing "access to affordable care" and improving "health care delivery so that it better meets . . . patients' needs."

See Ramachandran Decl. ¶ 4.   And the Court can think of no reason that DFA's medical professionals must participate in the case rather than allowing DFA to speak for them.

The standing inquiry thus turns on the first requirement: whether DFA has identified a member with standing.  See Summers v. Earth Island Inst., 555 U.S. 488, 498–99 (2009).  That means one DFA member must "demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."  FDA v. All. for Hippocratic Med. ("Hippocratic Med."), 602 U.S. 367, 380 (2024).  DFA identifies seven members.[4]  If any one of them could bring this case, then so can DFA.

DFA has succeeded at least thrice over with Doctors Liou, Ramachandran, and Harris.[5]  Dr. Liou works at a clinic "serving predominately low-income immigrant families in southwest Chicago" and "at one of the most underserved high schools in Chicago."  Decl. of Dr. Han Yu Stephanie Liou [ECF No. 37-7] ("Liou Decl.") ¶¶ 1, 3.  In her clinical work, she "regularly rel[ies]" on information the CDC publishes.  Id. ¶ 3.  Her access to that information is both routine and time-sensitive.  For instance, when the websites were first removed, Dr. Liou could no longer use CDC resources to combat a contemporaneous chlamydia outbreak in her high school.  Id. ¶ 7.  And when CDC removed its guidance for clinicians on testing patients for HIV and prescribing PrEP (a medication that prevents HIV), Dr. Liou lost access to resources that are "extremely important for [her] work with adolescents" and patients whom she screens for HIV "every day."  Id.

_____

[4] Dr. Angie Bakke, Dr. Daniel Debowy, Dr. Kathryn Harris, Dr. Han Yu Stephanie Liou, Dr. Reshma Ramachandran, Dr. McKayla Saine, and Dr. Eugenia Siegler.  See Bakke Decl. ¶ 1; Decl. of Dr. Daniel Debowy [ECF No. 37-5] ("Debowy Decl.") ¶ 2; Decl. of Dr. Kathryn Harris [ECF No. 37-6] ¶ 2; Decl. of Dr. Han Yu Stephanie Liou [ECF No. 37-7] ¶ 2; Ramachandran Decl. ¶ 3; Decl. of Dr. McKayla Saine [ECF No. 37-10] ¶ 2; Decl. of Dr. Eugenia Siegler [ECF No. 37-11] ("Siegler Decl.") ¶ 3.

[5] The Court makes no determination as to whether the remaining declarations are sufficient for standing.

The initial removal of the CDC's "Contraceptive Guidance for Health Care Providers," another resource that Dr. Liou "rel[ies] on . . . daily," also "caused a huge disruption in [her] work." Id. ¶ 9. Without the use of this resource to "discuss safe and effective" contraception with patients with serious health conditions, Dr. Liou will have "to spend significantly more time putting together comparable information from multiple sources," which will cause delays in her clinic—making it unlikely that she can continue seeing "3-4 patients per hour." See id.

In short, because Dr. Liou works at an under-resourced, inner-city clinic that lacks "access to many expensive clinical resources" that might offer similar information to the removed webpages, and she does not "have the time on a daily basis" to find alternate resources, see id. ¶ 11, without the webpages Dr. Liou will see fewer patients per day, and patients will have to wait longer for her care.

Dr. Ramachandran works in a primary-care practice and research program at the Yale School of Medicine. Ramachandran Decl. ¶ 1. Like Dr. Liou, Dr. Ramachandran has long relied on CDC resources to guide her treatment of STIs and prescription of various forms of contraception. See id. ¶¶ 7–9. Without these resources, which are "designed for easy use in the clinical setting," id. ¶ 8, Dr. Ramachandran, too, is left scrambling for alternatives—a process that "will take up a larger portion of a typical 20 minute visit with patients, leaving less time" for other essential activities during appointments "and potentially causing delays to patients' access to appropriate contraception," id. ¶ 13. This is no minor matter. Without the CDC "resources that allow [her] to be confident in [her] choice of treatment," it might take Dr. Ramachandran "a few hours or a few days to finalize a treatment plan." Id. ¶ 16. In those cases, instead of ascertaining the proper course of treatment and providing that treatment in the same appointment, Dr. Ramachandran may have to schedule two appointments: one to receive the patient's request for

treatment, such as contraception, and, after she has determined the appropriate treatment, a second to prescribe and administer the treatment.  See id. ¶ 15.

Like Dr. Liou, Dr. Ramachandran also "rel[ies] on CDC online material about prescribing PrEP medication for HIV prevention."  See id. ¶ 9.  After the initial webpage removals, Dr. Ramachandran saw a patient with a "complex medical history" and considered prescribing a particular form of PrEP.  Id. ¶ 17.  Patients must begin treatment "right away in order to reduce the risk of them becoming infected with HIV, and developing [AIDS]."  Id. ¶ 18.  But because Dr. Ramachandran could not utilize the CDC resources that provided a centralized "list of requirements that physicians must check off" to confirm the desired medication is appropriate for a particular patient, she could not immediately prescribe it.  Id. ¶ 17.  Instead, the patient's treatment was delayed until Dr. Ramachandran had located the information in an alternative resource—which was neither routinely updated nor "fully equivalent to CDC's resources."  See id.

In sum, the loss of CDC resources has "impeded [Dr. Ramachandran's] ability to treat [her] patients," id. ¶ 12, and made it "difficult or impossible [for her] to provide the same level of care to [her] patients and to carry out [her] health research," id. ¶ 22.

Lastly, Dr. Harris works at "a busy urgent care" center in Massachusetts treating "a population at high risk for sexually transmitted diseases."  Decl. of Dr. Kathryn Harris [ECF No. 37-6] ("Harris Decl.") ¶¶ 1, 3.  Dr. Harris, too, "rel[ies] frequently" on CDC resources, including the STI treatment guidelines mobile application, which "enable[s] [her] to accurately treat [her] patients . . . for a wide variety of" conditions.  Id. ¶ 3.  Dr. Harris relies on the STI application because the CDC's "information is considered the standard of care": it is "easily accessible, up to date," "free of pharmaceutical company bias," "timely," and "accurate."  Id. ¶ 4.

Dr. Harris's work meaningfully suffers without these "important resource[s]."  See id. ¶ 6. She must spend more time providing the same level of care, and even then, it is "harder to guarantee" that she provides her patients with "the best treatment."  Id.  And because she must spend more time locating and consulting new resources to guide her treatment, Dr. Harris "cannot see as many patients" as before.  See id.

Doctors Liou, Ramachandran, and Harris have all suffered injuries in fact.  The doctors' time and effort are valuable, scarce resources.  All routinely use the removed webpages in their daily clinical work, see Liou Decl. ¶¶ 3, 7; Ramachandran Decl. ¶¶ 15–18; Harris Decl. ¶ 3, such that the removals have "inhibit[ed]" the doctors' "daily operations" and forced them to spend their time and efforts elsewhere—an injury that is "concrete and specific to the work in which they are engaged."  See People for the Ethical Treatment of Animals v. USDA ("PETA"), 797 F.3d 1087, 1094 (D.C. Cir. 2015) (quoting Action All. of Senior Citizens of Greater Phila. v. Heckler, 789 F.2d 931, 938 (D.C. Cir. 1986)); see also Lujan, 504 U.S. at 566 ("It is clear that the person who . . . works with a particular [resource that is] threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist.").  This harm is also actual—indeed, the removals have already occurred—and particularized, as the doctors decry the loss of specific webpages that they use in their work.  See TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021); see generally Liou Decl.; Ramachandran Decl.; Harris Decl.

The defendants claim that individual standing based on diversion of resources "breaks new standing ground" and constitutes an impermissible extension of "unique standards for organization[al standing]."  See Opp'n at 19.  This argument fails, because organizational standing is nothing more than individual standing applied to organizations.  Hippocratic Med., 602 U.S. at 393–94.  When government conduct has "directly affected and interfered" with a plaintiff's core

professional activities in a way that causes the diversion of time and resources, the plaintiff has suffered an injury in fact—whether the plaintiff is an organization or an individual. See id. at 395;[6] see also PETA, 797 F.3d at 1097; Flyers Rts. Educ. Fund v. Dep't of Transp., 810 F. App'x 1, at *2 (D.C. Cir. 2020) (per curiam); Sherley v. Sebelius, 610 F.3d 69, 70–71 (D.C. Cir. 2010).

The Court thus remains on well-trodden grounds in concluding that DFA has associational standing, as "precedent makes plain that" both the "inhibition" of the doctors' daily operations, see Action All., 789 F.2d at 938, and the corresponding expenditure of additional time and resources, see PETA, 797 F.3d at 1097, are injuries in fact.

The Court then turns to causation and redressability, which are "often flip sides of the same coin." Hippocratic Med., 602 U.S. at 380 (cleaned up). The defendants argue that setting aside the OPM Memo would not redress the doctors' injuries, because the E.O. independently obligates the HHS defendants to remove or substantially modify the webpages. See Opp'n at 12. The Court disagrees. The daylight between the E.O. and the OPM Memo is facially apparent.[7] And the plaintiffs challenge the ways the OPM Memo directed the agencies to implement—and go beyond—the E.O. On the plaintiffs' theory of the merits, see Tanner-Brown v. Haaland, 105 F.4th 437, 445 (D.C. Cir. 2024), the E.O. directed agencies to comply with all applicable laws in implementing its objectives and proposed a generous timeline for completion. See E.O. §§ 7(a),

---

[6] The defendants' attempt to distinguish Hippocratic Medicine falls flat. The defendants emphasize that the Supreme Court there concluded the doctors' injuries were too speculative. See Defs.' Reply at 6. But the Court suggested the doctors' injuries would not have been too speculative had the plaintiffs alleged that the challenged action had "caused a resulting diversion of the doctors' time and resources." See Hippocratic Med., 602 U.S. at 390. Here, Doctors Liou, Ramachandran, and Harris demonstrate that missing link.

[7] Nothing in the E.O. mandates the blanket removal of entire webpages. Its broad directive to "remove" communications promoting gender ideology could sensibly be read to require, for example, removal of only the offending term(s). See E.O. § 3(e). The OPM Memo, by contrast, commands agencies to "[t]ake down" websites promoting gender ideology. See J.A. at 71. And where the E.O. requires a 120-day status report from agencies, see E.O. § 7(a), the OPM Memo states that agencies should complete the tasks "[n]o later than **5:00 p.m. EST on Friday, January 31, 2025**"—or within 48 hours, see J.A. at 71 (emphasis in original). Plus, it was only when the OPM Memo issued that HHS officials perceived a January 31 deadline. See, e.g., id. at 58, 64. Furthermore, OPM and HHS repeatedly refer to the obligation to comply with both directives. See id. at 72 (OPM); id. at 32, 58, 61, 67 (HHS).

8(b).  Complying with those tenets did not permit—let alone order—the agencies to violate their statutory obligations and make the procedural missteps alleged here.[8]

In short, on the plaintiffs' theory, the OPM Memo catalyzed the challenged agency actions that caused the doctors' injuries.  Cf. Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, Civ. A. No. 25-239 (LLA), 2025 WL 597959, at *6 (D.D.C. Feb. 25, 2025) (the timing of the agencies' conduct only "after the [OMB] memorandum was issued" "convincingly demonstrated that the memorandum," had triggered the agencies' actions).  And vacating that memorandum will redress their injuries.  See Hippocratic Med., 602 U.S. at 381.  Although "standing is ordinarily 'substantially more difficult' to establish" where, as here, DFA's members are not the direct subjects of the agency action, see Lujan, 504 U.S. at 562, DFA has met its burden, and the plaintiffs have standing for their claims against OPM.

## B.  The Plaintiffs Have Standing to Sue the HHS Defendants

Armed with the determination that the plaintiffs have standing to sue OPM, standing against the HHS defendants falls into place.  To begin, the same injury in fact applies—the direct interference with the doctors' work and the resulting diversion of their finite time and resources. Next, the injuries are traceable to the challenged HHS conduct.  The plaintiffs challenge the HHS Guidance and HHS defendants' webpage removals.  See Am. Compl. ¶¶ 66–72.  It was, according to the plaintiffs, the OPM Memo by and through the HHS Guidance that imposed the timeline and

---

[8] The defendants also make much of the fact that the FDA may have removed two of the restored webpages pursuant to a different executive order, "Ending Radical and Wasteful Government DEI Programs and Preferencing," Exec. Order 14,151 90 Fed. Reg. 8339 (Jan. 20, 2025).  See Opp'n at 11; J.A. at 34–35.  Although the administrative record is unclear on this point, even assuming arguendo those webpages were removed solely based on Executive Order 14151, this does not doom the plaintiffs' standing as to OPM.  The plaintiffs identify numerous other webpages whose removals or modifications are directly tied to the OPM Memo and Gender Ideology E.O., which satisfies traceability.  See, e.g., Am. Compl. ¶¶ 38–44.  And for Count II, the doctors' injuries as to the two FDA webpages are traceable to the FDA's removal of them.  See id. ¶¶ 66–72.

actions directing the rushed and bulk removals. And there is no doubt that the act of removing the webpages caused the plaintiffs' injuries.

Finally, the relief requested would redress the plaintiffs' injuries. The plaintiffs ask the Court to declare the HHS Guidance unlawful and order the defendants to restore the webpages that they removed or modified pursuant to the guidance. Under the plaintiffs' theory, the E.O. authorized neither the timing nor the method of the modifications and removals that the defendants conducted pursuant to the HHS Guidance. As such, granting the requested relief would undo those actions and their harms.

The defendants' final standing challenge is that Count II, which challenges the individual webpage removals, is "largely moot." See Opp'n at 20. The defendants argue that they have replaced the challenged removal directive with a new one, which renders the plaintiffs' challenge to the prior removals moot. Opp'n at 20–22; Joint Status Report (Feb. 21, 2025) at 3–4; see Anderson v. U.S. Dep't of Hous. & Urb. Dev., 731 F. Supp. 3d 19, 31 (D.D.C. 2024) (explaining challenges to "superseded agency action[s] generally become moot"). The defendants style the old policy as the removal of webpages without consideration of the PRA, EBPA, and IQA. See Opp'n at 20–22. At the time that summary-judgment briefing concluded, the defendants were newly reviewing each restored webpage to ascertain the applicability of and compliance with those laws. So, the argument goes, any harm caused to the plaintiffs by the HHS defendants' webpage removals without consideration of those statutes has dissipated—even though the defendants have since completed this review and determined none of these laws either prohibit the removals or require prior notice. See Final Status Report at 4–5.

The defendants misunderstand both the mootness standard and the plaintiffs' asserted harm. "A suit becomes moot[] when the issues presented are no longer live or the parties lack a

legally cognizable interest in the outcome." Chafin v. Chafin, 568 U.S. 165, 172 (2013) (internal quotation marks omitted).  DFA's members assert that core aspects of their jobs have become harder or impossible because the HHS defendants illegally removed the webpages.  Because the defendants have determined they are free to take down the webpages as they wish—and they have indicated an intent to do so, see Final Status Report at 4–5—that harm remains.  The defendants' rumination as to the legality of the removals does not deprive the Court of jurisdiction, since for standing a court assessing mootness must assume the plaintiffs will succeed on the merits of their legal claims, Sandpiper Residents Assoc. v. U.S. Dep't of Hous. & Urb. Dev., 106 F.4th 1134, 1141 (D.C. Cir. 2024), and the plaintiffs claim the removals were unlawful.

### C.  The Plaintiffs Lack Standing to Challenge the Disclaimer

The defendants finally find solid ground with their argument that plaintiffs lack standing to sue HHS, CDC, NCHS, SAMHSA, and CBHSQ under the EBPA for the posting of the following disclaimer on their restored webpages:

> Per a court order, HHS is required to restore this website as of 11:59PM ET, February 14, 2025.  Any information on this page promoting gender ideology is extremely inaccurate and disconnected from the immutable biological reality that there are two sexes, male and female.  The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation, and to women, by depriving them of their dignity, safety, well-being, and opportunities.  This page does not reflect biological reality and therefore the Administration and this Department rejects it.

See Am. Compl. ¶ 47.

Only San Francisco could have standing here, because its members, Dr. Cohen and Dr. Philip, are the only declarants who materially address the disclaimer.  See Second Decl. Stephanie Cohen, M.D., M.P.H. [ECF No. 37-4] ("Cohen Decl."); ¶¶ 7–8; Second Decl. Dr. Susan Philip [ECF No. 37-8] ("Philip Decl.") ¶¶ 10–11.  But both fall short of alleging an injury in fact.

Dr. Cohen states that she is "hesitant" to use the restored webpages because some of her patients may find the disclaimer inflammatory.  See Cohen Decl. ¶ 8.  But mere hesitancy is far from an attestation that Dr. Cohen has stopped or will imminently stop using these webpages.  She merely indicates that she might, which is too speculative to support an injury in fact.  See TransUnion, 594 U.S. at 423, 438.  And even if Dr. Cohen had attested to as much, that would amount to a self-imposed harm, which is not a cognizable injury in fact.  See Animal Legal Def. Fund, Inc. v. Vilsack, 111 F.4th 1219, 1228 (D.C. 2024).

And Dr. Philip, for her part, fails to proffer that the disclaimers have caused her any harm.  She observes that in her "professional opinion," the disclaimers are "not supported by scientific evidence, are highly inflammatory and likely to mislead, and undermine the credibility of CDC's authority to speak on matters of public health."  See Philip Decl. ¶ 11.  But reading a government statement with which one strongly disagrees does not inflict a cognizable injury in fact.

For these reasons, the plaintiffs lack standing for their Count II claim challenging the disclaimer.  See Am. Compl. ¶ 71.

## II.    Merits

The Court now proceeds to the merits.  The plaintiffs' claims are grounded in the APA, which "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."  Franklin v. Massachusetts, 505 U.S. 788, 796 (1992).  The APA instructs courts to "set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction."  5 U.S.C. § 706(2)(A), (C).

The plaintiffs' claims touch on several of these standards.  They argue that OPM exceeded its statutory authority, the individual webpage and dataset removals were not in accordance with

24

the law and were arbitrary and capricious, and the OPM Memo and HHS Guidance were arbitrary and capricious.  See Am. Compl. ¶¶ 61–74.

### A. Final Agency Action

Before proceeding to the heart of each claim, the Court must first determine whether each challenged action is even subject to APA review.  "The APA only provides for judicial review of final agency action."  Am. Tort Reform Ass'n v. OSHA, 738 F.3d 387, 395 (D.C. Cir. 2013) (internal quotation marks omitted); see 5 U.S.C. §§ 702, 704.  If "there is no final agency action, a plaintiff simply has no cause of action under the APA."  Bark v. U.S. Forest Serv., 27 F. Supp. 3d 41, 50 (D.D.C. 2014).

An agency activity is a final agency action only if it is both an "agency action" and "final."  An agency activity is an "agency action" if it is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  And it is "final" if it meets the well-known two-prong test set forth in Bennett v. Spear, 520 U.S. 154 (1997).  "First, the action must mark the consummation of the agency's decisionmaking process.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett, 520 U.S. at 177–78 (cleaned up).

The defendants argue that neither the OPM Memo nor the HHS Guidance nor the individual webpage removals were final agency actions.  See Opp'n at 21.

### 1. The OPM Memo

The defendants contend that the OPM Memo was neither an agency action nor final.  The first argument easily fails.  Once again, to be an "agency action," an action must be "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  According to the defendants, the OPM Memo does not fit neatly within one of the categories listed in § 551(13).  See Opp'n at 22.  But the D.C. Circuit has

cautioned against the defendants' approach of focusing on the labels of these "imprecise" categories, see, e.g., Indus. Safety Equip. v. EPA, 837 F.2d 1115, 1117 (D.C. Cir. 1988), instead encouraging courts to focus on whether there was an exercise of agency power, see, e.g., Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt., 460 F.3d 13, 19 (D.C. Cir. 2006) (explaining the definition of agency action is "expansive" and "meant to cover comprehensively every manner in which an agency may exercise its power"). Considering that the OPM Memo explicitly states that it was issued "[p]ursuant to [OPM's] authority under 5 U.S.C. § 1103(a)(1) and (a)(5)," J.A. at 71, it is hard to read the memo as anything other than a purported exercise of agency power.[9]

And in any event, the OPM Memo fits comfortably as a rule. The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). The OPM Memo is an agency statement "designed to implement [and] interpret" the Gender Ideology E.O., which is an executive branch statement of policy. See id. The memo also prescribes a policy by providing agencies with new tasks and a new timeline on which to complete them. Either way, the OPM Memo is a rule and thus was an agency action. See, e.g., Biden v. Texas, 597 U.S. 785, 809–10 (2022).

The question then becomes whether the OPM Memo was "final"—i.e., whether it "marked the consummation of [OPM's] decisionmaking process" and whether it determined "rights or obligations" or was an action "from which legal consequences will flow." Bennett, 520 U.S. at 177–78 (internal quotation marks omitted).

---

[9] The defendants' reliance on Association of Administrative Law Judges v. OPM, 640 F. Supp. 2d 66 (D.D.C. 2009), is misplaced. The OPM memo there fell short of agency action because it simply provided notice of "OPM's plans to publish a vacancy announcement" for Administrative Law Judge positions "within the next few days." See 640 F. Supp. 2d at 73. The OPM memo was not itself the vacancy announcement. Hence, the court there concluded the memo was issued in anticipation of a future agency action. See id. But the OPM Memo here is neither simple notice nor anticipatory. It commands action.

The OPM Memo was plainly the consummation of OPM's decisionmaking process with respect to how agencies should implement the E.O.'s instruction to "remove all statements . . . that promote or otherwise inculcate gender ideology," <u>see</u> E.O. § 3(e), and complete the memo's eleven tasks, <u>see</u> J.A. at 71–72.  It is difficult to imagine how directing agencies to perform enumerated tasks and report back on their compliance within 48 hours is anything other than OPM's "definitive conclusion" that the agencies must implement the memorandum's checklist of tasks.  <u>See, e.g.</u>, <u>Scenic Am., Inc. v. U.S. Dep't of Transp.</u>, 836 F.3d 42, 56 (D.C. Cir. 2016).  Although the defendants claim "[t]he face of the document reveals that OPM contemplated an ongoing dialogue with other agencies about compliance," <u>see</u> Opp'n at 22, the Court does not discern any "informal . . . or tentative" intent from a memorandum issued by the acting director of OPM to all agency heads and acting heads and replete with specific tasks and bolded and underlined deadlines. <u>See</u> <u>Soundboard Ass'n v. FTC</u>, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting <u>Abbott Lab'ys v. Gardner</u>, 387 U.S. 136, 151 (1967)).

For the second <u>Bennett</u> prong, the Court must engage in a "'pragmatic inquiry' that looks to [the OPM Memo's] formal legal effect as well as the agency's characterizations and any track record of applying the guidance as if it bound regulated parties."  <u>ForUsAll, Inc. v. U.S. Dep't of Lab.</u>, 691 F. Supp. 3d 14, 28 (D.D.C. 2023) (quoting <u>Sierra Club v. EPA</u>, 955 F.3d 56, 62–63 (D.C. Cir. 2020)).  The OPM Memo determined the other agencies' obligations to perform its commands. <u>See</u> <u>Venetian Casino Resort, LLC v. EEOC</u>, 530 F.3d 925, 931 (D.C. Cir. 2008); <u>Biden</u>, 597 U.S. at 808–09.  It obligated federal agencies to take specific actions within a certain time frame and report back to OPM.  It is of no moment that the memo's directives were couched in the word "should."  Although "should" is typically permissive, the context in which it is used can show that it is mandatory.  <u>See</u> <u>Thompson v. Clifford</u>, 408 F.2d 154, 158 (D.C. Cir. 1968) (explaining

connotation of "may" depends on context). Here, the context shows that the memo is a directive. After stating that agencies "should take prompt actions" to implement the E.O., the memo then both "[s]pecif[ies]" eleven tasks for agencies to complete and requires a report back "to OPM on all steps taken to implement this guidance" within 48 hours—a bolded and underlined deadline. See J.A. at 71–72. And within the bulleted list of directives and deadlines, never once does typically permissive language appear again. Given the specificity of the tasks, emphasized deadlines, and reporting requirements, it is evident that OPM expected agencies to comply with the memo, not simply to take it as "guidance." And it is no surprise, then, that HHS interpreted the OPM Memo as a command, rather than a suggestion. See J.A. at 58, 64.

Simply put, the OPM Memo "bound [agency] staff by" requiring them to take certain actions. See Biden, 597 U.S. at 808–09. Although OPM may not have "dressed its [memo] with the conventional procedural accoutrements of finality, its own behavior"—and that of the recipient agencies—"belies the claim that" the memorandum was not final. See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 479 (2001); Gen. Elec. Co. v. EPA, 290 F.3d 377, 383 (D.C. Cir. 2002) ("[A]n agency pronouncement [is] considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." (cleaned up)). Hence, the OPM Memo was a final agency action.

### 2. The HHS Guidance

The plaintiffs next contend that the HHS defendants adopted the OPM Memo as their own policy and that the resulting HHS Guidance was also a final agency action. Because the directives are nearly the same, so too is the Court's analysis.

Like the OPM Memo, the HHS Guidance is a rule. See 5 U.S.C. § 551(4). It was an exercise of agency power labeled an "action" of the agency. HHS's acting secretary issued "Action: Initial Guidance Regarding President Trump's Executive Order Defending Women."

J.A. at 67.  It communicated an order that "[a]ll HHS Operating and Staff Divisions" "shall" take "prompt actions" to "comply with [the executive order] and OPM guidance."  See id. at 67–70.  In other words, the HHS Guidance is a statement designed to implement and interpret the Gender Ideology E.O. and OPM Memo.  See § 551(4).  With the express commands that staff must comply with the E.O. and OPM Memo, HHS leadership's repeated use of the word "shall," the reporting template attached for staff to document compliance, and the requirement that staff submit bi-weekly status reports "until all necessary actions have been completed," it is hard to read the HHS Guidance as anything other than an exercise of agency power.  See J.A. at 67–70; see, e.g., Fund for Animals, 460 F.3d at 1; see also Philip Morris USA Inc. v. U.S. FDA, 202 F. Supp. 3d 31, 46 (D.D.C. 2016) (a "court must consider the context and form in which [an] agency action arises").

As for finality, HHS's adoption of the removal policy—disseminated through its highest-ranking official—marked the consummation of its decisionmaking process about whether and how HHS would comply with the E.O. and the OPM Memo, including the timeline on which it would do so.  See Biden, 597 U.S. at 808–09.  And the policy similarly determined the agency's obligations to implement the OPM Memo.  See Venetian Casino, 530 F.3d at 931.  Hence, the HHS defendants' issuance of the HHS Guidance was a final agency action.

Despite this straightforward analysis, the defendants contend the HHS Guidance is not reviewable under the APA because it is not a policy at all.  They argue the plaintiffs merely placed the "policy" label on a group of discrete HHS actions as a guise for challenging "the agencies' general implementation of [the executive order]."  See Opp'n at 24–25.  If true, that might be a programmatic attack "on the general day-to-day operations of the agency" that is unreviewable under the APA.  See Am. Farm Bureau v. EPA, 121 F. Supp. 2d 84, 102 (D.D.C. 2000) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 899 (1990)).

But the Court disagrees that the plaintiffs launch a programmatic attack. The plaintiffs challenge HHS leadership's adoption of an unlawful directive to HHS staff, as shown by the January 31 memorandum. This is unlike the kinds of programmatic attacks that courts have found unreviewable.

In Lujan v. National Wildlife Federation, 497 U.S. 871 (1990), for example, the plaintiffs challenged what they coined the Bureau of Land Management's ("BLM") "land withdrawal review program." See 497 U.S. at 877. But there was no such program. Rather, the plaintiffs had grouped together various BLM actions taken pursuant to five separate policies, called it a "program," and sought collective APA review. See id. The Supreme Court rejected this framing, concluding "[t]he term 'land withdrawal review program' . . . does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations"; instead, the term was a moniker the plaintiffs had used for BLM's "continuing (and thus constantly changing) operations" in executing its various statutory responsibilities. Id. at 890. The APA, the Court explained, is an avenue for challenging discrete agency actions—not for "seek[ing] wholesale improvement of" agencies' compliance with statutory schemes. Id. at 891 (emphasis omitted). In other words, the plaintiffs could not identify specific actions they disliked, group them together, call them a "program," and seek collective APA review. See id. Otherwise, "it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." Norton v. S. Utah Wilderness All. ("SUWA"), 542 U.S. 55, 66–67 (2004).

But the plaintiffs here do not challenge a patchwork of actions held together by only their own arbitrary grouping. The HHS Guidance is a cohesive directive for implementing a single executive order, set forward in full in a single memorandum, with a single set of commands for

the entire agency. Said another way, rather than "seek[ing] wholesale improvement of" HHS's statutory compliance, Lujan, 497 U.S. at 891 (emphasis omitted), plaintiffs challenge a "circumscribed, discrete agency action," SUWA, 542 U.S. at 62; see, e.g., Venetian Casino, 530 F.2d at 931; Nat'l Council of Nonprofits, 2025 WL 597959, at *13 ("[p]laintiffs only challenge one specific act by [the agency]": adopting a policy). And far less circumscribed and self-contained actions have been reviewed under the APA. See, e.g., Hisp. Affs. Project v. Acosta, 901 F.3d 378, 387 (D.C. Cir. 2018) (concluding plaintiffs could challenge as an agency action the Department of Homeland Security's "practice of shrugging off [its] statutory and regulatory" obligations); New York v. Trump, 133 F.4th 51, 67 (1st Cir. 2025) (finding "discrete final agency actions" in "decisions by the Agency Defendants to implement broad, categorical [funding] freezes" in response to an executive order). The HHS Guidance thus was a final agency action.

### 3. The Individual Webpage Removals

Lastly, the Court turns to whether the HHS defendants' individual webpage removals were final agency actions. At the time-sensitive TRO stage, the Court concluded the removals likely constituted final agency actions, see TRO Mem. Op. at 9–14, as has at least one other court, see Schiff v. OPM, Civ. A. No. 25-10595 (LTS), 2025 WL 1481997, at *9 (D. Mass. May 23, 2025). But with the benefit of additional briefing, and upon closer examination, the Court ultimately concludes that the individual webpage removals are not "agency actions" within the meaning of the APA.

The APA defines an "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." See 5 U.S.C. § 551(6). Facially, the decision to rescind from the public domain or modify a longstanding government webpage is a "final disposition" of the

public nature of that webpage and, in some cases, its core information.  But the rub lies in whether this is the <u>type</u> of disposition that the APA covers.

On one hand, a webpage removal seems to fit within the APA's definition of "agency action."  Courts are instructed to interpret "agency action" broadly "to cover comprehensively every manner in which an agency may exercise its power."  <u>See</u> <u>Fund for Animals</u>, 460 F.3d at 19 (quoting <u>Whitman</u>, 531 U.S. at 478).  The focus is whether the challenged action is "circumscribed" and "discrete" and evinces an agency's exercise of power.  <u>See</u> <u>id.</u> at 20; <u>SUWA</u>, 542 U.S. at 62.  There is little doubt that the decision to remove a webpage is circumscribed, discrete, and an exercise of agency power.

On the other hand, "agency action" "is not so all-encompassing as to authorize [courts] to exercise judicial review over everything done by an administrative agency."  <u>See</u> <u>Fund for Animals</u>, 460 F.3d at 19.  The APA does not permit judicial review of "broad programmatic attack[s]" that "seek wholesale improvement" of an agency's work.  <u>See</u> <u>SUWA</u>, 542 U.S. at 64.  Such an expansive view of agency action would lead to "undue judicial interference with [agencies'] lawful discretion."  <u>See</u> <u>id.</u> at 66.  For "[i]f courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered . . . to determine whether compliance was achieved," which would be an impermissible level of judicial oversight of agency affairs.  <u>Id.</u> at 66–67.

At the TRO stage, the plaintiffs did not challenge the HHS Guidance.  They only challenged—and thus only sought relief for—the webpages removed pursuant to the OPM Memo.  <u>See, e.g.</u>, Proposed Order Granting TRO [ECF No. 6-2] at 1–2 (seeking restoration of the webpages taken down "in response to" the OPM Memo and injunctive relief prohibiting the then-three HHS defendants "from removing or substantially modifying other webpages and datasets in

implementation of" the OPM Memo).  This was a more targeted group of removals linked to the OPM Memo—i.e., a "completed universe" of action, see Lujan, 497 U.S. at 890, arguably similar to the kinds of "discrete" and "circumscribed" actions subject to judicial review, see SUWA, 542 U.S. at 62.

But the plaintiffs now separately challenge the OPM Memo and the HHS Guidance, plus all individual webpage removals conducted by the HHS defendants either "in response to the OPM memorandum or without reasoned justification."  See Pls.' Proposed Order at 2 (emphasis added). So the scope of the challenged webpage removals has expanded significantly to include webpages removed for reasons other than the OPM Memo.  Now unmoored from the OPM Memo, this separate challenge to hundreds or thousands of individual webpages removed for an unknown number of different reasons falls into the category of a challenge to "[g]eneral deficiencies in [the HHS defendants'] compliance" with the APA, PRA, and EBPA—a claim over which the APA does not permit judicial review.  See SUWA, 542 U.S. at 66.

The Court concludes that an individual webpage removal challenged alone and distinct from the auspices of an overarching agency removal directive is not an agency action within the meaning of the APA.  Hence, it will grant the defendants' motion to dismiss Count II.[10]

---

[10] One could perceive a tension between the Court's conclusion on Count II—that the individual webpage removals were not final agency actions—and the relief granted as to Counts I and III—vacatur of the agencies' removal directives and restoration of certain webpages.  But to grant effective relief to the plaintiffs on Counts I and III, the Court must both vacate the unlawful directives that required the removal of the webpages and reverse the implementation of those directives that caused the plaintiffs' injuries, i.e., the removal of certain webpages.  So the Court will order the restoration of certain webpages as a component of the relief as to Counts I and III.  This relief is independent from the Court's conclusion that the plaintiffs' separate Count II claims fail.

### B.  OPM Exceeded Its Statutory Authority

The Court turns now to the meat of each remaining claim.   In Count I, the plaintiffs argue OPM exceeded its statutory authority in directing other agencies on how to comply with the Gender Ideology E.O.  See Am. Compl. ¶¶ 61–65; Mot. at 11–12.  Agencies, including OPM, "are creatures of statute."   Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA, 595 U.S. 109, 117 (2022).  They "'ha[ve] no power to act' except to the extent Congress [has] authorized."   Marin Audubon Soc'y v. FAA, 121 F.4th 902, 912 (D.C. Cir. 2024) (first alteration in original) (quoting FEC v. Ted Cruz for Senate, 596 U.S. 289, 301 (2022)).   And if an agency acts without statutory authority, then a court must set that action aside.  See 5 U.S.C. § 706(2)(C).

"To determine 'whether an agency has acted within its statutory authority,' [courts] use 'the traditional tools of statutory construction.'"   U.S. Sugar Corp. v. EPA, 113 F.4th 984, 997 (D.C. Cir. 2024) (quoting Loper Bright Enters. v. Raimondo, 603 U.S. 369, 403 (2024)).   Here, there is little question that the tools of statutory instruction show that § 1103(a)(1) and (a)(5) do not give OPM the authority to issue the mandates in the OPM Memo.

Section 1103(a)(1) simply vests the OPM director with the authority to "secur[e] accuracy, uniformity, and justice in the" otherwise-prescribed "functions of" OPM.  § 1103(a)(1).  Nothing in it speaks to OPM's ability to instruct agencies how to implement policy, including ordering the agencies to remove their websites—a power that reaches far beyond matters of federal personnel.  The defendants fare no better under § 1103(a)(5), which simply vests the OPM director with the authority to "execut[e], administer[], and enforc[e] . . . the civil service rules and regulations of the President and [OPM] and the laws governing the civil service; and the other activities of [OPM] including retirement and classification activities."

Section 1103 demonstrates what is obvious: OPM's "central responsibility" is "executing, administering, and enforcing civil service rules and regulations."   Nat'l Treasury Emps. Union v.

Devine, 733 F.2d 114, 119 (D.C. Cir. 1984). These are matters of federal employment, not the substance of federal policy. Neither provision grants a power to order agencies to implement non-personnel policies. Nor do the defendants claim they do. The defendants agree "OPM could not" "order[] other agencies to remove information from their websites," see Opp'n at 25 (internal quotation marks omitted), but provide no explanation for the memo's invocation of § 1103(a)(1) and (a)(5) in the first place.

OPM's lack of statutory authority to direct federal agencies' implementation of the E.O. is also consistent with the E.O. itself. It assigns OPM the limited tasks of "implement[ing] changes [as] to . . . government-issued identification documents" and "ensur[ing] that applicable personnel records accurately report Federal employees' sex." See E.O. § 3(d). Those relate to federal personnel matters. But where the President seeks broader monitoring of agencies' compliance with the E.O. in agencies' substantive work, he assigns that responsibility to OMB. See id. § 7(a). Nowhere does the order direct OPM (or even OMB, for that matter) to tell agencies how to comply with the E.O., let alone require them to complete specific tasks or edit their websites, or define for agencies what it means to "promote" or "inculcate" gender ideology under the E.O. See Schiff, 2025 WL 1481997, at *9.

Because neither § 1103(a)(1) nor (a)(5) provides OPM with the authority to issue the OPM Memo, in doing so OPM exceeded its statutory authority. See id. (coming to the same conclusion); see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 20 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" (quoting Michigan v. EPA, 576 U.S. 743, 758 (2015))). Hence, the Court must set aside the OPM Memo under the APA.

### C.  The OPM Memo and HHS Guidance Were Arbitrary and Capricious

The Court finally reaches the plaintiffs' last argument: OPM's and the HHS defendants' "adoption of a policy requiring removal or modification of the webpages and datasets . . . lacked reasonable justification" and failed to consider the plaintiffs' reliance interests—hence, they were arbitrary and capricious and must be set aside under the APA.  See Am. Compl. ¶¶ 73–74; 5 U.S.C. § 706(2)(A).

The touchstone of arbitrary-and-capricious review is whether an agency "engage[d] in 'reasoned decisionmaking.'"  Regents, 591 U.S. at 16 (quoting Michigan, 576 U.S. at 750 ).  A court must determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (internal quotation marks omitted); see Chamber of Com. of the U.S. v. SEC, 412 F.3d 133, 140 (D.C. Cir. 2005).  This is a "narrow" standard of review.  State Farm, 463 U.S. at 43.  "[A] court is not to substitute its judgment for that of the agency," id., "supply a reasoned basis for the agency's action that the agency itself has not given," Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285–86 (1974) (internal quotation marks omitted), or "affirm an agency decision on a ground other than that relied upon by the agency," Manin v. Nat'l Transp. Safety Bd., 627 F.3d 1239, 1243 (D.C. Cir. 2011).

"The Court should focus its review on the administrative record," Brodie, 796 F. Supp. 2d at 150 (citing Camps v. Pitts, 411 U.S. 138, 142 (1973)), and consider only "the materials that were before the agency at the time its decision was made," IMS, P.C. v. Alvarez, 129 F.3d 618, 623 (D.C. Cir. 1997); see, e.g., Regents, 591 U.S. at 20–21  If the agency failed to examine the relevant data and articulate a satisfactory response—such as by failing to consider an important

aspect of the problem or relevant reliance interests—then the action was not "the product of reasoned decisionmaking" and must be set aside.  See State Farm, 463 U.S. at 52.

Considering the scant administrative record, the answer here is clear: neither the OPM Memo nor the HHS Guidance was the product of reasoned decisionmaking.  The defendants argue "[t]he record leaves no doubt as to why [they] acted as they did": to comply "with the sweeping requirements of EO 14168."  See Defs.' Reply at 20.  True, the E.O. precipitated these actions. But the E.O. limited OPM's role to "implement[ing] changes to require that government-issued identification documents" and "applicable personnel records accurately report Federal employees' sex."  See E.O. § 3(d).  And for the other agencies, the E.O. only required an update on their efforts to perform tasks such as "remov[ing] all statements . . . that promote or otherwise inculcate gender ideology" through OMB within 120 days.  See id. §§ 3(e), 7(a).  Plus, it required them to act consistent with all applicable laws.  See id. § 8(b).  The OPM Memo and HHS Guidance went well beyond these provisions by ordering precisely how the directives would be implemented: agencies would "[t]ake down . . . websites . . . that inculcate or promote gender ideology" within 48 hours. See J.A. at 71.  The E.O. itself thus does not provide a reasoned explanation for these specific actions by the agencies.

Moreover, the existence of an executive order does not automatically render an agency's implementing actions adequately reasoned.  See, e.g., Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1327 (1996); State v. Su, 121 F.4th 1, 15 (9th Cir. 2024); see also RFE/RL, Inc. v. Lake, Civ. A. No. 25-799 (RCL), 2025 WL 900481, at *5 (D.D.C. Mar. 25, 2025).  Even when "implement[ing] an executive order," agencies are bound by their APA obligations to "analyz[e] the impacts, costs, and benefits of alternative policy options."  See Su, 121 F.4th at 16.  But here, OPM and the HHS defendants analyzed almost nothing.  Begin with the timelines.  The OPM

Memo required agencies' compliance within two days.  See J.A. at 71.  And the HHS Guidance—
which relied on the OPM Memo—gave staff even less time.  See id. at 64, 67.  Indeed, HHS issued
its overarching action memo to staff on the same day as the first OPM deadline.  Why?  The OPM
Memo and administrative record are silent.

Next, look at the command.  The OPM Memo required agencies to "[t]ake
down . . . websites . . . that promote or inculcate gender ideology" within 48 hours.  Id. at 71.  But
common sense dictates there are numerous ways to remove an offending word or statement without
rescinding the entire webpage.  Why did the agencies choose this route?  The OPM Memo, HHS
Guidance, and administrative record are again silent.  Similarly, although the defendants stated an
intent to modify some of the removed webpages, there is silence as to why the agencies chose to
remove the webpages pending mere modification.  Generally, one aspect of a reasoned explanation
is a justification for rescinding a resource before creating its replacement.  Cf. State Farm, 463
U.S. at 52.

The defendants have not explained their decisionmaking, and from the sparse
administrative record it cannot "reasonably be discerned."  See id. at 43 (quoting Bowman Transp.,
419 U.S. at 286).  The agencies' decisions "leave[] too many key questions unanswered to satisfy
the APA."  See Cboe Futures Exch., LLC v. SEC, 77 F.4th 971, 978 (D.C. Cir. 2023).  And for
this reason alone, the OPM Memo and HHS Guidance were arbitrary and capricious.

But the plaintiffs are not done.  They raise two additional reasons why the defendants'
directives fail arbitrary-and-capricious review, and both have merit.

First, the plaintiffs argue that the defendants adopted policies that ignored—and ran
contrary to—the defendants' other statutory obligations.  The PRA, for example, requires federal
agencies to "provide adequate notice when initiating, substantially modifying, or terminating

significant information dissemination products." See 44 U.S.C. § 3506(d)(3). HHS defines "information dissemination products" to include webpages, and it strains credulity to assert that not a single challenged webpage is "significant." But according to the administrative record—and as the defendants conceded in conducting their individualized review of the restored webpages— the defendants adopted policies requiring the near-immediate substantial modification or termination of information dissemination products without giving any thought whatsoever to whether any were "significant."[11] "Entirely failing to consider an important aspect of the problem," such as the applicability of another federal statute, "alone renders their decisions arbitrary and capricious." Regents, 590 U.S. at 30 (cleaned up); see also Venetian Casino, 530 F.3d at 934 (surmising plaintiffs might have a colorable arbitrary-and-capricious claim against an EEOC policy if the "policy . . . routinely caused agency employees to violate" a statute).[12]

Second, the plaintiffs argue that in adopting their respective policies, both OPM and the HHS defendants failed to consider the plaintiffs' (and indeed the public's) substantial reliance on the webpages. Where, as here, the defendants were "not writing on a blank slate"—in other words, the defendants had changed course from a policy of public access to certain health care webpages to a policy of broad rescission—the APA required the defendants to "assess whether there were

---

[11] Astute reviewers of the administrative record will observe that one data call instructed FDA staff to consider whether the PRA applied and, if so, to "include the collection number." See J.A. at 61. This invocation of the PRA seemingly refers only to information-gathering procedures not at issue in this case. See generally 44 U.S.C. §§ 3507(a)(3), 3512; 16 C.F.R. § 1.101 (2025).

[12] Because the plaintiffs have provided numerous bases on which to set aside the OPM Memo and HHS Guidance, the Court will not focus on the claim that the defendants failed to consider the EBPA except to say that the plaintiffs' arguments that 44 U.S.C. § 3563 and the EBPA's implementing regulations compel the continued disclosure of certain information are unpersuasive. See Van Cleve v. U.S. Sec'y of Com., Case No. 21-13699, 2022 WL 1640669, at *4 (11th Cir. May 24, 2022) (per curiam) (concluding § 3563 refers to "the responsibilities of statistical agencies" and is not "a mechanism for members of the public to seek disclosure of certain information").

reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." <u>Regents</u>, 591 U.S. at 33.

The reliance interests here are staggering, in no small part due to the defendants' long-term provision of high-quality health care resources and the defendants' recognition—indeed, their encouragement—of widespread reliance on those resources. Begin with the length of time. For years—in some instances for decades—the defendants provided a wide swath of health-related resources to the public free of charge, in part through the webpages at issue. <u>See</u> Am. Compl. ¶¶ 38–44. Next, consider the types of resources the webpages contained. The HHS defendants developed resources written specifically for clinicians, including—but not limited to—guidance on prescribing HIV medication and contraception, prescribing and administering drugs with serious side effects, caring for patients with opioid dependency, and utilizing electronic health records. <u>See, e.g.</u>, <u>id.</u> ¶¶ 38–40; Ramachandran Decl. ¶¶ 8–9.

Finally, consider the defendants' conduct. HHS, for example, touts that its "information dissemination activities and products rank among the highest quality scientific, statistical and programmatic information among federal agencies, and in many cases set the national and international standard for quality." <u>See</u> HHS IQA Guidelines (under tab "A. Summary of HHS Agency Guidelines"). NCHS boasts that it "is the nation's source for official health statistics" and a "unique public resource for data and evidence" used by "[p]olicymakers, public health professionals, and others."[13] NCHS also claims that it "shares [its] data, statistics, and analysis as

---

[13] <u>See</u> About NCHS, https://www.cdc.gov/nchs/about/index.html [https://perma.cc/Z7Y3-NH4B] (last visited June 30, 2025). Courts in this jurisdiction frequently take judicial notice of information posted on government agencies' public websites. <u>See, e.g.</u>, <u>Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs.</u>, 43 F. Supp. 3d 28, 33–34 (D.D.C. 2014).

widely as possible," because NCHS "collect[s] this information on behalf of the American people," and the "resources and the insights they provide belong to all of us."[14]

In light of the fact that the defendants developed health care resources for use by specific populations, including clinicians; consistently made those resources publicly available; touted the resources' unmatched quality; and embraced and celebrated the breadth and depth of the public's reliance on those resources, the defendants' barely briefed argument that the plaintiffs' reliance was too "unidentified and unproven" to warrant consideration, see Opp'n at 26, is beyond the pale. The defendants engendered the plaintiffs' substantial reliance on the webpages and datasets.[15]  The APA thus required the defendants to weigh that reliance against competing policy concerns before adopting removal policies.  See Regents, 591 U.S. at 32.  Because the defendants admittedly failed to do so, the OPM Memo and HHS Guidance were yet again arbitrary and capricious.[16]

*                    *                    *

The defendants' actions were ill-conceived from the beginning.  Rather than taking a measured approach to harmonizing the HHS defendants' public-facing webpages with the Gender Ideology E.O., considering their other statutory obligations, and ascertaining and weighing the obvious reliance interests—which the E.O. left the agencies time to do—the defendants instead adopted policies of "remove first and assess later" that failed to consider multiple important aspects

---

[14] See Measuring the Nation's Health, https://www.cdc.gov/nchs/about/measuring-the-nations-health.html [https://perma.cc/U6YR-PJAG] (last visited June 30, 2025).

[15] The plaintiffs adequately allege that DFA and San Francisco are among those who relied on the webpages. See, e.g., Ramachandran Decl. ¶¶ 7–9; Liou Decl. ¶¶ 3–11; Cohen Decl. ¶¶ 4–14; Philip Decl. ¶¶ 13–21; Debowy Decl. ¶ 5; Siegler Decl. ¶¶ 5–7; Harris Decl. ¶¶ 3–7.

[16] This Court is not the first to set aside an agency's hurried implementation of an executive order-mandated policy change that failed to afford due consideration to reliance interests.  See, e.g., Aids Vaccine Advoc. Coal. v. U.S. Dep't of State, 770 F. Supp. 3d 121, 139–40 (D.D.C. 2025); Nat'l Council of Nonprofits, 2025 WL 597959, at *19.

of the situation.  See State Farm, 463 U.S. at 43; Nat'l Council of Nonprofits, 2025 WL 597959 at

*14.  In fact, the administrative record is devoid of reasoning generally, save a handful of

references to the E.O. and the OPM Memo.  The APA requires more.  See, e.g., Cboe Futures

Exch., 77 F.4th at 978.  A court must consider whether the evidence in the administrative record

permitted the agency to make the decision it did, see, e.g., Alvarez, 129 F.3d at 623, and here the

evidence did not.  For these reasons, the OPM Memo and HHS Guidance were arbitrary and

capricious and thus violated the APA.

## III.   Remedies

Having concluded that the OPM Memo and HHS Guidance violated the APA, the

remaining question is what relief the Court should award.  The plaintiffs request declaratory and

injunctive relief, vacatur of the OPM Memo and HHS Guidance, rescission of the acts taken

pursuant to those directives, and a permanent injunction preventing the defendants from further

adopting webpage removal policies based on "gender ideology."  See Am. Compl. at 26–27; Pls.'

Proposed Order at 1–2.  The defendants have not contested the scope or form of relief sought.

To start, there is no question about who should receive the requested relief.  Because the

directives' commands to "[t]ake down all outward facing media (websites, social media accounts,

etc.) that inculcate or promote gender ideology," J.A. at 71, are unlawful, "the ordinary result is

that the[y] are vacated—not that their application to the individual petitioners is proscribed,"

NAACP v. Trump, 298 F. Supp. 3d 209, 243 (D.D.C. 2018) (quoting Harmon v. Thornburgh, 878

F.2d 484, 495 n.21 (D.C. Cir. 1989)), aff'd sub nom., Dep't of Homeland Sec. v. Regents of the

Univ. of Cal., 591 U.S. 1 (2020).[17]

---

[17] The defendants do not argue that more tailored relief is even possible here, let alone appropriate.  And as this is a case involving APA vacatur, not a universal or national injunction, the Supreme Court's recent decision in Trump v. CASA, Inc., No. 24A884 (June 27, 2025), does not apply.  See id., slip op. at 11 n.10.

The question is the form of relief.  "[U]nsupported agency action normally warrants vacatur."  Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1151 (D.C. Cir. 2005).  So the Court will vacate both the OPM Memo and the HHS Guidance and remand the directives to the agencies.  And because vacatur restores the status quo, see, e.g., Am. Great Lakes Ports Ass'n v. Zukunft, 301 F. Supp. 3d 99, 103–04 (D.D.C. 2018), vacating the directives ordering the removal or substantial modification of webpages "naturally implie[s]" the restoration of those webpages in their unmodified forms, see Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 985 F.3d 1032, 1054 (D.C. Cir. 2021) (discussing Nat'l Parks Conservation Ass'n v. Semonite, 925 F.3d 500 (D.C. Cir. 2019)).  Hence, vacatur also requires the HHS defendants to restore the webpages and datasets that they removed or substantially modified pursuant to the OPM Memo or HHS Guidance.[18]

But vacatur does not require the HHS defendants to undo every action taken pursuant to the OPM Memo or HHS Guidance.  "In general, courts narrowly tailor remedies to APA violations."  Am. Ass'n of Cosmetology Schs. v. Devos, 258 F. Supp. 3d 50, 76 (D.D.C. 2017).  So the defendants need only remedy plaintiffs' injuries, which requires restoring the webpages and

---

[18] Although a narrow exception permits courts to remand without vacatur, that "exceptional remedy," Am. Great Lakes Ports Ass'n v. Schultz, 962 F.3d 510, 519 (D.C. Cir. 2020), is inapplicable here.  Courts have the discretion to remand without vacatur if "there is at least a serious possibility that the [agency] will be able to substantiate its decision," and if "vacating would be 'disruptive.'"  Radio–Television News Dirs. Ass'n v. FCC, 184 F.3d 872, 888 (D.C. Cir. 1999) (alteration in original) (quoting Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n, 988 F.2d 146, 151 (D.C. Cir. 1993)).  Because OPM acted contrary to statute in issuing the OPM Memo and admittedly failed to consider an important aspect of the problem, see Opp'n at 26, OPM cannot justify the policy on remand.  Similarly, because the administrative record shows the HHS Guidance simply adopted the OPM Memo, there is not a serious possibility that HHS can justify its policy, either.  Cf. NAACP, 298 F. Supp. 3d at 244 (finding the policy "curable in theory" where the agency had provided a legal justification but not adequately explained it).  And because the agencies removed the webpages pursuant to the directives in the OPM Memo and HHS Guidance, the removals, too, likely cannot be justified on remand.

Moreover, requiring the agencies to restore the removed webpages is only modestly disruptive, for in the defendants' own words, it merely requires them to "review and modif[y] . . . web content" and "updat[e] [their] web presence."  See Opp'n at 23; cf. id. at 34 n.6.  The Court must also consider that remand without vacatur invites "agency indifference," see NAACP, 298 F. Supp. 3d at 245 (quoting In re Core Commc'ns, Inc., 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring)), and the plaintiffs have amply demonstrated the serious and harmful effects that would accompany such indifference.

datasets on which the plaintiffs rely and that the defendants either removed or substantially modified pursuant to the OPM Memo or HHS Guidance.[19]

Finally, the Court rejects the plaintiffs' request to broadly enjoin the HHS defendants from "further enforcing a policy requiring removal of all outward facing media, including webpages and datasets, in whole or in part, that the agencies identify as promoting 'gender ideology.'" See Pls.' Proposed Order at 2. Although the plaintiffs' desire for such far-reaching relief is understandable, it strays beyond remedying the underlying legal violations. The Court has determined that the OPM Memo and HHS Guidance violated the APA—not that any similar policy would necessarily violate the APA. It is possible that the HHS defendants could, after reasoned decisionmaking, adopt a new, lawful policy requiring some standardized modification or removal of content related to "gender ideology." It is also possible that the countervailing considerations, including the plaintiffs' reliance interests, are so strong that the adoption of a similar policy, even after reasoned decisionmaking, would violate the APA. Because both conclusions are possible and purely speculative at this point, the plaintiffs have not demonstrated "adequate proof of a threatened injury" as required for this Court to order broader injunctive relief. See Taylor v. Resol. Tr. Corp., 56 F.3d 1497, 1508 (D.C. Cir. 1995). The Court will therefore vacate the OPM Memo and HHS Guidance but will not prevent the defendants from heading back to the drawing board and attempting to craft a lawful policy with similar objectives.

---

[19] The Court's Order applies to all removed or modified webpages and datasets, including the restored webpages for which the defendants conducted an individualized review of the applicability of the PRA, EBPA, and IQA. The defendants' individualized review did not address all procedural defects identified regarding the OPM Memo and HHS Guidance; for example, it did not provide a reasoned explanation for the directives, nor did it consider the plaintiffs' reliance on those webpages.

## IV.    Preliminary Injunction

"Because the Court consolidated the plaintiffs' preliminary injunction motion with a decision on the merits, the Court need not decide the preliminary injunction." New Lifecare Hosps. of Chester Cnty. LLC v. Azar, 417 F. Supp. 3d 31, 41 n.2 (D.D.C. 2019) (cleaned up). The Court will therefore deny as moot the plaintiffs' motion for a preliminary injunction. See Analysas Corp. v. Bowles, 827 F. Supp. 20, 21 (D.D.C. 1993).[20]

### Conclusion

An executive order can do a lot, but it does not absolve agencies of their obligations to follow the law. The defendants acted contrary to law and arbitrarily and capriciously in swiftly enacting and implementing sweeping and poorly thought-through directives that ordered the bulk removal of health care resources on which the government had induced substantial and ongoing reliance. Hence, the Court must vacate both directives and the actions taken pursuant to them that caused the plaintiffs' injuries—i.e., the substantial modification or removal of webpages and datasets on which the plaintiffs rely.

Despite the defendants' concern, this decision does not threaten the government's ability to "choose[] what to say and what not to say." See Opp'n at 1 (quoting Shurtleff v. City of Boston, 596 U.S. 243, 251 (2022)). Far from it. The government is free to say what it wants, including about "gender ideology." But in taking action, it must abide by the bounds of authority and the procedures that Congress has prescribed, through the APA and otherwise. And the government failed to do so here.

---

[20] The parties trade footnotes arguing whether the Court, if it orders preliminary-injunctive relief, should impose a Federal Rule of Civil Procedure 65(c) bond. See Opp'n at 34 n.6; Pls.' Reply at 24 n.4. Responding in kind, the Court will deny as moot the request for a Rule 65(c) bond.

For these reasons, the Court will grant in part the plaintiffs' motion for summary judgment, vacate the OPM Memo and the HHS Guidance, and order the restoration of some webpages and datasets.  A separate order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: July 2, 2025